IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| BROOKE LAYTON, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>MAINSTAGE MANAGEMENT, INC., NICK'S MAINSTAGE, INC. - DALLAS PT'S d/b/a PT'S MENS CLUB and NICK MEHMETI,<br><br>Defendants. | § § § § § § § § § § § § § | CIVIL ACTION NO.<br>3:21-cv-01636-N<br><br><br><br>COLLECTIVE ACTION<br>JURY TRIAL DEMANDED |

DEFENDANTS' APPENDIX IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT

COME NOW, MAINSTAGE MANAGEMENT, INC.,NICK'S MAINSTAGE, INC. - DALLAS PT'S d/b/a PT MEN'S CLUB and NICK MEHMETI (collectively, the "Defendants") and file this, their Supplemental Appendix in Support of Defendants' Motion for Summary Judgment (the "Supplemental Appendix") and incorporates the same by reference as if fully set forth herein:

| Exhibit | Description | APPX |
|---|---|---|
| F | Deposition of Nick Mehmeti dated July 7, 2022 (the "Mehmeti Depo. I"); and, | SUPP APPX 110-146 |
| G | Excerpts from the Deposition of Nick Mehmeti dated March 9, 2022 (the "Mehmeti Depo. II"); and, | SUPP APPX147-170 |
| H | Deposition of Brooke Layton dated February 11, 2022 (the "Layton Depo."). | SUPP APPX 171-209 |

Respectfully submitted,

SHEILS WINNUBST
A Professional Corporation

By:    */s/ Latrice E. Andrews*
       Latrice E. Andrews
       State Bar No. 24063984

1100 Atrium II
1701 N. Collins Boulevard
Richardson, Texas  75080
Telephone No.: (972) 644-8181
Telecopier No.: (972) 644-8180
*latrice@sheilswinnubst.com*

AND

LAW OFFICES OF ROGER ALBRIGHT, LLC
  Of Counsel to:
SHEILS WINNUBST, PC

By:    */s/ Roger Albright*
       Roger Albright
       State Bar No. 00974580

1100 Atrium II
1701 N. Collins Boulevard
Richardson, Texas  75080
Telephone No.: (972) 644-8181
Telecopier No.: (972) 644-8180
*roger@sheilswinnubst.com*

ATTORNEYS FOR DEFENDANTS

## CERTIFICATE OF SERVICE

I certify that on July 26, 2022,  I electronically submitted the foregoing document with the clerk of the court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the Court.  I hereby certify that I have served all counsel and parties of record electronically or by another means authorized through Federal Rule of Civil Procedure 5(b)(2) and Local Rule 7.2.

                    */s/ Latrice E. Andrews*
                    Latrice E. Andrews

```
 1                  UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF TEXAS
 2                        DALLAS DIVISION

 3    BROOKE LAYTON, Individually  )
      and on behalf of all other   )
 4    similarly situated,          )
            Plaintiff,             )
 5                                 )
      VS.                          ) CA NO. 3:21-cv-01636-N
 6                                 )
      MAINSTAGE MANAGEMENT, INC.,  ) COLLECTIVE ACTION
 7    NICK'S MAINSTAGE, INC. -     ) JURY DEMANDED
      DALLAS PT'S d/b/a PT'S       )
 8    MEN'S CLUB and NICK MEHMETI, )
            Defendants.            )
 9
                       ORAL DEPOSITION OF
10                        NICK MEHMETI
                          JULY 7, 2022
11                     (Reported Remotely)

12

13       ORAL DEPOSITION of NICK MEHMETI, produced as a witness

14    at the instance of the Plaintiff, and duly sworn, was taken in

15    the above-styled and numbered cause on July 7, 2022, from

16    11:10 a.m. to 12:07 p.m., before KELLY CHANDLER, a Certified

17    Shorthand Reporter in and for the State of Texas, reported by

18    machine shorthand, pursuant to the Federal Rules of Civil

19    Procedure, the First Emergency Order Regarding the COVID-19

20    State of Disaster, and the provisions stated on the record.

21

22

23

24

25
```





EXHIBIT
F

```
 1                      A P P E A R A N C E S

 2     (Appearing Via Zoom Videoconference)

 3

 4     FOR THE PLAINTIFF, BROOKE LAYTON, Individually and on behalf
       of all other similarly situated:
 5
           MR. ALEXANDER KYKTA
 6         Ellzey & Associates, PLLC
           1105 Milford Street
 7         Houston, Texas 77066
           alex@ellzeylaw.com
 8

 9

10     FOR THE DEFENDANTS, MAINSTAGE MANAGEMENT, INC., NICK'S
       MAINSTAGE, INC. - DALLAS PT'S d/b/a PT'S MEN'S CLUB and NICK
11     MEHMETI:

12         MS. LATRICE E. ANDREWS
           Sheils Winnubst, PC
13         1701 North Collins Boulevard
           Suite 1100
14         Richardson, Texas 75080
           latrice@sheilswinnubst.com
15

16

17

18

19

20

21

22

23

24

25
```



```
 1                            INDEX

 2    Appearances...................................  PG. 2

 3    NICK MEHMETI

 4         Examination by Mr. Kykta....................  PG. 4
           Examination by Ms. Andrews..................  PG. 30
 5         Further Examination by Mr. Kykta............  PG. 32

 6    Signature and Changes..........................  PG. 34
      Reporter's Certificate.........................  PG. 36
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



NICK MEHMETI                                                    July 07, 2022
LAYTON V. MAINSTAGE MANAGEMENT                                             4

```
 1              COURT REPORTER:  This deposition of Nick
 2   Mehmeti is being conducted remotely via Zoom.  The witness is
 3   located in Richardson, Texas.  My name is Kelly Chandler.  I
 4   am administering the oath and reporting the deposition
 5   remotely by stenographic means from my residence within the
 6   State of Texas.
 7              NICK MEHMETI,
 8   having been duly sworn, testified as follows:
 9              EXAMINATION
10   BY MR. KYKTA:
11       Q    Good morning, Mr. Mehmeti.  My name is Alex Kykta.
12   I represent the Plaintiffs in the matter.  That would be
13   Brooke Layton and Ashlynn Shipley.  Let me start by asking,
14   have you ever been deposed before?
15       A    Yes, sir.
16       Q    When was the last time you were deposed?
17       A    I do not remember the date, Mr. Kykta, but I've been
18   deposed, yes, sir.
19       Q    Was it in the past few years?
20       A    Yes.
21       Q    And was it in relation to FLSA matters?
22       A    I'm not sure about that too, but I definitely got
23   deposed before.
24       Q    Okay.  Do you know how many times you've been
25   deposed?
```



NICK MEHMETI                                          July 07, 2022
LAYTON V. MAINSTAGE MANAGEMENT                                   5

1      A    I'd say at least a couple times.

2      Q    All right.

3      A    It was not FLSA.  It was other matters.  I don't

4  know exact, but it was not FLSA.

5      Q    Okay.  Was it in relation to activities at your

6  club?

7      A    My other businesses.

8      Q    And what businesses do you run?

9      A    Restaurants and clubs.

10     Q    Okay.  And so today we're talking specifically about

11 Nick's Mainstage, Inc. doing business as PT's; is that

12 correct?

13     A    Yes, sir.

14     Q    Okay.  And I'll probably refer to the club as PT's

15 throughout.  You'll know what I'm referring to?

16     A    I'd prefer you do that.

17     Q    Excellent.  Okay.  And so just as a refresher how

18 things will go today, I'll be asking questions; you'll be

19 answering.  We'll try not to talk over each other, and we'll

20 wait until each other's finished speaking before we begin

21 talking.  That way it's easiest on the court reporter.  Does

22 that work for you?

23     A    That will work great.

24     Q    Okay.  And if you need a break at any time, just let

25 me know, and we can take one and grab some water or go to the



1  restroom, et cetera.  Does that work?

2       A    Lunch break and all?  All right.

3       Q    I think so, at this point, yes.  Okay.  So let's

4  start.  What is the address of PT's Club?

5       A    10609 Plano Road, Dallas, Texas.

6       Q    And how long has PT's been open there?

7       A    Well, in that location, since February 14th of

8  2004.

9       Q    And was PT's at another location beforehand?

10      A    Yes, sir.

11      Q    Where was it beforehand?

12      A    Back in Dallas at another location.

13      Q    Do you remember that address?

14      A    4875 West Lawther Drive.

15      Q    And when did that location open?

16      A    We opened in 1976.

17      Q    So PT's has been open quite a long time now?

18      A    About 40-something years.

19      Q    All right.  Now, what hours is PT's usually open

20  now?

21      A    11:00 a.m. Monday through Saturday; 12:00 noon

22  Sunday; and closed Monday, Tuesday, Wednesday at 2:00 a.m.;

23  Thursday, Friday, Saturday at 4:00 a.m.

24      Q    And what position do you hold with PT's?

25      A    CEO/President.



1      Q     And how long have you been the CEO/President?

2      A     Since I was 24, 1983.

3      Q     All right.  And about how many people does PT's

4   employ?

5      A     It employs anywhere from 70 to 80 biweekly payroll.

6      Q     And what are the different types of employees that

7   you have on staff?

8      A     Employees: Waitresses, bartenders, busboys,

9   barbacks, kitchen, dishwashers, deejays, managers, assistant

10   managers, floor managers.

11      Q     Thank you.  How many dancers work at PT's?

12      A     Anywhere from --

13            MS. ANDREWS:  Objection, form.

14      A     The entertainers, anywhere from 15 to 40 a shift.

15      Q     And a shift is how long?

16      A     For our shifts, we run two shifts: 11:00 a.m. to

17   7:00, then 4:00 to midnight, then 7:00 to 4:00.

18      Q     Okay.  So about nine hours, or eight to nine hours a

19   shift?

20      A     No, there's never a nine-hour shift.  Anywhere from

21   six to eight hours max.

22      Q     Okay.  So for the 7:00 to 4:00, you're just saying

23   within that time period, you'd work an eight-hour shift?

24      A     Well, it depends what position you're at, you know.

25   If you work day shift, you can work eight hours or you can



1  work six hours, depending what position you're at.

2      Q    Okay.  How many clubs do you own?

3      A    Two clubs.

4           MS. ANDREWS:  Objection, form.  And are we

5  taking the corporate rep deposition, or which deposition are

6  you proceeding with?

7           MR. KYKTA:  I was taking the personal,

8  individual deposition of Nick Mehmeti.

9           MS. ANDREWS:  Okay.  I'm sorry.  Leigh said

10 that y'all were doing it the other way around, so okay.

11          MR. KYKTA:  Oh, my apologies.  I thought we had

12 it scheduled with the personal first and then the corporate

13 rep second.

14          MS. ANDREWS:  It doesn't really matter.  I was

15 just making sure because, obviously, the scope is different.

16          MR. KYKTA:  Yeah.  Understood.  We'll be doing

17 the individual first, and then switching to the corporate rep

18 afterwards.

19     Q    (By Mr. Kykta) Okay.  And what's the name of your

20 other club, Mr. Mehmeti?

21     A    Lipstick Men's Club.

22     Q    And is that located in Dallas?

23     A    Yes, sir.

24     Q    How long have you had that club?

25     A    June 1st of 1990.



NICK MEHMETI                                        July 07, 2022
LAYTON V. MAINSTAGE MANAGEMENT                              9

1     Q    So that was your second club?

2     A    Yes.

3     Q    So at PT's, do you ever get involved in the hiring

4    process?

5     A    I have the final say-so on almost everything.

6     Q    So you have hire and fire ability?

7     A    Correct.

8     Q    How often are you at the club?

9     A    I'm in and out of there every day -- not every day,

10   seven days a week, but I'll say at least five, six, sometimes

11   seven.

12    Q    So relatively frequently?

13    A    Yes.

14    Q    How often do you spend at the club?

15    A    Anywhere from half an hour to seven, eight, ten

16   hours.

17    Q    Whatever's required that day?

18    A    Yes, sir.

19    Q    Okay.  So have you set the different rules at the

20   club?

21         MS. ANDREWS:  Objection, form.

22    A    What do you mean by that, sir?

23    Q    So I know there are certain requirements that the

24   employees have to follow, as well as the entertainers.  Were

25   you involved in setting those different requirements and



 1  rules?

 2          MS. ANDREWS:  Objection, form.

 3      A    That would be myself and the attorneys I've got, and

 4  probably the GM when it's needed.

 5      Q    Who's the GM?

 6      A    Todd Williams.

 7      Q    How long has Todd Williams been the general manager,

 8  GM?

 9      A    I think he's been there about 12 years.

10      Q    And he's a salaried employee?

11      A    Yes, sir.

12      Q    Is he there every day, or what is his schedule?

13      A    He's there five or six days a week, mostly five and

14  six or six.

15      Q    And you hired him and determined how much he gets

16  paid?

17      A    Yes, sir.

18      Q    And you've set the different prices that the

19  entertainers get paid, as well, at the club?

20          MS. ANDREWS:  Objection, form.

21      A    Entertainers don't get paid, sir.  I set the fees.

22  I set the fees for the contracts, yes.

23      Q    So what are the different fees that you've set in

24  the contracts for the entertainers?

25      A    They vary, sir.  It could be from zero to $100.00.



1        Q    What is the 100-dollar fee for?

2        A    Entertainers make their own schedules.  They come

3   when they want to, leave when they want to.  There's no set

4   time for them to come in.  They come when they want to.

5             If they come in at midnight and leave two hours

6   later, they pay the highest fees, or if they get there early

7   -- they set the fees they want to pay.  If they want to pay

8   nothing, they come early, they pay zero.  If they come late,

9   they pay more.

10       Q    Well, what is the timing that determines the

11  different payments?

12       A    I don't know the exact time and minute, but if you

13  come in when the club opens, you pay zero.  You come in at

14  midnight, you pay anywhere from 50 bucks to $100.00.

15       Q    There's also other fees in between 50 and 100?

16  Would you pay, say, 25 for a certain time?

17       A    Yeah, they're anywhere from 20 to 200 -- from zero

18  to 100.

19       Q    Zero to 100?

20       A    Yes.

21       Q    Not 200?

22       A    No, no.

23       Q    Okay.  Is there a cover fee to enter PT's?

24       A    Yes, sir.

25       Q    What is the cover fee?



NICK MEHMETI                                           July 07, 2022
LAYTON V. MAINSTAGE MANAGEMENT                              12

1        A     Well, now, or at the time that we're talking about

2    of this case?

3        Q     Oh, I guess during the relevant period.  Well, both.

4    Let's start with now, and then what was the cover fee during

5    the relevant period of this case, 2018 to 2019?

6        A     At the time, I think it was anywhere from $8.00 for

7    the day shift, and 10 to $20.00 at night.  And now I think

8    it's $10.00 for day, and 20 at night.

9        Q     Thank you.  Mr. Mehmeti, do you own an interest in

10   Mainstage, Inc.?

11       A     Yes, sir.

12       Q     Are you the sole owner of Mainstage, Inc.?

13       A     Correct.

14       Q     And what does Mainstage, Inc. do?

15       A     Well, Mainstage, Inc. owns and operates PT's.

16       Q     So you're the CEO/President of PT's, and Mainstage,

17   Inc. owns PT's, and you own Mainstage, Inc.?

18       A     PT's is a trade name, sir.  PT's Men's Club is a

19   trade name.

20       Q     And that's of Nick's Mainstage?

21       A     Right, Nick's Mainstage.

22       Q     And Mainstage, Inc. owns Nick's Mainstage?

23       A     I'm all confused here, sir.  In the last year, I

24   don't know what all -- what anymore.  All I know, it's Nick's

25   Mainstage, Inc. now, and PT's Men's Club is the trade name



1   that we're doing business.

2        Q      And my apologies.  I meant to say Mainstage

3   Management, Inc.

4        A      Mainstage Management.  Different story there.

5        Q      Yes, sir.  Do you own Mainstage Management, Inc.?

6        A      Correct.

7        Q      And what does Mainstage Management, Inc. do?

8        A      They do the accounting and bookkeeping for my

9   different businesses.  They're a separate entity, separate

10  place doing business.  They do nothing but accounting and

11  bookkeeping.

12       Q      Okay.  So PT's, which is Nick's Mainstage, Inc.,

13  employs Mainstage Management, Inc. to do --

14       A      They don't employ Mainstage.

15       Q   I'm sorry.  They --

16       A      They don't employ.  I didn't let you finish.  I'm

17  sorry.  Mainstage does other services for other companies

18  besides Nick's Mainstage - PT's.

19       Q      And what companies does Mainstage Management, Inc.

20  do business for?

21              MS. ANDREWS:  Objection, form.

22       A      Other people and companies.

23       Q      That you own?

24       A      It does bookkeeping and accounting.

25       Q      And are they only businesses that you own?



1      A     Yes, and other ones.  No.  Actually, mine and other

2    businesses.

3      Q     So Mainstage Management does bookkeeping and

4    accounting for a variety of businesses, more than just

5    businesses you own?

6      A     Correct.

7      Q     Thank you.  How long has Nick's Mainstage employed

8    Mainstage Management, Inc.?

9            MS. ANDREWS:  Objection, form.

10     A     I don't know the exact date, but there's always been

11   a separate office that does accounting and bookkeeping for

12   Nick's Mainstage and other businesses I'm associated with.

13     Q     Understood.  So PT's Men's Club, also known as

14   Nick's Mainstage -- Nick's Mainstage, Inc., doing business as

15   PT's Men's Club, does all of its bookkeeping and accounting

16   through Mainstage Management, Inc.?

17     A     I'm sorry.  I lost you there for a second.

18     Q     My apologies.  I'll reask that question.  PT's Men's

19   Club does all of its bookkeeping and accounting through

20   Mainstage Management, Inc.; is that correct?

21     A     Well, yes, but we also have a CPA company that does

22   our accounting services, our tax returns and quarterlies and

23   everything else.

24     Q     And is that hired by PT's Men's Club or Mainstage

25   Management, Inc.?



```
 1      A    That's hired by Mainstage Management to do

 2  accounting and final say-so on all of our bookkeeping, our

 3  taxes and everything else associated with the businesses.

 4      Q    Understood.  And does Mainstage Management, Inc.

 5  keep track of the documents, including employment records, for

 6  PT's?

 7      A    PT's does keep all employments in-house, employment

 8  records.

 9      Q    So, like, the sign-in sheets that the entertainers

10  sign when they enter the club would be kept by PT's?

11      A    Sign-in sheets when the entertainers come in, it

12  goes in the office, who keeps all the records of the club.  It

13  goes in the office and goes to storage.

14      Q    But those are managed by PT's and not Mainstage

15  Management?

16      A    Well, they're managed by PT's but end up in the

17  Mainstage Management office.

18      Q    So they can review it for different hours and fees

19  collected?

20      A    Correct.

21      Q    Did you personally know Brooke Layton?

22      A    Sir, I know the name.  If I see her, I'm sure I know

23  her.  I don't personally know her, no.  We go through a lot of

24  different entertainers.  I mean, I know managers, I know

25  faces, but I really don't know everybody on a first name/last
```



1    name basis.

2        Q    So you wouldn't remember any conversations you've

3    had with Brooke?

4        A    I would not remember, sir.  If I tell you any

5    different, I'd be lying to you.

6        Q    And is that the same for Ashlynn Shipley?

7        A    Correct.

8        Q    So you wouldn't know either of their stage names,

9    offhand?

10       A    No, sir.

11       Q    Understood.  When you go into PT's, typically what

12   activities do you do while you're there?

13       A    I check what's going on in the club, walk the

14   properties outside and inside, the dressing room, the kitchen,

15   the offices, talk to managers, cooks, waitresses.  Not a lot

16   with the waitresses, but I visit with them, what's going on,

17   what kind of day they're having, good day/bad day, any issues.

18   That's what I do.

19       Q    Gotcha.

20       A    I make sure the property is in good shape, clean or

21   not clean.  That's what I do, and advise managers what I like,

22   what I don't like, what I'm seeing that day.

23       Q    Have you had to fire anyone recently?

24       A    No.

25       Q    When was the last time you personally fired someone?



 1      A    I don't remember dates, but I told my GM that a

 2  person needed to go.

 3      Q    What type of person was that, or what was that

 4  person employed as?

 5      A    One of the employees.  One of the employees.

 6      Q    Do you remember what they were employed as?

 7      A    A waitress.

 8      Q    A waitress.  And that was relatively recently?  Do

 9  you remember, like, a year, two years ago?

10      A    I'd say about a couple months ago.

11      Q    Thank you.  And your GM was Todd Williams; is that

12  correct?

13      A    Correct.

14      Q    Does he fire people without your input?

15      A    He can fire people with my approval.  I mean, he

16  will send them home for the shift, whatever the position might

17  be, and then call me and say, Boss, this or that, and I say,

18  "Yes, go ahead and let them go."

19      Q    What does he typically send people home for?  What

20  are some of the things that would get people sent home?

21      A    Drinking on the job, doing things they're not

22  supposed to be doing while on duty, coming late, the same

23  person all the time.  I'm talking employees.  And after one,

24  two, three warnings, he'll send them home for the shift or

25  send them home for good, period.



1    Q    Give me one second.  I'm just reviewing some

2  documents I received from your attorney, Ms. Andrews.

3              MS. ANDREWS:  I think they're for the corporate

4  rep depo.

5              MR. KYKTA:  Yeah.  They look like financials.

6    Q    (By Mr. Kykta) Are the entertainers the only people

7  that you employ or that work there who are contractors, as you

8  would call them?

9    A    Yes, sir.

10    Q    There's no other types of contractors who work

11  there?

12    A    I mean, contractors:  AC people, electrical people,

13  plumbers.  They don't work there.  They work for themself, and

14  come do a service for us when we need them, as we need them.

15    Q    What about the house moms?

16    A    They're not contractors.  They're service providers

17  for entertainers, for contractors, for dancers.

18    Q    So are they employees of PT's?

19    A    We don't pay them.  They're not employees.

20    Q    So are they independent contractors for the

21  independent contractors that work at PT's?

22    A    They don't have a contract, but they're service

23  providers for the contractors, for the independent

24  contractors.

25    Q    But you or someone who works for PT's decides if



1  they're allowed to work there or allowed to operate inside of

2  PT's?

3      A    Yes, sir.

4      Q    And do you or someone at PT's set the hours that

5  they work?

6      A    They have no set hours.  They work a shift, day

7  shift or night shift, whatever shift they need to for the

8  entertainers.  They take care of the dancers.  They're there

9  to provide service to the girls, whatever they need.

10     Q    What do those services typically consist of?

11     A    Whatever the dancers need.  I don't know exactly.

12 Whatever the dancers need.

13     Q    Do the house moms schedule the shifts that they're

14 going to be working ahead of time?

15     A    I'm not sure, to be honest with you.  There's not

16 always -- there's always a lady that takes care of the girls.

17     Q    So, presumably, they communicate amongst themselves

18 or with the general manager?

19     A    They communicate with the general manager or

20 themselves.  There's more than one.  There's two, three, four

21 different girls.  Sometimes there's not one, you know, so ...

22     Q    There are situations where there's not a house mom?

23     A    Correct.

24     Q    And how do the house moms make money?

25     A    We don't pay them.  Entertainers, they provide a



SUPP APPX 128

NICK MEHMETI                                          July 07, 2022
LAYTON V. MAINSTAGE MANAGEMENT                                      20

1    service fee for the service that's rendered to the

2    entertainers.

3         Q    And is that a set service fee?

4         A    No, sir.

5         Q    So it's at the entertainer's discretion?

6         A    Correct.

7         Q    And what other fees do the -- or let me ask this

8    another way.  Who else do the entertainers pay while they're

9    at PT's?

10        A    Well, they don't pay nobody.  At PT's, they get paid

11   from customers to provide service for table dances.  It's the

12   other way around, actually.

13        Q    But they also pay the house moms for their services?

14        A    They don't pay them.  They give a service fee,

15   whatever, between them and the deejays.  So they provide

16   services.  It's between the entertainers and the house moms

17   and deejays.

18        Q    And is there anyone else that the entertainers pay

19   service fees to?

20        A    I'm not sure.

21        Q    Bartenders, for example?

22        A    I'm not sure, to be honest with you.

23        Q    So, potentially, entertainers pay or give service

24   fees to house moms, deejays, and possibly bartenders or other

25   people on staff?



1    A    I'm not sure, to be honest with you.  All I know,

2  they pay house -- I mean the shift fees.  And then between the

3  deejay and house mom, that's their business.  I don't

4  interfere with that.  We don't interfere with that.

5    Q    There are no written rules for house fees?

6    A    No.  Oh, house fees?  I mean, the rules.  There's

7  fees.  They pay what they want when they get there, you know,

8  so ...

9    Q    Yeah.  And that's inscribed in the contract that you

10  have with them?

11    A    Correct.

12    Q    And then any fees that they would give to the house

13  moms, deejays, or anyone else are not set, they're not written

14  down?

15    A    That's between them and the deejays and house moms.

16    Q    And if an entertainer leaves a shift early, is there

17  a fee for that as well?

18    A    Yes, sir.

19    Q    What is that fee?

20    A    I think it's 50 now.  It used to be different.  I

21  don't know what it was, but I think it's 50 now.

22    Q    Fifty dollars if you leave your shift early?

23    A    Yes.

24    Q    Are there any dress codes for the employees or the

25  entertainers at PT's?



1      A    For entertainers?

2      Q    Yes.

3      A    I don't think so.  They look appropriate, but

4    there's no dress code.  I mean, the dress code is we're a

5    topless bar, so ...

6      Q    Have you ever sent any entertainers home for how

7    they were dressed?

8      A    I don't remember, to be honest with you.

9      Q    Do you know if your general manager would have sent

10   anyone home for how they were dressed?

11     A    I'm not sure.

12     Q    Do entertainers have to dress a certain way on

13   holidays or for specific events?

14     A    No, sir.  We have holidays, whatever the holidays

15   are, but they don't have to dress up a certain way, you know.

16     Q    So PT's has not fired anyone for not dressing up on

17   a holiday, or sent someone home?

18     A    I don't think so.

19     Q    Okay.  Let's go a little bit more into your

20   background.  How long have you lived in Dallas?

21     A    I've lived in Dallas -- I bought PT's August 24th.

22   I moved to Dallas August 23rd of 1983, sir.

23     Q    And where did you live before that?

24     A    Chicago.

25     Q    Is that where you were born?



SUPP APPX 131

NICK MEHMETI                                                    July 07, 2022
LAYTON V. MAINSTAGE MANAGEMENT                                              23

1    A    No.  I was born in Albania, and grew up in Chicago.

2    Q    When did you move to America?

3    A    Well, I first came to America in '75, moved in '76.

4    Q    And what year were you born?

5    A    1957.

6    Q    What's your birthday?

7    A    April 12th, '57.

8    Q    So you moved here before you were 20?

9    A    Seventeen.

10   Q    That's very impressive.  You got a business going

11   relatively quick?

12   A    Not by choice.  My parents lived here.  I was the

13   last one down here.

14   Q    So they left, and then you followed them afterwards?

15   A    Well, yes, I did, but not by choice.  My father left

16   and came to get us.  Albanian tradition: the grandfathers rule

17   the family.  So he came to get myself and my two sisters and

18   my mom.  Grandpa says, "Nope, don't go nowhere.  You can take

19   your wife and go.  Make sure you come back for the kids."

20          Well, that's what happened.  After wife goes,

21   and uncles go, then the last one, then Grandpa goes,

22   "Grandson, nobody's coming back.  I guess we better join

23   them."  So, not by choice, I joined them.

24   Q    I see.  Did you end up enjoying the trip anyway,

25   enjoying the fact that you came here, or would you rather have



SUPP APPX 132

NICK MEHMETI                                                July 07, 2022
LAYTON V. MAINSTAGE MANAGEMENT                                        24

1  stayed in Albania?

2      A    I had a great time over there.  I'd rather have

3  stayed over there at the time.

4      Q    All right.  So you got here.  You lived in Chicago.

5  And then did you come to Texas, or was there anywhere else in

6  between?

7      A    I went to Canada for two years.

8      Q    All right.  Where in Canada?

9      A    London, Ontario.

10     Q    And what years were those two years?

11     A    '77 to '79.

12     Q    And where were you in '78?  Back in Chicago?

13     A    No.  '77 to '79 I was in London.

14     Q    Oh, through those two.  Sorry.  I thought there was

15  a year in between.  And then in '79, where did you move to?

16     A    Back to Chicago.

17     Q    And then after Chicago, you came to Texas?

18     A    Yes, sir.

19     Q    And what year was that?

20     A    '83.

21     Q    And then in '83 you bought the club?

22     A    Yes, sir.

23     Q    You bought it or -- yeah, you mentioned that

24  earlier.  You said you bought the club in '83, and it had

25  opened in '79?



NICK MEHMETI                                                    July 07, 2022
LAYTON V. MAINSTAGE MANAGEMENT                                            25

1      A    Well, it opened in '76, but I didn't open it;
2   someone else opened it.
3      Q    And then you purchased it?
4      A    Yes.
5      Q    Were you working there before you bought it, or did
6   you just move and buy it, because there was a day or so in
7   between?
8      A    I had never been to a strip joint in my life.  I
9   came here for three days to see a friend of mine on the way to
10  San Diego to go to Mexico.  I took some time off, actually.
11  My partner at the time said, "Get out of here.  Get out of
12  Dodge, take some time."
13           So I came to see my friend because he talked me
14  into coming to Dallas to see him, not to buy any business.
15  And three days later, I was in the strip joint business.
16     Q    All right.  And after you bought PT's, was the next
17  club you bought Lipstick's, or were there any in between?
18     A    No.  There was two in between.
19     Q    What were those clubs called?
20     A    Arcadia Bar & Grill.  I bought that in 1985 --
21  opened it in 1985.  In '89 I bought Nick's Bar & Grill in The
22  Colony, and in 1990 was Lipstick's.
23     Q    And what happened to Arcadia?  Is that still open?
24     A    I sold it the day I bought Nick's in The Colony.  I
25  took it back two years later, and built it back up and gave it



1  to my GM.

2      Q    Who is your GM that you gave it to?

3      A    Tom O'Leary.

4      Q    So not Todd Williams?

5      A    No.

6      Q    That's an earlier GM.  Understood.  And you still

7  have Nick's in The Colony?

8      A    Yes, sir.

9      Q    Do you have any other strip clubs?

10     A    I had them, but not no more.

11     Q    So now you own three; is that correct?

12     A    Two.

13     Q    Two.  Oh, so Nick's in The Colony, is that not a

14  strip club?

15     A    No.  The only strip club is Lipstick's and PT's.

16     Q    Understood.  Nick's is just a bar and restaurant?

17     A    Bar and grill/restaurant.

18     Q    And do you have any other businesses?

19     A    Yes.

20     Q    What are those?

21     A    Restaurants.

22     Q    Are they in Texas?

23     A    They're in the metroplex, Oklahoma.

24     Q    So all in the general Dallas-Fort Worth area, and

25  then in Oklahoma?



1      A    Correct, sir.

2      Q    Where are they in Oklahoma, and how many are in

3  Oklahoma?

4            MS. ANDREWS:  Objection, form.

5      A    Well, I had the Sports City Cafe in Durant,

6  Oklahoma, right next to Choctaw Casino, if you've been there.

7  Four years ago, the State took it from me for eminent domain.

8  They're redoing the highway there next to the casino because

9  the casino has so much growth.  And since then, I bought

10  another restaurant there in Durant.

11      Q    Is it also by the casino?

12      A    No, it's not.  The original was right next to the

13  casino, actually, but the other is not.  It's in downtown

14  Durant.

15      Q    Understood.  Let's go back to PT's.  Do you own the

16  property that PT's is located on?

17      A    The corporation owns it.  I don't personally own it.

18      Q    Which corporation owns it?

19      A    Nick's Properties, Dallas.  I don't even know, I've

20  got so many different corporations, to be honest with you.  We

21  change the names, so I don't know which.  If I tell you

22  something, I don't mean to lie, but it might not be correct,

23  so ...

24      Q    I understand.  But it's a company that you own?

25      A    Correct.





NICK MEHMETI                                                July 07, 2022
LAYTON V. MAINSTAGE MANAGEMENT                                        28

1    Q    How long have you owned the property -- or how long

2    has your company owned the property that PT's is on?  Was it

3    when you bought the club?

4    A    Well, I bought the club, PT's, originally in 1983.

5    I didn't own the property.  The new location, we opened in

6    2004.  We bought the land in '97, Christmas of '97, and built

7    it in 2003, and opened in 2004.

8    Q    Was the land vacant until you had the club built?

9    A    Yes.  It was a field.

10    Q    Do you mind if we take a quick five-minute break?

11    A    Sure.

12              MS. ANDREWS:  Sure.

13              (Recess Taken)

14    Q    (By Mr. Kykta) Mr. Mehmeti, I just want to go over a

15    few final questions.  When was the last time that you

16    personally hired someone to work at PT's?

17    A    I put cooks in the kitchen.

18    Q    Is that this year?

19    A    Yeah.

20    Q    And the last person you fired was a waitress?

21    A    A waitress.  I mean, I didn't fire her.  I told the

22    manager to fire her.  I didn't walk up to her and say, "You're

23    fired," you know.

24    Q    Yeah.  The power to hire and fire rests with you?

25    A    Right.



NICK MEHMETI                                          July 07, 2022
LAYTON V. MAINSTAGE MANAGEMENT                                    29

1        Q    And you control the schedules?  Sorry.  You have the

2    potential to control the schedules of your employees, but you

3    kind of hand that off to Todd Williams, your general manager?

4        A    Sir, I don't control the schedules.  The managers

5    make the schedules, you know.

6        Q    But you set --

7        A    I make Todd's schedule, and he makes whatever

8    schedule him and the managers work out.

9        Q    Understood.  You're on top of Todd, and then Todd

10   handles everyone --

11       A    I tell them how many days they need to work, and

12   they work how many shifts to get it covered.

13       Q    Okay.  And you set how much Todd gets paid, and Todd

14   sets how much everyone else gets paid, or do you decide the

15   salaries for everybody?

16       A    I decide the salaries for everybody.

17       Q    And then who at PT's maintains the employment

18   records?

19       A    The employment records, all applications, records

20   when they get hired, they're in the club.  And then from the

21   club, go to the office to make sure they get paid, so people

22   get paid when payroll is due.

23       Q    And the office is Mainstage Management, Inc.?

24       A    Correct.

25                 MR. KYKTA:  I think that's all I had for the



NICK MEHMETI                                                    July 07, 2022
LAYTON V. MAINSTAGE MANAGEMENT                                           30

1    individual deposition.  I'll pass the witness, Latrice.

2                    MS. ANDREWS:  I just have a couple quick

3    questions.

4                    EXAMINATION

5    BY MS. ANDREWS:

6        Q    The house mom is not an employee, correct?

7        A    Correct.

8        Q    The club does not require any tip outs or any

9    payments to any other person by the entertainers?

10       A    Correct.

11       Q    And with regard to Mainstage Management, Inc., are

12   they involved in the hiring or firing of any of the dancers?

13       A    No, ma'am, they don't hire anybody in the club.

14   They got no say-so in the club, except they do the accounting

15   and bookkeeping.

16       Q    So other than the fact that you have a common

17   ownership, is there anything else that Mainstage Management

18   does in the operations of the club?

19                   MR. KYKTA:  Objection, form.

20       A    They don't do anything else besides accounting,

21   bookkeeping, payroll checks, services, pay the bills.  They

22   have no say-so in management of the club or who works there

23   and don't work there.

24       Q    Are the employment records maintained by the club?

25       A    The employment records for employees, after they get



1   hired, they go in the Mainstage Management office.  We have

2   employees come and go all the time.  We deal with a thousand

3   employees at one time, so they get moved to the office, to the

4   storage.

5        Q    And the storage facility, that's PT's storage?

6        A    No, it's all the restaurants and clubs and all my

7   businesses.  I have storage for everybody.

8        Q    And the records that are kept by or that are held in

9   the warehouse, in storage, to the extent they're property of

10  the club, the club maintains those records?

11       A    Correct.

12       Q    And the club is the one that goes and retrieves its

13  own files from that storage, correct?

14       A    When they need it, yes.

15       Q    And the club sets up how it's organized and indexed,

16  correct?

17       A    Correct.

18       Q    And Mainstage Management is solely doing the

19  accounting for the club, correct?

20       A    Correct.

21       Q    Do they have any say-so in the rules or policies of

22  the club?

23       A    No, ma'am.

24                 MS. ANDREWS:  I pass the witness.

25                 MR. KYKTA:  Let me follow up.



NICK MEHMETI                                      July 07, 2022
LAYTON V. MAINSTAGE MANAGEMENT                              32

```
 1              FURTHER EXAMINATION
 2   BY MR. KYKTA:
 3        Q    So the storage facility is owned by Mainstage
 4   Management, Inc.?
 5        A    No.  The storage facility is owned by the club,
 6   PT's.  It's all in the corporation we added when we bought
 7   this building, and it just stayed like that.  But now I think
 8   it's Nick's Properties, Inc. - Dallas.
 9        Q    Okay.  Nick's Properties owns the building, and then
10   it has operations for PT's running out of it, as well as
11   Mainstage Management, Inc.?
12        A    Mainstage Management, Inc. operates in there.
13   That's where the office is, and they do the accounting and
14   bookkeeping for all my businesses.
15        Q    Understood.  And one other question.  Did you create
16   the rules and policies for PT's?
17        A    That would be me -- myself, Todd, and one of my
18   attorneys.
19              MR. KYKTA:  All right.  I think that wraps up
20   this individual deposition for Nick Mehmeti.
21              THE WITNESS:  Thank you.
22              COURT REPORTER:  Ms. Andrews, do you need a
23   copy of this deposition?
24              MS. ANDREWS:  For purposes of read and sign,
25   yes.  Yeah, we'll take a copy of this deposition, as well as
```



1    the corporate rep subsequent to.

2                    COURT REPORTER:  A copy other than read and

3    sign?

4                    MS. ANDREWS:  Yes, we'll need one.

5                    (Deposition Adjourned)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



**NICK MEHMETI**                                        July 07, 2022
**LAYTON V. MAINSTAGE MANAGEMENT**                      34

```
 1                    CHANGES AND SIGNATURE

 2     WITNESS NAME:                  DATE OF DEPOSITION:

 3     NICK MEHMETI                   JULY 7, 2022

 4      PAGE      LINE      CHANGE              REASON

 5     _____

 6     _____

 7     _____

 8     _____

 9     _____

10     _____

11     _____

12     _____

13     _____

14     _____

15     _____

16     _____

17     _____

18     _____

19     _____

20     _____

21     _____

22     _____

23     _____

24     _____

25     _____
```



1          I, NICK MEHMETI, have read the foregoing deposition

2     and hereby affix my signature that same is true and correct,

3     except as noted above.

4                              _____
                               NICK MEHMETI
5

6     THE STATE OF TEXAS

7     COUNTY OF _____

8

9          Before me, _____, on this day

10    personally appeared NICK MEHMETI, known to me (or proved to

11    me under oath or through _____) (description of

12    identity card or other document) to be the person whose name

13    is subscribed to the foregoing instrument and acknowledge to

14    me that they executed the same for the purposes and

15    consideration therein expressed.

16

17         Given under my hand and seal of office this

18    _____ day of _____, 2022.

19

20                              _____
                                Notary Public, State of Texas
21

22                              _____
                                My Commission Expires

23

24

25



```
 1                UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF TEXAS
 2                     DALLAS DIVISION

 3   BROOKE LAYTON, Individually  )
     and on behalf of all other   )
 4   similarly situated,          )
          Plaintiff,              )
 5                                )
     VS.                          ) CA NO. 3:21-cv-01636-N
 6                                )
     MAINSTAGE MANAGEMENT, INC.,  ) COLLECTIVE ACTION
 7   NICK'S MAINSTAGE, INC. -     ) JURY DEMANDED
     DALLAS PT'S d/b/a PT'S       )
 8   MEN'S CLUB and NICK MEHMETI, )
          Defendants.            )
 9
                    REPORTER'S CERTIFICATION
10             DEPOSITION OF NICK MEHMETI
                     JULY 7, 2022
11               (Reported Remotely)

12         I, KELLY CHANDLER, Certified Shorthand Reporter

13   in and for the State of Texas, hereby certify to the

14   following:

15         That the witness, NICK MEHMETI, was duly sworn by

16   the officer and that the transcript of the oral deposition is

17   a true record of the testimony given by the witness;

18         I further certify that pursuant to FRCP Rule

19   30(f)(1)the signature of the deponent:

20   ____X___ was requested by the deponent or a party

21   before the completion of the deposition and returned within 30

22   days from date of receipt of the transcript.  If returned, the

23   attached Changes and Signature Page contains any changes and

24   the reasons therefor;

25   _____ was not requested by the deponent or a party
```



NICK MEHMETI                                                July 07, 2022
LAYTON V. MAINSTAGE MANAGEMENT                                        37

1    before the completion of the deposition.

2            I further certify that I am neither counsel for,

3    related to, nor employed by any of the parties or attorneys in

4    the action in which this proceeding was taken, and further

5    that I am not financially or otherwise interested in the

6    outcome of this action.

7

8

9            Certified to by me this _____ day of _____,

10   2022.

11

12                          KELLY CHANDLER, CSR, RPR, CRR, CRC

13                          Texas CSR 3793
                            Expiration Date: 04/30/2023
14                          Script Deposition Services, LLC
                            Firm Registration No. 11972
15                          904 S. Paris
                            Ennis, Texas 75119
16                          903.470.0098

17

18

19

20

21

22

23

24

25



# In the Matter of:

 *vs*

*Nick's Management, Inc.*

---

*Nick Mehmeti*

*March 09, 2022*

---

*68 Commercial Wharf • Boston, MA 02110*
*888.825.3376 - 617.399.0130*
*Global Coverage*
*court-reporting.com*



EXHIBIT
G

Page 3

1          AMERICAN ARBITRATION ASSOCIATION

2

3    - - - - - - - - - - - - - - - - x

4    JULIA PREDMORE,

5           Claimant,

6    v.

7                     AAA Case

8                     No. 01-21-0002-3409

9    NICK'S MANAGEMENT, INC.,

10   NICK'S CLUBS, INC.,

11   f/k/a ADVENTURE PLUS

12   ENTERPRISES, INC.,

13   d/b/a/ PT'S MEN'S CLUB,

14   and NICK MEHMETI,

15           Respondents.

16   - - - - - - - - - - - - - - - - x

17

18   VIDEOCONFERENCE DEPOSITION OF NICK MEHMETI

19           Conducted Remotely

20           1701 North Collins Boulevard

21                Suite 1100

22           Richardson, Texas

23           March 9, 2022

24           11:00 a.m.

---

Page 3

1               I N D E X

2    Deposition of:  Direct  Cross  Redirect  Recross

3    NICK MEHMETI

       By Mr. Thomson  5

4      By Ms. Andrews      51

5

6

7               E X H I B I T S

8    No.                    Page

9    Exhibit 1  Document titled, PTS

            Dancer Rent          52

10

11   Exhibit 2  Declaration of Predmore in

            Support of Plaintiff's Motion

12             For Conditional Certification  52

13

14

15

16

17

18

19

20

21

22

23

24

---

Page 2

1    APPEARANCES VIA VIDEOCONFERENCE:

2

3    LICHTEN & LISS-RIORDAN, P.C.

4    By Matthew Thomson, Esq.

5    729 Boylston Street, Suite 2000

6    Boston, Massachusetts  02116

7    (617) 994-5800

8    mthomson@llrlaw.com

9    For the Claimant.

10

11   SHEILS WINNUBST PC

12   By Latrice E. Andrews, Esq.

13   1701 N. Collins Boulevard, Suite 1100

14   Richardson, Texas  75080

15   (972) 644-8181

16   latrice@sheilswinnubst.com

17   For the Respondents.

18

19

20

21

22

23

24

---

Page 4

1          P R O C E E D I N G S

2          THE STENOGRAPHER:  This is Julie

3    Mercier.  I'm a Registered Professional

4    Reporter, and I'm a Notary Public in the

5    Commonwealth of Massachusetts.

6          This deposition is being taken

7    remotely.  This witness is appearing remotely

8    from 1701 North Collins Boulevard, Richardson,

9    Texas.

10         The attorneys participating in this

11   proceeding acknowledge their understanding that

12   I am not physically present in the proceeding

13   room, nor am I physically present with the

14   witness and that I will be reporting this

15   proceeding remotely.  They further acknowledge

16   that, in lieu of an oath administered in person,

17   the witness will verbally declare his testimony

18   in this matter under the pains and penalties of

19   perjury.  The parties and their counsel consent

20   to this arrangement and waive any objections to

21   this manner of proceeding.

22         Please indicate your agreement by

23   stating your name and your agreement on the

24   record, after which I will swear in the witness

Page 5

1    and we may begin.
2        MR. THOMSON:  Attorney Matthew Thomson
3    for the Claimant, and we agree.
4        MS. ANDREWS:  Attorney Latrice Andrews
5    for the Respondents, and we agree.
6        THE WITNESS:  Nick Mehmeti.
7
8            NICK MEHMETI,
9
10    a witness called for examination by counsel for
11    the Claimant, being satisfactorily identified by
12    the production of his driver's license, being
13    first duly sworn, was examined and testified as
14    follows:
15
16            DIRECT EXAMINATION
17    BY MR. THOMSON:
18        MR. THOMSON:  Thank you, everyone.
19    Thank you for being here today.
20    Q.  Good morning, Mr. Mehmeti.  My name is
21    Matt Thomson.  I represent Julia Predmore in this
22    arbitration proceeding.
23        My first question to you, Mr. Mehmeti,
24    is, have you ever been deposed before?

Page 6

1    A.  Yes, sir.
2    Q.  Okay.  Just a quick refresher of how
3    things will go today.  Obviously I will be asking
4    you questions.  I hope that you'll be answering
5    the questions, and we'll both do our best not to
6    speak over each other because the court reporter
7    is making a transcript obviously of what we say.
8    Does that sound good?
9    A.  Yes, sir.
10    Q.  In addition, if you can't hear any of
11    my questions or if my question just doesn't make
12    sense, please ask me to repeat it or rephrase it,
13    and I'm happy to do that at any time.  Is that all
14    right?
15    A.  Yes, sir.
16    Q.  And then if at any point today you'd
17    like to take a break to get a glass of water, do
18    whatever else, please let me know and we're happy
19    to do that at any time.  Is that all right?
20    A.  Yes, sir.
21    Q.  Okay.  You mentioned, Mr. Mehmeti, that
22    you have been deposed before.  Do you recall the
23    name of the proceeding that you were deposed in?
24    A.  I don't remember, sir.

Page 7

1    Q.  Approximately when was it that you last
2    had your deposition taken?
3    A.  About three, four years ago.
4    Q.  Okay.  Do you remember the subject
5    matter of that case?
6    A.  It was a lease pertaining to one of my
7    other businesses.
8    Q.  Okay.  Is that the only other time
9    you've ever had your deposition taken?
10    A.  I think I've taken deposition a couple
11    other times before in the past.
12    Q.  Have you ever had your deposition taken
13    in a case in which an entertainer or an exotic
14    dancer has filed a lawsuit against the club?
15    A.  I'm not sure, sir.  I know this one
16    will be the first one exotic dancer, but I'm not
17    sure about the other one.
18    Q.  Okay.  And I take it, Mr. Mehmeti, that
19    you're affiliated with PT's Men's Club of Dallas;
20    is that correct?
21    A.  Yes, sir.
22    Q.  And what is your title or position with
23    the club?
24    A.  President.

Page 8

1    Q.  Okay.  Do you also have any ownership
2    interest in the club?
3    A.  Yes, sir.
4    Q.  And are you the sole owner or are there
5    other owners?
6    A.  I'm the sole owner.
7    Q.  And for how long have you been the sole
8    owner of PT's?
9    A.  Since 1983.
10    Q.  And I take it you're the only president
11    of the club; is that right?
12    A.  Yes.  Correct.
13    Q.  Is there anyone else who holds other
14    positions such as vice president or treasurer?
15    A.  No, sir.
16    Q.  In your role as president of the club,
17    can you describe to me what your duties are, how
18    involved you are in the day-to-day activities of
19    the club?
20        MS. ANDREWS:  Objection, form.
21    A.  I'm really not involved in day-to-day
22    activities.
23    Q.  And the club has, I take it, a specific
24    location that it operates at, correct?

Page 9

1    A. Yes, sir.
2    Q. What is the address of that location?
3    A. 10601 Plano Road, Dallas, Texas.
4    Q. And how often would you say per week --
5    how many days per week do you visit that location?
6    A. And/or two, three times. Two, three,
7    four times a week.
8    Q. Do you have any type of office or other
9    place where you work when you go to that location?
10    A. Yes.
11    Q. About how many hours per week do you
12    spend at the club location?
13    A. I'd say about ten hours a week, give or
14    take.
15    Q. And the case that we're here for today
16    related to Ms. Predmore, I understand that she was
17    affiliated with the club back in 2019; does that
18    sound correct to you?
19    A. I don't remember dates, but she
20    definitely was affiliated with the club, yes.
21    Q. Focusing our attention to 2019, was
22    your schedule in terms of how many hours you were
23    at the club and how many days per week, was it
24    similar in 2019 as you just described a moment

Page 10

1    ago?
2    A. Sir, I don't have a schedule. I go
3    when I need to go, and leave when I need to leave.
4    Q. So in 2019, were you going about the
5    same frequency as you're going now or were you --
6    A. I'd say, yes. Yes.
7    Q. About the same?
8    A. Yes. Sorry.
9    Q. Okay. Speaking currently, who is it
10    that would be in charge of the day-to-day
11    operations of the club?
12    A. The general manager.
13    Q. General manager?
14    A. Yes, sir.
15    Q. And what is the general manager's name?
16    A. Todd Williams.
17    Q. And was Mr. Williams also the general
18    manager in 2019?
19    A. Yes, sir.
20    Q. Is Mr. Williams an employee of the
21    club, a W-2 employee?
22    A. Yes, sir.
23    Q. Is he paid a salary or by the hour?
24    A. He gets paid salary.

Page 11

1    Q. Does the club have any other salary
2    employees other than Mr. Williams?
3    A. The management. Management team.
4    Q. And speaking only of titles, just so I
5    don't get myself confused, can you explain to me
6    who, title wise, is on the management team?
7    A. Well, there's six, seven -- six, seven
8    other managers on the management team and also
9    kitchen manager.
10    Q. Okay. Understood. And those
11    individuals are all salary employees of the club?
12    A. All the management are salary, yes.
13    Q. And does the club have any hourly
14    employees?
15    A. Yes, sir.
16    Q. And what type of positions does the
17    club employ people as hourly employees?
18    A. Waitresses, bartenders, cooks, doormen,
19    DJ, dishwasher, busboy, bar backs, security.
20    Q. Approximately how many hourly employees
21    of the club are there currently?
22    A. It varies from about 75 to 85 in a
23    given pay period.
24    Q. Was that true in 2019 also?

Page 12

1    A. About the same, give or take.
2    Q. Mr. Mehmeti, I take it there are
3    customers of the club also; is that fair to say?
4    A. Yes, sir.
5    Q. Speaking just physically, is there a
6    particular one single entrance where the customers
7    would come into the club?
8    A. Correct.
9    Q. And as the customers enter the club, is
10    there any type of signage explaining to them any
11    cover charge or anything like that?
12    A. There's a sign that explains the dress
13    code, and, I guess, that's about it really.
14    Q. Okay. And do these customers -- are
15    these customers charged any cover charge?
16    A. Yes, sir.
17    Q. And how much is the cover charge?
18    A. It varies from time of the day.
19    Q. What's the maximum amount of the cover
20    charge?
21    A. $20.
22    Q. And I take it it may be less if the
23    person is coming in in the afternoon; is that fair
24    to say?

Page 13

1     A.  Correct.
2         Q.  And who is it that determines the cover
3     charge?
4         A.  I guess it'd be me and the general
5     manager.
6         Q.  And, Mr. Mehmeti, I take it there are
7     also exotic dancers or entertainers who are
8     present at the club most days; is that correct?
9         A.  Correct.
10        Q.  Do you prefer to refer to them as
11    "entertainers" or "dancers"?  Is there a term that
12    you prefer?
13        A.  Entertainers.
14        Q.  Entertainers, okay.
15        A.  Contract entertainers.
16        Q.  Is there ever a time when the club is
17    open and there are not entertainers at the club?
18        A.  There's times we open and there might
19    not be entertainers.
20        Q.  How often does that happen?
21        A.  Sometimes early morning.  Well, not
22    early morning.  When we open up and sometimes
23    later on in the evening.
24        Q.  What are the hours of operation of the

Page 14

1     club?
2         A.  11:00 a.m. until 2:00 a.m. -- 11:00
3     a.m., Monday through Saturday; Sunday, 12:00 noon.
4     And evening, Monday, Tuesday and Wednesday, we
5     close at 2:00 a.m.; Thursday, Friday, Saturday,
6     Sunday, 4:00 a.m.
7         Q.  Okay.  And is it fair to say,
8     Mr. Mehmeti, that many of the customers who enter
9     the club are there for adult entertainment?
10        MS. ANDREWS:  Objection, form.
11        A.  Not necessarily.
12        Q.  Why else may the customers be going to
13    the club?
14        MS. ANDREWS:  Objection, form.
15        A.  We got great food.  Our kitchen is open
16    from actually 8:00 o'clock in the morning.  Get
17    ready from 11:00 o'clock to 4:00 a.m.  So we do a
18    great lunch buffet.  People come eat actually for
19    lunch.
20        Q.  Understood.  And are there some
21    customers who come in and then pay for a
22    performance by the entertainers?
23        A.  Yes, sir.
24        Q.  And how would a customer pay for a

Page 15

1     performance from a entertainer?
2         A.  We don't control how he pays, sir, so
3     he choose to pay how he choose to pay for
4     entertainment.
5         Q.  Understood.  So is there a certain
6     price that a customer would pay in order to get a
7     performance from a entertainer?
8         A.  We don't control it.  By standard --
9     industry standard, it's $20 for a lap dance.
10    Industry standard lap dance is $20, but they could
11    charge more or less.
12        Q.  So your testimony is that dancer would
13    charge more or less than the $20 for a lap dance?
14        A.  They can, yes.
15        Q.  Are there any -- other than a lap
16    dance, are there any other types of performances
17    that a customer may purchase?
18        A.  A customer could -- no.  I mean they
19    could tip them on stage, when they're on stage.
20        Q.  Are there any type of private boxes or
21    private rooms where a customer in there pays for a
22    performance?
23        A.  We have rooms, but they're not private
24    rooms.  I have no private rooms.

Page 16

1         Q.  Okay.  But are there some customers who
2     may pay an amount to go into one of these rooms
3     for a performance?
4         A.  Yes.
5         Q.  And is there a standard price that a
6     customer would pay to go into one of those rooms?
7         A.  $20 fee to get in the club or depends
8     when he come in.  And then they could go to
9     different rooms.  Get a lap dance on the main
10    floor or different called VIP area, so get a lap
11    dance where they want to or sit wherever they want
12    to.
13        Q.  I see.  So is there a section of the
14    club that's designated as a "VIP area"?
15        A.  Correct.
16        Q.  Okay.  And does a customer have to pay
17    more to be in that VIP area?
18        A.  They could buy what we call the dance
19    bands, like, $10 of dances in VIP area, but it's
20    open to whoever wants to go in there.  It's not,
21    like, a private room.
22        Q.  Okay.
23        A.  It's a little nicer room.
24        Q.  And when the customers may be paying

Page 17

1  $20 for a lap dance, do they hand the money to an
2  employee of the club or to the dancer?  How do
3  they do that?
4      A.  We have no say so.  That's between the
5  dancer and the customer.
6      Q.  Okay.  And if a customer is to purchase
7  one of those VIP bands for $10, would they hand
8  money over to an employee of the club or to a
9  dancer?
10     A.  The band they can buy at the bar or the
11  manager or waitress or floor men.
12     Q.  And do most of the customers who would
13  pay $20 for a lap dance, do most of them use cash?
14          MS. ANDREWS:  Objection, form.
15     A.  I don't know, but I wouldn't say -- I'd
16  say, yes, but I'm not sure actually.
17     Q.  Is there a way for a customer to use a
18  credit card to pay for -- to pay that $20 for a
19  lap dance?
20     A.  Yes, sir.
21     Q.  How would they do that?
22     A.  They buy, we call them funny money,
23  play money.  Then they tip whoever they want to
24  tip, tip the waitress, tip the bartender or buy

Page 18

1  lap dances.
2      Q.  How would the customer get the funny
3  money or play money?
4      A.  Goes to the waitress or bartender.
5      Q.  And could they then -- just so I
6  understand it, would the customer be using a
7  credit card and saying, for instance, "I want $200
8  of funny money" and then the credit card gets
9  charged?
10          MS. ANDREWS:  Objection, form.
11     A.  Correct.
12     Q.  Is the credit card charge equal in
13  dollar value to the play money or is there some
14  transaction fee?
15     A.  There's a transaction fee.
16     Q.  And what is that transaction fee to the
17  customer?
18     A.  Ten percent.
19     Q.  Okay.  If a waitress or an entertainer
20  has received some of the funny money from a
21  customer, how do they then turn that back into
22  cash?
23     A.  They cash it into the club.
24     Q.  And is there any transaction fee or

Page 19

1  discount to the waitress or entertainer?
2      A.  There's a handling fee of ten percent.
3      Q.  The lap dances that we described, do
4  they last for a single song or is there some other
5  measure of time for a lap dance?
6      A.  The rule of thumb is a lap dance is one
7  song, but, again, that's between the dancer and
8  the customer.  Could be two songs, three songs,
9  but the rule of thumb is one song.
10     Q.  Now, a moment ago you mentioned a stage
11  at the club.  I take it, physically speaking,
12  there's some type of stage; is that right?
13     A.  Correct.
14     Q.  Is the stage in the center of the club
15  or is it off to one side or in the back?
16     A.  We've got six stages throughout the
17  club, sir.
18     Q.  Okay.  And I imagine each stage has
19  some lighting above it; is that accurate?
20     A.  Yes, sir.
21     Q.  Does each stage have sort of the
22  traditional stripper pole on it as well?
23     A.  We only got two of them, two stages
24  that's got stripper poles.

Page 20

1      Q.  Okay.  And a moment or a few minutes
2  ago I think you described a bar inside the club.
3  Does the club sell alcohol?
4      A.  No.  We call them bar because there's a
5  bar, but we don't sell alcohol, sir, no.
6      Q.  Okay.  Is it a BYOB establishment?
7      A.  Correct.
8      Q.  Does the club charge any type of fee if
9  someone were to bring in a bottle of wine or
10  something like that?
11     A.  We don't charge fee, sir.  Just bring
12  liquor, beer and wine.  We sell set-ups.
13     Q.  What is that "set-up"?
14     A.  Coke, water, 7Up, Red Bull,
15  non-alcoholic beer, if they want to choose to do,
16  food, ice.
17     Q.  Got it.  If a customer was bringing in
18  a bottle or two of liquor, how much would they pay
19  for a set-up of those things you described?
20     A.  They don't pay nothing, just if they
21  want to buy a Coke, they buy a Coke or they buy
22  three Cokes and a bottle of water.  We don't
23  charge them set-up.  Bring liquor, beer or wine.
24     Q.  Okay.  Is there a corking fee if

Page 21

1  someone brings wine or champagne?
2      A.  No, sir, we don't.
3      Q.  Do you have any idea of the square
4  footage of the club?
5      A.  The club is the whole building.  It's
6  50,000 square feet, but we don't use but 7,000 or
7  7,500 feet.  That's including the club, dressing
8  rooms, bathrooms, kitchen, offices.
9      Q.  Has PT's Men's Club always operated at
10  this location?
11      A.  No, sir.
12      Q.  How long has it been at this location?
13      A.  Eighteen years.
14      Q.  And does the club lease or rent this
15  property or does it own the property?
16      MS. ANDREWS:  Objection, form.
17      A.  Different corporation owns the
18  property.
19      Q.  What corporation is that?
20      A.  Adventure Plus Enterprises.
21      Q.  Do you have any position with Adventure
22  Plus Enterprises?
23      A.  I'm the president.
24      Q.  Are you also an owner or shareholder of

Page 22

1  that entity?
2      A.  I'm a shareholder.
3      Q.  Does the club also have DJ equipment
4  and sound equipment?
5      A.  Yes, sir.
6      Q.  And was that equipment purchased by the
7  club?
8      A.  Yes, sir.
9      Q.  And after hours is there any type of
10  cleaning crew that comes in to tidy up the club
11  when the customers have left?
12      A.  Yes, sir.
13      Q.  And does the club pay for that cleaning
14  crew?
15      A.  They're employees of the club.
16      Q.  Okay.
17      A.  Their job is come and clean before the
18  club opens.
19      Q.  Got it.  If there's any necessary
20  maintenance on the club, such as plumbing or
21  electrical work, the club would pay for that?
22      A.  Yes, sir.
23      Q.  Does the club have a website?
24      A.  I think we do, yes.

Page 23

1      Q.  Is there any particular employee of the
2  club who's responsible for the website?
3      A.  Yes.
4      Q.  Who is that?
5      A.  Another manager.  That's his job is for
6  the website.
7      Q.  And what's his name?
8      A.  Ambrose Martinez.  He works for other
9  people, but he does ours, too.
10      Q.  Okay.  Is the club on Facebook or
11  Instagram?
12      A.  Sir, I'm a flip phone type of guy, so
13  if you can tell, that's why I ask Monterez, I
14  said, "What do I do here?  Because if you leave
15  the room," you guys might not be able to hear me.
16  I'm definitely an old timer.  I have not changed
17  with times, let's put it this way.
18      Q.  Understood.  Well, we'll reserve that
19  question for one of the other managers at some
20  point.  Thank you.
21      Putting aside anything on the internet,
22  does the club do any type of advertising?
23      A.  Not really.  We used to do radio,
24  advertise billboard, but not no more we don't.

Page 24

1      Q.  About when did you stop doing the radio
2  and billboard ads?
3      A.  At least about seven, eight years ago.
4      Q.  And why is it that you stopped?
5      A.  It didn't work.  It was not worth the
6  money, let's put it this way.
7      Q.  Got it.  I understood from your
8  testimony earlier there's someone who's employed
9  as the kitchen manager; is that right?
10      A.  Yes, sir.
11      Q.  And does he or she have
12  responsibilities to hire the kitchen crew?
13      A.  He's responsible for hiring the kitchen
14  crew, that's it.
15      Q.  Okay.  And would the kitchen manager
16  also be responsible for choosing the menu and
17  deciding what food is going to be put out?
18      A.  That would be between the GM and him
19  and me.
20      Q.  Mr. Mehmeti, have you ever been
21  involved in the process by which a new entertainer
22  begins work at the club?
23      A.  I'd say about 20 years ago.
24      Q.  Okay.  Currently is there any type of

Case 3:21-cv-01636-N    Document 58    Filed 07/26/22    Page 47 of 102    PageID 892

Julie Predmore vs.
Nick's Management, Inc.                                                    March 09, 2022

Page 25

1  application that entertainers must fill out before
2  they begin their affiliation with the club?
3       MS. ANDREWS:  Objection, form.
4    A.  There's a License Agreement they have
5  to fill out and sign before they come in.
6       Q.  Is there any type of audition that's
7  required before they begin?
8    A.  I'm not sure.
9       Q.  Are there any type of requirements that
10  someone must be in order to be an entertainer?
11       MS. ANDREWS:  Objection, form.
12    A.  Sort of, yes.
13       Q.  And what types of requirements?
14    A.  Well, they got to be old enough --
15       Q.  Sure.
16    A.  -- to be a dancer.  They have to have a
17  -- we do a background check on all management,
18  entertainers.  Fingerprints and all through the
19  State of Texas.
20       Q.  Other than the age requirement and
21  background check and fingerprints, are there any
22  other requirements that the club would require
23  before someone began work as an entertainer?
24       MS. ANDREWS:  Objection, form.

Page 26

1    A.  Well, they got -- we try to make sure
2  they're representable.
3       Q.  In other words, the club I assume is
4  concerned that the person is attractive or good
5  looking; is that fair to say?
6       MS. ANDREWS:  Objection, form.
7    A.  I would like to be attractive, they're
8  entertainers, but not necessarily.
9       Q.  Does the club require that the
10  entertainers have any previous experience?
11    A.  No, sir.
12       Q.  Mr. Mehmeti, you mentioned there are
13  stages at the club, correct?
14    A.  Correct.
15       Q.  How is it determined which stage the
16  entertainers will be on, which entertainers will
17  be on the stage?
18    A.  We have an entertainers list.  Like I
19  said, we got six stages and it depends how many
20  entertainers or contractors are in the building,
21  that's how many stage we got going, but it's not
22  any set the way of six stages all filled up
23  because it depends how many entertainers are in
24  the building at the time.

Page 27

1       Q.  Got it.  So there may be a time --
2    A.  Can you guys see me because the lights
3  went out in the office?
4       Q.  We can still see you.  It does look
5  darker though.
6    A.  I guess we got the energy savings,
7  so...
8       MS. ANDREWS:  You have to move to make
9  it come on.
10       Q.  I thought maybe Latrice's office hadn't
11  paid their electric bill, but it seems like it's
12  still working.
13    A.  She just wants to hide me.
14       Q.  I take it from your prior answer then
15  there may be a time when given the number of
16  dancers, there are only three stages that are
17  being used at a given time; is that fair to say?
18    A.  It could be one stage or it could be no
19  stage at any given time, so...
20       Q.  And does every entertainer who's there
21  during a shift get up on the stage at some point?
22    A.  Yes, sir, if they want to.  They don't
23  ever have to.
24       Q.  So there are some entertainers who

Page 28

1  don't go up on the stage?
2    A.  Some choose not to go, correct.
3       Q.  And that's the choice of the dancers is
4  your testimony?
5    A.  Correct.
6       Q.  And those who don't go up on stage, do
7  they have to pay any additional type of fee or
8  anything like that?
9    A.  I'm not sure about that, sir.
10       Q.  Ms. Predmore, my client, as we talked
11  about, was an entertainer who was affiliated with
12  the club in 2019.  Does the club have any record
13  of the amounts that she received from customers
14  for her work at the club?
15    A.  Sir, we don't keep track of that.  We
16  don't keep track how much everybody makes.
17       Q.  Okay.  And I understand then the club
18  wouldn't keep track of the amount that an
19  individual gets or made.  Does the club keep track
20  of the total amount collected by dancers during a
21  particular shift?
22    A.  No, sir.
23       Q.  So there's no record of how much money
24  is generated by the entertainers on a given day?

Page 29

1     A. No, sir.
2     Q. So those amounts aren't reported in any
3  type of tax form or filing of the club?
4     A. We don't because it's -- we don't get
5  the money.
6     Q. I understand.  Mr. Mehmeti, I think you
7  mentioned earlier, the entertainers are treated as
8  contractors; is that right?
9     A. Correct, they are contractors.
10    Q. Has the club ever hired an entertainer
11 as a W-2 employee?
12    A. We give them a check.  Yes, we have
13 hired W-2 employees.
14    Q. Are there any entertainers currently
15 working for the club as W-2 employees?
16    MS. ANDREWS:  Objection, form and
17 relevance.
18    A. No, sir.
19    Q. When was it that the club last hired an
20 entertainer as a W-2?
21    A. We give them a choice when they come
22 in, sign the License Agreement, "Do you want to be
23 a contractor or employee," so they get to choose.
24    Q. And when was it that the club last

Page 30

1  employed an entertainer as a W-2 employee?
2     A. I'd say at least about 25 years ago.
3     Q. Did you say four or five years ago?
4     A. Twenty-five years ago.
5     Q. Twenty-five.  Sorry.
6     MR. THOMSON:  I'm going to take a
7  short break and get a glass of water and get
8  organized.  Maybe we can come back in five
9  minutes, roughly at 10:45 Central Time.
10    MS. ANDREWS:  Yes.  That works.
11    MR. THOMSON:  Thank you.
12    (Recess taken.)
13 BY MR. THOMSON:
14    Q. I have a few more questions for you,
15 Mr. Mehmeti.  Earlier I think you mentioned that
16 one of the positions at the club is a DJ; is that
17 right?
18    A. Yes, sir.
19    Q. What are the job duties of a DJ?
20    A. He is one that introduces the
21 entertainers on stage, keep track of the list of
22 entertainers who's on, ready to go to dance on
23 stage, plays the music more importantly to the
24 liking of entertainment, and the ASCAP BMI rules,

Page 31

1  music we're allowed to play, not to play.
2     Q. So who is it that chooses what music is
3  playing at a particular time at the club?
4     A. The DJs actually bring their own
5  laptop.  Equipment is all ours, but they usually
6  bring their own laptop.  The music the DJ plays,
7  it's according to the girls, the girls like to
8  play, but also it's got to be on the list of ASCAP
9  BMI licensing fee because if it's not, they cannot
10 play it.  The club cannot play it.  The DJ cannot
11 play it.
12    Q. And the DJ is an employee of the club;
13 is that right?
14    A. Correct.
15    Q. Is there a position at the club known
16 as "house mom"?
17    A. Yes, sir.
18    Q. What is a house mom?
19    A. House mom is the lady in the dressing
20 room that really takes care of the entertainers
21 from the minute they come in to the minute they
22 leave, their whole shift.
23    Q. Is the house mom an employee of the
24 club?

Page 32

1     A. No, sir.
2     Q. How is the house mom paid then?
3     A. We don't pay the house mom.  The house
4  mom is really a servant to the entertainers.
5  They're there to supply the entertainers whatever
6  their needs from whatever the need is for them,
7  wash their clothes, dry their clothes, fix their
8  hair, makeup.  All the money they choose to give
9  them.  Water, soda, drinks, whatever they need,
10 iron their clothes, wash their clothes.
11    Q. Got it.  I imagine though the house mom
12 is not a volunteer position, so she must be
13 getting paid by someone, correct?
14    MS. ANDREWS:  Objection.
15    A. We don't pay her.  We don't pay her.
16 She's not getting paid.  She's not an employee of
17 the club.
18    Q. Got it.  So the club is not paying the
19 house mom; is that right?
20    A. Correct.
21    Q. Do you know if the dancers pay the
22 house mom anything?
23    A. That's between the dancer and house
24 mom.

---

Page 33

1    Q.  Do you know how much the house mom
2  earns on a given shift?
3    A.  I really don't know, sir.  I don't
4  count their money.
5    Q.  Have you ever discussed with any
6  managers a suggested amount the dancers should pay
7  to the house mom each shift?
8        MS. ANDREWS:  Objection, form.
9    A.  I do not, no.
10    Q.  So is your testimony you have no idea
11  how much the house mom could earn on a shift, some
12  dancers might pay her $100 and some might pay her
13  $2?
14    A.  The dancers don't pay the house mother.
15  They tip them, but it's not mandatory.  It's
16  voluntary because, like I said, they give a lot of
17  service.  They do a lot of service to the
18  entertainers.
19    Q.  How is the house mom chosen?
20    A.  They talk to the GM.  There's three,
21  four, five different house moms.  They make sure
22  they come in.  Their job is to take care of the
23  girls.
24    Q.  So the general manager would decide who

---

Page 34

1  was working as a house mom?
2        MS. ANDREWS:  Objection, form.
3    A.  There is more than one, so we -- we
4  just make sure that there is one.  It's necessary
5  that there's one there, somebody to take care of
6  the girls back there.
7    Q.  Has the club ever had to terminate a
8  house mom?
9        MS. ANDREWS:  Objection, form.
10    A.  I'm not sure because I'm not manager on
11  the shift on daily basis.
12    Q.  Have you ever been involved in the
13  hiring of a house mom?
14        MS. ANDREWS:  Objection, form.
15    A.  Yes.  When I was day-to-day manager
16  about 15, 20 years ago, and they used to be
17  employees of the club at the time.
18    Q.  I see.  When was it that the house moms
19  ceased being an employee of the club?
20    A.  I'd say about 20 years ago.
21    Q.  Did you say about 20 years ago?
22    A.  Yes, sir.
23    Q.  And was it your decision to take the
24  house mom from an employee position to this new

---

Page 35

1  type of position where she's paid by the dancers?
2    A.  It became kind of industry standard
3  basically nationwide.  Same time that entertainers
4  became -- as I said earlier, all our entertainers
5  -- my entertainer about 20 years ago were my
6  employees.  They all got paid.  We all paid them,
7  house moms and entertainers.  They all got paid.
8  They were employees.
9    Q.  And who was it who made the decision, I
10  understand it was maybe 20 years ago, for the
11  dancer position to be -- to no longer be an
12  employee position?
13    A.  Obviously it had to be me making that
14  kind of decision with my GMs, but it was industry,
15  went from employees to contractors actually about
16  15 years ago actually.  And don't quote me on
17  exact date but give or take.
18    Q.  And how is it -- why is it that you
19  made that decision?
20    A.  The industry went that way.  We follow
21  the industry, sir.
22    Q.  How is it that you learned the industry
23  was going that way?  Were you at conferences or
24  something like that?

---

Page 36

1        MS. ANDREWS:  Objection, form.
2    A.  Well, there's --
3        MS. ANDREWS:  I'm going to instruct
4  the witness not to answer to the extent it
5  invades the attorney/client privilege or would
6  divulge an attorney/client communication.
7        You can go forward, but if it's
8  referencing anything with your communications
9  of counsel at the time, then don't say anything
10  further.
11        THE WITNESS:  Okay.
12    Q.  I'll just repeat the question then.  I
13  obviously agree with Attorney Andrews'
14  instruction, but I'm not asking you for anything
15  you said to lawyers or lawyers said to you, but to
16  the extent you can answer it, why is it that you
17  made the decision 15 or 20 years ago to take
18  dancers from employee position and make them a
19  contractor position?
20    A.  Because we really start not having
21  control.  The girls come and go, it's hard to keep
22  track of it, so we just made them contractor.
23  They come and they go when they want to leave,
24  they want choose to work when they want to work.

---

Page 37

1      Q.  Mr. Mehmeti, earlier we discussed the
2  management team.  I understand there's a handful
3  of employees at the club who are managers and are
4  paid salaries; is that right?
5      A.  Correct.
6      Q.  Who were the managers in 2019?
7      A.  Todd Williams is one of them.  Got a
8  bunch of new guys there right now.  2019 -- the
9  only people being 2019 that are still there would
10  be two other managers.
11      Q.  And what are their names?
12      A.  Jesse and Bear.
13      Q.  And what is Bear's real name, if you
14  know it?
15      A.  Gerardo Cordova.
16      Q.  In 2019, was there a manager at the
17  club named Mike?
18      A.  Sir, I have a lot of managers that come
19  and go, especially the last two or three years.  I
20  had a young man named Mike.  The guy's last
21  name -- he's no longer there, I know that.
22      Q.  Do you recall his last name?
23      A.  No, I don't.
24      Q.  Is it possible there was a dayshift

Page 38

1  manager in 2019 named Mike?
2          MS. ANDREWS:  Objection, form.
3      A.  It would be possible, and I know I had
4  a young man called Mike, but I don't remember if
5  he worked days or nights.  I'm not sure.
6      Q.  Okay.  If they're -- because the
7  managers are W-2 employees, I take it the club
8  could look back at records from 2019 and figure
9  out who was employed then?
10      A.  Yes, sir.
11      Q.  Once an entertainer arrives and begins
12  working, is there any type of standard for her
13  dress or attire the club would enforce?
14          MS. ANDREWS:  Objection, form.
15      A.  Not standard.  I mean they wear what
16  they want to, lingerie, shorts, t-backs.  They
17  wear what they want to wear, make sure they look
18  proper, but there's no standard actually.
19      Q.  Does the club have any requirement that
20  the entertainers have to wear heels of a certain
21  height or anything like that?
22      A.  No, sir.  No.
23      Q.  Does the club require dancers to remove
24  or cover body piercings?

Page 39

1      A.  Well, if you ask me this question
2  30 years ago, I'd say, yes, but now, if you
3  require to remove body piercing, we have nobody
4  left in the building.
5      Q.  At one time there was a requirement
6  that dancers would have to remove piercings before
7  they worked?
8      A.  Actually, because I happened to be the
9  manager then, again, there were employees then, we
10  pay them, they got paid hourly, and if they had a
11  tattoo, they could not work in our clubs -- club,
12  but now that change.  Like, say if we don't have
13  -- we'd have no entertainers, no females on the
14  staff.
15      Q.  So is there any requirement now that
16  dancers must cover certain tattoos?
17      A.  No, sir.  No.
18      Q.  Are there any standards in terms of a
19  dancers' behavior once they're out on the floor?
20          MS. ANDREWS:  Objection, form.
21      A.  I mean we have no standard.  I have
22  certain behavior.  We definitely don't want the
23  girls to go crazy on the floor or -- no, there's
24  no standard, but we definitely -- if they

Page 40

1  misbehave, we want them in the dressing room, stay
2  in the dressing room.
3      Q.  Have there been instances when dancers
4  misbehaved and were sent back into the dressing
5  room?
6          MS. ANDREWS:  Objection.
7      A.  I don't give -- yes.
8      Q.  Have there been instances when the club
9  terminated or fired an entertainer?
10          MS. ANDREWS:  Objection, form.
11      A.  No, we didn't fire.  They're not
12  employee, but we terminated the contract, what
13  they can do.
14      Q.  And what might the reasons be that the
15  club would terminate the contract of an
16  entertainer?
17      A.  For drugs.  Drugs and drugs.
18      Q.  Any other reason in the last three
19  years that the club has terminated a contract
20  other than drug use?
21      A.  Drug use, getting drunk and fighting
22  with other employees or customers.
23      Q.  Are the dancers allowed to chew gum out
24  on the dance floor, if they want?

Page 41

1   A.  Yes.  I guess, yes.
2      Q.  Are dancers allowed to bring their
3   cell. phone out on the floor with them?
4      A.  Yes, sir.
5      Q.  As the owner of the club, is there a
6   particular type of theme or atmosphere that you
7   try to create for customers?
8         MS. ANDREWS:  Objection, form.
9      A.  Not theme, but we like to play upbeat,
10  happy music, but, no, we don't have certain theme.
11     Q.  Earlier, Mr. Mehmeti, we spoke about
12  the hours that the club is open.  Who is it who
13  sets those hours?
14     A.  That'd be myself.
15     Q.  And, I take it, you know, around the
16  stage and in the VIP area, there's furniture in
17  the club; is that right?
18     A.  Correct.
19     Q.  Are there chairs and couches and that
20  sort of stuff?
21     A.  Both, yes, sir, chair, tables, couches,
22  sofas.
23     Q.  And those were purchased by the club?
24     A.  Correct.

Page 42

1      Q.  Over the past three years, has the club
2   ever advertised to get new entertainers to come?
3      A.  I'm not sure, sir.  We don't advertise
4   on paper, I know that for sure.
5      Q.  Okay.
6      A.  We used to.  Used to a long time ago,
7   but we don't do it anymore.
8      Q.  I'm just going to bring up a document
9   or two, if you'll give me a second.
10     A.  Okay.  Sorry, guys, I lost my light
11  again.  The time is up.
12     Q.  Mr. Mehmeti, can you see a document
13  that's been shared on the screen?
14     A.  Yes, sir.  Let me put on my glasses.
15     Q.  Sure.
16     A.  Yes, sir.
17     Q.  And I'm just going to say for
18  identifying purposes, this is a single page
19  document.  It's Bates numbered R0021.
20     A.  Yes, sir.
21     Q.  Mr. Mehmeti, my first question is just
22  whether you recognize this type of document?
23     A.  That's a sign-in sheet.  I cannot read
24  -- Julia Predmore.  That's a sign-in sheet.  The

Page 43

1   entertainer comes in, exactly I see, $15, 5:47,
2   7:30, 40 sign up.
3      Q.  Got it.  And what is that $15 that you
4   just read off, what is that?
5      A.  That's house fees, rental fees.
6      Q.  That was an amount paid by Ms. Predmore
7   to the club?
8      A.  Yes, sir.
9      Q.  And then the second to last column,
10  Contract Damages Collected, do you see that it
11  says 40?
12     A.  Correct.
13     Q.  What are "Contract Damages"?
14     A.  As we said, the girls make their own
15  hours.  They can come and go whenever they want
16  to.  If they leave early before the shift ends per
17  the Contract Agreement/License Agreement, they pay
18  a fee.  They could leave, like I said, whenever
19  they want to.  That $40 is damages of her
20  contract, so she didn't finish the shift.
21     Q.  Got it.  I'm just going to show one
22  more document.  Mr. Mehmeti, can you see another
23  document on the screen?
24     A.  Yes, sir.

Page 44

1      Q.  I'm just going to state, for
2   identification purposes, this is a document
3   titled, Declaration of Julia Predmore in Support
4   of Plaintiff's Motion For Conditional
5   Certification.
6      A.  Okay.
7      Q.  The date on this document indicates it
8   was filed in court in July of 2020.  I just have
9   one question for you, Mr. Mehmeti.  I'm going to
10  move down in the document briefly.
11        In Paragraph 16, Mr. Mehmeti, it says,
12  "I was also required to pay a service and supply
13  fee of $24 each shift to the house mom, $10 of the
14  fee went to the house mom, $10 to the DJ and $4 to
15  the bartender"; did I read that correctly?
16     A.  Yes, you read correctly.
17     Q.  Are you familiar with any term at the
18  club as "Service and Supply Fee"?
19     A.  They're not mandatory, but there's,
20  like as we said, service the house mothers.  The
21  house mothers and DJs, they really work for --
22  they're there to take care of the entertainers.
23  They put a lot of effort to take care of the
24  entertainers, so there's not mandatory certain

Page 45

1  fee.  They could pay -- they could tip them $20,
2  $30, $50.  They could tip them nothing.
3      Q.  Understood.  So do you have any reason
4  to dispute Ms. Predmore's testimony that she was
5  paying $24 per shift?
6      A.  I'm not saying I'm wrong or not.  She
7  could be -- she could be tipping a lot more.
8  There's days I know they tip $20, $30, $40.  I
9  don't know what they tip.  I'm not there.  And
10 managers are there, okay, "give me this" or "give
11 me that," you know, so she claims she had to tip
12 out $24, so that's what she claimed.  I don't know
13 what she tip.
14     Q.  Okay.  Do you have any reason to
15 dispute her testimony that when she tipped $24
16 that it was split $10 to house mom, $10 to DJ and
17 $4 to bartender?
18         MS. ANDREWS:  Objection, form.
19     A.  I'm not sure how it split up, sir, or
20 what she tipped or exactly when right now.
21         MR. THOMSON:  Okay.  If it's all
22 right, I'm going to take another five-minute
23 break, come back, let's just say, 11:20 Central
24 Time.

Page 46

1          MS. ANDREWS:  Okay.  Sounds good.
2          (Recess taken.)
3  BY MR. THOMSON:
4      Q.  Mr. Mehmeti, I just have a few more
5  questions for you.
6          When a new entertainer begins at the
7  club, does she have any training that she
8  undergoes?
9      A.  Not really.  No, sir.  No.
10     Q.  Who would know that?
11     A.  I guess the manager know, but I know
12 there's no training for the entertainers.  There's
13 training for waitresses, bartenders, managers, but
14 not entertainers.
15     Q.  So your testimony is, there is no
16 training for new entertainers?
17     A.  They walk in and the management show
18 them the building, the stages, the whole club
19 operation, what is where, but there is no training
20 for entertainers.
21     Q.  Okay.  Earlier I think you mentioned,
22 Mr. Mehmeti, there is a space at the club that you
23 referred to as the locker room; is that right?
24     A.  Dressing room, yes.

Page 47

1      Q.  Who uses the locker room or dressing
2  room?
3      A.  Oh, I'm sorry.  I didn't hear.
4      Q.  That's fine.  My question was, who uses
5  the locker room or dressing room?
6      A.  The entertainers mostly, the
7  waitresses.  The house mother is there.  I mean
8  everybody goes in and out, other employees, but
9  really is for waitresses and entertainers.
10     Q.  Okay.  Does the club ever post any
11 signs to communicate, like, information to the
12 entertainers or waitresses in the locker room?
13     A.  There's signs there I know for sure
14 that -- for human trafficking.  I know those are
15 signs there for sure.
16     Q.  Any other signs you can recall in the
17 locker room?
18     A.  I'm not sure, sir.
19     Q.  We spoke earlier, Mr. Mehmeti, about a
20 main entrance where the customers enter the club;
21 is that right?
22     A.  Correct.
23     Q.  Do the entertainers when they arrive
24 for their shift, do they go through the same

Page 48

1  entrance or a different entrance?
2      A.  Same entrance.  They're supposed to go
3  same entrance, but there's a back door.  Sometimes
4  they come in.  You know, it's open all the time
5  while we're open, but they're supposed to come
6  through front door.
7      Q.  Why is it that they're supposed to come
8  through the front door?
9      A.  Because we want everybody coming in the
10 front door, who's coming and who's going.  There's
11 an emergency door right back in the dressing room.
12 We have six emergency doors.  They could come
13 through that, but they come through the front
14 door.  Actually, yes, they do because they valet
15 the cars.  Some they valet, and the valets park
16 right up front by the front door.
17     Q.  Got it.  I'm just going to bring up
18 another document.
19     A.  Okay.
20     Q.  And let me go to the top of this
21 document.  This is the same document that we
22 looked at a moment ago.  I forgot to say this
23 earlier, but this will be Mehmeti Deposition
24 Exhibit 2.  This is the document titled,

## Page 49

1  Declaration of Julia Predmore in Support of the
2  Plaintiff's Motion for Conditional Certification.
3  I'm just going to move down a little.
4      Mr. Mehmeti, I'm highlighting Paragraph
5  -- excuse me. Hold on. Let me find it.
6  Paragraph 13, I'm going to read it out loud and
7  just ask you if I've read it correctly. Paragraph
8  13 in Ms. Predmore's Declaration says, "PT's also
9  had rules for dancers' appearance. I was required
10  to have my hair down while working and was not
11  applied to have facial piercings." I think that's
12  a typo. "Dancers were also not allowed to chew
13  gum. PT's managers charged dancers fines of $80
14  to $100 for violating these rules and could send
15  dancers home."
16      A. That's not true, sir. That's not true.
17      Q. So my first question is, did I read
18  that accurately?
19      A. You read that very good, but that's not
20  true.
21      Q. So were there ever instances when the
22  club would charge dancers fines?
23      MS. ANDREWS: Objection, form.
24      A. I'm not sure, but I don't think so.

## Page 50

1  Charge a fine for chewing gum? No. Absolutely
2  not.
3      Q. Okay. Could PT's managers send dancers
4  home if they didn't think they were exhibiting the
5  right behavior or attire?
6      A. As we talked earlier, they were sent
7  home if they were intoxicated, if they were doing
8  drugs, if they're doing things they were not
9  supposed to do in the club, they would be sent
10  home for the shift, yes, for the rental period
11  that they were there or came in.
12      Q. Did the managers ever require
13  entertainers to wear their hair a certain way?
14      A. No, sir. No.
15      Q. Are you aware of an entertainer ever
16  being fined for not wearing her hair a certain way
17  or for chewing gum?
18      A. I'm not sure about that, sir.
19      Q. Just give me one moment.
20      A. Okay.
21      MR. THOMSON: I do not have any
22  additional questions, Ms. Andrews, I don't know
23  if you have anything.
24      MS. ANDREWS: Just a couple.

## Page 51

1      CROSS EXAMINATION
2  BY MS. ANDREWS:
3      Q. Mr. Mehmeti, are you appearing here in
4  your individual capacity?
5      A. I'm appearing on behalf of PT's Men's
6  Club as president.
7      Q. The deposition noticed you as Nick
8  Mehmeti, correct?
9      A. Yes, ma'am.
10      Q. Okay. And there weren't specific
11  topics that you were supposed to prepare for,
12  correct?
13      A. Yes, ma'am.
14      Q. And so today you just testified to the
15  best of your knowledge?
16      A. Yes, I did.
17      Q. And with your best recollection?
18      A. Yes, I did, ma'am.
19      Q. Okay.
20      MS. ANDREWS: With that, I pass the
21  witness.
22      MR. THOMSON: Okay. Nothing more from
23  me, so we can go off the record, unless the
24  court reporter needs to add anything else.

## Page 52

1      THE STENOGRAPHER: Can I just ask on
2  the record who wants to order a copy of the
3  transcript?
4      MR. THOMSON: Yes. The Claimant will
5  order a pdf copy, regular print and mini print,
6  please.
7      MS. ANDREWS: And the same, I just
8  prefer a condensed version.
9      THE STENOGRAPHER: Okay.
10      (Exhibits 1 and 2 marked
11      for identification)
12      (Whereupon, the deposition concluded
13  at 12:30 p.m.)

Page 53

```
 1          CERTIFICATE
 2   Commonwealth of Massachusetts
 3   Suffolk ss.
 4
 5        I, Julie A. Mercier, Registered
 6   Professional Reporter and Notary Public in and
 7   for the Commonwealth of Massachusetts, do
 8   hereby certify that NICK MEHMETI, the witness
 9   whose deposition is hereinbefore set forth, was
10   duly sworn by me and that such deposition is
11   transcribed to the best of my ability.
12        I further certify that I am neither related
13   to or employed by any of the parties in or
14   counsel to this action, nor am I financially
15   interested in the outcome of this action.
16
17        In witness whereof, I have hereunto set my
18   hand and seal this _____ day of
19   _____, 2022.
20
21
22                Notary Public
23   My commission expires:
24   September 2, 2022
```

Page 54

```
 1       ERRATA SHEET DISTRIBUTION INFORMATION
 2   DEPONENT'S ERRATA SHEET & SIGNATURE
 3            INSTRUCTIONS
 4       ERRATA SHEET DISTRIBUTION INFORMATION
 5
 6        The original of the Errata Sheet has been
 7   delivered to Latrice Andrews, Esq.
 8        When the Errata Sheet has been completed by
 9   the deponent and signed, a copy thereof should be
10   delivered to each party of record and the ORIGINAL
11   forwarded to Matthew Thomson, Esq. to whom the
12   original deposition transcript was delivered.
13
14            INSTRUCTIONS TO DEPONENT
15        After reading this volume of your
16   deposition, please indicate any corrections or
17   changes to your testimony and the reasons
18   therefore on the Errata Sheet supplied to you and
19   sign it.  DO NOT make marks or notations on the
20   transcript volume itself.  Add additional sheets
21   if necessary.  Please refer to the above
22   instructions for errata sheet distribution
23   information.
24
```

Page 55

```
 1   PLEASE ATTACH TO THE DEPOSITION OF NICK MEHMETI
 2   CASE:  PREDMORE v. NICK's MANAGEMENT
 3   DATE TAKEN:  MARCH 9, 2022
 4        ERRATA SHEET
 5   Please refer to page 54 for errata sheet
 6   instructions and distribution instructions.
 7   PAGE    LINE  CHANGE   REASON
 8   _____
 9   _____
10   _____
11   _____
12   _____
13   _____
14   _____
15        I have read the foregoing transcript of my
16   deposition and except for any corrections or
17   changes noted above, I hereby subscribe to the
18   transcript as an accurate record of the statements
19   made by me.            Executed
20   this ____ day of _____, 2022.
21
22
23        _____
24             NICK MEHMETI
```

**Exhibits**

**MehmetiExh1**
3:9
**MehmetiExh2**
3:11 48:24

**$**

**$10**
16:19 17:7
44:13,14
45:16
**$100**
33:12 49:14
**$15**
43:1,3
**$2**
33:13
**$20**
12:21 15:9,10,
13 16:7 17:1,
13,18 45:1,8
**$200**
18:7
**$24**
44:13 45:5,12,
15
**$30**
45:2,8
**$4**
44:14 45:17
**$40**
43:19 45:8
**$50**
45:2
**$80**
49:13

**1**

**10601**
9:3
**10:45**
30:9
**11:00**
14:2,17
**11:20**
45:23
**12:00**
14:3
**13**

49:6,8
**15**
34:16 35:16
36:17
**16**
44:11
**1701**
4:8
**1983**
8:9

**2**

**2**
48:24
**20**
24:23 34:16,
20,21 35:5,10
36:17
**2019**
9:17,21,24
10:4,18 11:24
28:12 37:6,8,
9,16 38:1,8
**2020**
44:8
**25**
30:2
**2:00**
14:2,5

**3**

**30**
39:2

**4**

**40**
43:2,11
**4:00**
14:6,17

**5**

**50,000**
21:6
**5:47**
43:1

**7**

**7,000**
21:6

**7,500**
21:7
**75**
11:22
**7:30**
43:2
**7up**
20:14

**8**

**85**
11:22
**8:00**
14:16

**A**

**a.m.**
14:2,3,5,6,17
**accurate**
19:19
**accurately**
49:18
**acknowledge**
4:11,15
**activities**
8:18,22
**addition**
6:10
**additional**
28:7
**address**
9:2
**administered**
4:16
**ads**
24:2
**adult**
14:9
**Adventure**
21:20,21
**advertise**
23:24 42:3
**advertised**
42:2
**advertising**
23:22
**affiliated**
7:19 9:17,20
28:11
**affiliation**
25:2

**afternoon**
12:23
**age**
25:20
**agree**
5:3,5 36:13
**agreement**
4:22,23 25:4
29:22 43:17
**Agreement/**
**license**
43:17
**alcohol**
20:3,5
**allowed**
31:1 40:23
41:2 49:12
**Ambrose**
23:8
**amount**
12:19 16:2
28:18,20 33:6
43:6
**amounts**
28:13 29:2
**And/or**
9:6
**Andrews**
5:4 8:20
14:10,14
17:14 18:10
21:16 25:3,11,
24 26:6 27:8
29:16 30:10
32:14 33:8
34:2,9,14
36:1,3 38:2,14
39:20 40:6,10
41:8 45:18
46:1 49:23
**Andrews'**
36:13
**answering**
6:4
**anymore**
42:7
**appearance**
49:9
**appearing**
4:7
**application**
25:1

**applied**
49:11
**Approximately**
7:1 11:20
**arbitration**
5:22
**area**
16:10,14,17,
19 41:16
**arrangement**
4:20
**arrive**
47:23
**arrives**
38:11
**ASCAP**
30:24 31:8
**assume**
26:3
**atmosphere**
41:6
**attention**
9:21
**attire**
38:13
**Attorney**
5:2,4 36:13
**attorney/client**
36:5,6
**attorneys**
4:10
**attractive**
26:4,7
**audition**
25:6

**B**

**back**
9:17 18:21
19:15 30:8
34:6 38:8 40:4
45:23 48:3,11
**background**
25:17,21
**backs**
11:19
**band**
17:10
**bands**
16:19 17:7
**bar**

11:19 17:10
20:2,4,5
**bartender**
17:24 18:4
44:15 45:17
**bartenders**
11:18 46:13
**basically**
35:3
**basis**
34:11
**Bates**
42:19
**bathrooms**
21:8
**Bear**
37:12
**Bear's**
37:13
**beer**
20:12,15,23
**began**
25:23
**begin**
5:1 25:2,7
**begins**
24:22 38:11
46:6
**behavior**
39:19,22
**bill**
27:11
**billboard**
23:24 24:2
**BMI**
30:24 31:9
**body**
38:24 39:3
**bottle**
20:9,18,22
**Boulevard**
4:8
**boxes**
15:20
**break**
6:17 30:7
45:23
**briefly**
44:10
**bring**
20:9,11,23
31:4,6 41:2

42:8 48:17
**bringing**
20:17
**brings**
21:1
**buffet**
14:18
**building**
21:5 26:20,24
39:4 46:18
**Bull**
20:14
**bunch**
37:8
**busboy**
11:19
**businesses**
7:7
**buy**
16:18 17:10,
22,24 20:21
**BYOB**
20:6

———————
**C**
———————
**call**
16:18 17:22
20:4
**called**
5:10 16:10
38:4
**card**
17:18 18:7,8,
12
**care**
31:20 33:22
34:5 44:22,23
**cars**
48:15
**case**
7:5,13 9:15
**cash**
17:13 18:22,
23
**ceased**
34:19
**cell**
41:3
**center**
19:14
**Central**
30:9 45:23

**Certification**
44:5 49:2
**chair**
41:21
**chairs**
41:19
**champagne**
21:1
**change**
39:12
**changed**
23:16
**charge**
10:10 12:11,
15,17,20 13:3
15:11,13
18:12 20:8,11,
23 49:22
**charged**
12:15 18:9
49:13
**check**
25:17,21
29:12
**chew**
40:23 49:12
**choice**
28:3 29:21
**choose**
15:3 20:15
28:2 29:23
32:8 36:24
**chooses**
31:2
**choosing**
24:16
**chosen**
33:19
**Claimant**
5:3,11
**claimed**
45:12
**claims**
45:11
**clean**
22:17
**cleaning**
22:10,13
**client**
28:10
**close**
14:5

**clothes**
32:7,10
**club**
7:14,19,23
8:2,11,16,19,
23 9:12,17,20,
23 10:11,21
11:1,11,13,17,
21 12:3,7,9
13:8,16,17
14:1,9,13
16:7,14 17:2,8
18:23 19:11,
14,17 20:2,3,8
21:4,5,7,9,14
22:3,7,10,13,
15,18,20,21,
23 23:2,10,22
24:22 25:2,22
26:3,9,13
28:12,14,17,
19 29:3,10,15,
19,24 30:16
31:3,10,12,15,
24 32:17,18
34:7,17,19
37:3,17 38:7,
13,19,23
39:11 40:8,15,
19 41:5,12,17,
23 42:1 43:7
44:18 46:7,18,
22 47:10,20
49:22
**clubs**
39:11
**code**
12:13
**Coke**
20:14,21
**Cokes**
20:22
**collected**
28:20 43:10
**Collins**
4:8
**column**
43:9
**Commonwealth**
4:5
**communicate**
47:11

**communication**
36:6
**communications**
36:8
**concerned**
26:4
**Conditional**
44:4 49:2
**conferences**
35:23
**confused**
11:5
**consent**
4:19
**contract**
13:15 40:12,
15,19 43:10,
13,17,20
**contractor**
29:23 36:19,
22
**contractors**
26:20 29:8,9
35:15
**control**
15:2,8 36:21
**cooks**
11:18
**Cordova**
37:15
**corking**
20:24
**corporation**
21:17,19
**correct**
7:20 8:12,24
9:18 12:8
13:1,8,9 16:15
18:11 19:13
20:7 26:13,14
28:2,5 29:9
31:14 32:13,
20 37:5 41:18,
24 43:12
47:22
**correctly**
44:15,16 49:7
**couches**
41:19,21
**counsel**

4:19 5:10 36:9
**count**
33:4
**couple**
7:10
**court**
6:6 44:8
**cover**
12:11,15,17,
19 13:2 38:24
39:16
**crazy**
39:23
**create**
41:7
**credit**
17:18 18:7,8,
12
**crew**
22:10,14
24:12,14
**customer**
14:24 15:6,17,
18,21 16:6,16
17:5,6,17
18:2,6,17,21
19:8 20:17
**customers**
12:3,6,9,14,15
14:8,12,21
16:1,24 17:12
22:11 28:13
40:22 41:7
47:20

———
**D**

**daily**
34:11
**Dallas**
7:19 9:3
**damages**
43:10,13,19
**dance**
15:9,10,13,16
16:9,11,18
17:1,13,19
19:5,6 30:22
40:24
**dancer**
7:14,16 15:12
17:2,5,9 19:7
25:16 32:23

35:11
**dancers**
13:7,11 27:16
28:3,20 32:21
33:6,12,14
35:1 36:18
38:23 39:6,16
40:3,23 41:2
49:12,13,15,
22
**dancers'**
39:19 49:9
**dances**
16:19 18:1
19:3
**darker**
27:5
**date**
35:17 44:7
**dates**
9:19
**day**
12:18 28:24
**day-to-day**
8:18,21 10:10
34:15
**days**
9:5,23 13:8
38:5 45:8
**dayshift**
37:24
**decide**
33:24
**deciding**
24:17
**decision**
34:23 35:9,14,
19 36:17
**Declaration**
44:3 49:1,8
**declare**
4:17
**depends**
16:7 26:19,23
**deposed**
5:24 6:22,23
**deposition**
4:6 7:2,9,10,
12 48:23
**describe**
8:17

**designated**
16:14
**determined**
26:15
**determines**
13:2
**DIRECT**
5:16
**discount**
19:1
**discussed**
33:5 37:1
**dishwasher**
11:19
**dispute**
45:4,15
**divulge**
36:6
**DJ**
11:19 22:3
30:16,19 31:6,
10,12 44:14
45:16
**DJS**
31:4 44:21
**document**
42:8,12,19,22
43:22,23 44:2,
7,10 48:18,21,
24
**dollar**
18:13
**door**
48:3,6,8,10,
11,14,16
**doormen**
11:18
**doors**
48:12
**dress**
12:12 38:13
**dressing**
21:7 31:19
40:1,2,4 46:24
47:1,5 48:11
**drinks**
32:9
**driver's**
5:12
**drug**
40:20,21

**drugs**
40:17
**drunk**
40:21
**dry**
32:7
**duly**
5:13
**duties**
8:17 30:19

———
**E**

**earlier**
24:8 29:7
30:15 35:4
37:1 41:11
46:21 47:19
48:23
**early**
13:21,22
43:16
**earn**
33:11
**earns**
33:2
**eat**
14:18
**effort**
44:23
**Eighteen**
21:13
**electric**
27:11
**electrical**
22:21
**emergency**
48:11,12
**employ**
11:17
**employed**
24:8 30:1 38:9
**employee**
10:20,21 17:2,
8 23:1 29:11,
23 30:1 31:12,
23 32:16
34:19,24
35:12 36:18
40:12
**employees**
11:2,11,14,17,
20 22:15

29:13,15
34:17 35:6,8,
15 37:3 38:7
39:9 40:22
47:8
**ends**
43:16
**energy**
27:6
**enforce**
38:13
**enter**
12:9 14:8
47:20
**Enterprises**
21:20,22
**entertainer**
7:13 15:1,7
18:19 19:1
24:21 25:10,
23 27:20
28:11 29:10,
20 30:1 35:5
38:11 40:9,16
43:1 46:6
**entertainers**
13:7,11,13,14,
15,17,19
14:22 25:1,18
26:8,10,16,18,
20,23 27:24
28:24 29:7,14
30:21,22
31:20 32:4,5
33:18 35:3,4,7
38:20 39:13
42:2 44:22,24
46:12,14,16,
20 47:6,9,12,
23
**entertainment**
14:9 15:4
30:24
**entity**
22:1
**entrance**
12:6 47:20
48:1,2,3
**equal**
18:12
**equipment**
22:3,4,6 31:5

establishment
20:6
evening
13:23 14:4
exact
35:17
examination
5:10,16
examined
5:13
excuse
49:5
Exhibit
48:24
exotic
7:13,16 13:7
experience
26:10
explain
11:5
explaining
12:10
explains
12:12
extent
36:4,16

**F**

Facebook
23:10
facial
49:11
fair
12:3,23 14:7
26:5 27:17
familiar
44:17
fee
16:7 18:14,15,
16,24 19:2
20:8,11,24
28:7 31:9
43:18 44:13,
14,18 45:1
fees
43:5
feet
21:6,7
females
39:13
fighting
40:21

figure
38:8
filed
7:14 44:8
filing
29:3
fill
25:1,5
filled
26:22
find
49:5
fine
47:4
fines
49:13,22
fingerprints
25:18,21
finish
43:20
fire
40:11
fired
40:9
five-minute
45:22
fix
32:7
flip
23:12
floor
16:10 17:11
39:19,23
40:24 41:3
Focusing
9:21
follow
35:20
food
14:15 20:16
24:17
footage
21:4
forgot
48:22
form
8:20 14:10,14
17:14 18:10
21:16 25:3,11,
24 26:6 29:3,
16 33:8 34:2,
9,14 36:1

38:2,14 39:20
40:10 41:8
45:18 49:23
forward
36:7
frequency
10:5
Friday
14:5
front
48:6,8,10,13,
16
funny
17:22 18:2,8,
20
furniture
41:16

**G**

general
10:12,13,15,
17 13:4 33:24
generated
28:24
Gerardo
37:15
girls
31:7 33:23
34:6 36:21
39:23 43:14
give
9:13 12:1
29:12,21 32:8
33:16 35:17
40:7 42:9
45:10
glass
6:17 30:7
glasses
42:14
GM
24:18 33:20
GMS
35:14
good
5:20 6:8 26:4
46:1 49:19
great
14:15,18
guess
12:13 13:4
27:6 41:1

46:11
gum
40:23 49:13
guy
23:12
guy's
37:20
guys
23:15 27:2
37:8 42:10

**H**

hair
32:8 49:10
hand
17:1,7
handful
37:2
handling
19:2
happen
13:20
happened
39:8
happy
6:13,18 41:10
hard
36:21
hear
6:10 23:15
47:3
heels
38:20
height
38:21
hide
27:13
highlighting
49:4
hire
24:12
hired
29:10,13,19
hiring
24:13 34:13
Hold
49:5
holds
8:13
home
49:15

hope
6:4
hour
10:23
hourly
11:13,17,20
39:10
hours
9:11,13,22
13:24 22:9
41:12,13
43:15
house
31:16,18,19,
23 32:2,3,11,
19,22,23 33:1,
7,11,14,19,21
34:1,8,13,18,
24 35:7 43:5
44:13,14,20,
21 45:16 47:7
human
47:14

**I**

ice
20:16
idea
21:3 33:10
identification
44:2
identified
5:11
identifying
42:18
imagine
19:18 32:11
importantly
30:23
including
21:7
individual
28:19
individuals
11:11
industry
15:9,10 35:2,
14,20,21,22
information
47:11
inside
20:2

Instagram
23:11
instance
18:7
instances
40:3,8 49:21
instruct
36:3
instruction
36:14
interest
8:2
internet
23:21
introduces
30:20
invades
36:5
involved
8:18,21 24:21
34:12
iron
32:10

**J**

Jesse
37:12
job
22:17 23:5
30:19 33:22
Julia
5:21 42:24
44:3 49:1
Julie
4:2
July
44:8

**K**

kind
35:2,14
kitchen
11:9 14:15
21:8 24:9,12,
13,15

**L**

lady
31:19
lap

15:9,10,13,15
16:9,10 17:1,
13,19 18:1
19:3,5,6
laptop
31:5,6
Latrice
5:4
Latrice's
27:10
lawsuit
7:14
lawyers
36:15
learned
35:22
lease
7:6 21:14
leave
10:3 23:14
31:22 36:23
43:16,18
left
22:11 39:4
license
5:12 25:4
29:22
licensing
31:9
lieu
4:16
light
42:10
lighting
19:19
lights
27:2
liking
30:24
lingerie
38:16
liquor
20:12,18,23
list
26:18 30:21
31:8
location
8:24 9:2,5,9,
12 21:10,12
locker
46:23 47:1,5,
12,17

long
8:7 21:12 42:6
longer
35:11 37:21
looked
48:22
lost
42:10
lot
33:16,17
37:18 44:23
45:7
loud
49:6
lunch
14:18,19

**M**

made
28:19 35:9,19
36:17,22
main
16:9 47:20
maintenance
22:20
make
6:11 26:1 27:8
33:21 34:4
36:18 38:17
43:14
makes
28:16
makeup
32:8
making
6:7 35:13
man
37:20 38:4
management
11:3,6,8,12
25:17 37:2
46:17
manager
10:12,13,18
11:9 13:5
17:11 23:5
24:9,15 33:24
34:10,15
37:16 38:1
39:9 46:11
manager's
10:15

managers
11:8 23:19
33:6 37:3,6,
10,18 38:7
45:10 46:13
49:13
mandatory
33:15 44:19,
24
manner
4:21
Martinez
23:8
Massachusetts
4:5
Matt
5:21
matter
4:18 7:5
Matthew
5:2
maximum
12:19
measure
19:5
Mehmeti
5:6,8,20,23
6:21 7:18 12:2
13:6 14:8
24:20 26:12
29:6 30:15
37:1 41:11
42:12,21
43:22 44:9,11
46:4,22 47:19
48:23 49:4
men
17:11
Men's
7:19 21:9
mentioned
6:21 19:10
26:12 29:7
30:15 46:21
menu
24:16
Mercier
4:3
Mike
37:17,20 38:1,
4
minute

31:21
minutes
20:1 30:9
misbehave
40:1
misbehaved
40:4
mom
31:16,18,19,
23 32:2,3,4,
11,19,22,24
33:1,7,11,19
34:1,8,13,24
44:13,14
45:16
moment
9:24 19:10
20:1 48:22
moms
33:21 34:18
35:7
Monday
14:3,4
money
17:1,8,22,23
18:3,8,13,20
24:6 28:23
29:5 32:8 33:4
Monterez
23:13
morning
5:20 13:21,22
14:16
mother
33:14 47:7
mothers
44:20,21
Motion
44:4 49:2
move
27:8 44:10
49:3
music
30:23 31:1,2,6
41:10

**N**

named
37:17,20 38:1
names
37:11

nationwide
35:3
necessarily
14:11 26:8
nicer
16:23
Nick
5:6,8
nights
38:5
non-alcoholic
20:15
noon
14:3
North
4:8
Notary
4:4
number
27:15
numbered
42:19

**O**

oath
4:16
Objection
8:20 14:10,14
17:14 18:10
21:16 25:3,11,
24 26:6 29:16
32:14 33:8
34:2,9,14 36:1
38:2,14 39:20
40:6,10 41:8
45:18 49:23
objections
4:20
office
9:8 27:3,10
offices
21:8
open
13:17,18,22
14:15 16:20
41:12 48:4,5
opens
22:18
operated
21:9
operates
8:24

operation
13:24 46:19
operations
10:11
order
15:6 25:10
organized
30:8
owner
8:4,6,8 21:24
41:5
owners
8:5
ownership
8:1
owns
21:17

**P**

paid
10:23,24
27:11 32:2,13,
16 35:1,6,7
37:4 39:10
43:6
pains
4:18
paper
42:4
Paragraph
44:11 49:4,6,7
park
48:15
participating
4:10
parties
4:19
past
7:11 42:1
pay
11:23 14:21,
24 15:3,6
16:2,6,16
17:13,18
20:18,20
22:13,21 28:7
32:3,15,21
33:6,12,14
39:10 43:17
44:12 45:1
paying
16:24 32:18

45:5
pays
15:2,21
penalties
4:18
people
11:17 14:18
23:9 37:9
percent
18:18 19:2
performance
14:22 15:1,7,
22 16:3
performances
15:16
period
11:23
perjury
4:19
person
4:16 12:23
26:4
pertaining
7:6
phone
23:12 41:3
physically
4:12,13 12:5
19:11
piercing
39:3
piercings
38:24 39:6
49:11
place
9:9
Plaintiff's
44:4 49:2
Plano
9:3
play
17:23 18:3,13
31:1,8,10,11
41:9
playing
31:3
plays
30:23 31:6
plumbing
22:20
point
6:16 23:20

27:21
pole
19:22
poles
19:24
position
7:22 21:21
31:15 32:12
34:24 35:1,11,
12 36:18,19
positions
8:14 11:16
30:16
post
47:10
Predmore
5:21 9:16
28:10 42:24
43:6 44:3 49:1
Predmore's
45:4 49:8
prefer
13:10,12
present
4:12,13 13:8
president
7:24 8:10,14,
16 21:23
previous
26:10
price
15:6 16:5
prior
27:14
private
15:20,21,23,
24 16:21
privilege
36:5
proceeding
4:11,12,15,21
5:22 6:23
process
24:21
production
5:12
Professional
4:3
proper
38:18
property
21:15,18

PT's
7:19 8:8 21:9
49:8,13
Public
4:4
purchase
15:17 17:6
purchased
22:6 41:23
purposes
42:18 44:2
put
23:17 24:6,17
42:14 44:23
Putting
23:21

**Q**

question
5:23 6:11
23:19 36:12
39:1 42:21
44:9 47:4
49:17
questions
6:4,5,11 30:14
46:5
quick
6:2
quote
35:16

**R**

R0021
42:19
radio
23:23 24:1
read
42:23 43:4
44:15,16 49:6,
7,17,19
ready
14:17 30:22
real
37:13
reason
40:18 45:3,14
reasons
40:14
recall
6:22 37:22

47:16
**received**
18:20 28:13
**recess**
30:12 46:2
**recognize**
42:22
**record**
4:24 28:12,23
**records**
38:8
**Red**
20:14
**refer**
13:10
**referencing**
36:8
**referred**
46:23
**refresher**
6:2
**Registered**
4:3
**related**
9:16
**relevance**
29:17
**remember**
6:24 7:4 9:19
38:4
**remotely**
4:7,15
**remove**
38:23 39:3,6
**rent**
21:14
**rental**
43:5
**repeat**
6:12 36:12
**rephrase**
6:12
**reported**
29:2
**reporter**
4:4 6:6
**reporting**
4:14
**represent**
5:21
**representable**
26:2

**require**
25:22 26:9
38:23 39:3
**required**
25:7 44:12
49:9
**requirement**
25:20 38:19
39:5,15
**requirements**
25:9,13,22
**reserve**
23:18
**Respondents**
5:5
**responsibilities**
24:12
**responsible**
23:2 24:13,16
**Richardson**
4:8
**Road**
9:3
**role**
8:16
**room**
4:13 16:21,23
23:15 31:20
40:1,2,5
46:23,24 47:1,
2,5,12,17
48:11
**rooms**
15:21,23,24
16:2,6,9 21:8
**roughly**
30:9
**rule**
19:6,9
**rules**
30:24 49:9,14

——————
**S**
——————
**salaries**
37:4
**salary**
10:23,24 11:1,
11,12
**satisfactorily**
5:11
**Saturday**
14:3,5

**savings**
27:6
**schedule**
9:22 10:2
**screen**
42:13 43:23
**section**
16:13
**security**
11:19
**sell**
20:3,5,12
**send**
49:14
**sense**
6:12
**servant**
32:4
**service**
33:17 44:12,
18,20
**set**
26:22
**set-up**
20:13,19,23
**set-ups**
20:12
**sets**
41:13
**shared**
42:13
**shareholder**
21:24 22:2
**sheet**
42:23,24
**shift**
27:21 28:21
31:22 33:2,7,
11 34:11
43:16,20
44:13 45:5
47:24
**short**
30:7
**shorts**
38:16
**show**
43:21 46:17
**side**
19:15
**sign**
12:12 25:5

29:22 43:2
**sign-in**
42:23,24
**signage**
12:10
**signs**
47:11,13,15,
16
**similar**
9:24
**single**
12:6 19:4
42:18
**sir**
6:1,9,15,20,24
7:15,21 8:3,15
9:1 10:2,14,
19,22 11:15
12:4,16 14:23
15:2 17:20
19:17,20 20:5,
11 21:2,11
22:5,8,12,22
23:12 24:10
26:11 27:22
28:9,15,22
29:1,18 30:18
31:17 32:1
33:3 34:22
35:21 37:18
38:10,22
39:17 41:4,21
42:3,14,16,20
43:8,24 45:19
46:9 47:18
49:16
**sit**
16:11
**soda**
32:9
**sofas**
41:22
**sole**
8:4,6,7
**song**
19:4,7,9
**songs**
19:8
**sort**
19:21 25:12
41:20
**sound**
6:8 9:18 22:4

**Sounds**
46:1
**space**
46:22
**speak**
6:6
**speaking**
10:9 11:4 12:5
19:11
**specific**
8:23
**spend**
9:12
**split**
45:16,19
**spoke**
41:11 47:19
**square**
21:3,6
**staff**
39:14
**stage**
15:19 19:10,
12,14,18,21
26:15,17,21
27:18,19,21
28:1,6 30:21,
23 41:16
**stages**
19:16,23
26:13,19,22
27:16 46:18
**standard**
15:8,9,10 16:5
35:2 38:12,15,
18 39:21,24
**standards**
39:18
**start**
36:20
**state**
25:19 44:1
**stating**
4:23
**stay**
40:1
**STENOGRAP
HER**
4:2
**stop**
24:1

**stopped**
24:4
**stripper**
19:22,24
**stuff**
41:20
**subject**
7:4
**suggested**
33:6
**Sunday**
14:3,6
**supply**
32:5 44:12,18
**Support**
44:3 49:1
**supposed**
48:2,5,7
**swear**
4:24
**sworn**
5:13

_____

**T**

**t-backs**
38:16
**tables**
41:21
**takes**
31:20
**talk**
33:20
**talked**
28:10
**tattoo**
39:11
**tattoos**
39:16
**tax**
29:3
**team**
11:3,6,8 37:2
**ten**
9:13 18:18
19:2
**term**
13:11 44:17
**terminate**
34:7 40:15
**terminated**
40:9,12,19

**terms**
9:22 39:18
**testified**
5:13
**testimony**
4:17 15:12
24:8 28:4
33:10 45:4,15
46:15
**Texas**
4:9 9:3 25:19
**That'd**
41:14
**theme**
41:6,9,10
**things**
6:3 20:19
**Thomson**
5:2,17,18,21
30:6,11,13
45:21 46:3
**thought**
27:10
**thumb**
19:6,9
**Thursday**
14:5
**tidy**
22:10
**time**
6:13,19 7:8
12:18 13:16
19:5 26:24
27:1,15,17,19
30:9 31:3
34:17 35:3
36:9 39:5
42:6,11 45:24
48:4
**timer**
23:16
**times**
7:11 9:6,7
13:18 23:17
**tip**
15:19 17:23,
24 33:15 45:1,
2,8,9,11,13
**tipped**
45:15,20
**tipping**
45:7

**title**
7:22 11:6
**titled**
44:3 48:24
**titles**
11:4
**today**
5:19 6:3,16
9:15
**Todd**
10:16 37:7
**top**
48:20
**total**
28:20
**track**
28:15,16,18,
19 30:21
36:22
**traditional**
19:22
**trafficking**
47:14
**training**
46:7,12,13,16,
19
**transaction**
18:14,15,16,
24
**transcript**
6:7
**treasurer**
8:14
**treated**
29:7
**true**
11:24 49:16,
20
**Tuesday**
14:4
**turn**
18:21
**Twenty-five**
30:4,5
**type**
9:8 11:16
12:10 15:20
19:12 20:8
22:9 23:12,22
24:24 25:6,9
28:7 29:3 35:1
38:12 41:6

42:22
**types**
15:16 25:13
**typo**
49:12

_____

**U**

**undergoes**
46:8
**understand**
9:16 18:6
28:17 29:6
35:10 37:2
**understanding**
4:11
**understood**
11:10 14:20
15:5 23:18
24:7 45:3
**upbeat**
41:9

_____

**V**

**valet**
48:14,15
**valets**
48:15
**varies**
11:22 12:18
**verbally**
4:17
**vice**
8:14
**violating**
49:14
**VIP**
16:10,14,17,
19 17:7 41:16
**visit**
9:5
**voluntary**
33:16
**volunteer**
32:12

_____

**W**

**W-2**
10:21 29:11,
13,15,20 30:1
38:7

**waitress**
17:11,24 18:4,
19 19:1
**waitresses**
11:18 46:13
47:7,9,12
**waive**
4:20
**walk**
46:17
**wash**
32:7,10
**water**
6:17 20:14,22
30:7 32:9
**wear**
38:15,17,20
**website**
22:23 23:2,6
**Wednesday**
14:4
**week**
9:4,5,7,11,13,
23
**Williams**
10:16,17,20
11:2 37:7
**wine**
20:9,12,23
21:1
**wise**
11:6
**words**
26:3
**work**
9:9 22:21
24:5,22 25:23
28:14 36:24
39:11 44:21
**worked**
38:5 39:7
**working**
27:12 29:15
34:1 38:12
49:10
**works**
23:8 30:10
**worth**
24:5
**wrong**
45:6

———————
**Y**
———————
**years**
  7:3 21:13
  24:3,23 30:2,
  3,4 34:16,20,
  21 35:5,10,16
  36:17 37:19
  39:2 40:19
  42:1
**young**
  37:20 38:4

BROOKE LAYTON   November 2, 2021                              1

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF TEXAS
 2                       DALLAS DIVISION

 3  BROOKE LAYTON, individually and)
    on behalf of all others       )
 4  similarly situated,           )
                                  )
 5              Plaintiff,         )
                                  )
 6  VS.                           )CA-NO. 3:21-cv-01636-N
                                  )
 7  MAINSTAGE MANAGEMENT, INC,    )
    NICK'S MAINSTAGE, INC. - DALLAS)
 8  PT'S d/b/a PT'S MENS CLUB and )
    NICK MEHMETI,                 )
 9                                )
                Defendants.       )
10

11

12              * * * * * * * * * * * * *

13                   ORAL DEPOSITION OF

14                     BROOKE LAYTON

15                    NOVEMBER 2, 2021

16              * * * * * * * * * * * * *

17

18              ANSWERS AND DEPOSITION of BROOKE LAYTON, taken

19  at the instance of the Defendant on the 2ND day of

20  NOVEMBER, 2021, in the above styled and numbered cause,

21  in the City of Dallas, County of Dallas and State of

22  Texas before Donna L. Johnston, a Certified Shorthand

23  Reporter in and for the State of Texas, pursuant to the

24  Federal Rules of Civil Procedure and the provisions

25  stated on the record.
```

EXHIBIT
H

1                         A P P E A R A N C E S

2

3      On Behalf of Plaintiff, BROOKE LAYTON, individually and
       on behalf of all others similarly situated:
4
       Ms. Ghazzaleh Rezazadeh, Esq.
5      ELLZEY & ASSOCIATES, PLLC
       1105 Mildord Street
6      Houston, Texas 77066
       Phone:  (888) 350-3931
7      E-mail:  firm@ellzeylaw.com

8
       On Behalf of Defendants, MAINSTAGE MANAGEMENT, INC.,
9      NICK'S MAINSTAGE, INC. - DALLAS PT'S d/b/a PT'S MENS
       CLUB and NICK MEHMETI:
10
       Ms. Latrice E. Andrews, Esq.
11     SHEILS WINNUBST
       1100 Atrium II
12     1701 N. Collins Boulevard
       Richardson, Texas 75080
13     Phone:  (972) 644-8181
       E-mail: latrice@sheilswinnubst.com
14

15

16

17

18

19

20

21

22

23

24

25

1                    I N D E X

2    Appearances                                    2

3    Stipulations                                   5

4    BROOKE LAYTON

5    EXAMINATION
         By Ms. Andrews                             5
6        By Ms. Rezazadeh                          88
         By Ms. Andrews                            91
7        By Ms. Rezazadeh                          94
         By Ms. Andrews                            95
8
     Signature and changes sheet                  100
9
     Reporter's certificate                       101
10
                    E X H I B I T S
11
     DEFENDANT'S DESCRIPTION                       PAGE
12
     Exhibit 1   Second Amended Notice Of           23
13               Intention To Take Oral
                 Deposition Of Brooke Layton
14
     Exhibit 2   Complaint -                         69
15               Summons in a Civil Action

16   Exhibit 3   Bio-Verify                          24

17   Exhibit 4   PT's Mens Club License And          25
                 Lease Agreement
18
     Exhibit 5   Plaintiff Brooke Layton's           77
19               Initial Disclosures

20   Exhibit 6   Plaintiff Brooke Layton's           92
                 Objections And Responses To
21               Defendant Mainstage Management,
                 Inc.'s First Request For Admission
22
     Exhibit 7   Plaintiff Brooke Layton's           93
23               Objections And Responses To
                 Defendant Mainstage Management,
24               Inc.'s First Set Of Interrogatories

25   Exhibit 8   Sign-in sheets                      68

BROOKE LAYTON  November 2, 2021                          4

1   E X H I B I T S (cont.)

2

DEFENDANT'S DESCRIPTION                          PAGE

3

Exhibit 9   Plaintiff Brooke Layton's         93
4              Objections And Responses To
             Defendant Mainstage Management,
5              Inc.'s First Request
             For Production

6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

BROOKE LAYTON  November 2, 2021                          5

1              P R O C E E D I N G S

2

3                   BROOKE LAYTON,
4   having been first duly sworn, testified as follows:
5        MS. ANDREWS:  Before we begin, I just wanted
6   to state we agree that we are taking the deposition
7   pursuant to the Federal Rules of Procedure as well as
8   the local rules of the Northern District of Texas, if
9   that's correct?
10        MS. REZAZADEH:  Correct.
11        MS. ANDREWS:  Thank you.
12                   EXAMINATION
13   BY MS. ANDREWS:
14   Q.   Ms. Layton, just so that you're aware of some
15   background stuff, obviously, I represent the defendants
16   that have been named in this case.  My name is Latrice
17   Andrews, and I'm located in the Dallas area; that's
18   where I practice.  The deposition today, when I ask you
19   yes-or-no questions, if you can make sure that you're
20   not nodding and you actually verbalize a yes or no for
21   the court reporter, that would be very helpful; are you
22   able to do that?
23   A.   Yes, ma'am.
24   Q.   And are you under any medication or influence or
25   anything that would prevent you from being able to tell

---

BROOKE LAYTON  November 2, 2021                          6

1   the truth today?
2   A.   No, ma'am.
3   Q.   Have you ever had your deposition taken before?
4   A.   No, ma'am.
5   Q.   Okay.  And Ms. Donna over here will be writing
6   down everything that we'll be saying back and forth, and
7   so she needs to make sure we don't talk over each other,
8   okay?
9   A.   Yes, ma'am.
10   Q.   So if you'll allow for me to finish my question
11   and I will do the courtesy of allowing you to finish
12   your answer, Donna won't get mad at us, okay?
13   A.   Yes, ma'am.
14   Q.   All right.  Can you please state your full name
15   for the record?
16   A.   My name is Brooke Ashlee Elizabeth Kiannejad,
17   K-I-A-N-N-E-J-A-D.  My maiden name is Layton,
18   L-A-Y-T-O-N.
19   Q.   Okay.  And where do you live now; what's your
20   address?
21   ████  ████████████████████████
22   ██  ████████████████████████████████
23   ██  ████████████████████████████
24   ██  ████████████████████████████████
25   █

---

BROOKE LAYTON  November 2, 2021                          7

1   I don't know --
2   Q.   And why do you say that's your permanent
3   address?
4   A.   Because I do not own a home, so that's my
5   family's -- my mom's address, so yeah.
6   Q.   Okay.  But you're currently residing in Plano,
7   Texas?
8   A.   Yes, ma'am.
9   Q.   And you're renting that home there with your
10   husband?
11   A.   Yes, we live with his father or his mother.
12   Q.   And prior to living where you're at in Plano,
13   where did you live?
14   A.   We lived in Carrollton, Texas.
15   Q.   When did you -- what time frame did you live
16   there?
17   A.   February 2020 to the end of May of 2021.
18   Q.   Okay.  And then prior to that, where did you
19   live?
20   A.   In Dallas, Texas from February 2019 to the end
21   of 2019.
22   Q.   Okay.  And so from December 2019 to February
23   2020, where were you living?
24   A.   In Plano with my husband's mother.
25   Q.   Okay.  And was that the Plano address that you

BROOKE LAYTON  November 2, 2021                 8

1    previously provided?
2      A.   Yes, ma'am.
3      Q.   Okay.  What was the address that you were at in
4    Dallas, Texas?
5      A.   I can't remember.  I know it was off Summer
6    Creek in Dallas, but that's all I remember.
7      Q.   Okay.  And then prior to living at that address
8    off of Summer Creek, where were you living?
9      A.   I was living in Mesquite at apartments off of
10   Galloway Avenue.
11     Q.   Okay.  And how long did you live there?
12     A.   Probably February 2018 to February 2019.
13     Q.   Okay.  And do you know the exact address of
14   those apartments?
15     A.   No, ma'am.
16     Q.   And the Oak -- The 990 Crystal Cove address is
17   the address that you provided to the defendants in this
18   case as your residence; is that correct?
19     A.   Yes, ma'am.
20     Q.   And when is it that you started, that you
21   believe you started working at the defendant's place of
22   business?
23     A.   July 2018.
24     Q.   Okay.  And when do you believe you stopped
25   working there?

BROOKE LAYTON  November 2, 2021                 9

1      A.   December 2019.
2      Q.   And do you know what day in July you started
3    working there, according to your memory?
4      A.   I don't know.
5      Q.   Okay.  Do you know what date in December you
6    last worked there, December of 2019?
7      A.   I also don't know.
8      Q.   Do you know if it was the beginning of the
9    month; was it before Christmas; do you have any
10   recollection?
11     A.   Potentially, you know, the middle or beginning
12   of the month for December.
13     Q.   Okay.  Do you know just kind of what it means to
14   have your deposition taken, for purposes of this case?
15     A.   To provide answers for the court in their
16   decision.
17     Q.   Kind of.  You understand the importance of the
18   oath that Donna administered and how to tell the truth,
19   correct?
20     A.   Yes, ma'am.
21     Q.   Okay.  I wanted to make sure we have that on the
22   record.
23          All right.  Are you aware of completing some
24   initial or reviewing some initial disclosures that you
25   served in this case?

BROOKE LAYTON  November 2, 2021                 10

1      A.   Can you elaborate?
2      Q.   Do you know what discovery is?
3      A.   Yes, ma'am.
4      Q.   Okay.  Have you been asked to review any
5    discovery responses or prepare any discovery responses?
6      A.   I was given questions that I was asked to answer
7    in regards to discovery.
8      Q.   Okay.  Were you -- Do you recall asking about
9    getting any documents together and providing those?
10     A.   Yes, ma'am.
11     Q.   Did you do that?
12     A.   I gathered what I could find.
13     Q.   Okay.  And those have been provided to your
14   attorney?
15     A.   Yes, ma'am.
16     Q.   Okay.  What documents did you get together?
17     A.   There was a couple of photos and some videos,
18   maybe one video, and I think that could be it; I can't
19   remember.
20     Q.   What about your 2018 tax return?
21     A.   I believe maybe I did provide that.
22          THE WITNESS:  Did I?
23          MS. REZAZADEH:  I don't -- You can go ahead
24   and answer what you recall.
25          THE WITNESS:  Okay.

BROOKE LAYTON  November 2, 2021                 11

1      A.   I may or may not have.
2      Q.   (BY MS. ANDREWS)  Did you file a tax return in
3    2018 and 2019?
4      A.   Yes.
5      Q.   What about your bank statements, did you provide
6    those?
7      A.   No.
8      Q.   Do you have bank statements for 2018 and 2019?
9      A.   No.
10     Q.   Do you have access to bank statements for 2018
11   and 2019?
12     A.   Possibly.  I wasn't actively using a bank
13   account for work at that time.
14     Q.   Were you using Venmo?
15     A.   No.
16     Q.   Were you using a bank at all in 2018 and 2019?
17     A.   Yes.
18     Q.   What bank was that?
19     A.   ████████████
20     Q.   Do you still bank there?
21     A.   Yes, ma'am.
22     Q.   Do you have any social media accounts?
23     A.   Not that are relevant to this case.
24     Q.   Do you have any social media accounts?
25     A.   Yes, ma'am.

BROOKE LAYTON  November 2, 2021                12

1    Q.    And what social media accounts are those?

2    A.    **All of them -- our Instagram is under The Pinup**

3 **Agent, which is -- My Tic Tock is also under The Pinup**

4 **Agent.**

5    Q.    I'm sorry?  A Pinup Agent?

6    A.    **The Pinup Agent.**

7    Q.    The, okay.  And what is The Pinup Agent; what is

8 that?

9    A.    **It's my real estate account.**

10    Q.    And what do you mean by a real estate account?

11    A.    **I'm a Realtor in the Dallas-Fort Worth area, and**

12 **I use that for social media purposes in regards to real**

13 **estate.**

14    Q.    Okay.  In 2018 and in 2019, did you have a

15 social media account?

16    A.    **Yes, ma'am.**

17    Q.    And what were the handles and hashtags used on

18 those accounts?

19    A.    **I believe --**

20    Q.    What?  I'm sorry.  Go ahead.

21    A.    **I believe it was under Shirley Poisin,**

22 **P-O-I-S-I-N.  And before that, it was KimberFoxOfficial.**

23 **But those were used for modeling purposes.**

24    Q.    Was Kimber also your stage name?

25    A.    **Kimber was my stage name, but Kimber Fox was my**

---

BROOKE LAYTON  November 2, 2021                13

1 **modeling name.  I never used Kimber Fox for dancing.**

2    Q.    And you speak about modeling, were you modeling

3 in 2018 and 2019?

4    A.    **Yes, I have modeled since 2013.**

5    Q.    And did you make money from modeling?

6    A.    **Yes.**

7    Q.    Were you an independent contractor as a model?

8          MS. REZAZADEH:  Objection, form.

9          You can answer, Brooke.

10    A.    **Okay.  What was the question again?**

11    Q.    (BY MS. ANDREWS)  Were you an independent

12 contractor as a model?

13          MS. REZAZADEH:  The same objection.

14    A.    **I was my own boss.**

15    Q.    (BY MS. ANDREWS)  When you -- Who did you work

16 for, like what contracts did you have?

17    A.    **I did not have any contracts while I was**

18 **modeling.**

19    Q.    Were you modeling at the same time you were --

20 you claim you were working at the defendant's business?

21    A.    **Yes.**

22    Q.    And the Kimber Fox account, do you still have

23 access to it?

24    A.    **No, that account has been deleted, as well as**

25 **Shirley Poisin has been deactivated.  There is a fake**

---

BROOKE LAYTON  November 2, 2021                14

1 profile of me under Kimber Fox right now that I've tried

2 to have removed since 2018.

3    Q.    Are -- Have you contacted or made any efforts or

4 attempts to retrieve the data in those deleted accounts?

5    A.    **No, ma'am.**

6    Q.    Do you understand you have the ability to do

7 that?

8          MS. REZAZADEH:  Objection, form.

9    A.    **No, I don't.**

10    Q.    (BY MS. ANDREWS)  When did you delete this

11 account?

12    A.    **Shirley Poisin was deleted maybe March of 2020,**

13 **but I hadn't been actively using the account; that's why**

14 **I deleted it or deactivated it.**

15    Q.    Right.  So can you explain the difference

16 between deactivating and deleting?

17          MS. REZAZADEH:  Objection, form.

18    A.    **When I got a new phone, I didn't ever log into**

19 **that Shirley Poisin account, so I don't have access to**

20 **it at this time or...**

21    Q.    (BY MS. ANDREWS)  So but you can reset the

22 password, correct?

23          MS. REZAZADEH:  Objection, form.

24    A.    **I'm unsure.  I haven't tried.  I don't -- I**

25 **don't have anything -- I wouldn't have had a reason to**

---

BROOKE LAYTON  November 2, 2021                15

1 try.

2    Q.    (BY MS. ANDREWS)  You understand that we served

3 a request for production in this case?

4          MS. REZAZADEH:  Objection, form.

5    A.    **Can you elaborate on that?**

6    Q.    (BY MS. ANDREWS)  Do you remember when we asked

7 for documents, and you gathered the documents for your

8 attorney?

9    A.    **Yes.**

10    Q.    We asked about there being social media

11 accounts: do you recall that question?

12    A.    **No.**

13    Q.    Do you recall responding you had no social media

14 accounts?

15    A.    **I can't remember.**

16    Q.    So now you're saying that you for 2018 and 2019,

17 you did have active social media accounts, correct?

18    A.    **I've had social media accounts since 2013.**

19    Q.    And you are also saying that you used the name

20 Kimber Fox, which -- on one of those social media

21 accounts, right?

22    A.    **Briefly.  I've also used the name Roxie Vixen.**

23 **These are primarily --**

24          MS. ANDREWS:  I'm going to object to the

25 non-responsive portion.

BROOKE LAYTON  November 2, 2021          16

1          MS. REZAZADEH:  Will you let her finish her
2   answer, please.  Thanks.
3          Go ahead.
4      A.  I've had many names for Burlesque, and that
5   would be Roxie Vixen, Kimber Crimson Fox, Shirley
6   Poisin; those were the primary accounts that were tied
7   to whatever name I was using for Burlesque, not
8   stripping purposes at that time.
9      Q.  (BY MS. ANDREWS)  So there was also a Kimber
10  Crimson Fox?
11     A.  Yes.  I don't believe that I had my Instagram to
12  that, though.  I can't recall, but...
13     Q.  Did you also have a Facebook account?
14     A.  My personal page.
15     Q.  Is that still active?
16     A.  It's as Kimber Fox, yes.
17     Q.  I'm sorry?  It's what?
18     A.  It's as Kimber Fox for real estate purposes.
19     Q.  Do you have a Facebook page under your legal
20  name of Brooke Layton?
21     A.  No.
22     Q.  And these accounts are currently active?
23     A.  My Kimber Fox one is, yes, on Facebook.  And I
24  do actually have The Pinup Agent on Facebook as well.
25     Q.  Okay.

BROOKE LAYTON  November 2, 2021          17

1          MS. ANDREWS:  Can we go off the record for a
2   second?
3          MS. REZAZADEH:  Sure, you want to take a
4   break?
5          MS. ANDREWS:  I just wanted to --
6          THE REPORTER:  Going off the record at
7   10:26.
8          (Recess taken)
9          THE REPORTER:  Going back on the record at
10  10:27.
11     Q.  (BY MS. ANDREWS)  Are you aware of whether you
12  signed documents when you first started having a working
13  relationship with PT's, we'll call the defendant's club?
14     A.  Yes, I signed something.
15     Q.  Okay.  What is it that you believe you signed?
16     A.  When I first started working there, I believe
17  that it may have been an independent contractor form,
18  but I was also -- I remember distinctly trying to read
19  through the form and have a manager come back and shame
20  me and say I didn't know that you could read when it
21  took me 30 minutes to go through the contract.  So I
22  felt rushed and I couldn't actually complete the
23  contract.
24     Q.  So you were capable of reading the contract?
25     A.  I was attempting to read the contract to see

BROOKE LAYTON  November 2, 2021          18

1   what I was signing but did not make it all the way
2   through before the manager came in and shamed me for
3   trying to read the contract.
4      Q.  So and that was 2018 you're alleging this
5   happened?
6      A.  Correct.
7      Q.  So you chose to sign it even though you didn't
8   feel like you had enough time to read it?
9      A.  Yes, this is common.  You are given documents to
10  sign and no one explains what those documents are.
11     Q.  Did you have to undertake work at this place or
12  sign a licensing agreement at this facility?
13     A.  What would a licensing agreement be?
14     Q.  For the -- What you're referring to, the
15  document that you signed or you're saying you signed,
16  did you have to sign it or could you -- or did you have
17  to choose to work there; could you have worked somewhere
18  else?
19          MS. REZAZADEH:  Objection, form.
20     A.  It is standard at all clubs that this form has
21  to be signed.  And never once, has anyone ever
22  explained.  They just say if you want to work here, you
23  have to sign this form.  And I was in need of work, so I
24  signed the form.
25     Q.  (BY MS. ANDREWS)  If you -- Were there other

BROOKE LAYTON  November 2, 2021          19

1   clubs to work at?
2      A.  Yes, that also would require the same form to be
3   signed.
4      Q.  And you know that about every single one of
5   them?
6      A.  I have worked at a few clubs now and every one
7   has to sign this.  It is standard knowledge within the
8   industry; this form is signed.
9      Q.  And that's the choice that you make to sign it
10  or not do that, correct?
11     A.  I would like to eat, so yes, I had to sign the
12  form.  And again, it's standard at all clubs that this
13  form is signed.  The only other option they had was an
14  actual employee contract, and that one was given to the
15  bartenders and people that were actual employees of the
16  clubs, not people that were working as independent
17  contractors.
18     Q.  Weren't you given the option to be an employee?
19     A.  I had no bartending experience.
20     Q.  Weren't you as part -- So weren't you given the
21  option to choose between being an employee, an
22  entertainer, or being an independent contractor?
23     A.  The way that they presented the employee
24  contract was not suitable for dancers and independent
25  contractor, people that were relying on making money

1    each shift rather than a paycheck.

2    **Q.**    Because employees are different than independent

3    contractors, right?

4    **A.    Absolutely.**

5    **Q.**    And y'all earn money differently, right?

6    **A.    It depends.  Because employees also receive tips**

7    **as well.**

8    **Q.**    Not all employees, correct?

9    **A.    Well, not a lot of independent contractors**

10   **receive tips either.**

11   **Q.**    Right, but not all employees receive tips,

12   correct?

13   **A.    I'm not an employee there, so I'm not sure how**

14   **many tips they received, but I know that the bartenders**

15   **received tips as well as the house mom and the DJ and**

16   **sometimes the managers who were considered employees.**

17   **Q.**    So you don't really know the terms of the

18   employment relationship and who got tips and who did not

19   get tips, correct; you just speculate, correct?

20        MS. REZAZADEH:  Objection, form.

21   **A.    Since I did not read the employee contract, I**

22   **was just given a briefing of what it was, I do not know**

23   **the specifics.**

24   **Q.**    (BY MS. ANDREWS)  Did you ask to come back the

25   next day to see if you could sign the contract the next

1    day?

2    **A.    No.  The day that I went in --**

3         MS. ANDREWS:  Objection, non-responsive.

4         MS. REZAZADEH:  I'm sorry.  Could she finish

5    her answer, Latrice?  No?  She's under oath; if she

6    wants to give a full answer, she's entitled to.

7         Go ahead, Brooke.

8         MS. ANDREWS:  I don't think that is correct.

9    And this is the deposition that I called.  And if you'd

10   like to ask her questions --

11        MS. REZAZADEH:  That's fine.  You're not

12   going to interrupt my client.

13        THE REPORTER:  I'm sorry, ladies.

14        MS. REZAZADEH:  You're not going to

15   interrupt my client in the middle of providing

16   testimony.  So you can either allow her to speak and

17   she'll allow you to speak like you said you were going

18   to or then we can take it to the court.  Because I

19   believe you interrupting her mid-answer is inappropriate

20   and improper.  You can object non-responsive nature of

21   her answer after she gives it.

22        MS. ANDREWS:  Then the objection is

23   untimely.

24        MS. REZAZADEH:  No, it's not.  It's after

25   she finishes her answer, you can say I object to the

1    non-responsive portion.  That is how it works.

2         Go ahead, Brooke.

3         MS. ANDREWS:  That is incorrect.

4         MS. REZAZADEH:  She's already throne you

5    off.  The question you were answering, you said, no.

6         MS. ANDREWS:  I'm going to object to counsel

7    testifying or putting words into her client's mouth.

8         MS. REZAZADEH:  If you're not going to let

9    her finish her question or answer, then you can stop the

10   deposition.  I'm not going to let you interrupt her

11   mid-answer.

12        MS. ANDREWS:  She's not answering the

13   question.

14        MS. REZAZADEH:  She did answer the question.

15   She started with a yes or a no, specifically --

16        MS. ANDREWS:  That was the answer.

17        MS. REZAZADEH:  -- to the question.  And

18   then she was providing details about her answer.  So I

19   don't know what you're trying to get at here other than

20   cutting my -- being rude and cutting off my client.

21        So go ahead, Brooke.

22        MS. ANDREWS:  If I ask a yes-or-no question

23   and she answers yes or no, the question is answered.  If

24   you want to let her elaborate subsequently, you are more

25   than welcome.

1         MS. REZAZADEH:  You are entitled to object

2    to the non-responsive portion of her question.  That's

3    all.

4         Go ahead, Brooke.

5    **A.    I did not go back the next day to read the**

6    **contract.  The way that it worked, I was also not given**

7    **an audition.  So whenever I went in, the manager**

8    **literally told me to get naked from head to toe so he**

9    **could check out my naked body, and then said at that**

10   **point that I was hired and to sign the contract.  And**

11   **that was it.**

12        **I did not go back the next time after being**

13   **humiliated like that and already having to expose**

14   **myself.  I felt pressured at that point that if I was**

15   **going to work there that I needed to sign that day.**

16   **Q.**    (BY MS. ANDREWS)  And if that were true, you

17   thought it was a good idea to work there?

18   **A.    People in power hold -- People in power exploit**

19   **vulnerable individuals, so yes, at the time --**

20        MS. ANDREWS:  Objection to the

21   non-responsive portion.

22        (Defendant's Exhibit No. 1 was marked.)

23   **Q.**    (BY MS. ANDREWS)  Let's look at Exhibit 2, which

24   is -- Actually, I'll go back.  Did you ever see this,

25   which is the notice of the intent to take your

BROOKE LAYTON  November 2, 2021                    24

1  deposition, which was at -- I think it was the second
2  time we noticed it.  It's set for November, for today at
3  10:00.  Did you see this document?
4      A.   Briefly, yes.
5      Q.   Okay.
6           MS. ANDREWS:  And this will be Exhibit 1 for
7  the deposition.  And I'm going to skip really fast to --
8           (Defendant's Exhibit No. 3 was marked.)
9      Q.   (BY MS. ANDREWS)  Is this a true and correct
10 image of you?
11     A.   Yes.
12     Q.   And did you -- Do you recall going to Bio-Verify
13 to get a background check done?
14     A.   Yes.
15     Q.   Okay.  And does it sound correct that you did
16 this on or about July 9, 2018?
17     A.   Yes.
18     Q.   Okay.  And this is the Oak Point address that
19 you had previously referenced on the first page of
20 Exhibit 3?
21     A.   Yes.
22     Q.   Okay.  Let's see.
23          MS. REZAZADEH:  Exhibit 3?  What was Exhibit
24 2?
25          MS. ANDREWS:  I'll come back to that.

BROOKE LAYTON  November 2, 2021                    26

1  or that you're being -- you're choosing to be treated as
2  an independent contractor?
3      A.   Yes, but I was not treated as such.
4      Q.   Was your understanding that this contract was
5  for you to be an independent contractor, correct?
6      A.   In order to keep working there, yes, they
7  required everyone --
8           MS. ANDREWS:  Object to the non-responsive
9  portion.
10          MS. REZAZADEH:  Will you please let her
11 finish.  Please stop interrupting her.  She's not been
12 interrupting you.  Thank you.
13          MS. ANDREWS:  I'm just asking her to answer
14 the question.  It would go a lot faster if the question
15 would just be answered.  It's a simple question.
16          MS. REZAZADEH:  She's entitled to give you
17 her testimony the way she feels fit, and you're not
18 entitled to interrupt her.
19          MS. ANDREWS:  She's entitled to answer the
20 question as asked; she's not entitled to change
21 questions.
22          MS. REZAZADEH:  Because she's not answering
23 your question, you can't cut her off, okay?  She is
24 answering your question.  Are you saying she's not
25 answering your questions?

BROOKE LAYTON  November 2, 2021                    25

1           MS. REZAZADEH:  All right.
2      Q.   (BY MS. ANDREWS)  Let's see.  And you did
3  provide your fingerprints as part of the application
4  process?
5      A.   Yes.
6      Q.   And then do you recall seeing this document
7  that's the Written Authorization of Employer/Independent
8  Contractor?
9      A.   Yes.
10     Q.   So at this point, you know that you were given
11 an option as to being one or the other?
12     A.   There's no "or" on that; it's just a slash, so
13 to me, it could have been either.  But to me, I know I
14 signed the independent contractor form.
15     Q.   And then is this the Mesquite address that you
16 had referred to that you couldn't remember the exact
17 address?
18     A.   Yes, ma'am.
19          (Defendant's Exhibit No. 4 was marked.)
20     Q.   (BY MS. ANDREWS)  And then Exhibit 4, is this
21 the License And Lease Agreement that you're referring to
22 that you signed?
23     A.   Yes.
24     Q.   And are you aware that part of this agreement
25 says that you're choosing to be treated as an employee

BROOKE LAYTON  November 2, 2021                    27

1           MS. ANDREWS:  I'm saying she's rambling on
2  about additional things, and I'm just asking simple
3  questions.
4           MS. REZAZADEH:  I'll also convey to you that
5  you're going to have to be polite and exercise
6  appropriate etiquette and let her finish speaking when
7  she's speaking.  I mean, you can object again if you --
8  to non-responsiveness, but otherwise, please stop
9  interrupting her.  It's not good for the court reporter,
10 and it's rude.
11          MS. ANDREWS:  It would be helpful if you
12 would ask your client to just answer the question.
13          MS. REZAZADEH:  I can't instruct my client.
14          MS. ANDREWS:  Thank you.
15     Q.   (BY MS. ANDREWS)  Okay.  Ms. Layton, if I ask
16 you a yes-or-no question if you can respond with yes or
17 no, to just answer the question I ask.
18          MS. REZAZADEH:  Objection.
19          MS. ANDREWS:  Are you trying to instruct
20 your client now?
21          MS. REZAZADEH:  I am objecting to you
22 instructing her that she has to answer yes or no to your
23 questions only; that is not appropriate.
24          MS. ANDREWS:  I'm not instructing her.  A
25 yes or no question, I just need an answer.

BROOKE LAYTON November 3, 2021                    28

1      MS. REZAZADEH:  I'm not -- That's fine.  Go
2  ahead.  You can ask her whatever you want.
3      Q.   (BY MS. ANDREWS)  And do you recognize the
4  initials at the bottom of each and every page down here:
5  are those your initials signing this document?
6      A.   Yes.
7      Q.   And do you know prior to filing this lawsuit,
8  did you ever discuss your intent to no longer be treated
9  as an independent contractor with any of the defendants?
10     A.   No.
11     Q.   Prior to filing this lawsuit, did you ever
12  assert that they were not treating you like an
13  independent contractor?
14         THE WITNESS:  Am I allowed to elaborate?
15         MS. REZAZADEH:  Yes, you're under oath.  You
16  can answer.
17     Q.   (BY MS. ANDREWS)  I ask you to just answer the
18  question.
19         MS. REZAZADEH:  Go ahead, Brooke.  Answer
20  how you feel you need to:  you're under oath.
21     A.   I don't recall specifically but know that I
22  thought it.  I don't know if I vocalized it.
23     Q.   (BY MS. ANDREWS)  Did they set your schedule?
24     A.   Yes.
25     Q.   Are you aware that's directly opposite of the

---

BROOKE LAYTON November 2, 2021                    30

1      A.   They --
2          Each week before the next week of work, they
3  came in.  You had to work a -- what was considered a
4  first of the week shift, which was a Saturday, Sunday or
5  Monday during specific times.  And then I was required
6  to work three days the following week that I -- that
7  schedule was set with them.  And then if I did not work
8  one of those days, if I did not work a first, I would
9  automatically be charged $100.  If I did not work a
10  fourth shift, I would also be charged $100.
11     Q.   So you had the option of paying or working
12  certain shifts?
13     A.   I had to pay to work every shift.  If I missed a
14  shift, it also cost me $100, so I tried not to miss any
15  shifts so I wouldn't have to owe the club money.
16     Q.   Speaking of that, did you get tips or get
17  entertainment fees from working when you were dancing?
18         MS. REZAZADEH:  Objection, form.
19     A.   What is constituted as entertainment fees?
20     Q.   (BY MS. ANDREWS)  I believe it --
21          Did you work for free at the club?
22     A.   No, I had to pay to work.
23     Q.   Did you earn any money at the club?
24     A.   Yes, the club had a standard set fee for $20 per
25  dances.  They also had a set fee if -- for VIP.

---

BROOKE LAYTON November 2, 2021                    29

1  response you had in your request for admission?
2      A.   What was my response?
3      Q.   The opposite.  Like, so I'm confused now.
4          So you're now saying they did set your work
5  schedule?
6      A.   Am I able to see what the previous responses
7  that you're talking about?
8      Q.   I'd like --
9          MS. REZAZADEH:  You are, actually, Brooke.
10  Thank you.
11          Latrice, please show her the document you're
12  referring to.  She's asked to refresh her recollection
13  and to see the document you're referring to.  She's
14  entitled to see it.
15         MS. ANDREWS:  I don't have an obligation to
16  do that now.
17         MS. REZAZADEH:  If you want to ask her a
18  question about it, then you need to show it.
19         THE REPORTER:  I'm sorry.  I can't take it
20  down when you are both speaking at the same time.  I'm
21  sorry I just cannot.
22         MS. ANDREWS:  Understood.  We will try to
23  slow down the overtalking.
24     Q.   (BY MS. ANDREWS)  Is it your testimony right now
25  that they set your schedule?

---

BROOKE LAYTON November 2, 2021                    31

1          MS. ANDREWS:  Objection, non-responsive.
2          MS. REZAZADEH:  Go ahead and finish, Brooke.
3      A.   They also had a fee for a Champaign Room, so
4  there were multiple fees that the club did set that I
5  was able to work with, that I had to work with what the
6  club's standards were.
7      Q.   (BY MS. ANDREWS)  So my question was, did you
8  earn money when you worked at the club?
9      A.   Yes.
10     Q.   If you did not earn money, would you have still
11  worked there?
12     A.   No.
13     Q.   Did you lose money working at the club, or did
14  you make more money working at the club?
15         MS. REZAZADEH:  Objection, form.
16     A.   All of that varies because there were days that
17  I was literally going into work to pay my mandatory
18  leave fee and my mandatory tip-out in order to not owe
19  the additional $100.  So there would be days I would be
20  leaving negative just so I wouldn't owe the club more
21  money.  On average, I was spending $75 a shift -- $76 a
22  shift to work.
23     Q.   (BY MS. ANDREWS)  And how much were you making a
24  shift?
25     A.   Again, its varies.  Sometimes I would leave

BROOKE LAYTON  November 2, 2021    32

1  negative; sometimes a standard day may be, you know, I
2  leave with $100. But there were many times that, again,
3  I didn't leave with any money; I paid the club money.
4     Q.  So your testimony is that you -- on average, you
5  paid $100 a day?
6     A.  Again, it varies with the times that I would
7  leave negative to other times. It just depends on the
8  day. It literally just depended on the day.
9     Q.  Like any other business, correct?
10    A.  I don't know. Some -- I wouldn't say like any
11 other business. Most people know exactly what they're
12 leaving with and what they're making each week.
13    Q.  Employees, yes, but independent contractors, no,
14 correct?
15       MS. REZAZADEH:  Objection, form.
16    Q.  (BY MS. ANDREWS)  What was the most you ever
17 made in a shift?
18    A.  I don't recall.
19    Q.  You don't remember the best days you ever had?
20    A.  One time, I made $700, and that was a one-time
21 thing. And out of my years or like how long I was
22 working there, that was, again, a one-time thing so I
23 would not say that is the average or the norm.
24    Q.  So what is the average or norm?
25       MS. REZAZADEH:  Objection, asked and

BROOKE LAYTON  November 2, 2021    33

1  answered.
2        Go ahead, Brooke.
3     A.  Anywhere from 100 to $200, and it really -- it
4  just depends. But again, I'm paying $100. I'm paying
5  anywhere from 76 to $100 to work.
6     Q.  (BY MS. ANDREWS)  So you made or --
7        And you said you worked four shifts a week?
8     A.  Four shifts a week. Again, if I missed a shift,
9  then I owed the club money. In order to be able to work
10 there, they would put a hold --
11       MS. ANDREWS:  Objection, non-responsive.
12    A.  They would put a hold on your funds that you
13 would have to come in and pay before you could work
14 again.
15    Q.  (BY MS. ANDREWS)  So you worked four shifts a
16 week on average, correct?
17    A.  That was mandatory, yes.
18    Q.  And how long was each shift?
19    A.  Each shift was eight hours. Often times, I
20 would leave early, and that would require a $50 pay-out
21 to the club in order to leave early. I always got there
22 before 11, and I usually left around 5 because it just
23 wasn't conducive for my mental health to continue
24 working into the later part. So I would pay $50 to
25 leave, and then I had a mandatory $26. $10 to the house

BROOKE LAYTON  November 2, 2021    34

1  mom, $10 to the DJ, 6 to the bar that I had to pay every
2  shift, regardless.
3     Q.  Do you think it's odd that you remember all of
4  this but you don't remember how much money you would
5  make on average?
6        MS. REZAZADEH:  Objection, form.
7     A.  No, I don't think it's odd.
8     Q.  (BY MS. ANDREWS)  Okay. And how long is -- The
9  normal shift that you worked was how long?
10    A.  Six hours. But again, it was required to work
11 eight if I didn't want to have to pay to leave. It
12 was a mandatory eight-hour shift, and it was $50 to
13 leave before then, which there was no way around that.
14 I paid it to the house, went up to the front to get my
15 ticket, had to have mom sign off on it and the DJ, then
16 I was able to leave at that point.
17    Q.  Okay. So just so that I understand your
18 testimony, you're saying that on average you made 100
19 and $200 a night, correct?
20    A.  During the day, I was a daytime worker.
21    Q.  Okay. And I'm saying that you worked on
22 average four shifts per week, correct?
23    A.  Yes.
24    Q.  And you're saying on average that your shifts
25 were six hours?

BROOKE LAYTON  November 2, 2021    35

1     A.  Give or take, yes. There were days I worked a
2  fifth shift because management would say that if you
3  worked an additional shift that they would be willing to
4  forgo any fees and penalties that you had accrued, which
5  they were still getting $75 even if I did work the next
6  day. The $76 dollars never changed.
7     Q.  So you're saying.
8        -- Your testimony is on average you worked
9  24 hours a week, correct?
10    A.  Twenty-four to 32 hours a week.
11    Q.  You testified six hours on average, and you
12 testified four shifts a week on average, correct?
13    A.  Yes, and that varies.
14    Q.  Okay. And you're testifying that you would
15 leave with 100 to $200 each shift, correct?
16    A.  Yes.
17       MS. REZAZADEH:  Objection, form.
18    Q.  (BY MS. ANDREWS)  Is it your testimony that on
19 average you would receive 100 to $200 per shift?
20       MS. REZAZADEH:  Objection, form.
21    A.  Again, it all depends on who was in the club
22 that day, how many workers there were, the competition,
23 if anyone was at the club. Again, it really depends
24 because there would be days that I left negative.
25    Q.  (BY MS. ANDREWS)  So on average, being taking in

BROOKE LAYTON  November 2, 2021                    36

1  all of the variations, what is your testimony that you
2  made each shift?
3          MS. REZAZADEH:  Objection, form.
4      A.  **I thought I already answered that.**
5      Q.  (BY MS. ANDREWS)  I thought you did, but now
6  it's changing, so I'm trying to make sure I understand
7  your testimony.  So I keep asking you on average, it was
8  100 to $200 a shift.  And then you keep saying it
9  varied.  So I'm saying what it means -- to mean on
10  average is when you take into account all of the
11  fluctuations, this is what we're normally at.
12          So I'm trying to find out on average how
13  much are you saying that you took home?
14      A.  **100 to $200.**
15          MS. REZAZADEH:  Objection, form.
16          THE WITNESS:  Can we take a break?
17          MS. ANDREWS:  Sure.
18          MS. REZAZADEH:  Sure.
19          MR. ANDREWS:  Five minutes, ten minutes?
20  Back on at 11?
21          MS. REZAZADEH:  Sure.
22          THE REPORTER:  Going off of the record at
23  10:54.
24          (Recess taken)
25          THE REPORTER:  Going back on the record at

BROOKE LAYTON  November 2, 2021                    37

1  11:06.
2      Q.  (BY MS. ANDREWS)  With regard to your criminal
3  history background, do you have any arrests?
4      A.  **No.**
5      Q.  Have you been involved in any other lawsuits?
6      A.  **No.**
7      Q.  Arbitrations?
8      A.  **No.**
9      Q.  Have you made any other demands under the FLSA?
10      A.  **No.**
11      Q.  Have you ever been sued?
12      A.  **No.**
13      Q.  Did you create your own choreography when you
14  worked at the club?
15      A.  **Can you elaborate on that?**
16      Q.  Did you have choreography when you performed at
17  the club?
18      A.  **No.**
19      Q.  So you didn't create your own choreography?
20      A.  **No, I danced to whatever music I was given.**
21      Q.  Did you prepare or review the request for
22  admission responses?
23      A.  **Do you have a copy of those?**
24      Q.  I do.  I'm just asking, did you prepare or
25  review the admission responses?

BROOKE LAYTON  November 2, 2021                    38

1          MS. REZAZADEH:  Latrice, she would like to
2  see a copy of document you're asking her if she
3  reviewed.  She is entitled to see it or else she can't
4  answer your question.
5          MS. ANDREWS:  If she says she doesn't know,
6  then that's fine too.
7          MS. REZAZADEH:  No, if she asks you to see a
8  document you're asking her about; you're required to
9  show it to her.
10          MS. ANDREWS:  I'm just asking if she did or
11  didn't.  If she says she doesn't know --
12          MS. REZAZADEH:  She can't answer your
13  question unless you show her the document she
14  specifically requested you're asking about, and she
15  asked you to see so she knows that she's talking about
16  the right document.  Not everybody knows what request
17  for admission or request for production, off the top of
18  their head.
19          MS. ANDREWS:  I understand that.  I'm just
20  trying to figure out the truth here.
21          MS. REZAZADEH:  Perfect.  Then show her the
22  document, and you'll get the truth.  She asked you to
23  show her the document.  So --
24          MS. ANDREWS:  I'm going to move on to my
25  next question.

BROOKE LAYTON  November 2, 2021                    39

1          MS. REZAZADEH:  Perfect.
2      Q.  (BY MS. ANDREWS)  Did you or did you not create
3  your own choreography?
4          MS. REZAZADEH:  Objection, asked and
5  answered.
6          Go ahead, Brooke.
7      A.  **I've already answered that.**
8          MS. REZAZADEH:  Go ahead.  You can answer
9  for her.
10      A.  **I did not create choreography; it was whatever**
11  **music I was given to dance to.**
12      Q.  (BY MS. ANDREWS)  Okay.  Do you have any
13  background or training in dance?
14      A.  **I was a Burlesque performer, so yes.**
15      Q.  Where were you a Burlesque performer?
16      A.  **With Her, H-E-R, Sins Burlesque & Cabaret.**
17      Q.  And when was this?
18      A.  **Since 2013.**
19          THE REPORTER:  I'm sorry.  Could you repeat
20  the name of the place.
21      A.  **Her, H-E-R, Sins Burlesque & Cabaret.**
22      Q.  (BY MS. ANDREWS)  And when did you stop working
23  there?
24      A.  **I still work with Her Sins Burlesque & Cabaret**
25  **using the name Shirley Poisin.**

BROOKE LAYTON November 2, 2021                40

1  Q.  And you deactivated that Instagram account?
2  A.  I do not have access to that account.
3  Q.  It's deactivated, correct?
4  A.  Yes.
5  Q.  And you just didn't port the login information
6  to your new phone, correct?
7       MS. REZAZADEH:  Objection, form.
8  A.  I have not logged on to that account since I've
9  had my new phone.
10  Q.  (BY MS. ANDREWS)  You could get the login
11  information, correct?
12       MS. REZAZADEH:  Objection, form.
13  A.  I don't know.
14  Q.  (BY MS. ANDREWS)  Have you tried to get the
15  login information?
16  A.  No, I've also deleted all photos before I
17  deactivated that account.  I deleted all photos from
18  that account.
19  Q.  When did you --
20      Why did you delete all of your photos and
21  deactivate all of your social media accounts?
22  A.  Because I'm a Realtor, and it was not conducive
23  to my work now.
24  Q.  But you're also still a Burlesque dancer?
25  A.  Yes, I didn't perform for 18 months.  I just

BROOKE LAYTON November 2, 2021                41

1  recently performed under Shirley Poisin this past
2  weekend.  But I did not promote that on any form of
3  social media page.
4  Q.  At the time you deleted all of your social media
5  photos and potential evidence in this case, were -- had
6  you consulted attorneys about filing this case?
7       MS. REZAZADEH:  Objection, form.
8  A.  No.
9  Q.  (BY MS. ANDREWS)  Do you still have your old
10  phone?
11  A.  Possibly, but I'm unsure of where it would be.
12  Q.  Is your data stored on a cloud?
13  A.  No.  I previously had an Android phone.
14  Q.  What's your e-mail address?
15  A.  For what?
16  Q.  Well, what are your e-mail addresses?
17  A.  Kimberfoxrealestate@gmail.com and Kimberlayton
18  -- L-A-Y-T-O-N -- 921@gmail.com.
19  Q.  Are your photos backed up automatically on
20  Google Photos since it's an Android?
21  A.  No.
22  Q.  Is it your testimony that you have no photos or
23  videos from prior to 2019 in your possession, custody
24  and control?
25       MS. REZAZADEH:  Objection, form.

BROOKE LAYTON November 2, 2021                42

1  A.  Correct, everything that I had, I sent to my
2  attorney; everything that I could find, I sent to my
3  attorney.
4  Q.  (BY MS. ANDREWS)  Except for your tax returns,
5  correct, and bank statements?
6  A.  Can you show me the form that was asking for
7  those.
8  Q.  But to be clear, you did not provide your tax
9  returns?
10  A.  Again, can I see where it was asking for those?
11  Q.  I'm asking that.  I'm just asking you if you
12  provided them or not.
13       MS. REZAZADEH:  That's fine, Brooke, go
14  ahead; you can answer whatever you recall.
15  A.  I don't know.
16  Q.  (BY MS. ANDREWS)  Okay.  And it was requested
17  for production number 3 that I asked for all tax returns
18  but.
19  A.  Again, can I see that document?
20  Q.  All right.  I think you previously testified you
21  didn't provide it, but that's -- I don't know why
22  we're --
23  A.  You keep asking, so I just want to make sure
24  that I'm recalling correctly.
25  Q.  You said that you didn't give them, so if you

BROOKE LAYTON November 2, 2021                43

1  didn't give them, you didn't give them.  I haven't
2  received anything.
3       MS. REZAZADEH:  She testified that --
4       MS. ANDREWS:  All the tax returns and
5  schedules.
6       MS. REZAZADEH:  You can have the court
7  reporter read it back.  She actually testified.  You're
8  misstating her testimony.  What she said was she wasn't
9  sure.  First she said I thought I did, maybe I didn't; I
10  don't know now.
11       MS. ANDREWS:  I'm talking about when I asked
12  her this the first time.
13       MS. REZAZADEH:  Yeah, that's what I'm
14  talking about, too.  You can have the court reporter
15  read it back if you like.
16       MS. ANDREWS:  I just want to get questions
17  answered and be done but.
18       MS. REZAZADEH:  Move on.
19       BY MS. ANDREWS:  Okay.  I don't know why
20  this is --
21  Q.  (BY MS. ANDREWS)  Okay.  And is it your
22  testimony that you did receive money for performing at
23  the club?
24  A.  Not from the club; from the customers, yes.  The
25  club never paid me.

1    Q.    So is it your testimony that you received money
2    for dancing at the club?
3          MS. REZAZADEH:  Objection, asked and
4    answered.
5          MS. ANDREWS:  She rephrased my question, so
6    she hasn't actually answered the question.
7    A.    Can you elaborate on your question?  If you're
8    referring to did the club pay me or did I receive money
9    from the clients at the club?
10   Q.    (BY MS. ANDREWS)  I'm just asking at all.  Did
11   you receive money at all based upon your performances at
12   the club?
13         MS. REZAZADEH:  And she answered you.  So
14   why are you asking her again?  Because she didn't say it
15   the way you like.  Like, she's not going to change her
16   answer for you.  This isn't going to go on.
17         Go ahead, Brooke, just answer her the same
18   question again and again.
19   A.    I never received money from the club, but I did
20   receive money from the clients at the club; the club
21   never paid me.
22   Q.    (BY MS. ANDREWS)  Did you do any kind of
23   practicing for any of the performances that you had?
24   A.    No.
25   Q.    Did you use any of your skills from your history

1    or training in Burlesque dancing at the club?
2    A.    Yes.
3    Q.    Can anybody be an exotic dancer?
4    A.    Anyone can if they get hired by the club.
5    There's no required skill set for the club to hire you
6    other than looking attractive.
7    Q.    Can you be earn money doing it if you're without
8    any specific skills?
9    A.    Yes, absolutely.
10   Q.    Do you have to know how to manage money?
11   A.    No.
12         MS. REZAZADEH:  Objection, form.
13   Q.    (BY MS. ANDREWS)  Do you have to know how to
14   charge and the amounts to charge certain individuals?
15   A.    Again, these were guidelines; it was the
16   standard.  The club required $20 per dances -- was what
17   everyone had to charge.
18   Q.    Do you recall --
19         So your testimony now is that the club set
20   all prices, is that correct, for the dances?
21         MS. REZAZADEH:  Objection, form.
22   A.    For the dances, yes, they -- The standard was a
23   $20 dance; you were not allowed to charge more.
24   Q.    (BY MS. ANDREWS)  I'm just -- Okay.
25         Did you report all the income that you

1    received from club in your -- on your tax returns?
2          MS. REZAZADEH:  Objection, form.
3          Go ahead, Brooke, you can answer.
4    A.    Yes, but I also recorded all of my losses on my
5    tax returns as well.
6    Q.    (BY MS. ANDREWS)  So what deductions did you
7    take on your losses on your tax returns?
8    A.    Fees paid to the club, as well as any outfits or
9    dance materials required for the club.
10   Q.    Did you deduct, like, hair/makeup?
11   A.    Not if those were things I was using outside of
12   the club.
13   Q.    So sometimes?
14         MS. REZAZADEH:  Objection, form.
15   A.    If it wasn't used inside the club specifically,
16   then no.
17   Q.    (BY MS. ANDREWS)  If it was used inside the
18   club, did you deduct for hair and makeup?
19         MS. REZAZADEH:  Objection, form.
20   A.    No.
21   Q.    (BY MS. ANDREWS)  Then why did you say that you
22   -- So your testimony is that you did not take any
23   deductions for hair and makeup on your tax returns?
24   A.    Correct.
25         And then you mentioned materials; what kind of

1    materials did you take deductions for?
2    A.    Outfits, shoes.
3    Q.    Have you had cosmetic surgery?
4    A.    No.
5    Q.    Botox?
6    A.    No.
7    Q.    Any other injections?
8    A.    Any injections that I have received were when I
9    wasn't working at the club anymore.
10   Q.    Did you adver -- Do you have any expenses for
11   advertising, social media, yourself phone that deducted?
12   A.    I deducted my cell phone, but that was just so I
13   could communicate with clients.  Like, hey, I'm coming
14   in today; can you come see me?
15   Q.    What about any advertising expenses?
16   A.    No.
17   Q.    Did you select the music that you wanted to be
18   played when you were dancing?
19   A.    No, you can give a genere, and that was it.  The
20   DJ chose all the music we danced to.
21   Q.    So it's not correct to say that you had to pay
22   the DJ for certain music?
23   A.    I had to pay the DJ a $10 tip-out to leave.  But
24   if a client wanted to hear certain music, they
25   could pay the DJ $20 to hear that music.

BROOKE LAYTON   November 2, 2021                    48

1    **Q.   So you didn't have to pay the DJ for certain**
2    **music to be played?**
3    **A.   Correct.**
4    **Q.   Was there a maximum amount you could charge for**
5    **a lap dance?**
6    **A.   No, $20 was the rate.  We weren't allowed to**
7    **solicit tips or charge more for dances.**
8    Q.   What's the relationship or --
9        When you would deduct the outfits, how would
10   you select these outfits?
11   **A.   I would go to the dancer store and buy outfits**
12   **that fit the club.  We were not allowed to wear any**
13   **fishnets or anything like that.  We were also required**
14   **on certain days every month that there would be a**
15   **costume day, and if you did not show up in the costume**
16   **that was suitable to the club, you would not be allowed**
17   **to work and a day would be deducted against you.**
18   Q.   Did you have head shots done in 2018/2019?
19   **A.   No.**
20   Q.   Were you working with a photographer in 2018 and
21   2019?
22   **A.   That's right around the time that I was stopping**
23   **modeling as much, but I never had head shots.  They were**
24   **always studio set body shots.**
25   Q.   And were you paying for those?

BROOKE LAYTON   November 2, 2021                    49

1    **A.   No.**
2    Q.   Who was paying for those?
3    **A.   No one.  It was a trade between me and the**
4    **photographer.**
5    Q.   Who was the photographer?
6    **A.   There was many; I don't recall.**
7    Q.   Well, can you name any?
8    **A.   2018, so Sisoliz Images, S-I-S-O-L-I-Z, and that**
9    **was for Pinup Modeling.**
10   Q.   And you were with Pinup Modeling in 2018 and
11   2019, correct?
12   **A.   Yes, I have been a Pinup model since 2013, but I**
13   **would not go in Pinup attire in the club.**
14   Q.   You claim that the club took a portion of tips
15   -- of your tips; explain that to me.
16   **A.   It was mandatory tip-out of before you leave,**
17   **you had to do a mandatory $26 tip-out, $10 to mom, $10**
18   **to the DJ, $6 to the bar; that was mandatory every**
19   **shift.**
20   Q.   So you paid out funds not to the club, but to
21   the DJ, the house mom and the bar, correct?
22   **A.   To employees of the club, yes, I paid out $26**
23   **every shift.**
24   Q.   Do you know whether or not the house mom and the
25   DJ and the bar that you were tipping were employees?

BROOKE LAYTON   November 2, 2021                    50

1    **A.   I assume since they weren't dancers that they**
2    **were employees.**
3    Q.   Okay.  It was your assumption that they are
4    employees, correct?
5    **A.   Correct.**
6    **Q.   Is your testimony that it took no skills to be**
7    **-- to do what you did?**
8    **A.   Yes, you just had to look good naked.**
9    Q.   With regard to the attorney's fees incurred in
10   this case, have you had to pay any?
11       MS. REZAZADEH:  Objection, form.
12   **A.   No.**
13   Q.   (BY MS. ANDREWS)  Do you know how much you owe
14   in attorney's fees?
15   **A.   No.**
16   Q.   Do you know the extent of the costs that have
17   been incurred in this case?
18   **A.   No.**
19   Q.   Have you received any invoice or billing
20   statement related to this case?
21   **A.   No.**
22   Q.   Is it your understanding that this is a
23   contingency case?
24   **A.   I believe so, yes.**
25   Q.   Is it your understanding that you don't have to

BROOKE LAYTON   November 2, 2021                    51

1    pay anything unless you win or get a settlement?
2    **A.   Correct.**
3        MS. REZAZADEH:  Objection, form.
4    **A.   That is correct.**
5    Q.   (BY MS. ANDREWS)  And prior to filing this
6    lawsuit, you never reached out to claim that you were an
7    employee or reached out to the club to claim that you
8    were an employee, correct?
9        MS. REZAZADEH:  Objection, form.
10   **A.   Can you repeat the question?  I'm sorry.**
11   Q.   (BY MS. ANDREWS)  So rather than talking to the
12   club first, you just filed a lawsuit claiming you're an
13   employee, correct?
14       MS. REZAZADEH:  Objection, form.
15   **A.   I never brought this to the owner's attention.**
16   **I remember a conversation once with mom of just asking**
17   **in general if -- just bringing up, are we employees or**
18   **independent contractors, because I had been sent home**
19   **for not wearing the mandatory outfit.**
20   Q.   (BY MS. ANDREWS)  And again, did you ever bring
21   this to the club owner's attention?
22   **A.   No, I was fearful of being fired during the**
23   **time.**
24   **Q.   What other clubs have you worked at?**
25   **A.   During my time at PT's, I had a couple of months**

BROOKE LAYTON  November 2, 2021                    54

1    of breaks where I worked at the Mens Club in Dallas;
2    that was not suitable for me, so I tried Bucks Cabaret
3    in Dallas.  After the Mens Club, I tried to go back to
4    PT's, and that's when they told me that I owed $300.  So
5    at that point in time, I went to a different club, which
6    was Bucks Wild in Dallas.
7        Q.    When did you stop or leave PT's and start going
8    to Mens Club?
9        A.    I was maybe at Mens Club from maybe just July
10   and August.
11       Q.    Of 2000 --
12       A.    -- of 2019.
13       Q.    Okay.  When were you at Bucks Cabaret?
14       A.    After I left PT's Mens Club in January, so I
15   started working at Bucks in January of 2020.
16       Q.    Have you sued these clubs, too?
17       A.    No, I did not work there long enough.  They also
18   didn't have a mandatory fee to leave or a required
19   tip-out.
20       Q.    And where are you --
21             Are you working at any clubs now?
22       A.    No, I haven't worked at any clubs since March of
23   2020.
24       Q.    So can you describe what you did when you were
25   working at -- we'll start at PT's; what did you do?

BROOKE LAYTON  November 2, 2021                    54

1        A.    No.
2        Q.    Were you involved in illegal sexual activities?
3        A.    No.
4        Q.    Did you work over 40 hours a week?
5        A.    When?
6        Q.    Well, you've got a claim for overtime, so I'm
7    trying to figure out how.
8              So did you work more than 40 hours in a
9    week?
10       A.    Can I see what you're referencing?
11       Q.    Did you -- I'm just asking did you work -- like,
12   did you work more than 40 hours a week?
13             MS. REZAZADEH:  Again, Latrice, when she
14   asks to see a document you're referring to --
15             MS. ANDREWS:  I'm not referring to a
16   document.  I'm asking her her recollection.
17             MS. REZAZADEH:  She wants to see the
18   document.  I mean, I just want to make it clear for the
19   record that you have repeatedly declined her request to
20   see documents you're specifically asking her about, so,
21   you know, that's fine.  That's how you want to obtain
22   your testimony from her by misleading her or not
23   providing her all the information she needs to answer
24   your questions, but I just want to make it clear for the
25   record.

BROOKE LAYTON  November 2, 2021                    53

1        A.    I entertained guests or customers that came in.
2        Q.    How?
3        A.    By dancing.
4        Q.    And how would you --
5              Was there any way that you would make more
6    or less money?
7        A.    By providing more dances.
8        Q.    And how could you provide more dances?
9        A.    By the client asking for more dances.
10       Q.    Is it your testimony that you didn't receive any
11   tips?
12       A.    I received tips while on stage, and sometimes
13   walking through the club, people that were tipping would
14   give you a dollar or two.
15       Q.    How much would you normally receive in just the
16   tips each night?
17       A.    Again, I was a daytime worker so tips weren't as
18   lucrative as they would have been at night, so.
19       Q.    How much did you receive in tips during your
20   shift?
21       A.    Average 20 to $30.
22       Q.    Did you engage in any inappropriate conduct
23   while working at the club?
24       A.    No.
25       Q.    Were you involved in using drugs?

BROOKE LAYTON  November 2, 2021                    55

1              Go ahead, Brooke, she's not going to show it
2    to you.
3        Q.    (BY MS. ANDREWS)  I'm asking a question.  If you
4    worked more than 40 hours a week.  That's my question.
5    It's not about a document.  I'm asking a question.
6              MS. REZAZADEH:  You brought in the document
7    into question by saying you made a claim for it.  And
8    she asked to see the document you're referring to that
9    she made the claim for it.  So you --
10             MS. ANDREWS:  If she's not making a claim
11   for it, then I don't need to worry about it.
12             MS. REZAZADEH:  All right.
13       Q.    (BY MS. ANDREWS)  My question is do you claim
14   that you worked 40 hours a week or more than 40 hours a
15   week?
16       A.    So again, you said that that is one of the
17   claims that is in this case, and I would just like to
18   verify that claim, a claim for over -- for overtime.
19       Q.    Did you work overtime?
20       A.    On average, I worked 32 hours a week.  But
21   again, that varies on how long I stayed.  If I came in
22   for additional shifts.  There would be some days that I
23   worked six days; there would be some days I would go in
24   and work all seven days.
25       Q.    Are you aware you just changed your testimony

BROOKE LAYTON  November 2, 2021                          56

1  again?

2      MS. REZAZADEH:  Objection, form,

3  argumentative, I mean.

4      Q.  (BY MS. ANDREWS)  Are you aware that you just

5  changed your testimony regarding the amount of hours you

6  said you worked on average?

7      MS. REZAZADEH:  She did not, so I don't know

8  why you're misstating the record.  She said the same --

9      MS. ANDREWS:  That's not an objection.

10  That's not true.  She testified in here that she worked

11  24 hours or worked an average of 24 hours, 32 hours --

12  shifts.

13      MS. REZAZADEH:  We can pull it back on the

14  record.  You can have the court reporter read it back to

15  you.  Is 24 to 32 is what she said.  So if you're going

16  to nitpick on it, she said the number 32 earlier.  So

17  she is not changing her testimony as you are

18  misrepresenting to her.  And she's entitled to know.

19      A.  At that time, I wasn't being asked about

20  overtime as well.  And again, all of these are averages,

21  so there would be days that I did work more.  On

22  average, it was required that I had to work at least

23  four shifts or I would owe the club money.  But often

24  times if I had missed a week before or missed a shift

25  or missed a first, the club would require that I

BROOKE LAYTON  November 2, 2021                          57

1  came in for an additional shift or additional shifts in

2  order to forgo that $100 that I owed them or sometimes

3  more money.

4      Q.  (BY MS. ANDREWS)  What are you claiming your

5  damages are in this case?

6      A.  I haven't calculated any damages.

7      Q.  How much are you --

8          It's your testimony that you don't know how

9  much you're owed?

10      A.  Correct.

11      Q.  How do you plan on coming up with the amount

12  that you're allegedly owed?

13      A.  By discussing with my attorney.  This was not

14  something that we prepared ahead of time.  We didn't sit

15  down and write all of this down together.

16      Q.  You're suing for money, correct?

17      A.  Yes.

18      Q.  You want money?

19      A.  Correct.  Money that is owed to me under the law

20  of what being -- money that is owed for me being

21  misclassified as an independent contractor whenever I

22  was doing employee based work.

23      Q.  I understand that's your allegation.  But you're

24  saying you don't know how much money you want, correct?

25      MS. REZAZADEH:  Objection, form.

BROOKE LAYTON  November 2, 2021                          58

1      A.  That is correct.  I answered that.

2      Q.  (BY MS. ANDREWS)  Do you have a calendar or any

3  records of time that you're saying that you worked at

4  the club?

5      A.  No, but the club keeps diligent records, so you

6  would have all of those records.

7      Q.  It is your testimony that you recall having to

8  sign in or sign out?

9      A.  I had to sign in every day and I had to sign out

10  every day to leave.

11      Q.  And in those times and those time records would

12  be accurate, correct?

13      MS. REZAZADEH:  Objection, form.

14      A.  It depends on what records the club has kept and

15  also what records they have provided to you.

16      Q.  (BY MS. ANDREWS)  How would you know if they

17  were accurate or not?

18      A.  Based off of me signing in and providing the

19  last four digits of my social with my stage name.

20      Q.  And how were you paid by customers for the

21  dances that you provided?

22      A.  Cash.

23      Q.  Who would know how much money you would make a

24  night other than you?

25      A.  I wouldn't know that.

BROOKE LAYTON  November 2, 2021                          59

1      Q.  Have you kept any record of exactly how much

2  money you made while working at the club?

3      A.  No.

4      Q.  Did you understand that that was part of the

5  contract or an obligation that you had under the

6  contract?

7      A.  Again, no one went over the contract with me.

8  No one told me that -- it wasn't like an introduction to

9  independent contractor class that they sat everyone down

10  and said these are the requirements.  Those were not

11  enforced.  So if it was in the contract that I signed,

12  no one enforced it and no one made sure that that's what

13  we were doing.

14      Q.  What did the club, I guess, do for you such that

15  you thought it was a good idea to keep coming back?

16      A.  It wasn't the club; it was the clients and the

17  potential to make money.  There's also not a lot of day

18  shifts in the Dallas-Fort Worth area that are lucrative

19  such as PT's.  Most daytime clubs, there's no activity

20  or most clubs during the daytime, there is no activity.

21      Q.  So it was lucrative to work there?

22      A.  Lucrative to my survival, yes.

23      Q.  And what do you mean by "potential to make

24  money"?

25      A.  Again, it depends on how well the club

1  advertised, what promotions the club did to bring
2  customers in.  But just going in on a day shift, you
3  were more likely to have more people; that didn't
4  necessarily mean those people were tipping or buying
5  dances from you.
6     Q.   Did you make a determination that you had the
7  potential to make more money at PT's than other clubs in
8  town?
9     A.   PT's hired me, so that's where I stayed to work.
10  Again, I tried working at other clubs during the day,
11  and that was not -- there wasn't money there.  So PT's
12  is where I did my day shift.  I also tried to get hired
13  at another club that would not hire me because I have
14  tattoos.  So my options were very limited.
15     Q.   So it's your testimony you made more money at
16  PT's than you did at Mens Club, correct?
17     A.   Correct.
18     Q.   How much money did you make at Mens Club?
19     A.   I didn't.  I would go multiple days without
20  making any money whatsoever.
21     Q.   What about at Bucks Cabaret?
22     A.   That's why I left PT's was because Bucks had a
23  better daytime shift.
24     Q.   You're able to move around like that from job to
25  job, correct?

1     Q.   Are you aware that there's a collective action
2  waiver that you signed?
3     A.   May I see the document?  Is this my --
4     Q.   See understands and agrees -- Understands and
5  acknowledges, do you see that paragraph?
6     A.   Yes.  At the time, that's not what I realized I
7  was signing.  And again, I didn't join the lawsuit with
8  Julia Predmoore, and I don't know if she's part of this
9  one.
10     Q.   But you understand this is a collective action,
11  correct?
12     A.   If I'm the only one, is it a collective action?
13     Q.   Is it your understanding you're the only person
14  in this lawsuit?
15     A.   Yes.
16     Q.   Do you know who Ashland Shipley is?
17     A.   Yes, but I don't know anything -- I don't know
18  if she's actually joining the lawsuit and will go
19  through with it.
20     Q.   Have you spoken to Ashland Shipley?
21     A.   I let her know that this was happening, and that
22  was as far as it got.
23     Q.   Have you solicited any other individuals to join
24  your lawsuit?
25     A.   No.

1     A.   You're not allowed to work at other clubs for
2  the same shift.  Because again, PT's has a standard four
3  days that you have to work, potentially more, so it
4  doesn't really leave room to work at other clubs while
5  working at PT's.
6     Q.   Who have you talked to regarding this lawsuit?
7     A.   My attorney, my husband knows.  I had mentioned
8  to one person that there may be a lawsuit, someone else
9  that had let me know that they were already part of a
10  lawsuit against PT's.
11     Q.   And who was that person?
12     A.   Julia Predmoore.  But I'm not familiar with that
13  case.
14     Q.   And when did you have this discussion?
15     A.   A few months ago.
16     Q.   And what did y'all talk about specifically?
17     A.   She had actually asked me if I would be
18  interested in joining a lawsuit that her lawyer set, and
19  I let her back to her.
20     Q.   Do you understand that this was filed as a
21  collective action?
22     A.   Yes, I believe that Julia has also spoken with
23  Ghazzaleh now, but I don't know if they've made contact.
24  I'm not sure because I don't know what other clients
25  Ghazzaleh has.

1  What else did you say about this lawsuit?
2          MS. REZAZADEH:  Objection, vague.
3          MS. ANDREWS:  That's fair.
4     Q.   (BY MS. ANDREWS)  What else did you tell Ashland
5  about this lawsuit?
6          MS. REZAZADEH:  Objection, misstates
7  testimony.
8          Go ahead, Brooke, you can answer.
9     A.   Again, I didn't really tell her anything.  I
10  just told her that there's a potential lawsuit going on.
11  But I, again, don't know how far she is in her process
12  with this.  And since all this has become more serious,
13  I haven't really talked with her, not about this
14  lawsuit.
15     Q.   (BY MS. ANDREWS)  When did you speak with her?
16     A.   In regards to this lawsuit?
17     Q.   Yes.
18     A.   Maybe like two months ago.
19     Q.   Have you spoken with her about anything else
20  since then?
21          MS. REZAZADEH:  Objection, vague, too
22  general.
23     Q.   (BY MS. ANDREWS)  Have you spoken with Ashland
24  at all since your conversation two months ago?
25     A.   I asked her if she had any photos of us when we

BROOKE LAYTON   November 2, 2021                    64

1    were working together.
2    Q.    And what was her response?
3    A.    **She never sent me any, so.**
4    Q.    How did you reach out to her?
5    A.    **I called her, messaged her; I'm not sure.**
6    Q.    Did you produce any of those communications to
7    your attorney?
8    A.    **No, I wasn't asked to.**
9    Q.    Request for production number -- do you know --
10         What do you know about Mainstage Management,
11   Inc.?
12   A.    **Based off the lawsuit, that is the company that**
13   **owns PT's. Before that, I had no knowledge about the**
14   **company.**
15   Q.    It's not the entity that owns PT's.
16         Do you know of anybody at Mainstage
17   Management, Inc. that hired or fired or had any
18   involvement with your tenure there?
19   A.    **I'm assuming the owner Nick, but no.**
20   Q.    Do you --
21   A.    **I don't know -- I don't know if people were**
22   **employees of Mainstage that also controlled my work. I**
23   **wasn't privileged to that information.**
24   Q.    Do you have any information regarding Mainstage
25   Management, Inc. that would make you think or that makes

BROOKE LAYTON   November 2, 2021                    65

1    you think they were involved in setting your rate of pay
2    or hiring and firing or anything related to your
3    relationship with PT's?
4    A.    **I'm not sure who set the club standard of the**
5    **$20 plus the 50 or the $76 that was mandatory. Again, I**
6    **don't know the inner workings of the club on that level,**
7    **so that information was not readily available to the**
8    **workers.**
9    Q.    So to be clear, you do not have any information
10   about Mainstage Management, Inc. and it being involved
11   with your employment or alleged employment?
12         MS. REZAZADEH:  Objection, form.
13   A.    **Again, I wasn't given that information.**
14   Q.    ==(BY MS. ANDREWS)  And since the filing of this==
15   ==lawsuit, have you become aware of any information that==
16   ==makes you think Mainstage Management, Inc. was involved==
17   ==with the hiring and firing, setting any practices or==
18   ==involved with your relationship with the club?==
19   A.    ==**Who owns the club? And if Mainstage isn't the**==
20   ==**person that owns the club or the entity that owns it,**==
21   ==**then I don't know why I would have information from**==
22   ==**them, I guess. So do they own PT's?**==
23   Q.    That's part of why I'm trying to find out why
24   they're in the case. So that's why I'm asking if
25   there's a reason that --

BROOKE LAYTON   November 2, 2021                    66

1    MS. REZAZADEH:  If you're presenting that
2    there's another entity that owns the club that we're
3    discussing, then you should have identified them in your
4    disclosures, right, potential parties. So the defendant
5    owns the club.
6         Brooke, just answer based on what you
7    remember because you can't rely on what she's telling
8    you. I mean, so I'm just going to recommend. I mean
9    she won't show you the documents either, so.
10   A.    ==**I -- Again, I was not aware that Mainstage was**==
11   ==**involved with PT's, so I do not have that information.**==
12   ==**But is PT's owned by Mainstage Entertainment?**==
13   Q.    (BY MS. ANDREWS)  So you don't know what
14   Mainstage Entertainment is?
15   A.    **I'm sorry. What was that?**
16         MS. REZAZADEH:  Talking about the owner of
17   the club. Answer the questions based on whoever the
18   owner of the club is even though we don't -- she's not
19   going to clarify for you who is the owner and who is
20   not, so all you can do is answer.
21   Q.    (BY MS. ANDREWS)  Will you identify any of the
22   managers and/or people that you know were involved with
23   setting these policies or fees or the basis of your
24   claims.
25   A.    **Are you asking if I know which managers I worked**

BROOKE LAYTON   November 2, 2021                    67

1    with?
2    Q.    Can you identify -- if you can identify the
3    people who were involved in hiring, firing day-to-day?
4    A.    **The manager was there most consistently was**
5    **Jessie. I don't know his last name. And I only**
6    **remember his name because there was multiple Jessie's**
7    **that worked at the club.**
8    Q.    Okay.
9         THE WITNESS:  Would we be able to take
10   another break? I'm sorry.
11        MS. ANDREWS:  Sure.
12   (Recess taken)
13        THE REPORTER:  Going back on the record.
14   Q.    (BY MS. ANDREWS)  Ms. Layton, are you aware of a
15   counter-claim having been filed in this case?
16   A.    **Like a claim from the people that you represent?**
17   Q.    Correct.
18   A.    **I believe so, yes.**
19   Q.    Okay. I'm going to try to share my screen.
20   ==Okay. Do you have records of how much money you made==
21   ==when you were working at the club?==
22   A.    ==**No.**==
23   Q.    ==Do you have any accurate or reliable information==
24   ==regarding the entertainment fees you made while you were==
25   ==working at the club?==

BROOKE LAYTON  November 2, 2021                68

1    A.   No.
2    Q.   Okay.  Do you recall testifying earlier about
3  there being sign-in sheets?
4    A.   Yes, that is correct.
5    Q.   Okay.  I'm going to open -- Let me share my
6  screen.  If I can get it to rotate.  Let's see what
7  happens when I press this; no, that did not do it.
8  There we go.
9         Are these kind of the type of sign-in sheets
10  that you were discussing?
11   A.   Yes, these are the sign-in sheets for the club
12  while I was working there.
13   Q.   And can you tell me how this was used?
14   A.   It was used for the club's records to verify
15  that you worked your required shifts, as well as what
16  time you clocked in and clocked out.
17   Q.   Okay.  And the first timesheet they have for you
18  is --
19        MS. ANDREWS:  And this will be marked as
20  Exhibit 8.  And I'm going to go back and try to fill in
21  all my exhibits really fast.
22        (Defendant's Exhibit No. 8 was marked.)
23   Q.   (BY MS. ANDREWS)  So the first timesheet they
24  actually have you coming in would be on July 15, 2018?
25        MS. REZAZADEH:  Has that been produced?

BROOKE LAYTON  November 2, 2021                69

1        MS. ANDREWS:  I actually got them today or
2  yesterday.  We've been going through them.
3        MS. REZAZADEH:  I'm not going to be able to
4  have you question her about them.  I haven't had the
5  chance to -- We haven't had the chance to review them.
6  I haven't had a chance to review them.  So if you want
7  to take a break so I can review them with her?
8        MS. ANDREWS:  I have a packet coming to
9  y'all and hopefully y'all will produce some documents to
10  me because I don't have anything.
11        MS. REZAZADEH:  We're not going to be able
12  to allow you to ask her questions about documents that
13  you haven't produced and --
14        MS. ANDREWS:  I already got the one I wanted
15  on the record.
16        (Defendant's Exhibit No. 2 was marked.)
17   Q.   (BY MS. ANDREWS)  So with regard to the
18  complaint we discussed earlier, did you ever -- have you
19  had a chance to look at the complaint that was filed in
20  this case?
21   A.   No, I have not reviewed it.
22   Q.   So you don't know the allegations that have been
23  and the basis of the claim in the lawsuit that you're
24  asserting against my clients?
25   A.   Just to clarify, you're saying that this is the

BROOKE LAYTON  November 2, 2021                70

1  counter-claim?
2    Q.   No, this is this complaint that your attorney's
3  filed on your behalf against --
4    A.   Yes, I have.  Yes, I have seen this.
5    Q.   Okay.  So earlier, we were discussing overtime
6  allegations; do you recall that discussion?
7    A.   Yes.
8    Q.   And one of the claims in the case -- I thought I
9  had written down the page number, but I have not.
10        So the second cause of action in your
11  complaint is there was a failure to pay overtime wages;
12  do you see that?
13   A.   Yes.
14   Q.   And do you have any specific week that you can
15  identify where you worked 40 hours?
16   A.   Without seeing the club records, no.
17   Q.   Other than the club records, would you have any
18  way to identify whether there were overtime hours due?
19   A.   Not that I recall.
20   Q.   And if the club records don't show that you ever
21  worked 40 hours a week, is it your contention that that
22  would be correct?
23        MS. REZAZADEH:  Objection, form.  I'm going
24  to instruct her not to answer.  The question is
25  misleading.  She can't answer when she hasn't seen the

BROOKE LAYTON  November 2, 2021                71

1  club records you're relying on.
2        MS. ANDREWS:  I don't think that's
3  misleading.
4    Q.   (BY MS. ANDREWS)  And are you stating that the
5  club records are the only records that would be able to
6  prove or disprove whether you had overtime?
7        MS. REZAZADEH:  Objection.
8        You can answer, Brooke, if you can.
9    A.   I don't know how to answer this one.
10        MS. REZAZADEH:  You're fine.  Just answer
11  whatever you know.
12   A.   Just depending on how well of records the club
13  kept, then yes.
14   Q.   (BY MS. ANDREWS)  Can you independently identify
15  a week that you worked more than 40 hours?
16   A.   No, not off the top of my head.
17   Q.   Was there a week that you know of that you
18  actually worked more than 40 hours?
19        MS. REZAZADEH:  Objection, asked and
20  answered.
21   A.   Not off the top of my head, but I know there
22  were some weeks that I did go in and work five to six
23  shifts, potentially more.
24   Q.   (BY MS. ANDREWS)  Okay.  What weeks were those?
25   A.   Typically rent weeks.

BROOKE LAYTON  November 2, 2021          72

1   Q.  When was a rent week?
2   A.  Usually the end of the month and the first week
3   of the month, depending on when rent was due, which was
4   typically the third or the fifth?
5   Q.  And if that is not reflected in any of the
6   records, do you have any other way to prove that you
7   worked overtime?
8   A.  No.
9   Q.  According to their records, the first day that
10  you worked would have been July 15, 2018; does that
11  sound correct to you?
12      MS. REZAZADEH:  Objection, form.  Again, I'm
13  not going to allow her to answer questions about records
14  she's not had an opportunity to review, neither have I.
15  Q.  (BY MS. ANDREWS)  Does July 15, 2018 sound like
16  the first date you may have worked?
17  A.  Potentially.  It depends on the contract that I
18  signed for 2018 and when that date was.
19  Q.  And then November 27, 2000 -- November 27, 2019
20  is the last time they have you signed in in 2019; does
21  that sound like the correct date -- last date you
22  worked?
23      MS. REZAZADEH:  I'm going to object and
24  instruct my client not to answer.  This is misleading
25  questioning because she has not had the benefit of

BROOKE LAYTON  November 2, 2021          74

1   that would be my for sure date.
2   Q.  And you testified earlier that you didn't work
3   in June or July because you were working at the Mens
4   Club, correct?
5       MS. REZAZADEH:  Objection, misstating
6   testimony.
7   A.  Again, I don't know the for sure months; that is
8   my best guess, but I do know it was during the summer at
9   some point.
10  Q.  (BY MS. ANDREWS)  Okay.  Would it be accurate to
11  say it was from about May 15th until August 3rd you did
12  not provide services?
13      MS. REZAZADEH:  Objection, asked and
14  answered.
15  A.  Do you have documentation stating those dates?
16  Q.  (BY MS. ANDREWS)  Yeah, I do but your attorney
17  doesn't want for you to look at them yet.
18      MS. REZAZADEH:  She didn't want to produce
19  them.
20      MS. ANDREWS:  As I stated on the record, I
21  received them yesterday.
22      MS. REZAZADEH:  While we're on the record, I
23  saw that's like a 100-page document.  Are you going to
24  serve those on plaintiffs today?
25      MS. ANDREWS:  Yeah, I actually have a

BROOKE LAYTON  November 2, 2021          73

1   reviewing the records you're relying on, neither have I.
2   Q.  (BY MS. ANDREWS)  Do you recall testifying
3   earlier that your last day was sometime in December
4   2019?
5       MS. REZAZADEH:  Go ahead, Brooke.
6   A.  Yes.
7   Q.  (BY MS. ANDREWS)  Could it actually have been
8   November 27, 2019?
9   A.  Without seeing the records, I don't know.
10  Q.  Do you have anything to show or prove that you
11  worked at all in December of 2019?
12  A.  Not at this time.
13  Q.  Not at this time or there is not anything?
14  A.  Not at this time.
15  Q.  What documents do you think you have that could
16  prove that you worked in December 2019?
17  A.  I don't actually know.
18  Q.  What would you --
19      What were you wanting to look at and refer to
20  to prove that you worked in December of 2019?
21  A.  I remember having a show with my Burlesque group
22  for December.  December was usually whenever we were
23  traveling for shows.  And I remember I had to miss a
24  show that was in Denton on December 6, 2019 because I
25  had come from a club drunk, so I could not perform.  So

BROOKE LAYTON  November 2, 2021          75

1   printed copy and I'll get those out to you.
2       MS. REZAZADEH:  Thank you.
3       MS. ANDREWS:  You're welcome.  And I would
4   really appreciate if y'all would produce any documents
5   because we have nothing from y'all and it's not
6   appropriate to say that you'll produce it at an agreed
7   upon time under the Federal Rules of Civil Procedure.
8   So if y'all could actually produce them, that would be
9   fantastic so that we're all in compliance.
10  Q.  (BY MS. ANDREWS)  With regard to -- We've
11  discussed, I think -- I think Exhibit 3 is --
12      MS. ANDREWS:  Donna, is Exhibit 4 the
13  contract?  I believe that's already been marked.  Can
14  you confirm?
15  Q.  (BY MS. ANDREWS)  And in 2018, you testified
16  that you signed the contract and you started working,
17  correct?
18  A.  Whatever form you showed me, that's what I
19  signed.
20  Q.  And this is actually the 2019 version, so this
21  is the second time that you signed the contract?
22  A.  This does not -- To my recollection, this wasn't
23  the same club or the same agreement that I signed when I
24  start working in 2018.  This was a new agreement that if
25  they decided to rehire you, you had to sign it in order

BROOKE LAYTON  November 2, 2021                76

1  to be an independent contractor.

2  **Q.**  But you signed this one in 2019, correct?

3  **A.  Yes.**

4  **Q.**  And it wasn't forced on you to be there; you

5  chose to sign again, correct?

6      MS. REZAZADEH:  Objection, form.

7  **A.  If I wanted to continue working at PT's, it was**

8  **required that I had to sign this.**

9  **Q.**  (BY MS. ANDREWS)  And this would have been the

10  second time you signed a License And Lease Agreement

11  with them, correct?

12      MS. REZAZADEH:  Objection, I'm going to

13  instruct her not answer because if you have an agreement

14  she signed in 2018 then you need to show it to her.  You

15  haven't produced it.  She hasn't had the benefit of

16  reviewing it.

17      MS. ANDREWS:  She's already testified she

18  signed the document in 2018.

19      MS. REZAZADEH:  Yeah, but she doesn't --

20      MS. ANDREWS:  She's already testified she

21  signed the document in 2018, that it was the license and

22  lease agreement.

23      MS. REZAZADEH:  You're misleading.  Go

24  ahead.

25  **A.  Can I see the 2018 document that you're**

---

BROOKE LAYTON  November 2, 2021                77

1  referring to?

2  **Q.**  (BY MS. ANDREWS)  I don't have that one.  I have

3  the 2019 one, which is the one, the second document

4  you're saying you signed in January of 2019.

5  **A.  Yes, this is the document I signed in 2019.  The**

6  **club, again, the first one that I signed, I don't**

7  **remember it being like this.  It was just me putting in**

8  **my name, and I thought it was...**

9  **Q.**  Okay.

10      (Defendant's Exhibit No. 5 was marked.)

11      MS. ANDREWS:  This is what's Exhibit 5 or

12  will be marked as Exhibit 5.

13  **Q.**  (BY MS. ANDREWS)  Have you seen these initial

14  disclosures before?

15  **A.  I can't say for certain.  This is the 2019 or**

16  **this is the case??**

17  **Q.**  This is the case.  This is the thing your

18  attorneys prepared on your behalf, and I'm trying to

19  find out if you reviewed it so I can ask you about it.

20  But if you've never seen it, then we're wasting our

21  time.  So does any of this look familiar to you?

22  **A.  Again, I got a lot of documents, and I reviewed**

23  **them as they came in.  But I don't really have in detail**

24  **understanding that an attorney would on the documents.**

25  **Q.**  Have you seen this before?

---

BROOKE LAYTON  November 2, 2021                78

1      MS. REZAZADEH:  Objection, asked and

2  answered.

3      MS. ANDREWS:  It has not been answered.

4  **Q.**  (BY MS. ANDREWS)  Have you seen this particular

5  document before?

6  **A.  I believe so.**

7  **Q.**  Okay.  Other than your assumption that the

8  Mainstage Management, Inc. has ownership of PT's, is

9  there any other reason that you would consider them an

10  employer?

11  **A.  Yes, they gave directions to management or**

12  **anyone that worked for the club on what was supposed to**

13  **happen.  If this is Nick's company, then Nick is the**

14  **owner, he created the requirements.**

15  **Q.**  So what specifically are you saying that

16  Mainstage Management, Inc. did related to PT's?

17      MS. REZAZADEH:  Objection, vague, too

18  general.

19      You can answer, Brooke, if you can.

20  **A.  I mean, this is the company that -- It says at**

21  **the top, it says Mainstage Management for d/b/a PT's**

22  **Club for Nick.  So they are the LLC that holds the**

23  **company.**

24  **Q.**  (BY MS. ANDREWS)  Is it your understanding that

25  because Nick may or may not own an interest in Mainstage

---

BROOKE LAYTON  November 2, 2021                79

1  Management, Inc., that's enough for it to be an

2  employer?

3      MS. REZAZADEH:  Objection, vague, ambiguous,

4  confusing.

5  **A.  Can you scroll back up to top of this, please?**

6  **Based off of what the defendants or who the defendants**

7  **are, then yes, I would say they are the management for**

8  **this club.  Nick's Mainstage, Inc. Dallas PT's d/b/a**

9  **PT's Mens Club and Nick Mehmeti like...**

10  **Q.**  (BY MS. ANDREWS)  Are you reading -- So I think

11  I'm -- There are two corporations that are being sued,

12  one being Mainstage Management, Inc., the other being,

13  Nick's Mainstage, Inc., which is Dallas PT's d/b/a PT's

14  Mens Club; do you see that?

15  **A.  Yes.  And if it says the management is in the**

16  **name.  So again, if this is someone that is a part owner**

17  **of PT's, then yes, I would say that they have a say in**

18  **how the club is run and how employees are treated versus**

19  **independent contractors.**

20  **Q.**  And if that entity does not have any ownership

21  of Nick's Mainstage, Inc. PT's, then you would agree

22  that they are not -- should not be in this case,

23  correct?

24      MS. REZAZADEH:  Objection, form, objection,

25  too general, calls for a legal conclusion.

1    MS. ANDREWS:  It's not a proper objection.

2    MS. REZAZADEH:  You can go ahead, Brooke.

3    **A.   So does Mainstage Management have an ownership**

4    **in PT's club?  Do they have a stake in PT's club with**

5    **Nick?**

6    Q.   (BY MS. ANDREWS)  Is that your understanding?

7    **A.   It is my understanding that the management club**

8    **as well as Nick's Mainstage would be the owners of the**

9    **club and would dictate what an employee does and how the**

10   **property is run.**

11   Q.   So it's your belief that Mainstage Management,

12   Inc. has an ownership in Nick's Mainstage, Inc. at PT's,

13   and therefore that's why they're a party; is that

14   correct?

15       MS. REZAZADEH:  Objection, misstates

16   testimony.

17   **A.   I feel I've already answered that question, so I**

18   **don't know how else to answer it.**

19   Q.   (BY MS. ANDREWS)  Have you received a document

20   ever signed by Mainstage Management, Inc. related when

21   you were working at PT's?

22   **A.   Without seeing documentation, I can't say for**

23   **sure.**

24   Q.   Did you ever communicate with someone from

25   Mainstage Management, Inc.?

1    **A.   Unless they were an employee at PT's and also**

2    **Mainstage Management, Inc., I wouldn't have that**

3    **information.**

4    Q.   But do you have any interaction with anyone from

5    Mainstage Management, Inc.?

6    **A.   Without them disclosing that they are part of**

7    **Mainstage Management, Inc., I would not be given that**

8    **information.**

9    Q.   Were you supervised by anybody from Mainstage

10   Management, Inc.?

11   **A.   Again, without knowing that they are represented**

12   **by Mainstage Management as an employee, then that**

13   **information is not readily given to independent**

14   **contractors.**

15   Q.   Other than the name of the entity, is there any

16   reason for you to believe that Mainstage Management,

17   Inc. was an employer of yours?

18   **A.   Again, we weren't given the owners names for the**

19   **club or who runs the club.  I know that Nick is the**

20   **owner of the club, but that doesn't mean other companies**

21   **don't have stakeholds within the same club and also**

22   **provide the requirements for independent contractors and**

23   **how the club is ran.**

24   Q.   My question was other than the name Mainstage

25   Management, Inc., is there anything that makes you think

1    that Mainstage Management, Inc. was an employer of

2    yours?

3        MS. REZAZADEH:  Objection, vague, objection

4    and too general, plus asked and answered.

5        Brooke, go ahead just keep repeating

6    yourself, I guess.

7    **A.   Yeah, again, I wasn't given information.  It's**

8    **not like whenever as an independent contractor you're**

9    **not given here are all of the owners; here's every**

10   **single person that has stakehold.**

11       MS. ANDREWS:  Objection, non-responsive.

12   Q.   (BY MS. ANDREWS)  Do you have anything other

13   than the name of the entity that causes you to believe

14   that Mainstage Management, Inc. was your employer?

15       MS. REZAZADEH:  I'm going to ask you not to

16   interrupt my client and to move on.  Because now you're

17   just harassing.  You've asked her, and she's answered

18   you repeatedly.

19       MS. ANDREWS:  She has not answered my

20   question.  It's a simple yes-or-no question.  She's

21   saying I didn't have this information; I didn't have

22   that.  I'm just asking if there's something that forms

23   her basis and belief other than the name of the company.

24   And she's not answered the question.

25       MS. REZAZADEH:  Like, just because she's not

1    giving you the answer you want doesn't mean you get to

2    ask it over and over again.  She told you she doesn't

3    know; she can't tell you.

4        MS. ANDREWS:  That's not what I'm -- I'm

5    asking if there is anything other than the name of the

6    company that causes her to believe they're involved.

7        MS. REZAZADEH:  Anything other than what?

8    What other things would it be?  Too general, too vague.

9        MS. ANDREWS:  I'm asking why are they being

10   sued.  That's all I'm asking.  If she doesn't have

11   anything other than the name, she can say no.  Is there

12   something other than the name, tell me yes.

13       MS. REZAZADEH:  She doesn't know what you're

14   talking about.  She's answered your bad question the

15   best way she can.

16       You don't have to answer unless she asks you

17   a question.  She can re-ask the question again --

18       If you want.

19       -- and you can answer.

20   Q.   (BY MS. ANDREWS)  When was the first time you

21   heard of Mainstage Management, Inc.?

22   **A.   Am I allowed to see the document that I signed**

23   **in 2019 or the one in 2018?**

24   Q.   I'm just asking you when you first heard the

25   name Mainstage Management, Inc.

BROOKE LAYTON  November 2, 2021                           84

1    A.   I know, and I'm under -- Like this is, like,
2  there -- you know, like I'm under oath right now.  I
3  just want to make sure if I signed something in 2018 or
4  2019 that states Mainstage Management, I would just like
5  to see that to make sure that I'm answering correctly.
6    Q.   If you don't know, you don't know.  Like I
7  really -- That's fine, too.  Like, if you don't know,
8  say I don't know, and then we'll move on.
9         MS. REZAZADEH:  That's fine.  Go ahead,
10  Brooke.  If you don't remember, you don't remember.  If
11  you don't know, you don't know.  Like, it's okay; it's
12  not the end of the world.
13    Q.   (BY MS. ANDREWS)  If this helps at all, I'm
14  scrolling PT's Mens Club to the signatory on that.
15         MS. REZAZADEH:  If you want to represent to
16  her and I can represent to her, I don't think Mainstage
17  Management, Inc. is named in this contract, right,
18  Latrice?
19         MS. ANDREWS:  I don't believe it's named in
20  this contract either.
21    A.   Is Nick's Mainstage in this contract?
22    Q.   (BY MS. ANDREWS)  Probably not.  It's signed by
23  PT's Mens Club.
24    A.   But is it under Nick Mehmeti?
25    Q.   It's signed as d/b/a PT's Mens Club?

BROOKE LAYTON  November 2, 2021                           85

1         MS. REZAZADEH:  Yeah, it's fine, Brooke, if
2  you don't remember.  I mean, it's not on these contracts
3  if that's what you were worried about, like it not being
4  on one of these contracts and you potentially not
5  acknowledging that.
6    Q.   (BY MS. ANDREWS)  Yeah, I just want to know when
7  the first time you heard of Mainstage Management, Inc.
8         MS. REZAZADEH:  Brooke.
9    A.   When this lawsuit was brought.  Because again, I
10  wasn't given the parent company information whenever I
11  signed a contract with PT's Mens Club.
12         MS. ANDREWS:  Objection to the
13  non-responsive portion.
14    Q.   (BY MS. ANDREWS)  Did you ever receive any money
15  or payment from the club?
16    A.   No.
17    Q.   Did the club ever, the club itself, ever take
18  any money from you?
19    A.   Yes, the $76 in which I've referenced where 10
20  goes to mom, that was mandatory; $10 goes to Rubin,
21  which was mandatory; the 6 goes to the bar, which was
22  mandatory, and then a mandatory $50 if I wanted to leave
23  before 7.  And I also -- If I missed a shift, then it
24  would be $100 that I had to pay them.  So every time I
25  went to work, I paid the club to work; they never paid

BROOKE LAYTON  November 2, 2021                           86

1  me.
2    Q.   And you made more -- Most of the time, you would
3  make more than you spent, correct?
4    A.   No, there were many a days -- there were many a
5  days that I either left negative or broke even.  So
6  those -- Again, that's why that factor when you asked on
7  average how much I made, those were factored in there as
8  the variables.
9    Q.   And your average was 100 to $200 a shift,
10  correct?
11    A.   Yes, with all of those factors included.  Either
12  --
13    Q.   On average, you would make money, correct?
14         MS. REZAZADEH:  Objection, too vague, calls
15  for calculations; she's not a mathematician.
16    Q.   (BY MS. ANDREWS)  Well, $100 is a positive
17  number, correct?
18    A.   Yes.
19    Q.   And $200 is a positive number, correct?
20    A.   Yes, but I've also given you negative numbers
21  that I have received as well by leaving the club owing
22  them money or having to pay that additional $100 fee if
23  I missed a shift or having to pay my tip-out.
24    Q.   Your testimony was that on average, you would
25  make $100 to $200.  This is on average, you would make

BROOKE LAYTON  November 2, 2021                           87

1  100 to $200 a shift; is that correct?
2         MS. REZAZADEH:  Objection, vague.
3    A.   Based off of my previous testimony, yes, that is
4  correct.
5    Q.   (BY MS. ANDREWS)  So on average, you made money
6  when you would work at the club?
7         MS. REZAZADEH:  Objection, vague, too
8  general, confusing.
9         Go ahead, Brooke.
10    A.   I don't know how to answer that.
11    Q.   (BY MS. ANDREWS)  If you would lose money or you
12  always got negative money, would you have gone somewhere
13  else?
14    A.   Yes, most people do not keep working at a job if
15  they're repeatedly losing money.  Again, PT's was my
16  only option for a while, so that is where I worked.
17  Everyone's survival level is different.  That was what
18  my survival level was at.
19         MS. ANDREWS:  And, Donna, can you find in
20  the transcript -- I just want to confirm when she talked
21  about six -- her average shifts being six hours and read
22  it back?
23         THE REPORTER:  Give me one second.
24         MS. ANDREWS:  Thank you.
25         (The requested portion was read.)

BROOKE LAYTON   November 2, 2021                                88

1          MS. ANDREWS:  That's what I needed to know.
2     I pass the witness.
3          MS. REZAZADEH:  Thanks for your time,
4     Brooke.  I just have a few questions for you.
5                    EXAMINATION
6     BY MR. REZAZADEH:
7     Q.     So Exhibit 4, that agreement that Latrice
8     showed you earlier, when was that signed?
9     A.     The one that was signed in January, January 3,
10    2019?
11    Q.     Uh-huh.
12    A.     Yes.
13    Q.     So do you recall signing an agreement at PT's
14    prior to that agreement?
15         MS. ANDREWS:  Objection.
16    Q.     (BY MS. REZAZADEH)  Huh?  Go ahead.
17    A.     Not that looked like the one I signed in 2019.
18    Q.     Okay.  Did you -- Could you perform in flats or
19    flip-flops at PT's?  What was the answer?
20    A.     No, it was required that I had to wear what were
21    considered dancer heels.
22    Q.     Okay.  Were there any other dress code
23    requirements like that?
24    A.     It was mandatory that we had to dress up for the
25    -- whatever monthly theme there was.  And if you

BROOKE LAYTON   November 2, 2021                                89

1     not dressed up even if that fell during one of your
2     first shifts, you had to wear a costume or you would be
3     asked to leave.  And that did happen to me once.  I was
4     trying to come in to get either my first or my last
5     shift for that week before the week started again, and
6     was told I could not work because did not have the
7     costume.
8     Q.     Who told you that?
9     A.     Management.
10    Q.     Okay.  What about the -- You had to wear dancer
11    heels; who told you that?
12    A.     Management.  I was...
13    Q.     You said earlier you got tips performing on
14    stage?
15    A.     Yes.
16    Q.     How did that work performing on stage?
17    A.     People would come up to the stage with cash to
18    tip you or to set it on stage.  But you -- Stage
19    rotation was mandatory.  The only times that you could
20    -- If they skipped you, maybe you didn't hear them or
21    you were with a client, they would charge you $60 for
22    each set that you skipped.
23    Q.     Was there any exception to that?
24    A.     If you had bought -- if your customer had bought
25    a skybox, you got one skip, but there had been multiple

BROOKE LAYTON   November 2, 2021                                90

1     times that you only get one skip.  So if you're trying
2     to either extend the skybox or there's not enough girls,
3     you would still have to go down for your second shift or
4     you would be charged $60.
5     Q.     Who collected the $60?
6     A.     The club did.
7     Q.     Like who, specifically, you know, the person?
8     A.     Either the manager or the house mom.
9     Q.     Okay.  Did you get to pick the music you
10    performed to on stage?
11    A.     Typically, no.  If -- We could say a genere, but
12    we couldn't give specifics.  Often times -- The only
13    time you could dance to a specific song was if your
14    customer paid $20 to the DJ for him to play it.
15    Q.     When you arrived at work at PT's, did you have
16    to -- What did you do?  What did you have to do?
17    A.     If you got there and were on stage or on the
18    floor before 11, your house fees were free.  And then
19    you -- So you come in, you get ready, you sign in with
20    mom; they verify who's in there and on the floor by 11.
21    If you're not on the floor by, I think it was honestly
22    like 10:55, then you would have to pay a house fee.
23         So typically if you came in and it was after
24    11 and you couldn't get ready on time, then you had to
25    check in with the door girl and get the slip which shows

BROOKE LAYTON   November 2, 2021                                91

1     that you paid that fee, and then you would go and take
2     it to mom and the DJ so they would know that you're
3     there and about to get ready.  And then in order to
4     leave, I would go and pay the door girl $50 to leave
5     and then had to have mom and the DJ sign it only after I
6     gave them my $26 tip-out.
7     Q.     Did we look at some records, sign-in records
8     from PT's together prior to your deposition?
9     A.     Yes, the ones that were -- I think there were
10    three dates in December for 2018 that we have had.
11    Q.     Are those the only ones you've seen prior to
12    your deposition today?
13    A.     Yes.
14    Q.     Okay.  So you haven't had the opportunity to
15    review any other sign-in records from PT's?
16    A.     Correct.
17         MS. REZAZADEH:  Pass the witness.
18                    EXAMINATION
19    BY MS. ANDREWS:
20    Q.     The sign-in records that you did look at, did it
21    have a column that talks about what the contract damages
22    were or how much you were charged for when you left?
23    A.     Can you show those records, please?
24    Q.     I don't have the three that she's referring to
25    in my things, so I don't have them.

BROOKE LAYTON November 2, 2021                                          92

1    I'm just asking if you recall seeing
2    anything about damages or the amounts that you paid on
3    those sign-in sheets?
4        A.   Those were typically -- That would be your fee
5    to leave.
6        Q.   So it wasn't always the same amount, correct?
7        A.   After January 2019, they changed it the standard
8    $50.  Before that, it was $8 every 30 minutes that had
9    to be paid to the club, so that would vary.
10       Q.   So it's not always as you previously testified,
11   correct?
12       A.   In regards to the contract that I signed for
13   2019, the $50 is accurate.
14       Q.   But it wasn't accurate for the entire term that
15   you were there, correct?
16       A.   Under the 2018 agreement that I signed, it was
17   at the time the standard $60 or $8 every 30 minutes.
18            (Defendant's Exhibit No. 6 was marked.)
19       Q.   (BY MS. ANDREWS) Okay.  And just for purposes
20   that we've got all of the exhibits, I'm going to share
21   screen and ask if you have seen any of the discovery.
22   We talked about the initial discovery disclosures, I
23   think, which were Exhibit 5.  The request for admissions
24   that you served your responses to, did you -- it's dated
25   -- Well, it's dated October 18th.  I don't --

BROOKE LAYTON November 2, 2021                                          93

1            Do you recall seeing these before?
2        A.   I may have opened it, but I'm not sure I've gone
3    through this.  It's a 42-page document.
4        Q.   All right.  I'm just asking.  And so that's
5    Exhibit 6.  Exhibit -- I think this is 7.  Seven is the
6    interrogs.  Do you recall preparing these or being --
7    participating in the preparation of the request for the
8    interrogatory responses?
9            (Defendant's Exhibit No. 7 was marked.)
10       A.   Yes.
11       Q.   (BY MS. ANDREWS) Did you prepare verification
12   for these interrogatory responses?
13       A.   What do you mean by verification?
14       Q.   Did you sign a notarized statement saying that
15   these responses were true and correct?
16       A.   Not that I can recall.
17            (Defendant's Exhibit No. 9 was marked.)
18       Q.   (BY MS. ANDREWS) And this will be Exhibit 9,
19   which are the production responses, and you have
20   provided all -- These are the requests for production,
21   which will be Exhibit 9.
22            And you testified previously that you
23   provided all the responsive documents that you had to
24   your counsel, correct?
25       A.   Yes.

BROOKE LAYTON November 2, 2021                                          94

1            MS. REZAZADEH:  Objection, misleading.
2        Q.   (BY MS. ANDREWS)  And you provided the responses
3    documents that you gave to counsel, correct?
4        A.   Yes.
5        Q.   And you recognize this document as well?
6        A.   It looks like the other one, so possibly.
7        Q.   Then this is request for production number 3,
8    which specifically requested your tax returns, do you
9    see that?
10       A.   Yes.
11       Q.   And if you have not, could you please provide
12   those to counsel so they can be produced whenever
13   counsel produces documents?  I'm going to stop share.
14            MS. ANDREWS:  I pass the witness.
15                         EXAMINATION
16   BY MS. REZAZADEH:
17       Q.   Brooke, you testified -- how did you make money
18   at PT's?
19       A.   By -- primarily by giving dances.
20       Q.   Right, so who would you get money from?
21       A.   The customers.
22       Q.   What gets a customer to come to a club like
23   PT's?
24       A.   Whatever advertising, marketing specials.  I
25   don't know the extent of all that they do, but it's

BROOKE LAYTON November 2, 2021                                          95

1    not my job to get people into the club; I'm just there
2    to entertain people that come in.
3        Q.   Okay.  So you didn't have any say at the
4    promotional events that they ran?
5        A.   Absolutely not.
6        Q.   Their advertising?
7        A.   No.
8        Q.   Specials, group specials?
9        A.   No.
10            MS. REZAZADEH:  Pass the witness.
11                         EXAMINATION
12   BY MS. ANDREWS:
13       Q.   Who decided how many lap dances you could give
14   during a shift?
15       A.   The clients.  I did get as many lap dances as
16   clients bought.
17       Q.   Did you also decide whether you wanted to give a
18   lap dance to somebody or not?
19       A.   Yes.
20       Q.   Were you also able to do things to increase the
21   amount of tips or money that was paid to you for a lap
22   dance?
23            MS. REZAZADEH:  Objection, vague.
24       A.   I mean, so PT's is a nude club, so you were more
25   likely to get more dances if you were nude, but that's

BROOKE LAYTON  November 2, 2021                    86

1    it.

2        Q.   (BY MS. ANDREWS)  Was that something you could

3    choose to do?

4        A.   Yes, it was up to the dancers.  But it was

5    required that when you were on stage by the second song,

6    you had to have your top off and you could not put it

7    back on; you would get in trouble.

8        Q.   So and your testimony is that if you were nude,

9    you would make more money?

10       A.   Not always.  It's up to the dancer's

11   comfortability.

12       Q.   Is it your experience that ladies that were nude

13   would make more money than ladies who were not?

14       A.   I can't speak for other workers and how they

15   work, but there would be some shifts where I would make

16   more money if I kept my underwear on.  So it really just

17   depended on who came in that day.

18       Q.   And did you have the flexibility to figure out

19   what would make you the most money?

20            MS. REZAZADEH:  Objection, vague, too

21   general.

22       Q.   (BY MS. ANDREWS)  Did you have flexibility in

23   deciding whether underwear on was more profitable that

24   day than off?

25       A.   Yes.

BROOKE LAYTON  November 2, 2021                    97

1        Q.   Did you have the ability to determine whether

2    being nude was more profitable than wearing any, you

3    know, lingerie or something like that?

4            MS. REZAZADEH:  Objection, too general.

5        A.   Again, it depends on what you're wearing.  And

6    some people really like the lingerie look.  Again, it

7    just depends on the clientele.

8        Q.   (BY MS. ANDREWS)  And those were decisions that

9    you got to make?

10           MS. REZAZADEH:  Objection, vague.

11       A.   Again, it just depends.  Because we were not

12   allowed to wear fishnet tights or anything like that, so

13   there was still some control even when we were

14   considered of like we couldn't walk around the club

15   topless or anything like that.  Like, we always had to

16   have our clothes on.  We couldn't wear fishnets even if

17   there was nothing else on them.  So it just depends.

18       Q.   (BY MS. ANDREWS)  You've just testified that

19   people were nude, so I'm confused.

20       A.   It is a nude-optional club.  That is primarily

21   why people go in is because it's known for being a

22   nude-optional club.  That does not mean that everyone is

23   nude, though.  And that means that depending on the day

24   and just how I was feeling, maybe I was menstruating or

25   maybe I was just having a bad body day that would

BROOKE LAYTON  November 2, 2021                    98

1    determine what I decided to wear.

2            MS. ANDREWS:  I pass the witness.

3            MS. REZAZADEH:  Reserve for trial.

4            Thanks, Brooke.  You can log off.

5    Appreciate you.

6            Oh, do you have any spelling questions for

7    her, Donna, before she logs off?

8            THE REPORTER:  No.

9            MS. REZAZADEH:  Thanks, Brooke, I'll touch

10   base with you later.

11           THE WITNESS:  Okay.  Thank you.

12           MS. REZAZADEH:  Thanks so much.

13           Latrice, do you have any housekeeping for

14   me?  I think we got all the exhibits.

15           MS. ANDREWS:  I think I tried to get all

16   that squared away.

17           MS. REZAZADEH:  All right.  I think we're

18   good.  Donna, do you need anything from me?  You know

19   our order and you have our e-mail address, so you're

20   good?

21           THE REPORTER:  I think we're good.

22           MS. REZAZADEH:  In the event defendant's

23   order an expedited transcript, we ask that you notify us

24   so that we can order one as well.

25           THE REPORTER:  Absolutely.

BROOKE LAYTON  November 2, 2021                    99

1            MS. REZAZADEH:  Thank you.  All right.

2            Latrice, have a good day.

3            MS. ANDREWS:  All right.  Thanks, you too.

4            Thank you, Donna.  If you need me, call me.

5            THE REPORTER:  Okay.  Do you have any

6    questions --

7            MS. ANDREWS:  Or e-mail me.  Sorry?

8            THE REPORTER:  Do you have any questions for

9    me?

10           MS. ANDREWS:  No, I think -- how much do you

11   think an expedited would be?

12           THE REPORTER:  You know what it depends on

13   how quickly you want it.  I can send you a rate sheet so

14   that you can look at it and you'll know exactly if you

15   would like.

16           MS. ANDREWS:  Yeah, what would be the

17   standard turnaround?

18           THE REPORTER:  Seven to ten business days.

19           MS. ANDREWS:  Oh, that's perfect; I don't

20   need it expedited.

21           THE REPORTER:  Okay.  Going off the record

22   at 1:13.

23           (Deposition concluded at 1:13 p.m.)

24

25

BROOKE LAYTON  November 2, 2021                    100

1                CORRECTIONS AND SIGNATURE
2   PAGE  LINE      CORRECTION      REASON FOR CHANGE
3
4
5
6
7
8
9
10
11
12
13
14      I, BROOKE LAYTON, have read the foregoing
15  deposition and hereby affix my signature that same is
16  true and correct, except as noted herein.
17
18                    BROOKE LAYTON
19      SUBSCRIBED AND SWORN to before me this the
20        day of          , 2021.
21
22            NOTARY PUBLIC IN AND FOR THE
23                  STATE OF TEXAS
24  My commission expires:
25

BROOKE LAYTON  November 2, 2021                    101

1   COUNTY OF DALLAS    )
2   STATE  OF  TEXAS    )
3        I, Donna L. Johnston, certified shorthand
4   reporter in and for the State of Texas, do hereby
5   certify that the facts as stated by me in the caption
6   hereto are true; that there came before me the
7   aforementioned named person, who was by me duly sworn to
8   testify the truth concerning the matters in controversy
9   in this cause; and that the examination was reduced to
10  writing by computer transcription under my supervision;
11  that the deposition is a true record of the testimony
12  given by the witness.
13        I further certify that I am neither attorney or
14  counsel for, nor related to or employed by, any of the
15  parties to the action in which this deposition is taken,
16  and further that I am not a relative or employee of any
17  attorney or counsel employed by the parties hereto, or
18  financially interested in the action.
19        Given under my hand and seal of office on this,
20  the 17th day of November, 2021.
21      _____
            Donna L. Johnston, Texas CSR 6115
22          Expiration Date 04-30-2022
            DEPOSITION REPORTING SERVICES
23          6309 Preston Road, Suite 1300
            Plano, Texas 75024
24          214-202-6237
            dljcsr6115@gmail.com
25

BROOKE BOYKIN - November 2, 2021

**$**

**$10** [6] - 33:24, 33:25, 47:22, 49:16, 85:19
**$100** [13] - 30:8, 30:9, 30:13, 31:18, 32:1, 32:4, 33:3, 33:4, 57:1, 85:23, 86:15, 86:21, 86:24
**$20** [7] - 30:23, 45:15, 45:22, 47:24, 48:5, 65:4, 90:13
**$200** [10] - 33:2, 34:18, 35:14, 35:18, 36:7, 36:13, 86:8, 86:18, 86:24, 86:25
**$26** [4] - 33:24, 49:16, 49:21, 91:5
**$30** [1] - 53:20
**$300** [1] - 52:3
**$50** [7] - 33:19, 33:23, 34:11, 85:21, 91:3, 92:7, 92:12
**$60** [4] - 89:20, 90:3, 90:4, 92:16
**$700** [1] - 32:19
**$75** [2] - 31:20, 35:4
**$76** [4] - 31:20, 35:5, 65:4, 85:18

**0**

**04-30-2022** [1] - 101:22

**1**

**1** [3] - 3:12, 23:21, 24:5
**10** [1] - 85:18
**100** [9] - 3:8, 33:2, 34:17, 35:14, 35:18, 36:7, 36:13, 86:8, 86:25
**100-page** [1] - 74:22
**101** [1] - 3:9
**10:00** [1] - 24:2
**10:26** [1] - 17:7
**10:27** [1] - 17:10
**10:54** [1] - 36:22
**10:55** [1] - 90:21
**11** [5] - 33:21, 36:19, 90:17, 90:19, 90:23
**1100** [1] - 2:11
**1105** [1] - 2:5
**11:06** [1] - 36:21
**1300** [1] - 101:23
**15** [3] - 68:23, 72:9, 72:14
**1509** [1] - 6:21

**15th** [1] - 74:10
**1701** [1] - 2:12
**17th** [1] - 101:20
**18** [1] - 40:24
**18th** [1] - 92:24
**1:13** [2] - 99:21, 99:22

**2**

**2** [6] - 1:15, 3:2, 3:14, 23:22, 24:23, 69:15
**20** [1] - 53:20
**2000** [2] - 52:10, 72:18
**2013** [4] - 13:4, 15:18, 39:17, 49:11
**2018** [30] - 8:12, 8:23, 10:20, 11:3, 11:8, 11:10, 11:16, 12:14, 13:3, 14:2, 15:16, 18:4, 24:15, 48:19, 49:7, 49:9, 68:23, 72:9, 72:14, 72:17, 75:14, 75:23, 76:13, 76:17, 76:20, 76:24, 83:22, 84:2, 91:9, 92:15
**2018/2019** [1] - 48:17
**2019** [37] - 7:20, 7:21, 7:22, 8:12, 9:1, 9:6, 11:3, 11:8, 11:11, 11:16, 12:14, 13:3, 15:16, 41:22, 48:20, 49:10, 52:11, 72:18, 72:19, 73:3, 73:7, 73:10, 73:15, 73:19, 73:23, 75:19, 76:1, 77:2, 77:3, 77:4, 77:14, 83:22, 84:3, 88:9, 88:16, 92:6, 92:12
**2020** [5] - 7:17, 7:23, 14:12, 52:14, 52:22
**2021** [6] - 1:15, 1:20, 6:24, 7:17, 100:20, 101:22
**214-202-6237** [1] - 101:24
**22** [1] - 3:12
**23** [1] - 3:16
**24** [5] - 3:17, 35:8, 56:10, 56:14
**27** [3] - 72:18, 73:7
**2ND** [1] - 1:19

**3**

**3** [8] - 3:16, 24:7, 24:19, 24:22, 42:16, 75:10, 88:8, 94:6
**30** [3] - 17:21, 92:7,

92:16
**32** [5] - 35:9, 55:19, 56:10, 56:14, 56:15
**350-3931** [1] - 2:6
**3:21-cv-01636-N** [1] - 1:6
**3rd** [1] - 74:10

**4**

**4** [5] - 3:17, 25:18, 25:19, 75:11, 88:6
**40** [10] - 54:3, 54:7, 54:11, 55:3, 55:13, 70:14, 70:20, 71:14, 71:17
**42-page** [1] - 93:2

**5**

**5** [8] - 3:3, 3:5, 3:18, 33:21, 77:9, 77:10, 77:11, 92:22
**50** [1] - 65:4

**6**

**6** [7] - 3:20, 33:25, 49:17, 73:23, 85:20, 92:17, 93:4
**6115** [1] - 101:21
**6309** [1] - 101:23
**644-8181** [1] - 2:13
**67** [1] - 3:25
**68** [1] - 3:14

**7**

**7** [4] - 3:22, 85:22, 93:4, 93:8
**75024** [1] - 101:23
**75075** [1] - 6:22
**75080** [1] - 2:12
**76** [2] - 3:18, 33:4
**77066** [1] - 2:6

**8**

**8** [5] - 3:25, 68:19, 68:21, 92:7, 92:16
**88** [1] - 3:6
**888** [1] - 2:6

**9**

**9** [5] - 4:3, 24:15, 93:16, 93:17, 93:20
**91** [2] - 3:6, 3:20
**92** [2] - 3:22, 4:3
**921@gmail.com** [1] -

92:16
**94** [1] - 3:7
**95** [1] - 3:7
**972** [1] - 2:13
**990** [2] - 6:25, 8:16

**A**

**ability** [2] - 14:6, 96:25
**able** [12] - 5:22, 5:25, 29:5, 31:4, 33:8, 34:15, 60:23, 67:8, 69:2, 69:10, 71:4, 95:19
**absolutely** [3] - 20:4, 45:8, 95:4
**Absolutely** [1] - 98:24
**access** [4] - 11:10, 13:23, 14:19, 40:17
**according** [2] - 9:3, 72:8
**account** [16] - 11:13, 12:9, 12:10, 12:15, 13:22, 13:24, 14:11, 14:13, 14:19, 16:13, 36:9, 39:25, 40:1, 40:7, 40:16, 40:17
**accounts** [13] - 11:22, 11:24, 12:1, 12:18, 14:4, 15:11, 15:14, 15:17, 15:18, 15:21, 16:6, 16:22, 40:20
**accrued** [1] - 35:3
**accurate** [6] - 58:11, 58:16, 67:22, 74:9, 92:12, 92:13
**acknowledges** [1] - 62:4
**acknowledging** [1] - 85:4
**Action** [1] - 3:15
**action** [7] - 61:20, 61:25, 62:9, 62:11, 70:9, 101:15, 101:18
**active** [3] - 15:17, 16:15, 16:22
**actively** [2] - 11:12, 14:13
**activities** [1] - 54:1
**activity** [2] - 59:18, 59:19
**actual** [2] - 19:14, 19:15
**additional** [7] - 27:1, 31:18, 35:2, 55:21, 56:25, 86:21
**address** [15] - 6:20, 6:25, 7:3, 7:5, 7:25, 8:3, 8:7, 8:13, 8:16, 8:17, 24:17, 25:14,

41:17

25:16, 41:13, 98:18
**addresses** [1] - 41:15
**administered** [1] - 9:18
**Admission** [1] - 3:21
**admission** [4] - 28:25, 37:21, 37:24, 38:16
**admissions** [1] - 92:22
**adver** [1] - 47:9
**advertised** [1] - 59:25
**advertising** [4] - 47:10, 47:14, 94:23, 95:5
**affix** [1] - 100:15
**aforementioned** [1] - 101:7
**Agent** [6] - 12:3, 12:4, 12:5, 12:6, 12:7, 16:24
**ago** [3] - 61:14, 63:17, 63:23
**agree** [2] - 5:6, 79:20
**agreed** [1] - 75:5
**Agreement** [3] - 3:17, 25:20, 76:9
**agreement** [11] - 18:12, 18:13, 25:23, 75:22, 75:23, 76:12, 76:21, 88:6, 88:12, 88:13, 92:15
**agrees** [1] - 62:3
**ahead** [26] - 10:23, 12:20, 16:3, 21:7, 22:2, 22:21, 23:4, 28:1, 28:18, 31:1, 33:1, 39:5, 39:7, 42:13, 44:16, 46:2, 54:25, 57:13, 63:7, 73:4, 76:23, 80:1, 82:4, 84:8, 87:8, 88:15
**allegation** [1] - 57:22
**allegations** [2] - 69:21, 70:5
**alleged** [1] - 65:10
**allegedly** [1] - 57:11
**alleging** [1] - 18:4
**allow** [5] - 6:10, 21:16, 21:17, 69:11, 72:12
**allowed** [8] - 28:13, 45:22, 48:5, 48:11, 48:15, 60:25, 83:21, 97:11
**allowing** [1] - 6:11
**ambiguous** [1] - 79:2
**Amended** [1] - 3:12
**amount** [5] - 48:3, 56:4, 57:10, 92:5, 95:20

**amounts** [2] - 45:13, 92:1
**AND** [4] - 1:18, 100:1, 100:19, 100:22
**Andrews** [4] - 2:10, 3:5, 3:7, 5:17
**ANDREWS** [181] - 5:5, 5:11, 5:13, 11:2, 13:11, 13:15, 14:10, 14:21, 15:2, 15:6, 15:24, 16:9, 17:1, 17:5, 17:11, 18:25, 20:24, 21:3, 21:8, 21:22, 22:3, 22:6, 22:12, 22:16, 22:22, 23:15, 23:19, 23:22, 24:5, 24:8, 24:24, 25:1, 25:19, 26:7, 26:12, 26:18, 26:25, 27:10, 27:13, 27:14, 27:18, 27:23, 28:2, 28:16, 28:22, 29:14, 29:21, 29:23, 30:19, 30:25, 31:6, 31:22, 32:15, 33:5, 33:10, 33:14, 34:7, 35:17, 35:24, 36:4, 36:16, 36:18, 37:1, 38:4, 38:9, 38:18, 38:23, 39:1, 39:11, 39:21, 40:9, 40:13, 41:8, 42:3, 42:15, 43:3, 43:10, 43:15, 43:18, 43:20, 44:4, 44:9, 44:21, 45:12, 45:23, 46:5, 46:16, 46:20, 50:12, 51:4, 51:10, 51:19, 54:14, 55:2, 55:9, 55:12, 56:3, 56:8, 57:3, 58:1, 58:15, 63:2, 63:3, 63:14, 63:22, 65:13, 66:12, 66:20, 67:10, 67:13, 68:18, 68:22, 68:25, 69:7, 69:13, 69:16, 71:1, 71:3, 71:13, 71:23, 72:14, 73:1, 73:6, 74:9, 74:15, 74:19, 74:24, 75:2, 75:9, 75:11, 75:14, 76:8, 76:16, 76:19, 77:1, 77:10, 77:12, 78:2, 78:3, 78:23, 79:9, 79:25, 80:5, 80:18, 82:10, 82:11, 82:18, 83:3, 83:8, 83:19, 84:12, 84:18, 84:21, 85:5, 85:11, 85:13, 86:15, 87:4, 87:10, 87:18, 87:23, 87:25, 88:14,

91:18, 92:18, 93:10, 93:17, 94:1, 94:13, 95:11, 96:1, 96:21, 97:7, 97:17, 98:1, 98:14, 99:2, 99:6, 99:9, 99:15, 99:18
**andrews** [1] - 3:6
**Android** [2] - 41:12, 41:19
**answer** [51] - 6:12, 10:6, 10:24, 13:9, 16:2, 21:5, 21:6, 21:19, 21:21, 21:25, 22:9, 22:11, 22:14, 22:16, 22:18, 26:12, 26:18, 27:11, 27:16, 27:21, 27:24, 28:15, 28:16, 28:18, 38:3, 38:11, 39:7, 42:13, 44:15, 44:16, 46:2, 54:22, 63:7, 66:5, 66:16, 66:19, 70:23, 70:24, 71:7, 71:8, 71:9, 72:12, 72:23, 76:12, 78:18, 80:17, 82:25, 83:15, 83:18, 87:9, 88:18
**answered** [21] - 22:23, 26:14, 32:25, 36:3, 39:4, 39:6, 43:16, 44:3, 44:5, 44:12, 57:25, 71:19, 74:13, 78:1, 78:2, 80:16, 82:3, 82:16, 82:18, 82:23, 83:13
**answering** [6] - 22:5, 22:12, 26:21, 26:23, 26:24, 84:4
**answers** [2] - 9:15, 22:23
**ANSWERS** [1] - 1:18
**apartments** [2] - 8:9, 8:14
**Appearances** [1] - 3:2
**application** [1] - 25:2
**appreciate** [2] - 75:3, 98:4
**appropriate** [3] - 27:5, 27:22, 75:5
**arbitrations** [1] - 37:6
**area** [3] - 5:17, 12:11, 59:17
**argumentative** [1] - 56:2
**arrests** [1] - 37:2
**arrived** [1] - 90:14
**Ashland** [4] - 62:15, 62:19, 63:3, 63:22
**Ashlee** [1] - 6:16
**assert** [1] - 28:11

**asserting** [1] - 69:23
**ASSOCIATES** [1] - 2:5
**assume** [1] - 49:25
**assuming** [1] - 64:18
**assumption** [2] - 50:2, 78:6
**Atrium** [1] - 2:11
**attempting** [1] - 17:25
**attempts** [1] - 14:4
**attention** [2] - 51:14, 51:20
**attire** [1] - 49:12
**attorney** [11] - 10:14, 15:8, 42:1, 42:2, 57:12, 61:6, 64:6, 74:15, 77:23, 101:13, 101:17
**attorney's** [3] - 50:8, 50:13, 70:1
**attorneys** [2] - 41:5, 77:17
**attractive** [1] - 45:5
**audition** [1] - 23:7
**August** [2] - 52:9, 74:10
**Authorization** [1] - 25:6
**automatically** [2] - 30:8, 41:18
**available** [1] - 65:6
**Avenue** [1] - 8:10
**average** [29] - 31:20, 32:3, 32:22, 32:23, 33:15, 34:4, 34:17, 34:21, 34:23, 35:7, 35:10, 35:11, 35:18, 35:24, 36:6, 36:9, 36:11, 53:20, 55:19, 56:5, 56:10, 56:21, 86:6, 86:8, 86:12, 86:23, 86:24, 87:4, 87:20
**averages** [1] - 56:19
**aware** [11] - 5:14, 9:23, 17:11, 25:23, 28:24, 55:24, 56:3, 61:25, 65:14, 66:9, 67:13

**B**

**backed** [1] - 41:18
**background** [4] - 5:15, 24:12, 37:2, 39:12
**bad** [2] - 83:13, 97:24
**bank** [8] - 11:5, 11:8, 11:10, 11:12, 11:16, 11:18, 11:20, 42:4
**bar** [5] - 33:25, 49:17,

49:20, 49:24, 85:20
**bartenders** [2] - 19:15, 20:14
**bartending** [1] - 19:19
**base** [1] - 98:9
**based** [8] - 44:10, 57:21, 58:17, 64:11, 66:5, 66:16, 79:5, 87:2
**basis** [3] - 66:22, 69:22, 82:22
**become** [2] - 63:11, 65:14
**begin** [1] - 5:5
**beginning** [2] - 9:8, 9:11
**Behalf** [2] - 2:3, 2:8
**behalf** [4] - 1:3, 2:3, 70:2, 77:17
**belief** [2] - 80:10, 82:22
**benefit** [2] - 72:24, 76:14
**best** [2] - 32:18, 74:7, 83:14
**better** [1] - 60:22
**between** [3] - 14:16, 19:21, 49:2
**billing** [1] - 50:18
**Bio** [2] - 3:16, 24:11
**Bio-Verify** [2] - 3:16, 24:11
**body** [3] - 23:9, 48:23, 97:24
**boss** [1] - 13:14
**botox** [1] - 47:4
**bottom** [1] - 28:3
**bought** [3] - 89:23, 95:15
**Boulevard** [1] - 2:12
**break** [4] - 17:4, 36:15, 67:9, 69:6
**breaks** [1] - 51:25
**briefing** [1] - 20:22
**briefly** [2] - 15:22, 24:3
**bring** [2] - 51:19, 59:25
**bringing** [1] - 51:16
**broke** [1] - 86:4
**BROOKE** [8] - 1:3, 1:14, 1:18, 2:3, 3:4, 5:3, 100:14, 100:18
**Brooke** [32] - 3:13, 3:18, 3:20, 3:22, 4:3, 6:16, 13:9, 16:20, 21:7, 22:2, 22:21, 23:4, 28:18, 29:8, 31:1, 33:1, 39:5, 42:12, 44:16, 46:2,

54:25, 63:7, 71:7, 73:4, 78:18, 80:1, 84:9, 84:25, 87:8, 88:3, 98:3, 98:8
**brooke** [4] - 66:5, 82:4, 85:7, 94:16
**brought** [3] - 51:14, 55:5, 85:8
**Bucks** [6] - 52:1, 52:5, 52:12, 52:14, 60:20, 60:21
**Burlesque** [10] - 16:4, 16:7, 39:13, 39:14, 39:15, 39:20, 39:23, 40:23, 44:25, 73:20
**business** [5] - 8:22, 13:20, 32:8, 32:10, 99:17
**but..** [1] - 16:12
**buy** [1] - 48:10
**buying** [1] - 60:3
**BY** [108] - 5:13, 11:2, 13:11, 13:15, 14:10, 14:21, 15:2, 15:6, 16:9, 17:11, 18:25, 20:24, 23:15, 23:22, 24:8, 25:1, 25:19, 27:14, 28:2, 28:16, 28:22, 29:23, 30:19, 31:6, 31:22, 32:15, 33:5, 33:14, 34:7, 35:17, 35:24, 36:4, 37:1, 39:1, 39:11, 39:21, 40:9, 40:13, 41:8, 42:3, 42:15, 43:18, 43:20, 44:9, 44:21, 45:12, 45:23, 46:5, 46:16, 46:20, 50:12, 51:4, 51:10, 51:19, 55:2, 55:12, 56:3, 57:3, 58:1, 58:15, 63:3, 63:14, 63:22, 65:13, 66:12, 66:20, 67:13, 68:22, 69:16, 71:3, 71:13, 71:23, 72:14, 73:1, 73:6, 74:9, 74:15, 75:9, 75:14, 76:8, 77:1, 77:12, 78:3, 78:23, 79:9, 80:5, 80:18, 82:11, 83:19, 84:12, 84:21, 85:5, 85:13, 86:15, 87:4, 87:10, 88:5, 91:18, 92:18, 93:10, 93:17, 94:1, 94:15, 95:11, 96:1, 96:21, 97:7, 97:17

# C

**CA** [1] - 1:6
**CA-NO** [1] - 1:6
**Cabaret** [6] - 39:15, 39:20, 39:23, 52:1, 52:12, 60:20
**calculated** [1] - 57:5
**calculations** [1] - 86:14
**calendar** [1] - 58:1
**cannot** [1] - 29:20
**capable** [1] - 17:24
**caption** [1] - 101:5
**Carrollton** [1] - 7:14
**case** [22] - 5:16, 8:18, 9:14, 9:25, 11:23, 15:3, 41:4, 41:5, 50:9, 50:16, 50:19, 50:22, 55:16, 57:4, 61:12, 65:23, 67:14, 69:19, 70:7, 77:15, 77:16, 79:21
**cash** [2] - 58:21, 89:16
**causes** [2] - 82:12, 83:5
**cell** [1] - 47:11
**certain** [7] - 30:11, 45:13, 47:21, 47:23, 47:25, 48:13, 77:14
**certificate** [1] - 3:9
**Certified** [1] - 1:22
**certified** [1] - 101:3
**certify** [2] - 101:5, 101:13
**Champaign** [1] - 31:2
**chance** [4] - 69:4, 69:5, 69:18
**change** [2] - 26:19, 44:14
**CHANGE** [1] - 100:2
**changed** [4] - 35:5, 55:24, 56:4, 92:6
**changes** [1] - 3:8
**changing** [2] - 36:5, 56:16
**charge** [7] - 45:13, 45:16, 45:22, 48:3, 48:6, 89:20
**charged** [4] - 30:8, 30:9, 90:3, 91:21
**check** [3] - 23:9, 24:12, 90:24
**choice** [1] - 19:9
**choose** [3] - 18:17, 19:21, 96:2
**choosing** [2] - 25:24, 25:25
**choreography** [5] - 37:12, 37:15, 37:18,

39:2, 39:9
**chose** [3] - 18:7, 47:19, 76:4
**Christmas** [1] - 9:9
**City** [1] - 1:21
**Civil** [3] - 1:24, 3:15, 75:6
**claim** [15] - 13:20, 49:13, 51:5, 51:6, 54:5, 55:6, 55:8, 55:9, 55:12, 55:17, 67:14, 67:15, 69:22, 69:25
**claiming** [2] - 51:11, 57:3
**claims** [3] - 55:16, 66:23, 70:7
**clarify** [2] - 66:18, 69:24
**class** [1] - 59:8
**clear** [4] - 42:7, 54:17, 54:23, 65:8
**client** [11] - 21:12, 21:15, 22:20, 27:11, 27:12, 27:19, 47:23, 53:8, 72:23, 82:15, 89:20
**client's** [1] - 22:7
**clientele** [1] - 97:6
**clients** [8] - 44:8, 44:19, 47:12, 59:15, 61:23, 69:23, 95:14, 95:15
**clocked** [2] - 68:15
**clothes** [1] - 97:15
**cloud** [1] - 41:11
**Club** [16] - 3:17, 51:25, 52:2, 52:7, 52:8, 52:13, 60:15, 60:17, 74:3, 78:21, 79:8, 79:13, 84:13, 84:22, 84:24, 85:10
**club** [110] - 17:13, 30:14, 30:20, 30:22, 30:23, 31:3, 31:7, 31:12, 31:13, 31:19, 32:2, 33:8, 33:20, 35:20, 35:22, 37:13, 37:16, 43:22, 43:23, 43:24, 44:1, 44:7, 44:8, 44:11, 44:18, 44:19, 44:25, 45:3, 45:4, 45:15, 45:18, 45:25, 46:7, 46:8, 46:11, 46:14, 46:17, 47:8, 48:11, 48:15, 49:12, 49:13, 49:19, 49:21, 51:6, 51:11, 51:20, 52:4, 53:12, 53:22, 56:22, 56:24,

58:3, 58:4, 58:13, 59:1, 59:13, 59:15, 59:24, 59:25, 60:12, 65:3, 65:5, 65:17, 65:18, 65:19, 66:1, 66:4, 66:16, 66:17, 67:6, 67:20, 67:24, 68:10, 70:15, 70:16, 70:19, 70:25, 71:4, 71:11, 73:24, 75:22, 77:5, 78:11, 79:7, 79:17, 80:3, 80:6, 80:8, 81:18, 81:19, 81:20, 81:22, 85:14, 85:16, 85:24, 86:20, 87:5, 90:5, 92:8, 94:21, 94:25, 95:23, 97:13, 97:19, 97:21
**CLUB** [2] - 1:8, 2:9
**club's** [2] - 31:5, 68:13
**clubs** [15] - 18:20, 19:1, 19:6, 19:12, 19:16, 51:23, 52:15, 52:20, 52:21, 59:18, 59:19, 60:6, 60:9, 60:25, 61:3
**code** [1] - 88:21
**collected** [1] - 90:4
**collective** [4] - 61:20, 61:25, 62:9, 62:11
**Collins** [1] - 2:12
**column** [1] - 91:20
**comfortability** [1] - 96:10
**coming** [5] - 47:12, 57:10, 59:14, 68:23, 69:7
**commission** [1] - 100:24
**common** [1] - 18:9
**communicate** [2] - 47:12, 80:23
**communications** [1] - 64:5
**companies** [1] - 81:19
**company** [8] - 64:11, 64:13, 78:12, 78:19, 78:22, 82:22, 83:5, 85:9
**competition** [1] - 35:21
**complaint** [4] - 69:17, 69:18, 70:1, 70:10
**Complaint** [1] - 3:14
**complete** [1] - 17:22
**completing** [1] - 9:23
**compliance** [1] - 75:8
**computer** [1] - 101:10
**concerning** [1] - 101:8
**concluded** [1] - 99:22

**conclusion** [1] - 79:24
**conducive** [2] - 33:22, 40:21
**conduct** [1] - 53:21
**confirm** [2] - 75:13, 87:19
**confused** [2] - 29:2, 97:18
**confusing** [2] - 79:3, 87:7
**consider** [1] - 78:8
**considered** [4] - 20:16, 30:2, 88:20, 97:13
**consistently** [1] - 67:3
**constituted** [1] - 30:18
**consulted** [1] - 41:5
**cont** [1] - 4:1
**contact** [1] - 61:22
**contacted** [1] - 14:3
**contention** [1] - 70:20
**contingency** [1] - 50:22
**continue** [2] - 33:22, 76:6
**contract** [26] - 17:21, 17:23, 17:24, 17:25, 18:3, 19:14, 19:24, 20:21, 20:25, 23:6, 23:10, 26:3, 59:4, 59:5, 59:6, 59:10, 72:16, 75:12, 75:15, 75:20, 84:16, 84:19, 84:20, 85:10, 91:20, 92:11
**Contractor** [1] - 25:7
**contractor** [14] - 13:7, 13:12, 17:17, 19:22, 19:25, 25:13, 26:1, 26:4, 28:8, 28:12, 57:20, 59:8, 75:25, 82:7
**contractors** [8] - 19:17, 20:3, 20:9, 32:12, 51:17, 79:18, 81:13, 81:21
**contracts** [4] - 13:16, 13:17, 85:1, 85:3
**control** [2] - 41:23, 97:12
**controlled** [1] - 64:21
**controversy** [1] - 101:8
**conversation** [2] - 51:15, 63:23
**convey** [1] - 27:3
**copy** [3] - 37:22, 38:1, 74:25
**corporations** [1] - 79:10

**correct** [78] - 5:9, 5:10, 8:18, 9:19, 14:22, 15:17, 18:6, 19:10, 20:8, 20:12, 20:19, 21:8, 24:8, 24:14, 26:4, 32:8, 32:13, 33:15, 34:18, 34:21, 35:8, 35:11, 35:14, 40:2, 40:5, 40:10, 41:25, 42:4, 45:19, 46:23, 47:20, 48:2, 49:10, 49:20, 50:3, 50:4, 51:1, 51:3, 51:7, 51:12, 57:9, 57:15, 57:18, 57:23, 57:25, 58:11, 60:15, 60:16, 60:24, 62:10, 67:16, 68:3, 70:21, 72:10, 72:20, 74:3, 75:16, 76:1, 76:4, 76:10, 79:22, 80:13, 86:2, 86:9, 86:12, 86:16, 86:18, 86:25, 87:3, 91:15, 92:5, 92:10, 92:14, 93:14, 93:23, 94:2, 100:16
**CORRECTION** [1] - 100:2
**CORRECTIONS** [1] - 100:1
**correctly** [2] - 42:23, 84:4
**cosmetic** [1] - 47:2
**cost** [1] - 30:13
**costs** [1] - 50:15
**costume** [4] - 48:14, 89:1, 89:6
**counsel** [7] - 22:6, 93:23, 94:2, 94:11, 94:12, 101:14, 101:17
**counter** [2] - 67:14, 69:25
**counter-claim** [2] - 67:14, 69:25
**County** [1] - 1:21
**COUNTY** [1] - 100:1
**couple** [2] - 10:17, 51:24
**COURT** [1] - 1:1
**court** [7] - 5:21, 9:15, 21:18, 27:8, 43:5, 43:13, 56:13
**courtesy** [1] - 6:11
**Cove** [2] - 6:25, 8:16
**create** [4] - 37:12, 37:18, 39:1, 39:9
**created** [1] - 78:13
**credit** [1] - 11:19

**Creek** [2] - 8:6, 8:8
**criminal** [1] - 37:1
**Crimson** [2] - 16:5, 16:10
**Crystal** [2] - 6:25, 8:16
**CSR** [1] - 101:21
**custody** [1] - 41:22
**customer** [3] - 89:23, 90:13, 94:21
**customers** [5] - 43:23, 52:25, 58:19, 60:1, 94:20
**cut** [1] - 26:22
**cutting** [2] - 22:20

## D

**d/b/a** [6] - 1:8, 2:9, 78:20, 79:7, 79:12, 84:24
**DALLAS** [4] - 1:2, 1:7, 2:9, 101:1
**Dallas** [13] - 1:21, 5:17, 7:20, 8:4, 8:6, 12:11, 51:25, 52:2, 52:5, 59:17, 79:7, 79:12
**Dallas-Fort** [2] - 12:11, 59:17
**damages** [4] - 57:4, 57:5, 91:20, 92:1
**dance** [8] - 39:10, 39:12, 45:22, 46:8, 48:4, 90:12, 95:17, 95:21
**danced** [2] - 37:19, 47:19
**dancer** [5] - 40:23, 45:2, 48:10, 88:20, 89:9
**dancer's** [1] - 96:9
**dancers** [3] - 19:24, 49:25, 96:3
**dances** [14] - 30:24, 45:15, 45:19, 45:21, 48:6, 53:6, 53:7, 53:8, 58:20, 60:4, 94:18, 95:12, 95:14, 95:24
**dancing** [6] - 13:1, 30:16, 44:1, 44:25, 47:17, 53:2
**data** [2] - 14:4, 41:11
**date** [6] - 9:5, 72:15, 72:17, 72:20, 73:25
**Date** [1] - 101:22
**dated** [2] - 92:23, 92:24
**dates** [2] - 74:14, 91:9
**day-to-day** [1] - 67:2

**days** [18] - 30:5, 30:7, 31:15, 31:18, 32:18, 34:25, 35:23, 48:13, 55:21, 55:22, 55:23, 56:20, 60:18, 61:2, 86:3, 86:4, 99:17
**daytime** [5] - 34:19, 53:16, 59:18, 59:19, 60:22
**deactivate** [1] - 40:20
**deactivated** [5] - 13:25, 14:14, 39:25, 40:2, 40:16
**deactivating** [1] - 14:16
**December** [13] - 7:22, 9:1, 9:5, 9:6, 9:12, 73:2, 73:10, 73:15, 73:19, 73:21, 73:23, 91:9
**decide** [1] - 95:16
**decided** [3] - 75:24, 95:12, 97:25
**deciding** [1] - 96:22
**decision** [1] - 9:16
**decisions** [1] - 97:7
**declined** [1] - 54:18
**deduct** [3] - 46:9, 46:17, 48:8
**deducted** [3] - 47:10, 47:11, 48:16
**deductions** [3] - 46:5, 46:22, 46:25
**Defendant** [1] - 1:19, 3:21, 3:23, 4:4
**defendant** [1] - 66:3
**defendant's** [4] - 8:21, 13:20, 17:13, 98:21
**Defendant's** [9] - 23:21, 24:7, 25:18, 68:21, 69:15, 77:9, 92:17, 93:8, 93:16
**DEFENDANT'S** [2] - 3:11, 4:2
**defendants** [5] - 5:15, 8:17, 28:8, 79:5
**Defendants** [2] - 1:9, 2:8
**delete** [2] - 14:10, 40:19
**deleted** [7] - 13:24, 14:4, 14:12, 14:14, 40:15, 40:16, 41:3
**deleting** [1] - 14:16
**demands** [1] - 37:8
**Denton** [1] - 73:23
**depended** [2] - 32:7, 96:16
**Deposition** [1] - 3:13
**deposition** [14] - 5:6,

5:18, 6:3, 9:14, 21:9, 22:10, 23:25, 24:6, 91:7, 91:11, 99:22, 100:15, 101:11, 101:15
**DEPOSITION** [3] - 1:13, 1:18, 101:22
**describe** [1] - 52:23
**DESCRIPTION** [2] - 3:11, 4:2
**detail** [1] - 77:22
**details** [1] - 22:18
**determination** [1] - 60:5
**determine** [2] - 96:25, 97:25
**dictate** [1] - 80:8
**difference** [1] - 14:15
**different** [3] - 20:2, 52:4, 87:16
**differently** [1] - 20:5
**digits** [1] - 58:18
**diligent** [1] - 58:4
**directions** [1] - 78:10
**directly** [1] - 28:24
**disclosing** [1] - 81:5
**Disclosures** [1] - 3:19
**disclosures** [4] - 9:24, 66:3, 77:13, 92:21
**discovery** [6] - 10:2, 10:5, 10:7, 92:20, 92:21
**discuss** [1] - 28:7
**discussed** [2] - 69:17, 75:10
**discussing** [4] - 57:12, 66:2, 68:9, 70:4
**discussion** [2] - 61:13, 70:5
**disprove** [1] - 71:5
**distinctly** [1] - 17:18
**District** [1] - 5:8
**DISTRICT** [2] - 1:1, 1:1
**DIVISION** [1] - 1:2
**DJ** [14] - 20:15, 33:25, 34:14, 47:19, 47:21, 47:22, 47:24, 47:25, 49:17, 49:20, 49:24, 90:13, 91:1, 91:4
**dljcsr6115@gmail. com** [1] - 101:24
**document** [31] - 18:15, 24:2, 25:5, 28:4, 29:10, 29:12, 38:1, 38:7, 38:12, 38:15, 38:21, 38:22, 42:18, 54:13, 54:15, 54:17, 55:4, 55:5, 55:7, 62:2, 74:22,

76:17, 76:20, 76:24, 77:2, 77:4, 78:4, 80:18, 83:21, 93:2, 94:4
**documentation** [2] - 74:14, 80:21
**documents** [18] - 10:9, 10:16, 15:7, 17:12, 18:9, 18:10, 54:19, 66:8, 69:8, 69:11, 73:14, 75:3, 77:21, 77:23, 93:22, 94:2, 94:12
**dollar** [1] - 53:13
**dollars** [1] - 35:5
**done** [3] - 24:12, 43:16, 48:17
**donna** [1] - 98:17
**Donna** [10] - 1:22, 6:5, 6:12, 9:18, 75:11, 87:18, 98:6, 99:3, 101:3, 101:21
**door** [2] - 90:24, 91:3
**down** [9] - 6:6, 28:3, 29:19, 29:22, 57:14, 59:8, 70:8, 90:2
**dress** [2] - 88:21, 88:23
**dressed** [1] - 88:25
**drugs** [1] - 53:24
**drunk** [1] - 73:24
**due** [2] - 70:17, 72:2
**duly** [2] - 5:4, 101:7
**during** [10] - 30:4, 34:19, 51:21, 51:24, 53:18, 59:19, 60:9, 74:7, 88:25, 95:13

## E

**E-mail** [2] - 2:7, 2:13
**e-mail** [4] - 41:13, 41:15, 98:18, 99:6
**early** [2] - 33:19, 33:20
**earn** [5] - 20:5, 30:22, 31:7, 31:9, 45:6
**eat** [1] - 19:11
**efforts** [1] - 14:3
**eight** [3] - 33:18, 34:10, 34:11
**eight-hour** [1] - 34:11
**either** [10] - 20:10, 21:16, 25:12, 66:8, 84:19, 86:4, 86:10, 89:3, 90:1, 90:7
**elaborate** [6] - 10:1, 15:5, 22:24, 28:13, 37:14, 44:6
**Elizabeth** [1] - 6:16
**ELLZEY** [1] - 2:5

**employed** [2] - 101:14, 101:17
**employee** [15] - 19:14, 19:18, 19:21, 19:23, 20:13, 20:21, 25:24, 51:6, 51:7, 51:12, 57:21, 80:8, 80:25, 81:11, 101:16
**employees** [14] - 19:15, 20:2, 20:6, 20:8, 20:11, 20:16, 32:12, 49:21, 49:24, 50:1, 50:3, 51:16, 64:21, 79:17
**employer** [5] - 78:9, 79:1, 81:16, 81:25, 82:13
**Employer/ Independent** [1] - 25:6
**employment** [2] - 20:18, 65:10
**end** [4] - 7:17, 7:20, 72:1, 84:11
**enforced** [2] - 59:10, 59:11
**engage** [1] - 53:21
**entertain** [1] - 95:1
**entertained** [1] - 52:25
**entertainer** [1] - 19:22
**Entertainment** [2] - 66:11, 66:13
**entertainment** [3] - 30:16, 30:18, 67:23
**entire** [1] - 92:13
**entitled** [9] - 21:6, 23:1, 26:15, 26:17, 26:18, 26:19, 29:13, 38:2, 56:17
**entity** [6] - 64:14, 65:19, 66:1, 79:19, 81:14, 82:12
**Esq** [2] - 2:4, 2:10
**estate** [4] - 12:9, 12:10, 12:13, 16:18
**etiquette** [1] - 27:5
**event** [1] - 98:21
**events** [1] - 95:3
**evidence** [1] - 41:4
**exact** [2] - 8:13, 25:15
**exactly** [2] - 32:10, 58:25, 99:13
**EXAMINATION** [6] - 3:5, 5:12, 88:4, 91:17, 94:14, 95:10
**examination** [1] - 101:9
**Except** [1] - 42:3
**except** [1] - 100:16
**exception** [1] - 89:22

**exercise** [1] - 27:4
**exhibit** [1] - 93:4
**Exhibit** [34] - 3:12, 3:14, 3:16, 3:17, 3:18, 3:20, 3:22, 3:25, 4:3, 23:21, 23:22, 24:5, 24:7, 24:19, 24:22, 25:18, 25:19, 68:19, 68:21, 69:15, 75:10, 75:11, 77:9, 77:10, 77:11, 88:6, 92:17, 92:22, 93:4, 93:8, 93:16, 93:17, 93:20
**exhibits** [3] - 68:20, 92:19, 98:13
**exotic** [1] - 45:2
**expedited** [3] - 98:22, 99:10, 99:19
**expenses** [2] - 47:9, 47:14
**experience** [2] - 19:19, 96:11
**Expiration** [1] - 101:22
**expires** [1] - 100:24
**explain** [2] - 14:15, 49:14
**explained** [1] - 18:22
**explains** [1] - 18:10
**exploit** [1] - 23:17
**expose** [1] - 23:12
**extend** [1] - 90:1
**extent** [2] - 50:15, 94:24

**F**

**Facebook** [4] - 16:13, 16:19, 16:23, 16:24
**facility** [1] - 18:12
**factor** [1] - 86:5
**factored** [1] - 86:6
**factors** [1] - 86:10
**facts** [1] - 101:5
**failure** [1] - 70:10
**fair** [1] - 63:2
**fake** [1] - 13:25
**familiar** [2] - 61:11, 77:20
**family's** [1] - 7:5
**fantastic** [1] - 75:8
**far** [2] - 62:21, 63:10
**fast** [2] - 24:6, 68:20
**faster** [1] - 26:13
**father** [1] - 7:11
**fearful** [1] - 51:21
**February** [5] - 7:17, 7:20, 7:22, 8:12
**Federal** [3] - 1:24, 5:7,

75:6
**fee** [9] - 30:23, 30:24, 31:2, 31:17, 52:17, 86:21, 90:21, 90:25, 92:3
**fees** [10] - 30:16, 30:18, 31:3, 35:3, 46:7, 50:8, 50:13, 66:22, 67:23, 90:17
**fell** [1] - 88:25
**felt** [2] - 17:22, 23:13
**few** [1] - 19:6, 61:14, 88:3
**fifth** [2] - 35:1, 72:3
**figure** [3] - 38:19, 54:6, 96:17
**file** [1] - 11:2
**filed** [5] - 51:11, 61:19, 67:14, 69:18, 70:2
**filing** [5] - 28:6, 28:10, 41:5, 51:4, 65:13
**fill** [1] - 68:19
**financially** [1] - 101:18
**fine** [9] - 21:11, 27:25, 38:5, 42:12, 54:20, 71:9, 84:6, 84:8, 84:25
**fingerprints** [1] - 25:2
**finish** [8] - 6:10, 6:11, 16:1, 21:4, 22:9, 26:10, 27:5, 31:1
**finishes** [1] - 21:25
**fired** [2] - 51:21, 64:16
**firing** [3] - 65:1, 65:16, 67:2
**firm@ellzeylaw.com** [1] - 2:7
**First** [3] - 3:21, 3:24, 4:5
**first** [21] - 5:4, 17:12, 17:16, 24:18, 30:3, 30:7, 43:8, 43:11, 51:11, 56:24, 68:16, 68:22, 72:1, 72:8, 72:15, 77:5, 83:19, 83:23, 85:6, 89:1, 89:3
**fishnet** [1] - 97:11
**fishnets** [2] - 48:12, 97:15
**fit** [2] - 26:16, 48:11
**five** [2] - 36:18, 71:21
**flats** [1] - 88:17
**flexibility** [2] - 96:17, 96:21
**flip** [1] - 88:18
**flip-flops** [1] - 88:18
**floor** [3] - 90:17, 90:19, 90:20
**flops** [1] - 88:18

**FLSA** [1] - 37:8
**fluctuations** [1] - 36:10
**following** [1] - 30:5
**follows** [1] - 5:4
**FOR** [3] - 1:1, 100:2, 100:22
**forced** [1] - 76:3
**foregoing** [1] - 100:14
**forgo** [2] - 35:3, 57:1
**form** [49] - 13:8, 14:8, 14:17, 14:23, 15:4, 17:17, 17:19, 18:19, 18:20, 18:23, 18:24, 19:2, 19:8, 19:12, 19:13, 20:20, 25:13, 30:17, 31:14, 32:14, 34:5, 35:16, 35:19, 36:2, 36:14, 40:6, 40:11, 41:1, 41:6, 41:24, 42:5, 45:11, 45:20, 46:1, 46:13, 46:18, 50:10, 51:2, 51:8, 51:13, 56:1, 57:24, 58:12, 65:11, 70:22, 72:11, 75:17, 76:5, 79:23
**forms** [1] - 82:21
**Fort** [2] - 12:11, 59:17
**forth** [1] - 6:6
**four** [9] - 33:6, 33:7, 33:14, 34:21, 35:9, 35:11, 56:22, 58:18, 61:1
**fourth** [1] - 30:9
**Fox** [10] - 12:25, 13:1, 13:22, 14:1, 15:20, 16:5, 16:10, 16:16, 16:18, 16:23
**frame** [1] - 7:15
**free** [2] - 30:20, 90:17
**front** [1] - 34:13
**full** [2] - 6:14, 21:6
**funds** [2] - 33:11, 49:19

**G**

**Galloway** [1] - 8:10
**gathered** [2] - 10:12, 15:7
**general** [9] - 51:16, 63:21, 78:17, 79:24, 82:3, 83:7, 87:7, 96:20, 97:3
**genere** [2] - 47:18, 90:10
**Ghazzaleh** [3] - 2:4, 61:22, 61:24
**girl** [2] - 90:24, 91:3

**girls** [1] - 90:1
**given** [19] - 10:6, 18:9, 19:14, 19:18, 19:20, 20:22, 23:6, 25:9, 37:19, 39:10, 65:12, 81:6, 81:12, 81:17, 82:6, 82:8, 85:9, 86:19, 101:12
**Given** [1] - 101:19
**Google** [1] - 41:19
**group** [2] - 73:20, 95:7
**guess** [4] - 59:13, 65:21, 74:7, 82:5
**guests** [1] - 52:25
**guidelines** [1] - 45:14

**H**

**hair** [2] - 46:17, 46:22
**hair/makeup** [1] - 46:9
**hand** [1] - 101:19
**handles** [1] - 12:17
**harassing** [1] - 82:16
**hashtags** [1] - 12:17
**head** [6] - 23:8, 38:17, 48:17, 48:22, 71:15, 71:20
**health** [1] - 33:22
**hear** [3] - 47:23, 47:24, 89:19
**heard** [3] - 83:20, 83:23, 85:6
**heels** [2] - 88:20, 89:10
**helpful** [2] - 5:21, 27:10
**helps** [1] - 84:12
**HER** [2] - 39:15, 39:20
**hereby** [2] - 100:15, 101:4
**herein** [1] - 100:17
**hereto** [2] - 101:6, 101:17
**hire** [2] - 45:4, 60:12
**hired** [5] - 23:10, 45:3, 60:8, 60:11, 64:16
**hiring** [3] - 65:1, 65:16, 67:2
**history** [2] - 37:2, 44:24
**hold** [3] - 23:17, 33:9, 33:11
**holds** [1] - 78:21
**home** [4] - 7:4, 7:9, 36:12, 51:17
**honestly** [1] - 90:20
**hopefully** [1] - 69:8
**hour** [1] - 34:11
**hours** [23] - 33:18, 34:9, 34:24, 35:8,

35:9, 35:10, 54:3, 54:7, 54:11, 55:3, 55:13, 55:19, 56:4, 56:10, 70:14, 70:17, 70:20, 71:14, 71:17, 87:20
**house** [8] - 20:15, 33:24, 34:13, 49:20, 49:23, 90:7, 90:17, 90:21
**housekeeping** [1] - 98:12
**Houston** [1] - 2:6
**humiliated** [1] - 23:12
**Huron** [1] - 6:21
**HURON** [1] - 6:22
**husband** [2] - 7:10, 61:6
**husband's** [1] - 7:24

**I**

**idea** [2] - 23:16, 59:14
**identified** [1] - 66:2
**identify** [6] - 66:20, 67:1, 70:14, 70:17, 71:13
**II** [1] - 2:11
**illegal** [1] - 54:1
**image** [1] - 24:9
**Images** [1] - 49:7
**importance** [1] - 9:17
**improper** [1] - 21:20
**IN** [2] - 1:1, 100:22
**inappropriate** [2] - 21:19, 53:21
**Inc** [28] - 64:10, 64:16, 64:24, 65:9, 65:15, 78:7, 78:15, 78:25, 79:7, 79:11, 79:12, 79:20, 80:11, 80:19, 80:24, 81:1, 81:4, 81:6, 81:9, 81:16, 81:24, 81:25, 82:13, 83:20, 83:24, 84:16, 85:6
**INC** [4] - 1:7, 1:7, 2:8, 2:9
**Inc.'s** [3] - 3:21, 3:24, 4:5
**included** [1] - 86:10
**income** [1] - 45:24
**incorrect** [1] - 22:3
**increase** [1] - 95:19
**incurred** [2] - 50:8, 50:16
**independent** [22] - 13:7, 13:11, 17:17, 19:16, 19:22, 19:24, 20:2, 20:9, 25:13,

26:1, 26:4, 28:8,
28:12, 32:12, 51:17,
57:20, 59:8, 75:25,
79:18, 81:12, 81:21,
82:7
**independently** [1] -
71:13
**individually** [2] - 1:3,
2:3
**individuals** [3] -
23:18, 45:13, 62:22
**industry** [1] - 19:8
**influence** [1] - 5:24
**information** [19] -
40:4, 40:10, 40:14,
54:22, 64:22, 64:23,
65:6, 65:8, 65:12,
65:14, 65:20, 66:10,
67:22, 81:2, 81:7,
81:12, 82:6, 82:20,
85:9
**initial** [4] - 9:24, 77:12,
92:21
**Initial** [1] - 3:19
**initials** [2] - 28:3, 28:4
**injections** [2] - 47:6,
47:7
**inner** [1] - 65:5
**inside** [2] - 46:14,
46:16
**Instagram** [3] - 12:2,
16:11, 39:25
**instance** [1] - 1:19
**instruct** [5] - 27:12,
27:18, 70:23, 72:23,
76:12
**instructing** [2] -
27:21, 27:23
**intent** [2] - 23:24, 28:7
**Intention** [1] - 3:13
**interaction** [1] - 81:3
**interest** [1] - 78:24
**interested** [2] - 61:17,
101:18
**Interrogatories** [1] -
3:24
**interrogatory** [2] -
93:7, 93:11
**interrogs** [1] - 93:5
**interrupt** [5] - 21:12,
21:15, 22:10, 26:17,
82:15
**interrupting** [4] -
21:19, 26:10, 26:11,
27:8
**introduction** [1] - 59:7
**invoice** [1] - 50:18
**involved** [11] - 37:4,
53:24, 54:1, 64:25,
65:9, 65:15, 65:17,

66:10, 66:21, 67:2,
83:5
**involvement** [1] -
64:17
**itself** [1] - 85:16

**J**

**January** [6] - 52:13,
52:14, 77:3, 88:8,
92:6
**Jessie** [1] - 67:4
**Jessie's** [1] - 67:5
**job** [4] - 60:23, 60:24,
87:13, 94:25
**Johnston** [3] - 1:22,
101:3, 101:21
**join** [2] - 62:6, 62:22
**joining** [2] - 61:17,
62:17
**Julia** [3] - 61:11,
61:21, 62:7
**July** [8] - 8:23, 9:2,
24:15, 52:8, 68:23,
72:9, 72:14, 74:2
**June** [2] - 6:24, 74:2

**K**

**K-I-A-N-N-E-J-A-D** [1]
- 6:17
**keep** [7] - 26:5, 36:6,
36:7, 42:22, 59:14,
82:4, 87:13
**keeps** [1] - 58:4
**kept** [4] - 58:13, 58:25,
71:12, 96:15
**Kiannejad** [1] - 6:16
**Kimber** [1] - 16:5
**kimber** [11] - 12:24,
12:25, 13:1, 13:22,
14:1, 15:20, 16:9,
16:16, 16:18, 16:23
**kimberFoxOfficial** [1]
- 12:22
**kimberfoxrealestate
@gmail.com** [1] -
41:16
**Kimberlayton** [1] -
41:16
**kind** [5] - 9:13, 9:17,
44:21, 46:24, 68:8
**knowing** [1] - 81:10
**knowledge** [2] - 19:7,
64:12
**known** [1] - 97:20
**knows** [3] - 38:14,
38:15, 61:6

**L**

**L-A-Y-T-O-N** [1] - 6:18
**ladies** [3] - 21:13,
96:11, 96:12
**lap** [5] - 48:4, 95:12,
95:14, 95:17, 95:20
**last** [7] - 9:6, 58:18,
67:4, 72:19, 72:20,
73:2, 89:3
**Latrice** [7] - 2:10,
5:16, 21:5, 37:25,
54:12, 84:17, 88:6
**latrice** [3] - 29:10,
98:12, 99:1
**latrice@
sheilswinnubst.
com** [1] - 2:13
**law** [1] - 57:18
**lawsuit** [21] - 28:6,
28:10, 51:5, 51:11,
61:5, 61:7, 61:9,
61:17, 62:6, 62:13,
62:17, 62:23, 62:25,
63:4, 63:9, 63:13,
63:15, 64:11, 65:14,
69:22, 85:8
**lawsuits** [1] - 37:4
**lawyer** [1] - 61:17
**layton** [1] - 67:13
**Layton** [5] - 3:13,
5:14, 6:17, 16:20,
27:14
**LAYTON** [9] - 1:3,
1:14, 1:18, 2:3, 3:4,
5:3, 4:17, 100:14,
100:18
**Layton's** [4] - 3:18,
3:20, 3:22, 4:2
**lease** [1] - 76:21
**Lease** [3] - 3:17,
25:20, 76:9
**least** [1] - 56:21
**leave** [23] - 31:17,
31:24, 32:1, 32:2,
32:6, 33:19, 33:20,
33:24, 34:10, 34:12,
34:15, 35:14, 47:22,
49:15, 52:6, 52:17,
58:9, 61:3, 85:21,
89:2, 91:3, 92:4
**leaving** [3] - 31:19,
32:11, 86:20
**left** [6] - 33:21, 35:23,
52:13, 60:21, 86:4,
91:21
**legal** [2] - 16:19, 79:24
**less** [1] - 53:5
**level** [3] - 65:5, 87:16,
87:17

**License** [3] - 3:17,
25:20, 76:9
**license** [1] - 76:20
**licensing** [2] - 18:12,
18:13
**like..** [1] - 79:8
**likely** [2] - 60:2, 95:24
**limited** [1] - 60:13
**LINE** [1] - 100:2
**lingerie** [2] - 97:2,
97:5
**literally** [3] - 23:8,
31:16, 32:7
**live** [6] - 6:19, 7:11,
7:13, 7:15, 7:19,
8:11
**lived** [2] - 6:23, 7:14
**living** [5] - 7:12, 7:23,
8:7, 8:8, 8:9
**LLC** [1] - 78:21
**local** [1] - 5:8
**located** [1] - 5:17
**log** [2] - 14:18, 98:3
**logged** [1] - 40:7
**login** [2] - 40:4, 40:9,
40:14
**logs** [1] - 98:6
**look** [10] - 23:22, 50:7,
69:18, 73:18, 74:16,
77:20, 91:6, 91:19,
97:5, 99:13
**looked** [1] - 88:16
**looking** [1] - 45:5
**looks** [1] - 94:5
**lose** [2] - 31:12, 87:10
**losing** [1] - 87:14
**losses** [2] - 46:3, 46:6
**lucrative** [4] - 53:17,
59:17, 59:20, 59:21

**M**

**ma'am** [18] - 5:23, 6:2,
6:4, 6:9, 6:13, 7:8,
8:2, 8:15, 8:19, 9:20,
10:3, 10:10, 10:15,
11:21, 11:25, 12:16,
14:5, 25:17
**mad** [1] - 6:12
**maiden** [1] - 6:17
**mail** [6] - 2:7, 2:13,
41:13, 41:15, 98:18,
99:6
**MAINSTAGE** [4] - 1:7,
1:7, 2:8, 2:9
**Mainstage** [42] - 3:21,
3:23, 4:4, 64:9,
64:15, 64:21, 64:23,
65:9, 65:15, 65:18,
66:9, 66:11, 66:13,

78:7, 78:15, 78:20,
78:24, 79:7, 79:11,
79:12, 79:20, 80:2,
80:7, 80:10, 80:11,
80:19, 80:24, 81:1,
81:4, 81:6, 81:8,
81:11, 81:15, 81:23,
81:25, 82:13, 83:20,
83:24, 84:3, 84:15,
84:20, 85:6
**makeup** [2] - 46:17,
46:22
**manage** [1] - 45:9
**management** [7] -
35:1, 78:10, 79:6,
79:14, 80:6, 89:8,
89:11
**Management** [31] -
3:21, 3:23, 4:4, 64:9,
64:16, 64:24, 65:9,
65:15, 78:7, 78:15,
78:20, 78:25, 79:11,
80:2, 80:10, 80:19,
80:24, 81:1, 81:4,
81:6, 81:9, 81:11,
81:15, 81:24, 81:25,
82:13, 83:20, 83:24,
84:3, 84:16, 85:6
**MANAGEMENT** [2] -
1:7, 2:8
**manager** [5] - 17:19,
18:2, 23:7, 67:3,
90:7
**managers** [3] - 20:16,
66:21, 66:24
**mandatory** [17] -
31:16, 31:17, 33:16,
33:24, 34:11, 49:15,
49:16, 49:17, 51:18,
52:17, 65:4, 85:19,
85:20, 85:21, 88:23,
89:18
**March** [2] - 14:12,
52:21
**marked** [12] - 23:21,
24:7, 25:18, 68:18,
68:21, 69:15, 75:12,
77:9, 77:11, 92:17,
93:8, 93:16
**marketing** [1] - 94:23
**materials** [3] - 46:8,
46:24, 46:25
**mathematician** [1] -
86:14
**matters** [1] - 101:8
**maximum** [1] - 48:3
**mean** [16] - 12:10,
27:6, 36:8, 54:17,
56:2, 59:22, 60:3,
66:7, 78:19, 81:19,

82:25, 85:1, 93:12, 95:23, 97:21
**means** [3] - 9:13, 36:8, 97:22
**media** [14] - 11:22, 11:24, 12:1, 12:12, 12:15, 15:10, 15:13, 15:17, 15:18, 15:20, 40:20, 41:2, 41:3, 47:10
**medication** [1] - 5:24
**Mehmeti** [2] - 79:8, 84:23
**MEHMETI** [2] - 1:8, 2:9
**memory** [1] - 9:3
**Mens** [15] - 3:17, 51:25, 52:2, 52:7, 52:8, 52:13, 60:15, 60:17, 74:2, 79:8, 79:13, 84:13, 84:22, 84:24, 85:10
**MENS** [2] - 1:8, 2:9
**menstruating** [1] - 97:23
**mental** [1] - 33:22
**mentioned** [2] - 46:24, 61:6
**Mesquite** [2] - 8:9, 25:14
**messaged** [1] - 64:4
**mid** [2] - 21:19, 22:11
**mid-answer** [2] - 21:19, 22:11
**middle** [2] - 9:11, 21:15
**Mildord** [1] - 2:5
**minutes** [5] - 17:21, 36:18, 92:7, 92:16
**misclassified** [1] - 57:20
**misleading** [6] - 54:21, 70:24, 71:2, 72:23, 76:22, 93:25
**misrepresenting** [1] - 56:17
**miss** [2] - 30:13, 73:22
**missed** [7] - 30:12, 33:7, 56:23, 56:24, 85:22, 86:22
**misstates** [2] - 63:5, 80:14
**misstating** [3] - 43:7, 56:7, 74:4
**model** [3] - 13:7, 13:12, 49:11
**modeled** [1] - 13:4
**Modeling** [2] - 49:8, 49:9
**modeling** [8] - 12:23, 13:1, 13:2, 13:5,

13:18, 13:19, 48:22
**mom** [12] - 20:15, 33:25, 34:14, 49:16, 49:20, 49:23, 51:15, 85:19, 90:7, 90:19, 91:1, 91:4
**mom's** [1] - 7:5
**Monday** [1] - 30:4
**money** [55] - 13:5, 19:25, 20:5, 30:14, 30:22, 31:7, 31:9, 31:12, 31:13, 31:20, 32:2, 33:8, 34:3, 43:21, 43:25, 44:7, 44:10, 44:18, 44:19, 45:6, 45:9, 53:5, 56:22, 57:2, 57:15, 57:17, 57:18, 57:19, 57:23, 58:22, 59:1, 59:16, 59:23, 60:6, 60:10, 60:14, 60:17, 60:19, 67:19, 85:13, 85:17, 86:12, 86:21, 87:4, 87:10, 87:11, 87:14, 94:16, 94:19, 95:20, 96:8, 96:12, 96:15, 96:18
**month** [5] - 9:9, 9:12, 48:13, 72:1, 72:2
**monthly** [1] - 88:24
**months** [6] - 40:24, 51:24, 61:14, 63:17, 63:23, 74:6
**Most** [1] - 86:1
**most** [7] - 32:10, 32:15, 59:18, 59:19, 67:3, 87:13, 96:18
**mother** [2] - 7:11, 7:24
**mouth** [1] - 22:7
**move** [5] - 38:23, 43:17, 60:23, 82:15, 84:7
**MR** [2] - 36:18, 88:5
**MS** [321] - 5:5, 5:10, 5:11, 5:13, 10:23, 11:2, 13:8, 13:11, 13:13, 13:15, 14:8, 14:10, 14:17, 14:21, 14:23, 15:2, 15:4, 15:6, 15:24, 16:1, 16:7, 17:1, 17:3, 17:5, 17:11, 18:19, 18:25, 20:20, 20:24, 21:3, 21:4, 21:8, 21:11, 21:14, 21:22, 21:24, 22:3, 22:4, 22:6, 22:8, 22:12, 22:14, 22:16, 22:17, 22:22, 23:1, 23:15, 23:19, 23:22, 24:5,

24:8, 24:22, 24:24, 24:25, 25:1, 25:19, 26:7, 26:9, 26:12, 26:15, 26:18, 26:21, 26:25, 27:3, 27:10, 27:12, 27:13, 27:14, 27:17, 27:18, 27:20, 27:23, 27:25, 28:2, 28:14, 28:16, 28:18, 28:22, 29:8, 29:14, 29:16, 29:21, 29:23, 30:17, 30:19, 30:25, 31:1, 31:6, 31:14, 31:22, 32:14, 32:15, 32:24, 33:5, 33:10, 33:14, 34:5, 34:7, 35:16, 35:17, 35:19, 35:24, 36:2, 36:4, 36:14, 36:16, 36:17, 36:20, 37:1, 37:25, 38:4, 38:6, 38:9, 38:11, 38:18, 38:20, 38:23, 38:25, 39:1, 39:3, 39:7, 39:11, 39:21, 40:6, 40:9, 40:11, 40:13, 41:6, 41:8, 41:24, 42:3, 42:12, 42:15, 43:2, 43:3, 43:5, 43:10, 43:12, 43:15, 43:17, 43:18, 43:20, 44:2, 44:4, 44:9, 44:12, 44:21, 45:11, 45:12, 45:20, 45:23, 46:1, 46:5, 46:13, 46:16, 46:18, 46:20, 50:10, 50:12, 51:2, 51:4, 51:8, 51:10, 51:13, 51:19, 54:12, 54:14, 54:16, 55:2, 55:5, 55:9, 55:11, 55:12, 56:1, 56:3, 56:6, 56:8, 56:12, 57:3, 57:24, 58:1, 58:12, 58:15, 63:1, 63:2, 63:3, 63:5, 63:14, 63:20, 63:22, 65:11, 65:13, 65:25, 66:12, 66:15, 66:20, 67:10, 67:13, 68:18, 68:22, 68:24, 68:25, 69:2, 69:7, 69:10, 69:13, 69:16, 70:22, 71:1, 71:3, 71:6, 71:9, 71:13, 71:18, 71:23, 72:11, 72:14, 72:22, 73:1, 73:4, 73:6, 74:4, 74:9, 74:12, 74:15, 74:17, 74:19, 74:21, 74:24, 75:1, 75:2, 75:9, 75:11,

75:14, 76:5, 76:8, 76:11, 76:16, 76:18, 76:19, 76:22, 77:1, 77:10, 77:12, 77:25, 78:2, 78:3, 78:16, 78:23, 79:2, 79:9, 79:23, 79:25, 80:1, 80:5, 80:14, 80:18, 82:2, 82:10, 82:11, 82:14, 82:18, 82:24, 83:3, 83:6, 83:8, 83:12, 83:19, 84:8, 84:12, 84:14, 84:18, 84:21, 84:25, 85:5, 85:7, 85:11, 85:13, 86:13, 86:15, 87:1, 87:4, 87:6, 87:10, 87:18, 87:23, 87:25, 88:2, 88:14, 88:15, 91:16, 91:18, 92:18, 93:10, 93:17, 93:25, 94:1, 94:13, 94:15, 95:9, 95:11, 95:22, 96:1, 96:19, 96:21, 97:3, 97:7, 97:9, 97:17, 98:1, 98:2, 98:8, 98:11, 98:14, 98:21, 98:25, 99:2, 99:6, 99:9, 99:15, 99:18
**multiple** [4] - 31:3, 60:18, 67:5, 89:24
**music** [9] - 37:19, 39:10, 47:16, 47:19, 47:21, 47:23, 47:24, 48:1, 90:8

## N

**naked** [2] - 23:8, 23:9, 50:7
**name** [27] - 5:16, 6:14, 6:16, 6:17, 12:24, 12:25, 13:1, 15:19, 15:22, 16:7, 16:20, 39:19, 39:24, 49:6, 58:18, 67:4, 67:5, 77:7, 79:15, 81:14, 81:23, 82:12, 82:22, 83:4, 83:10, 83:11, 83:24
**named** [4] - 5:16, 84:16, 84:18, 101:7
**names** [2] - 16:4, 81:17
**nature** [1] - 21:20
**necessarily** [1] - 60:3
**need** [9] - 18:23, 27:24, 28:19, 29:17, 55:10, 76:13, 98:17,

99:3, 99:19
**needed** [2] - 23:14, 87:25
**needs** [2] - 6:7, 54:22
**negative** [7] - 31:19, 31:25, 32:6, 35:23, 86:4, 86:19, 87:11
**never** [13] - 13:1, 18:21, 35:5, 43:24, 44:18, 44:20, 48:22, 51:5, 51:14, 61:18, 64:2, 77:19, 85:24
**new** [4] - 14:18, 40:5, 40:8, 75:23
**next** [7] - 20:25, 23:5, 23:11, 30:1, 35:4, 38:24
**NICK** [2] - 1:8, 2:9
**Nick** [8] - 64:18, 78:12, 78:21, 78:24, 79:8, 80:4, 81:18, 84:23
**Nick's** [7] - 78:12, 79:7, 79:12, 79:20, 80:7, 80:11, 84:20
**NICK'S** [2] - 1:7, 2:9
**night** [4] - 34:18, 53:15, 53:17, 58:23
**nitpick** [1] - 56:15
**NO** [1] - 1:6
**non** [12] - 15:25, 21:3, 21:20, 22:1, 23:2, 23:20, 26:7, 27:7, 30:25, 33:10, 82:10, 85:12
**non-responsive** [11] - 15:25, 21:3, 21:20, 22:1, 23:2, 23:20, 26:7, 30:25, 33:10, 82:10, 85:12
**non-responsiveness** [1] - 27:7
**norm** [2] - 32:22, 32:23
**normal** [1] - 34:8
**normally** [2] - 36:10, 53:14
**NORTHERN** [1] - 1:1
**Northern** [1] - 5:8
**notarized** [1] - 93:13
**NOTARY** [1] - 100:22
**noted** [1] - 100:16
**nothing** [2] - 75:4, 97:16
**Notice** [1] - 3:12
**notice** [1] - 23:24
**noticed** [1] - 24:1
**notify** [1] - 98:22
**November** [5] - 24:1, 72:18, 73:7, 101:20

**NOVEMBER** [2] -
1:15, 1:20
**nude** [10] - 95:23,
95:24, 96:7, 96:11,
97:1, 97:13, 97:18,
97:19, 97:21, 97:22
**nude-optional** [2] -
97:19, 97:21
**number** [7] - 42:16,
56:15, 64:8, 70:8,
86:16, 86:18, 94:6
**numbered** [1] - 1:20
**numbers** [1] - 86:19

## O

**Oak** [3] - 6:25, 8:16,
24:17
**oath** [5] - 9:18, 21:5,
28:14, 28:19, 84:1
**object** [8] - 15:24,
21:20, 21:25, 22:6,
23:1, 26:7, 27:6,
72:22
**objecting** [1] - 27:20
**Objection** [3] - 30:17,
74:12, 87:1
**objection** [71] - 13:8,
13:13, 14:8, 14:17,
14:23, 15:4, 18:19,
20:20, 21:3, 21:22,
23:19, 27:17, 30:25,
31:14, 32:14, 32:24,
33:10, 34:5, 35:16,
35:19, 36:2, 36:14,
39:3, 40:6, 40:11,
41:6, 41:24, 44:2,
45:11, 45:20, 46:1,
46:13, 46:18, 50:10,
51:2, 51:8, 51:13,
56:1, 56:8, 57:24,
58:12, 63:1, 63:5,
63:20, 65:11, 70:22,
71:6, 71:18, 72:11,
74:4, 76:5, 76:11,
77:25, 78:16, 79:2,
79:23, 79:25, 80:14,
82:2, 82:10, 85:11,
86:13, 87:6, 88:14,
93:25, 95:22, 96:19,
97:3, 97:9
**Objections** [3] - 3:20,
3:23, 4:4
**obligation** [2] - 29:14,
59:4
**obtain** [1] - 54:20
**obviously** [1] - 5:15
**October** [1] - 92:24
**odd** [2] - 34:2, 34:6
**OF** [5] - 1:1, 1:13,

100:23, 101:1, 101:2
**office** [1] - 101:19
**often** [3] - 33:18,
56:22, 90:11
**old** [1] - 41:8
**once** [3] - 18:21,
51:15, 89:2
**one** [40] - 10:18,
15:20, 16:23, 18:10,
19:4, 19:6, 19:14,
25:10, 30:7, 32:19,
32:21, 49:2, 55:15,
59:6, 59:7, 59:11,
61:7, 62:8, 62:11,
69:13, 70:7, 71:8,
76:1, 77:1, 77:2,
77:5, 79:11, 83:22,
85:3, 87:22, 88:8,
88:16, 88:25, 89:24,
89:25, 94:5, 98:23
**one-time** [2] - 32:19,
32:21
**ones** [2] - 91:8, 91:10
**open** [1] - 68:4
**opened** [1] - 93:1
**opportunity** [2] -
72:13, 91:13
**opposite** [2] - 28:24,
29:2
**option** [6] - 19:13,
19:18, 19:21, 25:10,
30:10, 87:15
**optional** [2] - 97:19,
97:21
**options** [1] - 60:13
**or..** [1] - 14:20
**Oral** [1] - 3:13
**ORAL** [1] - 1:13
**order** [10] - 26:5,
31:17, 33:8, 33:20,
57:1, 75:24, 91:2,
98:18, 98:22, 98:23
**otherwise** [1] - 27:7
**outfit** [1] - 51:18
**outfits** [5] - 46:7, 47:1,
48:8, 48:9, 48:10
**outside** [1] - 46:10
**overtalking** [1] - 29:22
**overtime** [9] - 54:5,
55:17, 55:18, 56:19,
70:4, 70:10, 70:17,
71:5, 72:6
**owe** [5] - 30:14, 31:17,
31:19, 50:12, 56:22
**owed** [7] - 33:8, 52:3,
57:1, 57:8, 57:11,
57:18, 57:19
**owing** [1] - 86:20
**own** [7] - 7:4, 13:14,
37:12, 37:18, 39:2,

65:21, 78:24
**owned** [1] - 66:11
**owner** [7] - 64:18,
66:15, 66:17, 66:18,
78:13, 79:15, 81:19
**owner's** [2] - 51:14,
51:20
**owners** [3] - 80:7,
81:17, 82:8
**ownership** [4] - 78:7,
79:19, 80:2, 80:11
**owns** [7] - 64:12,
64:14, 65:18, 65:19,
66:1, 66:4

## P

**P-O-I-S-I-N** [1] - 12:22
**p.m** [1] - 99:22
**packet** [1] - 69:7
**page** [6] - 16:14,
16:19, 24:18, 28:3,
41:2, 70:8
**PAGE** [3] - 3:11, 4:2,
100:2
**paid** [16] - 32:2, 32:4,
34:13, 43:24, 44:20,
46:7, 49:19, 49:21,
58:19, 85:24, 90:13,
90:25, 92:1, 92:8,
95:20
**paragraph** [1] - 62:4
**parent** [1] - 85:9
**part** [10] - 19:20, 25:2,
25:23, 33:23, 59:3,
61:8, 62:7, 65:22,
79:15, 81:5
**participating** [1] -
93:6
**particular** [1] - 78:3
**parties** [3] - 66:3,
101:15, 101:17
**party** [1] - 80:12
**pass** [5] - 88:1, 91:16,
94:13, 95:9, 98:1
**password** [1] - 14:22
**past** [1] - 40:25
**pay** [22] - 30:12,
30:21, 31:16, 33:12,
33:19, 33:23, 33:25,
34:10, 44:7, 47:20,
47:22, 47:24, 47:25,
50:9, 50:25, 64:25,
70:10, 85:23, 86:21,
86:22, 90:21, 91:3
**pay-out** [1] - 33:19
**paycheck** [1] - 20:1
**paying** [5] - 30:10,
33:3, 48:24, 49:1
**payment** [1] - 85:14

**penalties** [1] - 35:3
**People** [1] - 23:17
**people** [19] - 19:15,
19:16, 19:25, 23:17,
32:10, 53:12, 60:2,
60:3, 64:20, 66:21,
67:2, 67:15, 87:13,
89:16, 94:25, 95:1,
97:5, 97:18, 97:20
**per** [4] - 30:23, 34:21,
35:18, 45:15
**Perfect** [2] - 38:20,
38:25
**perfect** [1] - 99:18
**perform** [3] - 40:24,
73:24, 88:17
**performances** [2] -
44:10, 44:22
**performed** [3] - 37:15,
40:25, 90:9
**performer** [3] - 39:13,
39:14
**performing** [3] -
43:21, 89:12, 89:15
**permanent** [3] - 6:24,
6:25, 7:2
**person** [7] - 61:7,
61:10, 62:12, 65:19,
82:9, 90:6, 101:7
**personal** [1] - 16:14
**Phone** [2] - 2:6, 2:13
**phone** [7] - 14:18,
40:5, 40:8, 41:9,
41:12, 47:10, 47:11
**photographer** [3] -
48:19, 49:3, 49:4
**photos** [8] - 10:17,
40:15, 40:16, 40:19,
41:4, 41:18, 41:21,
63:24
**Photos** [1] - 41:19
**pick** [1] - 90:8
**Pinup** [10] - 12:2,
12:3, 12:5, 12:6,
12:7, 16:24, 49:8,
49:9, 49:11, 49:12
**place** [3] - 8:21, 18:11,
39:19
**Plaintiff** [6] - 1:5, 2:3,
3:18, 3:20, 3:22, 4:3
**plaintiffs** [1] - 74:23
**plan** [1] - 57:10
**Plano** [7] - 6:21, 6:22,
7:6, 7:12, 7:24, 7:25,
101:23
**play** [1] - 90:13
**played** [2] - 47:17,
48:1
**PLLC** [1] - 2:5
**plus** [2] - 65:4, 82:3

**point** [6] - 23:10,
23:13, 25:9, 34:15,
52:4, 74:8
**Point** [2] - 6:25, 24:17
**Poisin** [7] - 12:21,
13:25, 14:12, 14:19,
16:6, 39:24, 40:25
**policies** [1] - 66:22
**polite** [1] - 27:4
**port** [1] - 40:4
**portion** [8] - 15:25,
22:1, 23:2, 23:20,
26:8, 49:13, 85:12,
87:24
**positive** [2] - 86:15,
86:18
**possession** [1] -
41:22
**possibly** [3] - 11:12,
41:10, 94:5
**potential** [6] - 41:4,
59:16, 59:22, 60:6,
63:9, 66:3
**potentially** [5] - 9:11,
61:2, 71:22, 72:16,
85:3
**power** [2] - 23:17
**practice** [1] - 5:18
**practices** [1] - 65:16
**practicing** [1] - 44:22
**Predmoore** [2] -
61:11, 62:7
**preparation** [1] - 93:6
**prepare** [4] - 10:5,
37:20, 37:23, 93:10
**prepared** [2] - 57:13,
77:17
**preparing** [1] - 93:5
**presented** [1] - 19:23
**presenting** [1] - 65:25
**press** [1] - 68:6
**pressured** [1] - 23:13
**Preston** [1] - 101:23
**prevent** [1] - 5:25
**previous** [2] - 29:5,
87:2
**previously** [6] - 8:1,
24:18, 41:12, 42:19,
92:9, 93:21
**prices** [1] - 45:19
**primarily** [2] - 15:23,
94:18, 97:19
**primary** [1] - 16:6
**printed** [1] - 74:25
**privileged** [1] - 64:22
**Procedure** [3] - 1:24,
5:7, 75:6
**process** [2] - 25:3,
63:10
**produce** [6] - 64:5,

69:8, 74:17, 75:3, 75:5, 75:7
**produced** [4] - 68:24, 69:12, 76:14, 94:11
**produces** [1] - 94:12
**production** [7] - 15:3, 38:16, 42:16, 64:8, 93:18, 93:19, 94:6
**Production** [1] - 4:5
**profile** [1] - 14:1
**profitable** [2] - 96:22, 97:1
**promote** [1] - 41:1
**promotional** [1] - 95:3
**promotions** [1] - 59:25
**proper** [1] - 79:25
**property** [1] - 80:9
**prove** [5] - 71:5, 72:5, 73:9, 73:15, 73:19
**provide** [10] - 9:15, 10:21, 11:5, 25:2, 42:7, 42:20, 53:7, 74:11, 81:21, 94:10
**provided** [9] - 8:1, 8:17, 10:13, 42:11, 58:14, 58:20, 93:19, 93:22, 94:1
**providing** [6] - 10:9, 21:15, 22:18, 53:6, 54:22, 58:17
**provisions** [1] - 1:24
**PT's** [50] - 3:17, 17:13, 51:24, 52:3, 52:6, 52:13, 52:24, 59:18, 60:6, 60:8, 60:10, 60:15, 60:21, 61:1, 61:4, 61:9, 64:12, 64:14, 65:2, 65:21, 66:10, 66:11, 76:6, 78:7, 78:15, 78:20, 79:7, 79:8, 79:12, 79:16, 79:20, 80:3, 80:11, 80:20, 80:25, 84:13, 84:22, 84:24, 85:10, 87:14, 88:12, 88:18, 90:14, 91:7, 91:14, 94:17, 94:22, 95:23
**PT'S** [4] - 1:8, 2:9
**PUBLIC** [1] - 100:22
**pull** [1] - 56:12
**purposes** [6] - 9:14, 12:12, 12:23, 16:8, 16:18, 92:18
**pursuant** [2] - 1:23, 5:7
**put** [3] - 33:9, 33:11, 96:5
**putting** [2] - 22:7, 77:6

## Q

**questioning** [1] - 72:24
**questions** [16] - 5:19, 10:6, 21:10, 26:20, 26:24, 27:2, 27:22, 43:15, 54:23, 66:16, 69:11, 72:12, 88:3, 98:5, 99:5, 99:7
**quickly** [1] - 99:12

## R

**rambling** [1] - 26:25
**ran** [2] - 81:22, 95:3
**rate** [3] - 48:5, 64:25, 99:12
**rather** [2] - 20:1, 51:10
**re** [1] - 83:16
**re-ask** [1] - 83:16
**reach** [1] - 64:3
**reached** [2] - 51:5, 51:6
**read** [3] - 17:18, 17:20, 17:25, 18:3, 18:8, 20:21, 23:5, 43:6, 43:14, 56:13, 87:20, 87:24, 100:14
**readily** [2] - 65:6, 81:12
**reading** [1] - 17:24, 79:9
**ready** [3] - 90:18, 90:23, 91:2
**real** [4] - 12:9, 12:10, 12:12, 16:18
**realized** [1] - 62:5
**really** [13] - 20:17, 24:6, 33:2, 35:22, 61:3, 63:8, 63:12, 68:20, 75:3, 77:22, 84:6, 96:15, 97:5
**Realtor** [2] - 12:11, 40:21
**REASON** [1] - 100:2
**reason** [4] - 14:25, 65:24, 78:8, 81:15
**recalling** [1] - 42:23
**receive** [12] - 20:6, 20:10, 20:11, 35:18, 43:21, 44:7, 44:10, 44:19, 53:9, 53:14, 53:18, 85:13
**received** [12] - 20:14, 20:15, 43:1, 43:25, 44:18, 45:25, 47:7, 50:18, 53:11, 74:20, 80:18, 86:20
**recently** [1] - 40:25

**recess** [1] - 17:8
**Recess** [2] - 36:23, 67:11
**recognize** [2] - 28:2, 94:4
**recollection** [4] - 9:10, 29:11, 54:15, 75:21
**recommend** [1] - 66:7
**record** [19] - 1:25, 6:15, 9:22, 17:1, 17:6, 17:9, 36:21, 36:24, 54:18, 54:24, 56:7, 56:13, 58:25, 67:12, 69:14, 74:19, 74:21, 99:20, 101:11
**recorded** [1] - 46:3
**records** [25] - 58:2, 58:4, 58:5, 58:10, 58:13, 58:14, 67:19, 68:13, 70:15, 70:16, 70:19, 70:25, 71:4, 71:11, 72:5, 72:8, 72:12, 72:25, 73:8, 91:6, 91:14, 91:19, 91:22
**reduced** [1] - 101:9
**refer** [1] - 73:18
**referenced** [2] - 24:18, 85:18
**referencing** [1] - 54:9
**referred** [1] - 25:15
**referring** [10] - 18:14, 25:20, 29:11, 29:12, 44:7, 54:13, 54:14, 55:7, 76:25, 91:23
**reflected** [1] - 54:2
**refresh** [1] - 29:11
**regard** [4] - 37:1, 50:8, 69:16, 75:9
**regarding** [4] - 56:4, 61:5, 64:23, 67:23
**regardless** [1] - 34:1
**regards** [4] - 10:7, 12:12, 63:15, 92:11
**rehire** [1] - 75:24
**related** [5] - 50:19, 65:1, 78:15, 80:19, 101:14
**relationship** [5] - 17:13, 20:18, 48:7, 65:2, 65:17
**relative** [1] - 101:16
**relevant** [1] - 11:23
**reliable** [1] - 67:22
**rely** [1] - 66:6
**relying** [3] - 19:25, 70:25, 72:25
**remember** [19] - 8:5, 8:6, 10:19, 15:6, 15:15, 17:18, 25:15,

32:18, 34:2, 34:3, 51:15, 66:6, 67:5, 73:20, 73:22, 77:6, 84:9, 85:1
**removed** [1] - 14:2
**rent** [3] - 71:24, 71:25, 72:2
**renting** [1] - 7:9
**repeat** [2] - 39:18, 51:9
**repeatedly** [3] - 54:18, 82:17, 87:14
**repeating** [1] - 82:4
**rephrased** [1] - 44:4
**report** [1] - 45:24
**REPORTER** [17] - 17:6, 17:9, 21:13, 29:18, 36:21, 36:24, 39:18, 67:12, 87:22, 98:7, 98:20, 98:24, 99:4, 99:7, 99:11, 99:17, 99:20
**reporter** [6] - 5:21, 27:8, 43:6, 43:13, 56:13, 101:4
**Reporter** [1] - 1:23
**Reporter's** [1] - 3:9
**REPORTING** [1] - 101:22
**represent** [4] - 5:15, 67:15, 84:14, 84:15
**represented** [1] - 81:10
**request** [10] - 15:3, 28:25, 37:20, 38:15, 38:16, 54:18, 64:8, 92:22, 93:6, 94:6
**Request** [2] - 3:21, 4:5
**requested** [4] - 38:13, 42:15, 87:24, 94:7
**requests** [1] - 93:19
**require** [3] - 19:2, 33:19, 56:24
**required** [14] - 26:6, 30:4, 34:9, 38:7, 45:4, 45:15, 46:8, 48:12, 52:17, 56:21, 68:14, 76:7, 88:19, 96:4
**requirements** [4] - 59:9, 78:13, 81:21, 88:22
**reserve** [1] - 98:2
**reset** [1] - 14:21
**residence** [1] - 8:18
**residing** [1] - 7:6
**respond** [1] - 27:15
**responding** [1] - 15:13
**response** [3] - 28:25,

29:1, 64:1
**Responses** [3] - 3:20, 3:23, 4:4
**responses** [11] - 10:5, 29:5, 37:21, 37:24, 92:23, 93:7, 93:11, 93:14, 93:18, 94:1
**responsive** [12] - 15:25, 21:3, 21:20, 22:1, 23:2, 23:20, 26:7, 30:25, 33:10, 82:10, 85:12, 93:22
**responsiveness** [1] - 27:7
**retrieve** [1] - 14:4
**return** [2] - 10:20, 11:2
**returns** [9] - 42:3, 42:8, 42:16, 43:3, 45:25, 46:4, 46:6, 46:22, 94:7
**review** [6] - 10:4, 37:20, 37:24, 69:4, 69:5, 69:6, 72:13, 91:14
**reviewed** [4] - 38:2, 69:20, 77:18, 77:21
**reviewing** [3] - 9:24, 72:25, 76:15
**Rezazadeh** [3] - 2:4, 3:6, 3:7
**REZAZADEH** [143] - 5:10, 10:23, 13:8, 13:13, 14:8, 14:17, 14:23, 15:4, 16:1, 17:3, 18:19, 20:20, 21:4, 21:11, 21:14, 21:24, 22:4, 22:8, 22:14, 22:17, 23:1, 24:22, 24:25, 26:9, 26:15, 26:21, 27:3, 27:12, 27:17, 27:20, 27:25, 28:14, 28:18, 29:8, 29:16, 30:17, 31:1, 31:14, 32:14, 32:24, 34:5, 35:16, 35:19, 36:2, 36:14, 36:17, 36:20, 37:25, 38:6, 38:11, 38:20, 38:25, 39:3, 39:7, 40:6, 40:11, 41:6, 41:24, 42:12, 43:2, 43:5, 43:12, 43:17, 44:2, 44:12, 45:11, 45:20, 46:1, 46:13, 46:18, 50:10, 51:2, 51:8, 51:13, 54:12, 54:16, 55:5, 55:11, 56:1, 56:6, 56:12, 57:24, 58:12, 63:1, 63:5, 63:20, 65:11,

65:25, 66:15, 68:24, 69:2, 69:10, 70:22, 71:6, 71:9, 71:18, 72:11, 72:22, 73:4, 74:4, 74:12, 74:17, 74:21, 75:1, 76:5, 76:11, 76:18, 76:22, 77:25, 78:16, 79:2, 79:23, 80:1, 80:14, 82:2, 82:14, 82:24, 83:6, 83:12, 84:8, 84:14, 84:25, 85:7, 86:13, 87:1, 87:6, 88:2, 88:5, 88:15, 91:16, 93:25, 94:15, 95:9, 95:22, 96:19, 97:3, 97:9, 98:2, 98:8, 98:11, 98:16, 98:21, 98:25
**Richardson** [1] - 2:12
**Road** [1] - 101:23
**room** [1] - 61:3
**Room** [1] - 31:2
**rotate** [1] - 68:5
**rotation** [1] - 89:18
**Roxie** [2] - 15:22, 16:5
**Rubin** [1] - 85:19
**rude** [2] - 22:20, 27:9
**Rules** [3] - 1:24, 5:7, 75:6
**rules** [1] - 5:8
**run** [2] - 79:17, 80:9
**runs** [1] - 81:18
**rushed** [1] - 17:22

## S

**sat** [1] - 59:8
**Saturday** [1] - 30:3
**saw** [1] - 74:22
**schedule** [4] - 28:22, 29:4, 29:24, 30:6
**schedules** [1] - 43:4
**screen** [3] - 67:18, 68:5, 92:20
**scroll** [1] - 79:4
**scrolling** [1] - 84:13
**seal** [1] - 101:19
**Second** [1] - 3:12
**second** [9] - 17:2, 23:25, 70:9, 75:20, 76:9, 77:2, 87:22, 90:2, 96:4
**see** [31] - 17:25, 20:25, 23:23, 24:2, 24:21, 25:1, 29:5, 29:12, 29:13, 38:1, 38:2, 38:6, 38:14, 42:9, 42:18, 47:13, 54:9, 54:13, 54:16, 54:19,

55:7, 62:2, 62:3, 62:4, 68:5, 70:11, 76:24, 79:13, 83:21, 84:4, 94:8
**seeing** [6] - 25:5, 70:15, 73:8, 80:21, 91:25, 92:25
**select** [2] - 47:16, 48:9
**send** [1] - 99:12
**sent** [4] - 41:25, 42:1, 51:17, 64:2
**serious** [1] - 63:11
**serve** [1] - 74:23
**served** [3] - 9:25, 15:2, 92:23
**services** [1] - 74:11
**SERVICES** [1] - 101:22
**Set** [1] - 3:24
**set** [15] - 24:1, 28:22, 29:3, 29:24, 30:6, 30:23, 30:24, 31:3, 45:4, 45:18, 48:23, 61:17, 65:3, 89:17, 89:21
**setting** [3] - 64:25, 65:16, 66:22
**settlement** [1] - 50:25
**seven** [3] - 55:23, 93:4, 99:17
**sexual** [1] - 54:1
**shame** [1] - 17:19
**shamed** [1] - 18:2
**share** [4] - 67:18, 68:4, 92:19, 94:12
**sheet** [2] - 3:8, 99:12
**sheets** [3] - 3:25, 68:2, 68:8, 68:10, 92:2
**sHEILS** [1] - 2:11
**shift** [37] - 20:1, 30:3, 30:9, 30:12, 30:13, 31:20, 31:21, 31:23, 32:16, 33:7, 33:17, 33:18, 34:1, 34:8, 34:11, 35:1, 35:2, 35:14, 35:18, 36:1, 36:7, 49:18, 49:22, 53:19, 56:23, 56:25, 60:1, 60:11, 60:22, 61:1, 85:22, 86:8, 86:22, 86:25, 89:4, 90:2, 95:13
**shifts** [18] - 30:11, 30:14, 33:6, 33:7, 33:14, 34:21, 34:23, 35:11, 55:21, 56:11, 56:22, 56:25, 59:17, 68:14, 71:22, 87:20, 89:1, 96:14
**Shipley** [2] - 62:15,

62:19
**shirley** [1] - 14:12
**Shirley** [6] - 12:21, 13:25, 14:19, 16:5, 39:24, 40:25
**shoes** [1] - 47:1
**shorthand** [1] - 101:3
**Shorthand** [1] - 1:22
**shots** [3] - 48:17, 48:22, 48:23
**show** [16] - 29:10, 29:17, 38:8, 38:12, 38:20, 38:22, 42:5, 48:14, 54:25, 66:8, 70:19, 73:9, 73:20, 73:23, 76:13, 91:22
**showed** [2] - 75:17, 88:7
**shows** [2] - 73:22, 90:24
**sign** [29] - 18:7, 18:10, 18:12, 18:16, 18:23, 19:7, 19:9, 19:11, 20:25, 23:10, 23:14, 34:14, 58:7, 58:8, 68:2, 68:8, 68:10, 75:24, 76:4, 76:7, 90:18, 91:4, 91:6, 91:14, 91:19, 92:2, 93:13
**Sign** [1] - 3:25
**sign-in** [7] - 68:2, 68:8, 68:10, 91:6, 91:14, 91:19, 92:2
**Sign-in** [1] - 3:25
**signatory** [1] - 84:13
**SIGNATURE** [1] - 100:1
**Signature** [1] - 3:8
**signature** [1] - 100:15
**signed** [39] - 17:12, 17:14, 17:15, 18:15, 18:21, 18:24, 19:3, 19:8, 19:13, 25:13, 25:21, 59:10, 62:1, 72:17, 72:19, 75:15, 75:18, 75:20, 75:22, 76:1, 76:9, 76:13, 76:17, 76:20, 77:3, 77:4, 77:5, 80:19, 83:21, 84:2, 84:21, 84:24, 85:10, 88:7, 88:8, 88:16, 92:11, 92:15
**signing** [5] - 18:1, 28:4, 58:17, 62:6, 88:12
**similarly** [2] - 1:4, 2:3
**simple** [3] - 26:14, 27:1, 82:19

**single** [2] - 19:4, 82:9
**Sins** [3] - 39:15, 39:20, 39:23
**Sisoliz** [1] - 49:7
**SISOLIZ** [1] - 49:7
**sit** [1] - 57:13
**situated** [2] - 1:4, 2:3
**six** [7] - 34:9, 34:24, 35:10, 55:22, 71:21, 87:20
**skill** [1] - 45:4
**skills** [3] - 44:24, 45:7, 50:5
**skip** [3] - 24:6, 89:24, 89:25
**skipped** [2] - 89:19, 89:21
**skybox** [2] - 89:24, 90:1
**slash** [1] - 25:11
**slip** [1] - 90:24
**slow** [1] - 29:22
**social** [15] - 11:22, 11:24, 12:1, 12:12, 12:15, 15:10, 15:13, 15:17, 15:18, 15:20, 40:20, 41:2, 41:3, 47:10, 58:18
**solicit** [1] - 48:6
**solicited** [1] - 62:22
**someone** [3] - 61:7, 79:15, 80:23
**sometime** [1] - 73:2
**sometimes** [6] - 20:16, 31:24, 31:25, 46:12, 53:11, 57:1
**somewhere** [2] - 18:17, 87:11
**song** [2] - 90:12, 96:4
**sorry** [12] - 12:5, 12:20, 16:17, 21:4, 21:13, 29:18, 29:20, 39:18, 51:9, 66:14, 67:9, 99:6
**sound** [4] - 24:14, 72:10, 72:14, 72:20
**speaking** [4] - 27:5, 27:6, 29:19, 30:15
**specials** [1] - 94:23, 95:7
**specific** [4] - 30:4, 45:7, 70:13, 90:12
**specifically** [9] - 22:15, 28:20, 38:13, 46:14, 54:19, 61:15, 78:14, 90:6, 94:7
**specifics** [2] - 20:23, 90:11
**speculate** [1] - 20:19
**spelling** [1] - 98:5

**spending** [1] - 31:20
**spent** [1] - 86:2
**spoken** [4] - 61:21, 62:19, 63:18, 63:22
**squared** [1] - 98:15
**Stage** [1] - 89:17
**stage** [11] - 12:24, 12:25, 53:11, 58:18, 89:13, 89:15, 89:16, 89:17, 90:9, 90:16, 96:4
**stake** [1] - 80:3
**stakehold** [1] - 82:9
**stakeholds** [1] - 81:20
**standard** [12] - 18:20, 19:7, 19:12, 30:23, 31:25, 45:15, 45:21, 61:1, 65:3, 92:6, 92:16, 99:16
**standards** [1] - 31:5
**start** [3] - 52:6, 52:24, 75:23
**started** [9] - 8:20, 8:21, 9:2, 17:12, 17:16, 22:15, 52:14, 75:15, 89:4
**state** [2] - 5:6, 6:14
**State** [3] - 1:21, 1:23, 101:4
**STATE** [2] - 100:23, 101:2
**statement** [2] - 50:19, 93:13
**statements** [4] - 11:5, 11:8, 11:10, 42:4
**states** [1] - 84:3
**STATES** [1] - 1:1
**stating** [2] - 71:3, 74:14
**stayed** [2] - 55:20, 60:8
**still** [10] - 11:20, 13:22, 16:15, 31:9, 35:4, 39:23, 40:23, 41:8, 90:2, 97:12
**Stipulations** [1] - 3:3
**stop** [6] - 22:9, 26:10, 27:7, 39:21, 52:6, 94:12
**stopped** [1] - 8:24
**stopping** [1] - 48:21
**store** [1] - 48:10
**stored** [1] - 41:11
**Street** [1] - 2:5
**stripping** [1] - 16:8
**studio** [1] - 48:23
**stuff** [1] - 5:15
**styled** [1] - 1:20
**SUBSCRIBED** [1] - 100:19

**subsequently** [1] - 22:24
**sued** [4] - 37:10, 52:15, 79:10, 83:9
**suing** [1] - 57:15
**suitable** [3] - 19:24, 48:15, 52:1
**Suite** [1] - 101:23
**Summer** [2] - 8:5, 8:8
**summer** [1] - 74:7
**Summons** [1] - 3:15
**Sunday** [1] - 30:3
**supervised** [1] - 81:8
**supervision** [1] - 101:10
**supposed** [1] - 78:11
**surgery** [1] - 47:2
**survival** [3] - 59:21, 87:16, 87:17
**SWORN** [1] - 100:19
**sworn** [2] - 5:4, 101:7

**T**

**talks** [1] - 91:20
**tattoos** [1] - 60:13
**tax** [11] - 10:20, 11:2, 42:3, 42:7, 42:16, 43:3, 45:25, 46:4, 46:6, 46:22, 94:7
**ten** [2] - 36:18, 99:17
**tenure** [1] - 64:17
**term** [1] - 92:13
**terms** [1] - 20:17
**testified** [15] - 5:4, 35:10, 35:11, 42:19, 43:2, 43:6, 56:9, 74:1, 75:14, 76:16, 76:19, 92:9, 93:21, 94:16, 97:17
**testify** [1] - 101:8
**testifying** [4] - 22:7, 35:13, 68:1, 73:1
**testimony** [31] - 21:16, 26:16, 29:23, 32:3, 34:17, 35:7, 35:17, 35:25, 36:6, 41:21, 43:7, 43:21, 43:25, 45:18, 46:21, 50:5, 53:9, 54:21, 55:24, 56:4, 56:16, 57:7, 58:6, 60:14, 63:6, 74:5, 80:15, 86:23, 87:2, 96:7, 101:11
**TEXAS** [3] - 1:1, 100:23, 101:2
**Texas** [16] - 1:22, 1:23, 2:6, 2:12, 5:8, 6:21, 6:22, 6:25, 7:7, 7:14, 7:20, 8:4,

11:19, 101:4, 101:21, 101:23
**THE** [25] - 1:1, 1:1, 10:22, 10:25, 17:9, 21:13, 28:13, 29:18, 36:15, 36:21, 36:24, 39:18, 67:8, 67:12, 87:22, 98:7, 98:10, 98:20, 98:24, 99:4, 99:7, 99:11, 99:17, 99:20, 100:22
**theme** [1] - 88:24
**therefore** [1] - 80:12
**they've** [1] - 61:22
**third** [1] - 72:3
**three** [3] - 30:5, 91:9, 91:23
**throne** [1] - 22:4
**Tic** [1] - 12:3
**ticket** [1] - 34:14
**tied** [1] - 16:6
**tights** [1] - 97:11
**timesheet** [2] - 68:16, 68:22
**tip** [8] - 31:17, 47:22, 49:15, 49:16, 52:18, 86:22, 89:17, 91:5
**tip-out** [7] - 31:17, 47:22, 49:15, 49:16, 52:18, 86:22, 91:5
**tipping** [3] - 49:24, 53:12, 60:3
**tips** [18] - 20:6, 20:10, 20:11, 20:14, 20:15, 20:18, 20:19, 30:15, 48:6, 49:13, 49:14, 53:10, 53:11, 53:15, 53:16, 53:18, 89:12, 95:20
**Tock** [1] - 12:3
**today** [7] - 5:18, 6:1, 24:1, 47:13, 68:25, 74:23, 91:11
**toe** [1] - 23:8
**together** [5] - 10:9, 10:16, 57:14, 63:25, 91:7
**took** [4] - 17:21, 36:12, 49:13, 50:5
**top** [6] - 38:16, 71:15, 71:20, 78:20, 79:4, 96:5
**topless** [1] - 97:14
**touch** [1] - 98:8
**town** [1] - 60:7
**trade** [1] - 49:2
**Trail** [2] - 6:21, 6:22
**training** [2] - 39:12, 44:25
**transcript** [2] - 87:19,

98:22
**transcription** [1] - 101:10
**traveling** [1] - 73:22
**treated** [5] - 25:24, 25:25, 26:2, 28:7, 79:17
**treating** [1] - 28:11
**trial** [1] - 98:2
**tried** [9] - 14:1, 14:24, 30:13, 40:13, 52:1, 52:2, 60:9, 60:11, 98:14
**trouble** [1] - 96:6
**true** [7] - 23:15, 24:8, 56:9, 93:14, 100:16, 101:6, 101:11
**truth** [5] - 6:1, 9:18, 38:19, 38:21, 101:8
**try** [4] - 15:1, 29:21, 67:18, 68:19
**trying** [12] - 17:18, 18:3, 22:19, 27:18, 36:5, 36:11, 38:19, 54:6, 65:22, 77:17, 89:3, 89:25
**turnaround** [1] - 99:16
**twenty** [1] - 35:9
**twenty-four** [1] - 35:9
**two** [5] - 53:13, 63:17, 63:23, 79:10
**type** [1] - 68:8
**typically** [5] - 71:24, 72:3, 90:10, 90:22, 92:3

**U**

**under** [20] - 5:24, 12:2, 12:3, 12:21, 14:1, 16:19, 21:5, 28:14, 28:19, 37:8, 40:25, 57:18, 59:4, 75:6, 83:25, 84:1, 84:23, 92:15, 101:10, 101:19
**Understood** [1] - 29:21
**undertake** [1] - 18:11
**underwear** [2] - 96:15, 96:22
**Union** [1] - 11:19
**UNITED** [1] - 1:1
**unless** [4] - 38:12, 50:25, 80:25, 83:15
**unsure** [2] - 14:24, 41:10
**untimely** [1] - 21:23
**up** [11] - 34:13, 41:18, 48:14, 51:16, 57:10,

79:4, 88:23, 88:25, 89:16, 96:3, 96:9

**V**

**vague** [12] - 63:1, 63:20, 78:16, 79:2, 82:2, 83:7, 86:13, 87:1, 87:6, 95:22, 96:19, 97:9
**variables** [1] - 86:7
**variations** [1] - 35:25
**varied** [1] - 36:8
**varies** [5] - 31:15, 31:24, 32:5, 35:12, 55:20
**vary** [1] - 92:8
**Venmo** [1] - 11:14
**verbalize** [1] - 5:20
**verification** [2] - 93:10, 93:12
**Verify** [2] - 3:16, 24:11
**verify** [3] - 55:17, 68:13, 90:19
**version** [1] - 75:19
**versus** [1] - 79:17
**video** [1] - 10:18
**videos** [2] - 10:17, 41:22
**VIP** [1] - 30:24
**Vixen** [2] - 15:22, 16:5
**vocalized** [1] - 28:21
**VS** [1] - 1:6
**vulnerable** [1] - 23:18

**W**

**wages** [1] - 70:10
**waiver** [1] - 62:1
**walk** [1] - 97:13
**walking** [1] - 53:12
**wants** [2] - 21:6, 54:16
**was..** [2] - 77:7, 89:11
**wasting** [1] - 77:19
**wear** [7] - 48:11, 88:19, 89:1, 89:9, 97:11, 97:15, 97:25
**wearing** [3] - 51:18, 97:1, 97:4
**week** [28] - 30:1, 30:3, 30:5, 32:11, 33:6, 33:7, 33:15, 34:21, 35:8, 35:9, 35:11, 54:3, 54:8, 54:11, 55:3, 55:13, 55:14, 55:19, 56:23, 70:13, 70:20, 71:14, 71:16, 71:25, 72:1, 89:4
**weekend** [1] - 41:1
**weeks** [3] - 71:21,

71:23, 71:24
**welcome** [2] - 22:25, 75:2
**whatsoever** [1] - 60:19
**Wild** [1] - 52:5
**willing** [1] - 35:2
**win** [1] - 50:25
**WINNUBST** [1] - 2:11
**WITNESS** [6] - 10:22, 10:25, 28:13, 36:15, 67:8, 98:10
**witness** [6] - 88:1, 91:16, 94:13, 95:9, 98:1, 101:12
**words** [1] - 22:7
**worker** [2] - 34:19, 53:16
**workers** [3] - 35:21, 65:7, 96:13
**workings** [1] - 65:5
**works** [1] - 22:1
**world** [1] - 84:11
**worried** [1] - 85:2
**worry** [1] - 55:10
**Worth** [2] - 12:11, 59:17
**write** [1] - 57:14
**writing** [2] - 6:5, 101:10
**written** [1] - 70:8
**Written** [1] - 25:6

**Y**

**y'all** [7] - 20:5, 61:15, 69:8, 75:3, 75:4, 75:7
**years** [1] - 32:20
**yes-or-no** [4] - 5:19, 22:22, 27:15, 82:19
**yesterday** [2] - 69:1, 74:20
**yourself** [2] - 47:10, 82:5