UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| BROOKE LAYTON and ASHLYNN SHIPLEY, individually and on behalf of all other similarly situated,<br>　　　*Plaintiffs,* | §<br>§<br>§<br>§<br>§ | |
| v. | §<br>§ | CIVIL ACTION NO. 3:21-cv-01636-N |
| MAINSTAGE MANAGEMENT, INC., NICK'S MAINSTAGE, INC. – DALLAS PT'S d/b/a PT'S MEN'S CLUB and NICK MEHMETI,<br>　　　*Defendants.* | §<br>§<br>§<br>§<br>§ | COLLECTIVE ACTION<br><br>JURY DEMANDED |

**APPENDIX TO PLAINTIFFS' BRIEF IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT ON EMPLOYEE STATUS AND MOTION FOR SUMMARY JUDGMENT ON DEFENDANTS' COUNTERCLAIMS AND AFFIRMATIVE DEFENSES**

COME NOW, Plaintiffs Brooke Layton and Ashlynn Shipley (collectively, "Plaintiffs") and submit this, their Appendix to Plaintiffs' Brief in Support of their Motion for Partial Summary Judgment on Employee Status and Motion for Summary Judgment on Defendants' Counterclaims and Affirmative Defenses, and in support thereof, submit the following exhibits:

| Exhibit | Description | APPX |
|---|---|---|
| Exhibit A | Defendants' Amended Objections and Responses to Plaintiffs' First Set of Interrogatories | PLTFS APPX 1-16 |
| Exhibit B | Defendants' Website page listing prices, DEF. 402 | PLTFS APPX 17 |
| Exhibit C | Brook Layton's Responses to Interrogatories | PLTFS APPX 18-46 |
| Exhibit D | Ashlynn Shipley's Responses to Interrogatories | PLTFS APPX 47-90 |

| Exhibit E | PT's Designated Corporate Representative, Nick Mehmeti, Deposition dated July 7, 2022 | PLTFS APPX 91-129 |
|---|---|---|
| Exhibit F | Case 3:23-cv-00253; [Dkt1-1]: Final Award of Arbitrator in *Julia Predmore v. Nick's Management, Inc. d/b/a PT's Men's Club and Nick Mehmeti* | PLTFS APPX 130-160 |
| Exhibit G | Declaration of Julia Predmore with attached "Specifications" EF 406-408 | PLTFS APPX 161-163 |
| Exhibit H | Defendants' 2018-2020 Tax Return Documents DEF 1925-1928 (Under Seal) | PLTFS APPX 164-167 |

Respectfully submitted,

**ELLZEY & ASSOCIATES, PLLC**

 */s/ Leigh S. Montgomery*
Jarrett L. Ellzey
Texas Bar No. 24040864
Leigh S. Montgomery
Texas Bar No. 24052214
1105 Milford Street
Houston, Texas 77006
Office: (713) 322-6387
Facsimile: (888) 276-3455
jarrett@ellzeylaw.com
leigh@ellzeylaw.com
*-and-*
Mark A.Alexander
**MARK A. ALEXANDER, P.C.**
Texas Bar No. 01007500
5080 Spectrum, Suite 850E
Addison,TX 75001
Phone: (972) 544-6968
Fax: (972) 421-1500
mark@markalexanderlaw.com

**ATTORNEYS FOR PLAINTIFFS**

## <u>CERTIFICATE OF SERVICE</u>

I certify that, on March 17, 2023, a true and correct copy of the foregoing document was electronically served on the following counsel of record, in accordance with the Federal Rules of Civil Procedure and the Local Rules of the Northern District of Texas.

Latrice E. Andrews
State Bar No. 24063984
1100 Atrium II
1701 N. Collins Boulevard
Richardson, Texas 75080
Telephone: (972) 644-8181
Facsimile: (972) 644-8180
Email: roger@sheilswinnubst.com
Email: latrice@sheilswinnubst.com
**-and-**
Roger E. Albright
Bar No. 00974580
ROGER ALBRIGHT, LP
Of Counsel to:
Sheils Winnubst, PC
1100 Atrium II
1701 N. Collins Boulevard
Richardson, Texas 75080
Telephone: 972-644-8181
Facsimile: 972-644-8180
E-mail: roger@sheilswinnubst.com
***Attorneys for Defendants***

      */s/ Leigh S. Montgomery*
Leigh S. Montgomery

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| BROOKE LAYTON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CASE NO. 3:21-cv-01636-N |
| | § | |
| MAINSTAGE MANAGEMENT, INC., | § | |
| NICK'S MAINSTAGE, INC. - DALLAS | § | |
| PT'S d/b/a PT MEN'S CLUB and | § | |
| NICK MEHMETI, | § | |
| | § | |
| Defendants. | § | |

---

DEFENDANTS MAINSTAGE MANAGEMENT, INC.,
NICK'S MAINSTAGE, INC. - DALLAS PT'S d/b/a PT MEN'S CLUB and
NICK MEHMETI'S AMENDED OBJECTIONS AND RESPONSES TO
PLAINTIFF'S FIRST SET OF INTERROGATORIES

---

Defendants MAINSTAGE MANAGEMENT, INC., NICK'S MAINSTAGE,

INC. - DALLAS PT'S d/b/a PT MEN'S CLUB and NICK MEHMETI's

("Defendants"), files this its Amended Objections and Responses to Plaintiff's First

Set of Interrogatories.

---

DEFENDANTS' AMENDED OBJECTIONS AND RESPONSES                                  Page 1
TO PLAINTIFF'S FIRST INTERROGATORIES

PLTFS APPX 000001

Respectfully Submitted,

SHEILS WINNUBST
A Professional Corporation

By:   */s/ Latrice E. Andrews*
       Latrice E. Andrews
       State Bar No. 24063984

1100 Atrium II
1701 N. Collins Boulevard
Richardson, Texas  75080
Telephone No.: (972) 644-8181
Telecopier No.: (972) 644-8180
*latrice@sheilswinnubst.com*

AND

ROGER ALBRIGHT, LP
Of Counsel to:
SHEILS WINNUBST, PC

By:   */s/ Roger Albright*
       Roger Albright
       State Bar No. 00974580

1100 Atrium II
1701 N. Collins Boulevard
Richardson, Texas  75080
Telephone No.: (972) 644-8181
Telecopier No.: (972) 644-8180
*roger@sheilswinnubst.com*

ATTORNEYS FOR DEFENDANTS

---

DEFENDANTS' AMENDED OBJECTIONS AND RESPONSES                    Page 2
TO PLAINTIFF'S FIRST INTERROGATORIES

<u>CERTIFICATE OF SERVICE</u>

In accordance with Fed. R. Civ. P. 5(b)(2)(E) and (b)(3), I hereby certify that a true and correct copy of the above and foregoing Defendants' Amended Objections and Responses to Interrogatories was served  upon counsel of record for Plaintiff, Jarrett L. Ellzey and Leigh Montgomery, Ellzey & Associates, PLLC, 1105 Milford St., Houston, Texas 77066, and Mark A. Alexander, 5080 Spectrum, Suite 850E, Addison, Texas 75001, via certified mail, return receipt requested, on this 20th day of May, 2022.

*/s/Latrice E. Andrews*
Latrice E. Andrews

---

DEFENDANTS' AMENDED OBJECTIONS AND RESPONSES                    Page 3
TO PLAINTIFF'S FIRST INTERROGATORIES

**INTERROGATORY NO. 1:**

Please state the name and, if known, the address, the email address and telephone number of each individual likely to have discoverable information, along with the subject of that information, related to the allegations in the operative Complaint and/or Answer(s) to the Complaint.

**RESPONSE:**      Assertion of Privilege.  Defendants assert the attorney-client privilege, work-product privilege, trade secret/confidential information privilege and withhold information based upon such privilege assertions.  Individuals that entered into a contractual relationship to lease space for their business of providing entertainment of this nature results requires a level of confidentiality so as not to invade the privacy interests of such individuals.

Objection.  Defendants object to the Interrogatory as unduly burdensome and harassing inasmuch as it is duplicative of the Initial Disclosures.

Subject to the aforementioned objection, without waiving the same, Defendants respond as follows:

*See* the Initial Disclosures and Produced Documents.

**INTERROGATORY NO. 2:**

Identify each and every employee or independent contractor, other than Entertainers, for the Club during the Relevant Period.

**RESPONSE:**      Assertion of Privilege.  Defendants assert the attorney-client privilege, work-product privilege, trade secret/confidential information privilege and withhold information based upon such privilege assertions.  Individuals that entered into a contractual relationship to lease space for their business of providing entertainment of this nature results requires a level of

PLTFS APPX 000004

confidentiality so as not to invade the privacy interests of such individuals.

Objection. Defendant objects to the Interrogatory as not relevant and not proportional. Defendants' records are not kept in an electronic format and are not in a manner that it could easily provide the identify of each individual contractor and employee over three years. Many individuals appear once and lease space at other locations so the amount of information and difficulty in identifying the same, particularly when combined with the small amount at issue in this case makes the Interrogatory disproportional to the amount in discovery and places a burden and expense on Defendants that outweighs any likely benefit.

Objection. Defendant objects to this Interrogatory to the extent it is overly broad. Plaintiff is merely seeking to recover for July, 2018 through 2019, the period she claims to have worked. Thus, information as to the dates and times occurring subsequent to 2019 are not relevant to this case, inasmuch as she has no claim related to those dates.

Objection. Defendants object to this Interrogatory to the extent it is overly broad, exceeds the permissible scope of discovery, is irrelevant and not proportional to the needs of the case, inasmuch as this case only involves a claim by Plaintiff and Plaintiff has signed a collective action waiver.

Subject to the aforementioned objections, without waiving the same, Defendants respond as follows:

*See* Produced Documents, specifically the Sign-in Sheets and the W-2s Produced herewith.

**INTERROGATORY NO. 3:**

**PLTFS APPX 000005**

Identify each person affiliated with the Club who was responsible for ensuring the Club complied with the FLSA, and for each such person state each and every act they engaged in to ensure compliance with the FLSA.

**RESPONSE:**    Nick Mehmeti, President of PT's Mens Club.

**INTERROGATORY NO. 4:**

Identify each Entertainer who performed at the Club during the Relevant Period.

**RESPONSE:**    Assertion of Privilege.  Defendants assert the attorney-client privilege, work-product privilege, trade secret/confidential information privilege and withhold information based upon such privilege assertions.  Individuals that entered into a contractual relationship to lease space for their business of providing entertainment of this nature results requires a level of confidentiality so as not to invade the privacy interests of such individuals.

Objection.  Defendants object to the Interrogatory as overly broad, harassing, not relevant and not proportional. Defendants' records are not kept in an electronic format and are not in a manner that it could easily provide the identify of each individual contractor over three years.  Many individuals appear once and lease space at other locations so the amount of information and difficulty in identifying the same, particularly when combined with the small amount at issue in this case makes the Interrogatory disproportional to the amount in discovery and places a burden and expense on Defendants that outweighs any likely benefit.

Objection.  Defendant objects to this Interrogatory to the extent it is overly broad. Plaintiff is merely seeking to recover for July, 2018 through 2019, the period she claims to have worked. Thus, information as to the dates and times occurring subsequent to

---

DEFENDANTS' AMENDED OBJECTIONS AND RESPONSES                                    Page 6
TO PLAINTIFF'S FIRST INTERROGATORIES

2019 are not relevant to this case, inasmuch as she has no claim related to those dates.

Objection. Defendants object to this Interrogatory to the extent it is overly broad, exceeds the permissible scope of discovery, is irrelevant and not proportional to the needs of the case, inasmuch as this case only involves a claim by Plaintiff and Plaintiff has signed a collective action waiver.

Subject to the aforementioned objections, without waiving the same, Defendants respond as follows:

*See* Produced Documents as to Entertainers from July 2018, through December 8, 2019.

## INTERROGATORY NO. 5:

Identify any fees, fines or other monetary charges imposed by the Club, or anyone affiliated with the Club, on Entertainers performing at the Club during the Relevant Period and identify any persons with knowledge thereof or documents regarding or relating to such fees or charges. This would include any house fees, rental fees or licensing fees the Club charged to its Entertainers.

**RESPONSE:**    Objection.  Defendant objects to this Interrogatory to the extent it is overly broad. Plaintiff is merely seeking to recover for July, 2018 through 2019, the period she claims to have worked. Thus, information as to the dates and times occurring subsequent to 2019 are not relevant to this case, inasmuch as she has no claim related to those dates.

Objection. Defendants object to this Interrogatory to the extent it is overly broad, exceeds the permissible scope of discovery, is irrelevant and not proportional to the needs of the case, inasmuch as this case only involves a claim by Plaintiff and Plaintiff has signed a collective action waiver.

---

DEFENDANTS' AMENDED OBJECTIONS AND RESPONSES                          Page 7
TO PLAINTIFF'S FIRST INTERROGATORIES

Objection.   Defendants object to the Interrogatory as overly broad, harassing, not relevant and not proportional. Defendants' records are not kept in an electronic format and are not in a manner that it could easily provide the identify of each individual contractor over three years.  Many individuals appear once and lease space at other locations so the amount of information and difficulty in identifying the same, particularly when combined with the small amount at issue in this case makes the Interrogatory disproportional to the amount in discovery and places a burden and expense on Defendants that outweighs any likely benefit.

*See* Defendants' Produced Documents, specifically including the Sign-in Sheets related to Plaintiff and the Licensing Agreement showing dates and times Plaintiff leased space per the Licensing Agreement.

## INTERROGATORY NO. 6:

Identify all documents showing or documenting any of the following for Entertainers for the Relevant Period. For each document identified, identify any persons with knowledge thereof:

    a. Dates worked;
    b. Hours worked per date;
    c. Any fees or fines paid;
    d. Private dances performed;
    e. VIP charges or time;
    f. Stage Rotation;
    g. Credit Card charges for Entertainer's performance.

**RESPONSE:**   Assertion of Privilege.   Defendants assert the trade secret/confidential information privilege and withhold information based upon such privilege assertions.  Individuals that entered into a contractual relationship to lease space for their business of providing entertainment of this nature results requires

DEFENDANTS' AMENDED OBJECTIONS AND RESPONSES                                   Page 8
TO PLAINTIFF'S FIRST INTERROGATORIES

**PLTFS APPX 000008**

a level of confidentiality so as not to invade the privacy interests of such individuals.

Objection.  Defendant objects to this Interrogatory to the extent it is overly broad. Plaintiff is merely seeking to recover for July, 2018 through 2019, the period she claims to have worked. Thus, information as to the dates and times occurring subsequent to 2019 are not relevant to this case, inasmuch as she has no claim related to those dates.

Objection. Defendants object to this Interrogatory to the extent it is overly broad, exceeds the permissible scope of discovery, is irrelevant and not proportional to the needs of the case, inasmuch as this case only involves a claim by Plaintiff and Plaintiff has signed a collective action waiver.

Objection.   Defendants object to the Interrogatory as overly broad, harassing, not relevant and not proportional. Defendants' records are not kept in an electronic format and are not in a manner that it could provide the identity of each individual contractor over three years.  Many individuals appear once and lease space at other locations so the amount of information and difficulty in identifying the same, particularly when combined with the small amount at issue in this case makes the Interrogatory disproportional to the amount in discovery and places a burden and expense on Defendants that outweighs any likely benefit.

Subject to the aforementioned objection, without waiving the same, Defendants respond as follows:

*See* Defendants' Produced Documents, specifically including the Sign-in Sheets and Licensing Agreement showing dates and times Plaintiff leased space per the Licensing Agreement. The Club did not keep records of the dances performed as to any Entertainer, inclusive of Plaintiff, as Plaintiff was an independent contractor and had the legal obligation as a contractor and also under the

---

PLTFS APPX 000009

terms of the Licensing Agreement to keep such records and to make the same available to the Club upon request or in the event that she sought to convert to an employee.  Such information, therefore, is exclusively in Plaintiff's possession, custody and control and if she does not have such records, it is evidence of the breach of the provisions of the contract.  The Club does not have "credit card charges for dancer performances."  Dancers collected the mandatory service charge directly from customers as set forth in the Licensing Agreement.  The stage rotation was based upon the Sign-in Sheets that have been produced and the Licensing Agreement.  Credit card charges do not indicate whether the charges are for a dance, to pay an entertain or otherwise. Accordingly, there are no records that show customer charges for dances.  None of the VIP Performances are paid to the Club, therefore the Club has no record of the VIP performances or VIP charges for any Entertainer.

**INTERROGATORY NO. 7:**

State the general legal and factual basis for your contention that Plaintiff is an independent contractor under the economic realities test identified in Reich v. Circle C. Investments, Inc., 998 F.2d 324 (5th Cir. 1993), and identify any persons with knowledge and documents in support thereof.

**RESPONSE:**       Assertion of Privilege.  Defendants assert the work-product privilege and withhold information based upon such privilege assertions.

Objection. Defendants object to this Interrogatory to the extent it is overly broad and vague, inasmuch as the economic realties test has evolved and been applied differently in different jurisdictions since *Reich v. Circle C. Investments, Inc.,* 998 F.2d 324 (5th Cir. 1993).

Subject to the aforementioned objection, without waiving the same, Defendants respond as follows:

---

PLTFS APPX 000010

*See* the Initial Disclosures (as amended from time to time), pleadings (as amended from time to time), deposition transcripts and discovery responses (as amended from time to time) and produced documents in this case. Based upon the foregoing, Defendants contend that the facts and proper application of the test weighs in favor of Plaintiff being an independent contractor. Plaintiff could set her own schedule, there was no maximum amount she could charge, Plaintiff independently advertised on social media, Plaintiff solicited her own clients to come to the Club to increase her income, Plaintiff had other businesses within the industry, Plaintiff was not obligated to report income from Entertainment Fees or tips to the Club, Plaintiff admitted that she could charge more for lap dances if she wanted to and could make more money by giving more dances, that the amount she made depended upon what she was wearing and that varied day by day and how much she was working. Plaintiff made choices regarding whether it would be more profitable to wear clothing or not or to go on stage or not that were all within her discretion. Applying the factors in *Reich*, as amended through subsequent case law, Plaintiff is an independent contractor.

## INTERROGATORY NO. 8:

Identify the monthly and annual expenditures for the Club on the following items during the Relevant Period:

1. Employees/Staff of the Club, including payroll and any benefits;
2. Rent, mortgage, or value paid for the building, whichever is applicable;
3. Utilities;
4. Building maintenance;
5. Alcohol (including inventory, licensing, permits, etc.);
6. Food;
7. Advertising, social media presence, or promotions;
8. Any licensing or permitting to operate a Sexually Oriented Business.

**RESPONSE:**     Objection. Defendants object to this Interrogatory to the extent it is unduly burdensome, harassing, irrelevant, and not proportional

to the needs of the case inasmuch as PT MEN'S CLUB will stipulate that its annual gross revenue in 2018 and 2019 exceeded $500,000.00.

Subject to the aforementioned objection, without waving the same, Defendants respond as follows:

1. Employees/Staff of the Club, including payroll and any benefits;   ($80,000/mo);
2. Rent, mortgage, or value paid for the building, whichever is applicable; ($2,000);
3. Utilities ($10,000);
4. Building maintenance; ($10,000)
5. Alcohol (including inventory, licensing, permits, etc.); ($0.00)
6. Food ($35,000/mo);
7. Advertising, social media presence, or promotions; ($10,000/mo);
8. Any licensing or permitting to operate a Sexually Oriented Business ($3000.00/yr).

## INTERROGATORY NO. 9:

State the gross revenue generated by the Club each year during the Relevant Period.

**RESPONSE:**    PT'S MENS CLUB will stipulate that its annual gross revenue in 2018 and 2019 exceeded $500,000.00.

## INTERROGATORY NO. 10:

Identify any lawsuits or arbitrations filed and/or opened against the Club or its owners in the past ten years. For each such lawsuit or arbitration, identify and describe the resolution, including whether there was a trial, verdict, interim award, final award and/or settlement reached.

**RESPONSE:**    Objection. Defendants object to the extent that publicly available documents are readily available and Plaintiff has the ability to discover the same on its own.  F.R.C.P. 26(b)(2)(C)(i).

**PLTFS APPX 000012**

Objection. Defendants object to this Interrogatory to the extent it is overly broad, exceeds the permissible scope of discovery, is irrelevant and not proportional to the needs of the case, inasmuch as this case only involves a claim by Plaintiff and Plaintiff has signed a collective action waiver for a period of no more than two years related to the FLSA.

Subject to the aforementioned objections, please *see* the Produced Documents.

## INTERROGATORY NO. 11:

If You contend any exemptions to Plaintiffs' claims in this matter apply to the Club, state the general legal and factual basis for such contention(s) and Identify any persons with knowledge and/or any documents supporting your contention(s).

**RESPONSE:**     Objection.  Defendants assert the Interrogatory is vague and confusing such that Defendants cannot identify what is being requested.  Specifically, Defendants are not certain what "exemptions" (as the term is not capitalized and the meaning of the term is not clear) are being referred to in the Interrogatory.

Subject to the aforementioned objections, without waiving the same, Defendants respond as follows:

None at this time.

## INTERROGATORY NO. 12:

Describe the application process a new Entertainer must complete in order to start performing at the Club. Include in your answer the Identity of any persons with knowledge of such process.

**RESPONSE:**     There is not an application process, but contracting process as Entertainers generally elect to be treated as independent contractors.  If they choose to be treated as an employee, they follow the process set forth in Interrogatory No. 13.  If they

---

DEFENDANTS' AMENDED OBJECTIONS AND RESPONSES                 Page 13
TO PLAINTIFF'S FIRST INTERROGATORIES

choose to be an independent contractor, they do not apply, but enter into a contract to be a contractor per the terms of the Licensing Agreement. Entertainers are interviewed and/or audition usually by Todd Williams, with Nick Mehmeti having the final decisionmaking authority.

## INTERROGATORY NO. 13:

Describe the application process a new employee must complete in order to start work for the Club. Include in your answer the Identity of any persons with knowledge of such process.

**RESPONSE:**     If an applicant seeks to be an employee, they would complete new hire paperwork seeking information required by all applicable laws and be interviewed likely by Todd Williams, with Nick Mehmeti having the final decisionmaking authority. Depending on the position, it may require certain background checks and licensing. Sometimes the process can vary depending upon the position applied for and the requirements of such position.

PLTFS APPX 000014

<u>VERIFICATION</u>

STATE OF TEXAS         §
                       §
COUNTY OF DALLAS       §

     BEFORE ME, the undersigned Notary Public, on this day personally appeared NICK MEHMETI who being by me duly sworn on his oath, deposed and stated that he has read the above and foregoing Defendants' Amended Objections and Responses to Plaintiff's First Set of Interrogatories, and that the statements contained therein are true and correct to the best of his knowledge and belief. The information supplied in these answers is not based solely on the knowledge of the executing party, but includes knowledge of the party, and attorneys, unless privileged. The word usage and sentence structure may be that of the attorney assisting in the preparation of the answers and thus, does not necessarily purport to be the precise language of the executing party. Legal objections to Interrogatories were prepared by Defendants' attorney.

 

_____
NICK MEHMETI


     SUBSCRIBED AND SWORN TO BEFORE ME by NICK MEHMETI, on this 18th day of May, 2022, to certify which witness my hand and seal of office.

(SEAL)

ANDREA TRIMBLE
My Notary ID # 3465967
Expires November 18, 2024

_____
Notary Public, State of Texas

PLTFS APPX 000015

`



UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| BROOKE LAYTON, individually and on behalf of all other similarly situated, *Plaintiff,* | § § § § | |
| v. | § § | CIVIL ACTION NO. 3:21-cv-01636-N |
| MAINSTAGE MANAGEMENT, INC., NICK'S MAINSTAGE, INC. – DALLAS PT'S d/b/a PT'S MEN'S CLUB and NICK MEHMETI, *Defendants.* | § § § § § § | COLLECTIVE ACTION JURY DEMANDED |

**PLAINTIFF BROOKE LAYTON'S SUPPLEMENTAL OBJECTIONS AND ANSWERS TO DEFENDANT MAINSTAGE MANAGEMENT, INC.'S FIRST SET OF INTERROGATORIES**

TO:   Defendant, MAINSTAGE MANAGEMENT, INC., by and through its attorney of record, Latrice E. Andrews and Y. Craig Sheils, SHEILS WINNUBST, PC, 1100 Atrium II 1701, N. Collins Blvd., Richardson, TX 75080.

Plaintiff Brooke Layton, by and through the undersigned counsel of record, serves her supplemental objections and answers to Defendant Mainstage Management, Inc.'s First Set of Interrogatories.

Dated: August 16, 2022

Respectfully submitted,

_/s/Leigh S. Montgomery_
Jarrett L. Ellzey
Texas Bar No. 24040864
Leigh Montgomery
Texas Bar No. 24052214
**ELLZEY & ASSOCIATES, PLLC**
1105 Milford Street
Houston, Texas 77006
Telephone: (713) 554-2377
Facsimile: (888) 276-3455
jarrett@ellzeylaw.com
leigh@ellzeylaw.com

*Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 16, 2022, a true and correct copy of the foregoing document was served on all counsel of record via Certified U.S. Mail, pursuant to the Federal Rules of Civil Procedure.

Ms. Latrice E. Andrews
Mr. Roger Albright
Sheils Winnubst, PC
1100 Atrium II
1700 N. Collins Blvd
Richardson, Texas 75080
latrice@sheilswinnubst.com
ralbright@sheilswinnubst.com

*/s/ Leigh S. Montgomery*
Leigh S. Montgomery

## PLAINTIFF BROOKE LAYTON'S SUPPLEMENTAL
## OBJECTIONS AND ANSWERS TO INTERROGATORIES

**INTERROGATORY NO. 1:**
Please state the legal name, address, phone number, and social security number of the person responding to these interrogatories.

**ANSWER: Plaintiff objects to the provision of her personal data as such violates her right to privacy. She can be contacted solely through counsel. Furthermore, the information requested is irrelevant to the claims and defenses asserted.**

**Subject thereto, Brooke Layton with the assistance of counsel.**

**SUPPLEMENTAL ANSWER: Brooke Kiannejad, 990 Crystal Cove, Oak Point, Tx 75068, phone: 214-293-3206, SSN (redacted): XXX-XX-X858.**

**INTERROGATORY NO. 2:**
Describe your work or employment history during the Relevant Period. In setting forth your answer, (i) identify the names and locations for each business where you have worked, (ii) your job title and classification *(e.g.,* independent contractor, employee, owner, *etc.),* (iii) your pay structure *(e.g.,* hourly, salaried, commission, tipped), (iv) the beginning and end dates of your work or employment relationship with such businesses, and (v) the reason for leaving each such employment or work relationships. The scope of this interrogatory includes any other adult cabarets or establishments similar to the Club where you have performed as an exotic dancer orentertainer.

**ANSWER: I worked as an entertainer for The Men's Club Dallas for two months in 2019. I also worked as a burlesque dancer and model.**

**SUPPLEMENTAL ANSWER: I worked as an entertainer for The Men's Club of Dallas, located at 2340 W Northwest Hwy, Dallas, TX 75220, from April 2019 to March 2019. I stopped working at The Men's Club of Dallas to try other clubs. I also worked as an entertainer at Bucks Cabaret, located at 2150 California Crossing Rd, Dallas, TX 75220, from approximately January 2020 to March 2020. I stopped working at Bucks Cabaret to pursue a relationship with my now husband. At both clubs, I only received tips for compensations from customers, but was also subject to fees, fines and tipout policies.**

**INTERROGATORY NO. 3:**
Describe the (i) work you engaged in at the Club during the Relevant Period, (ii) theprincipal activities of the work, (iii) describe how those activities were integral and indispensable parts of the work. (iv) identify for whose benefit you supplied your labor or services, and (v) each date you worked and the times your worked at the Club.

**ANSWER: Plaintiff objects to the extent this is a multiple part interrogatory, whose components are not related. Plaintiff will therefore answer the first part of the interrogatory only. Plaintiff objects to the terms "indispensable" and "integral" as vague**

*Plaintiff Brooke Layton's Supplemental Obj. & Ans. to*
*Defendant's Discovery*                                                    *Page 3 of 29*
**PLTFS APPX 000020**

and potentially requiring a legal conclusion.

**Subject thereto, I worked as a dancer and entertainer, with my work consisting mostly of dancing for, communicating with, and generally entertaining and engaging with Defendants' customers. The focus of the Club is adult entertainment, and that is what I performed for Defendants. I worked for Defendants' benefit, the non-entertainer personnel of the Club's benefit, as well as for my own tips. Every time I worked, I had to pay a fee. For every dance I gave, a portion went to the Club. The Club also made money off of credit card sales for my dances and other methods from customers I was entertaining, taking portions of my tips, and the fees I had to pay to perform. The benefit was financial for myself, the Club, and the Club's non-entertainer personnel. I worked at the Club from April 2018 to December 2019. I typically worked 4 shifts per week.**

### INTERROGATORY NO. 4:

Describe all work or activities you allege to have engaged in at the club before commencement and/or after completion of the work or activities you described in response to Interrogatory No. 4 for which you seek compensation, if any.

**ANSWER: Plaintiff objects the interrogatory is vague and nonsensical. The interrogatory references the answer in the same interrogatory, which makes it unanswerable at this time. Plaintiff requires clarification prior to providing objections (if any) and a response to this interrogatory.**

### INTERROGATORY NO. 5:

With regard to the work or activities set forth in your answers in Interrogatory Nos. 4 and 5, explain, identify, or quantify how much time you engaged in the work or activities on average each day.

**ANSWER: Plaintiff objects the interrogatory is vague and nonsensical. The interrogatory references the answer in the same interrogatory, which makes it unanswerable at this time. Plaintiff requires clarification prior to providing objections (if any) and a response to this interrogatory.**

**Subject thereto, to the extent the request asks how long Plaintiff engaged in her dancer/entertainer activities on average each day, the answer is 7-8 hours per day.**

### INTERROGATORY NO. 6:

Describe all alleged Rules you claim Defendants required you to comply with concerning or relating to the work activities set forth in your answers to Interrogatory No. 4 and/or 5 (by way of example only, Rules concerning your behavior, appearance, attire, scheduling, performance or any other means, manner or methods of your work). In your answer, (i) describe how you lean1ed about theseRules, including identification of the participants, the circumstances, substance, andmanner of those communications *(e.g.,* electronic, in writing. or verbal). and (ii)describe the individuals, communications, and circumstances in which you claims those Rules were actually applied, enforced, or threatened to be enforced against you.

**ANSWER: Plaintiff objects to the term "Rules," as vague and ambiguous.  Plaintiff objects to the extent this request calls for a narrative, that is more appropriate for deposition testimony and Plaintiff specifically incorporates any responsive deposition testimony into this response.**

**Subject thereto, Plaintiff asserts that some policies and procedures were in the application signed upon hiring.  Other rules were only verbally provided by management as I was working.  If you didn't comply with either set of rules, you would be terminated, fined or otherwise penalized.**

**Some of the "rules" (as Plaintiff understands that term) Defendants exerted over the dancers included (but are not limited to): 1) Mandatory tip out of at least $20; 2) the more you tip out the other employees, the better you were treated; 3) Club keeps a portion of entertainer's earnings if customer uses a credit card; 4) Pay a house fee each shift I worked; 5) Pay a fee to the manager at the end of each night; 6) Had to wear dance outfits, a thong, dance heels and must be topless on stage; 7) my outfits were subject to management veto and scrutiny; 8) your weight had to be managed or the managers wouldn't let you perform; 9) approval to work more than one shift/day and pay extra house fee; 10) $50 fine if you wanted to leave early, before the end of your shift; 11)  $100 fine for not working at least 4 shifts per week.**

**To the extent discussed/responsive to other discovery responses herein, Plaintiff incorporates her responses in this interrogatory.**

**<u>INTERROGATORY NO. 7:</u>**
Describe all alleged Rules you claim Defendants required you to comply with concerning or relating to your reporting, remittance, and/or retention of Dance Fees, if any.  In your answer, (i) describe how you learned about these Rules, including identification of the participants, the circumstances, substance, and manner of those communications  *(e.g.,* electronic, in writing, or verbal) and (ii) describe  the were actually applied, enforced, or threatened to be enforced against you.

**ANSWER: Plaintiff objects to the term "Rules," as vague and ambiguous.  Plaintiff objects to the extent this request calls for a narrative, that is more appropriate for deposition testimony and Plaintiff specifically incorporates any responsive deposition testimony into this response.**

**Subject thereto, Plaintiff asserts that some policies and procedures were in the application signed upon hiring.  Other rules were only verbally provided by management as I was working.  If you didn't comply with either set of rules, you would be terminated, fined or otherwise penalized. Although customers paid the dancer/entertainer directly for any amount agreed upon, the Club would then require us to pay a portion back to them through house fees, fines and/or tipouts.  Additionally, if a customer paid via credit card, the Club would keep a portion of the agreed upon amounts paid by customers.  The Club also had the right to set a minimum fee charge for my entertainment and required such be paid by any customer I chose to entertain.**

**Additionally, Plaintiff incorporates her other responses herein as to the Rules imposed on her by Defendants.**

**INTERROGATORY** NO. **8:**
Describe all alleged Rules you claim Defendants required you to comply with concerning or relating to monetary ·penalties.' 'kickbacks.' 'fees' and/or 'fines' that you claim to have paid. In your answer. (i) describe how you learned about these Rules, including identification for the participants. the circumstances, substance, and manner of those communications *(e.g.,* electronic. in writing, or verbal) and (ii) describe the individuals, communications, and circumstances in which you claim those Rules were actually applied, enforced, or threatened to be enforced against you.

**ANSWER: Plaintiff objects to the term "Rules," as vague and ambiguous.  Plaintiff objects to the extent this request calls for a narrative, that is more appropriate for deposition testimony and Plaintiff specifically incorporates any responsive deposition testimony into this response.**

**Subject thereto, Plaintiff asserts that some policies and procedures were in the application signed upon hiring.  Other rules were only verbally provided by management as I was working.  If you didn't comply with either set of rules, you would be terminated, fined or otherwise penalized.**

**Plaintiff incorporates her other responses herein as to the Rules imposed on her by Defendants. In addition to previous Rules discussed, as to fees or fines, including those identified in my responses to Interrogatories No. 6 and 7, Plaintiff alleges the following tipouts applied: 1) $10 tip out to the house mom each shift; 2) $10 tip out to the house mom each shift; 3) $4 tip out to the bartenders each shift; 4) $50 fine for leaving before the end of a shift; 5) $100 fine for not working 4 shifts per week.  All of the monies the dancer/entertainers paid in house fees, manager fees, fines and tipouts were paid solely to and for the benefit of the Club.  These fees and fines were not distributed back to the entertainers.**

**INTERROGATORY NO. 9:**
Describe all alleged Rules you claim Defendants required you to comply with concerning or relating to 'sharing· or ·splitting' your Dance Fees with any personnel who you associated with the Club. In your answer, (i) describe how you learned about these Rules, including identification for the participants, the circumstances, substance, and manner of those communications {e.g., electronic, in writing, or verbal) and (ii) describe  the  individuals, communications,   and   circumstances   in which you claims those Rules were actually applied. enforced, or threatened to beenforced against you.

**ANSWER: Plaintiff objects to the term "Rules," as vague and ambiguous.  Plaintiff objects to the extent this request calls for a narrative, that is more appropriate for deposition testimony and Plaintiff specifically incorporates any responsive deposition testimony into this response.**

**Subject thereto, Plaintiff asserts that some policies and procedures were in the**

application signed upon hiring.   Other rules were only verbally provided by management as I was working.  If you didn't comply with either set of rules, you would be terminated, fined or otherwise penalized.

Plaintiff incorporates her other responses herein describing the Rules imposed on her to this response. In addition to what I have previously explained, it was communicated verbally to me that there was a $20 mandatory tip-out to the DJ and $10 tip out to House Mom per shift. There was also a $50 fine for missing a stage rotation and $20 fine for leaving early.

## INTERROGATORY NO. 10:

Describe the items or services that you contend were necessary to perform your work at the Club, *e.g.,* facilities, goods, equipment, tools, personnel, processes, *etc.*  In your answer, (i) describe the basis for your contention that those items or services were necessary to perform your work, (ii) items or services, (iii) the cost of those items or services. and (iv) identify who bore the costs of those items or services.

ANSWER: Plaintiff objects to the request as overly broad and that it does not describe with particularity the information to be produced.  Specifically, Plaintiff objects to the terms "items" and "services" as vague and ambiguous.

Subject thereto, I supplied/paid for my clothing, dancer heels, as well as my own beauty supplies for hair and makeup. Of course, for any job you work, you need to look presentable, so my hair and makeup were not dancer/entertainer specific costs. Defendants have very strict guidelines on our performance wear, which I was required to follow and was enforced by Club management.

Additionally, in order to perform and entertain, I also need a space/floor, dressing room, restroom facilities, poles, lighting, music, DJ, utilities, advertising/signage to inform patrons of the entertainment services, security and/or management, cash register/credit card machines (or other payment processing), custodial services, furniture, separation for VIP and/or private dances, all of which Defendants are responsible for providing and, as such, I am unaware of the costs of those items.  Defendants also sold and served food and beverages to attract local and out-of-state customers to the club, but, again, Defendants were responsible for providing same and, as such, I am unaware of the costs of such items.

## INTERROGATORY NO. 11:

Describe whether Defendants imposed any alleged Rules on you that you contend affected your ability to work at any other similar commercial establishments or elsewhere. In your answer, (i) describe how you learned about these Rules, including identification of the participants, the circumstances, substance, and manner of those communications (e.g., electronic, in writing, or verbal) and (describe the individuals, communications, and circumstances in which you claims those Rules were actually applied, enforced, or threatened to be enforced against you.

ANSWER: No.

## INTERROGATORY NO. 12:

Describe whether Defendants imposed any alleged Rules on you that you contend affected your ability or desire to promote, advertise, or market the work you described in Interrogatory No. 4. In your answer, (i) describe how you learned about these Rules, including identification of the participants, the circumstances, substance, and manner of those communications (e.g., electronic, in writing, or verbal), and (ii) describe the individuals, communications, and circumstances in which you claim those Rules were actually applied, enforced, or threatened to be enforced against you.

**ANSWER: Plaintiff objects to the term "Rules," as vague and ambiguous.  Plaintiff objects to the extent this request calls for a narrative, that is more appropriate for deposition testimony and Plaintiff specifically incorporates any responsive deposition testimony into this response.  Plaintiff objects further as to the relevance of Plaintiff's desire to promote, advertise or market the work she performed for Defendants.**

**Subject thereto, Plaintiff asserts that some policies and procedures were in the application signed upon hiring.  Other rules were only verbally provided by management as I was working.  If you didn't comply with either set of rules, you would be terminated, fined or otherwise penalized. Plaintiff understood the Club would do the marketing and advertising for its customers/patrons that Plaintiff would then entertain.  Plaintiff incorporates her other responses herein as to the Rules imposed on her by Defendants, to the extent applicable.**

## INTERROGATORY NO. 13:

 If you contend that the Club's operational control, *e.g.,* control over maintenance of facilities, business hours, aesthetics, inventory of beverages or food, advertising, marketing, promotions, location, *etc.,* affected your opportunity to earn or lose money from your work, describe the facts and communications on which you base your contention.

**ANSWER: Plaintiff objects to the interrogatory as overly broad and unduly burdensome because it asks for 'facts and communications' to support Plaintiff's contention, which goes beyond the requirements of Fed. R. Civ. P. 33.  *See e.g. In & Out Welders, Inc. v. H&E Equip. Services, Inc.*, CV-16-86-JWD-RLB, 2018 WL 1370600, at \*7 (M.D. La. Mar. 16, 2018)("As with any interrogatory, however, a contention interrogatory may be overly broad where it seeks 'each and every' single fact upon which a party basis its case"); *Alexander v. Hartford Life and Acc. Ins. Co.,* No. 3-07-CV-1486, 2008 WL 906786, at \*4 (N.D. Tex. April 3, 2008)(Interrogatories only require a general explanation of the factual basis of the claimed contention).  Additionally, this case is in the early stages of discovery, and this interrogatory may not be fully answerable until such time as discovery is complete.  See Fed. R. Civ. P. 33, and Advisory Note ("Since interrogatories involving mixed questions of law and fact may create disputes between the parties which are bet resolved after much or all other discovery has been completed, the court is expressly authorized to defer an answer.")**

**Subject thereto, based on the information available to date, yes.  The price of food and/or beverages would be a draw to customers.  Additionally, advertising or marketing and**

promotions of big events or parties at the Club would draw more customers.  The
cleanliness, service, décor of the Club would keep customers coming in. More customers
in the Club effected my ability to earn.

**INTERROGATORY NO. 14:**
Do you have accurate records or reliable documentation of the Entertainer Fees (as defined in the
Licensing Agreement attached to your Arbitration Demand as Exhibit 1) you received while
providing services or performing at the Club?

**ANSWER: Plaintiff objects to this request as inappropriately attempting to shift a
burden of record keeping to Plaintiff, as opposed to her alleged Employers, as that term
is defined by the FLSA.  Any answer Plaintiff would provide, would therefore be
misleading to a jury as assuming Plaintiff had any obligation to do so or account for her
tips as 'Entertainer Fees.'**

**INTERROGATORY NO. 15:**
Describe any and all communications between you and either Respondent regarding your claims
in this Case, providing the dates, times persons involved and substance of the communications.

**ANSWER: Plaintiff objects to the request as overly broad and that it does not describe
with particularity the information to be produced and potentially includes any
conversation Plaintiff had with anyone at the Club or its ownership over the course of
her      work      period.      Specifically,      Plaintiff      objects      to      the      terms
"communications…regarding your claims in this Case" as vague and ambiguous.**

**Subject thereto, Plaintiff conversed with management of the Club on a regular basis
when she was working at the Club.  It would be impossible to recall specific conversations
that may relate to anything Plaintiff has claimed in this lawsuit.  To the extent Plaintiff
has described her interactions with the Club in other responses, she incorporates such
hereto.**

**INTERROGATORY NO. 16:**
If you contend that any of the Respondents bear liability to you under a 'joint employer' or similar
theory of vicarious liability, please describe the factual and legal basis for your contentions as to
each named Defendant.

**ANSWER: Plaintiff objects to the interrogatory as overly broad and unduly burdensome
because it asks for 'all facts' to support Plaintiff's contention, which goes beyond the
requirements of Fed. R. Civ. P. 33.  *See e.g. In & Out Welders, Inc. v. H&E Equip. Services,
Inc.,* CV-16-86-JWD-RLB, 2018 WL 1370600, at \*7 (M.D. La. Mar. 16, 2018)("As with
any interrogatory, however, a contention interrogatory may be overly broad where it
seeks 'each and every' single fact upon which a party basis its case"); *Alexander v.
Hartford Life and Acc. Ins. Co.,* No. 3-07-CV-1486, 2008 WL 906786, at \*4 (N.D. Tex.
April 3, 2008)(Interrogatories only require a general explanation of the factual basis of
the claimed contention).  Additionally, this case is in the early stages of discovery, and
this interrogatory may not be fully answerable until such time as discovery is complete.
See Fed. R. Civ. P. 33, and Advisory Note ("Since interrogatories involving mixed**

questions of law and fact may create disputes between the parties which are bet resolved after much or all other discovery has been completed, the court is expressly authorized to defer an answer.")

Subject thereto, the legal and factual basis for Plaintiff's contention Defendants bear liability to Plaintiff under a "joint employer" theory can be found in her operative Complaint and the text of the Fair Labor Standards Act, and any other codes/statutes referenced therein. The Club, and its officers/owners were Plaintiff's employer(s) as that term is defined by the FLSA.  The officers/owners of the Club acted directly or indirectly in the interest of the Club, as relates to Plaintiff or any of the dancer/entertainers at the Club. Defendants jointly were required to maintain Plaintiff's employment records, as well as determine the conditions of Plaintiff's employment (including the facility and other terms imposed by management of the Club), were ultimately responsible for any earnings or classification of Plaintiff as an independent contractor, and supervised and/or controlled Club management.

## INTERROGATORY NO. 17:
Provide the method of calculation and amount you claim is due and owing to you by the Club as wages, overtime, or any other amounts due.

ANSWER: See Plaintiff's Initial Disclosures, as well as any amendments or supplements thereto.  Until such time as Defendants provide all documented evidence of Plaintiff's work (if any), this interrogatory and/or Plaintiff's disclosures will be based on Plaintiff's reasonable estimates of her dates/hours worked during the Relevant Period, as well as the average fees, fines and tipouts Plaintiff recalls paying per shift.

## INTERROGATORYN0.18:
Describe and quantify (i) the hours and days per workweek that you claim to have performed at the Club during the Relevant Period (e.g., #hours on# days between July 15, 2018 - July 15, 2021 (ii) identify each date and number of hours on each such date performed at the Club, and (iii) identify any and all documents, methods, or sources of information you relied upon or referred to in providing your answer.

ANSWER: Plaintiff objects to the extent this interrogatory is actually multiple interrogatories concerning different subject matters.  As such, Plaintiff will answer only one as it is enumerated.

Subject thereto, I typically worked at least 4 shifts per week per Defendants' requirements, 8 hours per shift.

## INTERROGATORY NO. 19:
Describe (i) whether you had a fixed workweek at the Club and how that workweek was established, (ii) identify the workweeks in which you claim to have worked in excess of forty (40) hours, and (iii) and quantify how many hours in excess of 40 you claimed to have worked in those workweeks (e.g.,# total overtime hours) July 15, 2018 - July 15, 2021.

ANSWER: Plaintiff objects to the extent this interrogatory is actually multiple

interrogatories concerning different subject matters.  As such, Plaintiff will answer only one as it is enumerated.

Subject thereto, the Club requires you to work at least 4 days per week or you were subject to a $100 fine, so therefore I worked at least 4 shifts per week.

## INTERROGATORY NO. 20:

Identify all usernames, hashtags, screennames, and/or handles you have used or created on any social media platform - including but not limited to Facebook, Twitter, WhatsApp, Tumblr, Instagram, Messenger, SnapChat, TikTok, biogs, etc. - during the Relevant Period through which you have communicated with anyone employed by or affiliated with the Club about your work or activities at the Club, the subject matter of this Case, or any Rules.

ANSWER: Plaintiff objects to the request as overly broad and is not reasonably calculated to lead to the discovery of admissible evidence.  The request is not proportionate to the needs of this case, in that it requests unfettered access to Plaintiff's private social media accounts without a particular limitation or description of the item or information requested.

## INTERROGATORY NO. 21:

If you contend the Club is engaged in interstate commerce, please describe the legal and factual basis for your contention.

ANSWER: Plaintiff objects to the interrogatory as overly broad and unduly burdensome because it asks for 'all facts' to support Plaintiff's contention, which goes beyond the requirements of Fed. R. Civ. P. 33.  *See e.g. In & Out Welders, Inc. v. H&E Equip. Services, Inc.*, CV-16-86-JWD-RLB, 2018 WL 1370600, at *7 (M.D. La. Mar. 16, 2018)("As with any interrogatory, however, a contention interrogatory may be overly broad where it seeks 'each and every' single fact upon which a party basis its case"); *Alexander v. Hartford Life and Acc. Ins. Co.,* No. 3-07-CV-1486, 2008 WL 906786, at *4 (N.D. Tex. April 3, 2008)(Interrogatories only require a general explanation of the factual basis of the claimed contention.  Additionally, this case is in the early stages of discovery, and this interrogatory may not be fully answerable until such time as discovery is complete. See Fed. R. Civ. P. 33, and Advisory Note ("Since interrogatories involving mixed questions of law and fact may create disputes between the parties which are bet resolved after much or all other discovery has been completed, the court is expressly authorized to defer an answer.")

Subject thereto, the legal and factual basis for Plaintiff's contention the Club is engaged in interstate commerce can be found in her operative Complaint and the text of the Fair Labor Standards Act, and any other codes/statutes referenced therein. Congress "has determined that certain classes of activities have a sufficient impact upon interstate commerce to warrant regulation of the entire class, regardless of whether an individual instance of the activity in question can be shown to be in or to affect commerce." *Gulf Oil Corp. v. Copp Paving Co., Inc.*, 419 U.S. 186, 208 (1974).  On information and belief, the Club is engaged in interstate commerce either through use of streaming music, food

and/or beverage sales (if any), or catering or advertising to patrons from outside the state, or the myriad of other ways the Club could be found to engage in interstate commerce pursuant to the FLSA.

**INTERROGATORY NO. 22:**

If you contend Respondents acted willfully in violating the Fair Labor Standards Act, describe the legal and factual basis for such contentions.

**ANSWER: Plaintiff objects to the interrogatory as overly broad and unduly burdensome because it asks for 'all facts' to support Plaintiff's contention, which goes beyond the requirements of Fed. R. Civ. P. 33.** *See e.g. In & Out Welders, Inc. v. H&E Equip. Services, Inc.***, CV-16-86-JWD-RLB, 2018 WL 1370600, at \*7 (M.D. La. Mar. 16, 2018)("As with any interrogatory, however, a contention interrogatory may be overly broad where it seeks 'each and every' single fact upon which a party basis its case");** *Alexander v. Hartford Life and Acc. Ins. Co.,* **No. 3-07-CV-1486, 2008 WL 906786, at \*4 (N.D. Tex. April 3, 2008)(Interrogatories only require a general explanation of the factual basis of the claimed contention). Additionally, this case is in the early stages of discovery, and this interrogatory may not be fully answerable until such time as discovery is complete. See Fed. R. Civ. P. 33, and Advisory Note ("Since interrogatories involving mixed questions of law and fact may create disputes between the parties which are bet resolved after much or all other discovery has been completed, the court is expressly authorized to defer an answer.")**

**Subject thereto, the legal and factual basis for Plaintiff's contention Defendants' acted willfully in violating the FLSA can be found in her operative Complaint and the text of the Fair Labor Standards Act, and any other codes/statutes referenced therein. Plaintiff also refers Defendants to prior FLSA actions against Defendants, including but not limited to Case No. 3:20-cv-00513,** *Julia Predmore v. Nick's Clubs, Inc. d/b/a PT's Men's Club, et al.* **in the Northern District of Texas, and its later arbitration action.**

**INTERROGATORY NO. 23:**

If you contend you are entitled to attorney's fees and costs, please describe the legal and factual basis for such contention, inclusive of the amount and basis of calculation.

**ANSWER: Plaintiff objects to the interrogatory as overly broad and unduly burdensome because it asks for 'all facts' to support Plaintiff's contention, which goes beyond the requirements of Fed. R. Civ. P. 33.** *See e.g. In & Out Welders, Inc. v. H&E Equip. Services, Inc.***, CV-16-86-JWD-RLB, 2018 WL 1370600, at \*7 (M.D. La. Mar. 16, 2018)("As with any interrogatory, however, a contention interrogatory may be overly broad where it seeks 'each and every' single fact upon which a party basis its case");** *Alexander v. Hartford Life and Acc. Ins. Co.,* **No. 3-07-CV-1486, 2008 WL 906786, at \*4 (N.D. Tex. April 3, 2008)(Interrogatories only require a general explanation of the factual basis of the claimed contention). Additionally, this case is in the early stages of discovery, and this interrogatory may not be fully answerable until such time as discovery is complete. See Fed. R. Civ. P. 33, and Advisory Note ("Since interrogatories involving mixed questions of law and fact may create disputes between the parties which are bet resolved after much or all other discovery has been completed, the court is expressly authorized to defer an answer.")**

**Subject thereto, the legal and factual basis for Plaintiff's contention she is owed attorneys' fees and costs can be found in her operative Complaint and the text of the Fair Labor Standards Act, and any other codes/statutes referenced therein. Plaintiff has incurred court costs, expenses and attorneys' fees by prosecuting this action, for which the FLSA provides a successful Plaintiff a recovery. The amount of the expenses and fees claimed is the subject of expert testimony by Plaintiff's counsel and will be submitted in accordance with Federal law and the rules of this Court. See also Plaintiff's Initial Disclosures and any supplements thereto.**

## INTERROGATORY NO. 24:

State each of the dates and times you worked at the Club July 15, 2018 to July 15, 2021.

**ANSWER: I typically worked at least 4 shifts per week, 7-8 hours per shift.**

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| BROOKE LAYTON, individually and on behalf of all other similarly situated, | § § § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | CIVIL ACTION NO. 3:21-cv-01636-N |
| MAINSTAGE MANAGEMENT, INC., | § | |
| NICK'S MAINSTAGE, INC. – DALLAS | § | COLLECTIVE ACTION |
| PT'S d/b/a PT'S MEN'S CLUB and NICK | § | JURY DEMANDED |
| MEHMETI, | § | |
| Defendants. | § | |
| | § | |

## PLAINTIFF BROOKE LAYTON'S SUPPLEMENTAL OBJECTIONS AND RESPONSES TO DEFENDANT MAINSTAGE MANAGEMENT, INC.'S FIRST REQUEST FOR PRODUCTION

TO:   Defendant, MAINSTAGE MANAGEMENT, INC., by and through its attorney of record, Latrice E. Andrews and Y. Craig Sheils, SHEILS WINNUBST, PC, 1100 Atrium II 1701, N. Collins Blvd., Richardson, TX 75080.

Plaintiff Brooke Layton, by and through the undersigned counsel of record, serves her

supplemental objections and responses to Defendant Mainstage Management, Inc.'s First Request

for Production.

Dated: August 16, 2022                         Respectfully submitted,

*/s/  Leigh S. Montgomery*
Jarrett L. Ellzey
Texas Bar No. 24040864
Leigh Montgomery
Texas Bar No. 24052214
**ELLZEY & ASSOCIATES, PLLC**
1105 Milford Street
Houston, Texas 77006
Telephone: (713) 554-2377
Facsimile: (888) 276-3455
jarrett@ellzeylaw.com
leigh@ellzeylaw.com

***Attorneys for Plaintiff***

*Plaintiff Brooke Layton's Supplemental Obj. & Ans. to*
*Defendant's Discovery*                                             *Page 14 of 29*
**PLTFS APPX 000031**

**<u>CERTIFICATE OF SERVICE</u>**

      I hereby certify that on August 16, 2022, a true and correct copy of the foregoing document was served on all counsel of record via Certified U.S. Mail, pursuant to the Federal Rules of Civil Procedure.

Ms. Latrice E. Andrews
Mr. Roger Albright
Sheils Winnubst, PC
1100 Atrium II
1700 N. Collins Blvd
Richardson, Texas 75080
latrice@sheilswinnubst.com
ralbright@sheilswinnubst.com

*/s/ Leigh S. Montgomery*
Leigh S. Montgomery

*Plaintiff Brooke Layton's Supplemental Obj. & Ans. to*
*Defendant's Discovery*                                    *Page 15 of 29*
**PLTFS APPX 000032**

## PLAINTIFF BROOKE LAYTON'S SUPPLEMENTAL OBJECTIONS AND RESPONSES TO DEFENDANT'S REQUEST FOR PRODUCTION

**REQUEST FOR PRODUCTION NO. 1:**

Claimant's identification, driver's license, passport and other identifying document issued by the United States government or the government of any state of the United States.

**RESPONSE: Plaintiff objects as irrelevant to the claims and defenses asserted. Plaintiff further objects this request is not proportional to the needs of the case, given the importance of the discovery in resolving the issues and the burden of the proposed discovery outweighs any possible benefit.**

**Subject thereto, a copy of Plaintiff's driver's license can be made available for review at the office of Plaintiff's counsel on a mutually agreed upon date and time.**

**REQUEST FOR PRODUCTION NO. 2:**

All W-2 forms, 1099 forms, bank statements and other income reporting forms that evidence your income from the Club or any other person from whom your worked or provided services during the Relevant Period.

**RESPONSE: Plaintiff objects as irrelevant to the claims and defenses asserted. Plaintiff further objects this request is not proportional to the needs of the case, given the importance of the discovery in resolving the issues and the burden of the proposed discovery outweighs any possible benefit. Plaintiff responds only as to her earnings at Defendant's establishment.**

**Subject thereto, as to Plaintiff's earnings from this Club, responsive information, if any, can be made available for review at the office of Plaintiff's counsel on a mutually agreed upon date and time.**

**SUPPLEMENTAL RESPONSE: Relevant responsive materials are not being withheld on the basis of the objections.**

**REQUEST FOR PRODUCTION NO. 3:**

All U.S. individual tax returns (Form 1040) and accompanying schedules and documents used in connection with the preparation of such returns for the Relevant Period.

**RESPONSE: Plaintiff objects as irrelevant to the claims and defenses asserted. Plaintiff further objects this request is not proportional to the needs of the case, given the importance of the discovery in resolving the issues and the burden of the proposed discovery outweighs any possible benefit. Plaintiff responds only as to her earnings at Defendant's establishment.**

**Subject thereto, as to any 1040 form filed in which earnings from Defendant's establishment were listed by Plaintiff, if any, can be made available for review at the office**

**of Plaintiff's counsel on a mutually agreed upon date and time.**

**SUPPLEMENTAL RESPONSE: Relevant responsive materials are not being withheld on the basis of the objections.**

**REQUEST FOR PRODUCTION NO. 4:**

All documents pertaining to all income, distributions, wages, salaries, tips, commissions, earnings, monies, compensations, dividends, bonuses, royalties and remunerations in any other form received by you during the Relevant Period.

**RESPONSE: Plaintiff objects as irrelevant to the claims and defenses asserted. Plaintiff further objects this request is not proportional to the needs of the case, given the importance of the discovery in resolving the issues and the burden of the proposed discovery outweighs any possible benefit. Plaintiff responds only as to her earnings at Defendant's establishment.**

**Subject thereto, as to documents showing any earnings earned from Defendant's establishment, if any, can be made available for review at the office of Plaintiff's counsel on a mutually agreed upon date.**

**REQUEST FOR PRODUCTION NO. 5:**

All documents evidencing your rate of pay, including any changes thereto, during the period of your alleged employment during the Relevant Period.

**RESPONSE: Plaintiff objects to the extent this request assumes facts not in evidence, namely, that Defendants paid her.**

**Subject thereto, there are no responsive documents to this request as Defendants did not pay Plaintiff.**

**REQUEST FOR PRODUCTION NO. 6:**

All payroll statements, cleared checks, receipts, deposits, statements and pay stubs that evidence your earnings during the Relevant Period.

**RESPONSE: Plaintiff objects to the extent this request assumes facts not in evidence, namely, that Defendants paid her.**

**Subject thereto, documents responsive to this request, if any, can be made available for review at the office of Plaintiff's counsel on a mutually agreed upon date.**

**REQUEST FOR PRODUCTION NO. 7:**

All documents indicating or relating to your work schedule hours at the Club, including any

changes thereto.

**RESPONSE: Plaintiff objects to the extent this request does not state with reasonable particularity the item or thing to be produced. Plaintiff objects as vague as to what 'documents,' may 'indicate or relate,' to work schedule hours. Plaintiff is responding based on her understanding of documents listing or specifying hours worked.**

**Subject thereto, there are no responsive documents to this request in Plaintiff'spossession, custody and/or control.**

## REQUEST FOR PRODUCTION NO. 8:

All diaries, notes, memoranda, journals, or calendars, including electronic diaries, notes memoranda, journals, or calendars, or other written logs reflecting your daily routine, location, and activities during the Relevant Period.

**RESPONSE: There are no responsive documents to this request in Plaintiff's possession, custody and/or control.**

## REQUEST FOR PRODUCTION NO. 9:

All documents indicating or relating to your tardiness, attendance, unavailability and/or absences from the Club during the Relevant Period, including but not limited to medical, travel or other absences and emails or phone records to notify the Club of your tardiness, absence or unavailability.

**RESPONSE: Plaintiff objects as irrelevant to the claims and defenses asserted inthis action and to the extent the request is vague and ambiguous.  Plaintiff furtherobjects to the extent the request assumes facts not in evidence and is speculative.**

**Subject thereto, there are no responsive documents to this request in Plaintiff's possession, custody and/or control.**

## REQUEST FOR PRODUCTION NO. 10:

All documents, including representation agreements, fee agreements, contracts, invoices and billing statements, evidencing the contractual relationship with attorneys, experts, and/or investigators in connection with this Case.

**RESPONSE: Plaintiff objects to the extent this request goes beyond the scope of claims in this case, and is therefore irrelevant, and not proportionate to the needs of the case, given the relevance of the requested information.**

**Subject thereto, as to any contractual relationship with Plaintiff's counsel, such information can be made available for review at the office of Plaintiff's counsel on a mutually agreed upon date and time.**

**REQUEST FOR PRODUCTION NO. 11:**

Any and all payments, advances, or loans received in relation to pursuing or filing this Case.

**RESPONSE: There are no responsive documents to this request.**

**REQUEST FOR PRODUCTION NO. 12:**

All letters and correspondence, including electronic writings (e.g., e-mail), that constitute or contain matters relevant to the subject matter of this Case, excluding any privileged communications.

**RESPONSE: Plaintiff objects as the request does not state with particularity, the item or thing to be produced, specifically what constitutes 'relevant' matters to this case. Plaintiff further objects this request is not proportional to the needs of the case, given the importance of the discovery in resolving the issues and the burden of the proposed discovery outweighs any possible benefit.**

**Plaintiff further asserts the request invades the attorney-client and attorney work product privileges, despite claiming otherwise, to the extent it fails to define with specificity the documents to be produced. A general request to peruse a Plaintiff's file on a matter is an invasion of the work product privilege. Information will not be produced subject to these objections.**

**REQUEST FOR PRODUCTION NO. 13:**

Any and all documents pertaining to checking accounts, savings accounts, certificates of deposit and other accounts in any bank, savings and loan association or other financial institution, inclusive of CashApp, PayPal, Venmo, Zelle, Coinbase, and similar financial facilities, which stand in your name alone, individually or as trustee, or which are subject to withdrawal or control by you, or in which you claim or have claimed an interest, for the Relevant Period including but not limited to deposit slips, canceled checks, withdrawal slips, statements of account, passbooks and certificates of deposit.

**RESPONSE: Plaintiff objects as the request does not state with particularity, the item or thing to be produced. Plaintiff further objects this request is not proportional to the needs of the case, given the importance of the discovery in resolving the issues and the burden of the proposed discovery outweighs any possible benefit. Plaintiff objects to the extent this request creates such a burden on her and is such an invasion of her privacy, as the request is not limited in date or scope to the relevant claims and defenses before the Court, than any attempt to answer is impossible. Information will not be produced subject to these objections.**

**REQUEST FOR PRODUCTION NO. 14:**
Any contract of employment between you and the Club.

**RESPONSE: There are no responsive documents to this request.**

**REQUEST FOR PRODUCTION NO. 15:**

All documents relating to the work you performed for the Club regarding, referring to or related to:

      a.      Overtime compensation;
      b.      Christmas or other bonuses;
      c.      Deferred compensation;
      d.      Business expenses paid by employer;
      e.      Other receipts arising out of employment;
      f.      Advances or loans;
      g.      Vacation and sick-leave benefits; and,
      h.      Severance pay.

**RESPONSE: Plaintiff objects to the extent this request assumes facts not in evidence, namely that Defendants paid for any of the above-referenced items for anyone at the Club. Plaintiff further objects to the extent the information requested would be in Defendant's possession, custody and/or control and thereby burdensome anddisproportionate to the needs of the case for Plaintiff to provide.**

**Subject thereto, there are no responsive documents in Plaintiff's possession,custody and/or control.**

**REQUEST FOR PRODUCTION NO. 16:**

All documents reflecting on your credibility as a witness, including records of arrests, convictions, and sentencing for crimes involving theft, fraud, or moral turpitude at any time since 2011.

**RESPONSE: Plaintiff objects to the extent this request asks for information outside the scope of discovery. Fed. R. Evid. 609. Plaintiff further objects to the extent this request does not state with particularity the item or thing to be produced. Plaintiff further objects to the burdensomeness of this request, that it is disproportional to the needs of the case given Defendant's equal access to the requested information. Information regarding criminal convictions is publicly available.**

**Subject thereto, Plaintiff regards herself as a credible witness, and therefore there are no responsive documents to this request.**

**REQUEST FOR PRODUCTION NO. 17:**

Produce a copy of all documents that support your contention that the Club is engaged in interstate commerce.

**RESPONSE: Plaintiff objects to the extent the information requested would be in**

**Defendant's possession, custody and/or control and thereby burdensome and disproportionate to the needs of the case for Plaintiff to provide.**

**Subject thereto, all documents responsive to this request would be in Defendants' possession, custody and/or control. Such information will be available when Defendant provides the requested documents.**

## REQUEST FOR PRODUCTION NO. 18:

Legal actions, including demand letters, claim forms, arbitration demands, settlement offers and agreements, lawsuits, administrative proceedings, court proceedings and/or arbitrations in which you are or were a party from 2015 to present.

**RESPONSE: Plaintiff objects to the extent this request does not state with reasonable particularity the items or things to be produced. Plaintiff further objects this request is burdensome and expensive given the proportionate needs of the case given the importance of the discovery in resolving the issues and the burden of the proposed discovery outweighs any possible benefit. The information requested is publicly available, and as such equally available to Defendant, adding to the disproportionate needs for Plaintiff to produce such information.**

**Furthermore, the information requested invades the attorney work product and attorney/client privilege, as well as potentially other confidential information, and as such, information or materials may be withheld.**

**Subject thereto, there are no applicable responsive documents for any employment/FLSA claims for Plaintiff, other than the instant matter.**

## REQUEST FOR PRODUCTION NO. 19:

All documents reflecting your employment history from 2010 to date.

**RESPONSE: Plaintiff objects to the request in that it doesn't state the item or thing to be produced with reasonable particularity, such that Plaintiff does not know what documents may be responsive. Furthermore, Plaintiff objects to the request as disproportionate to the needs of the case, given the importance of the discovery in resolving the issues and the burden of the proposed discovery outweighs any possible benefit. Due to the breadth and ambiguity in this request, Plaintiff will not guess as to what may be a responsive document and rests on these objections.**

## REQUEST FOR PRODUCTION NO. 20:

All documents reflecting your educational background and training, including but not limited to diplomas, degrees, certificates, licenses, and transcripts.

**RESPONSE: Plaintiff objects to the request in that it doesn't state the item or thing to be produced with reasonable particularity, such that Plaintiff does not know what documents may be responsive. Furthermore, Plaintiff objects to the request as disproportionate to the needs of the case, given the importance of the discovery in**

**resolving the issues and the burden of the proposed discovery outweighs any possible benefit. Due to the breadth and ambiguity in this request, Plaintiff will not guess as to what may be a responsive document and rests on these objections.**

REQUEST FOR PRODUCTION NO. 21:

All documents and communications with the individually named Defendants during the Relevant Period.

**RESPONSE: Plaintiff objects to the request in that it doesn't state the item or thing to be produced with reasonable particularity, such that Plaintiff does not know what documents may be responsive. Furthermore, Plaintiff objects to the request as disproportionate to the needs of the case, given the importance of the discovery in resolving the issues and the burden of the proposed discovery outweighs any possible benefit.**

**Subject thereto, to the extent any such documents exist relevant to the claims and defenses assert, such will be made available at Plaintiff's counsel's office on a mutually agreeable date and time.**

REQUEST FOR PRODUCTION NO. 22:

Any and all documents evidencing any income received directly from or related to the performance of services at the Club during the Relevant Time Period.

**RESPONSE: Plaintiff objects to the extent this request assumes facts not in evidence, namely that Defendants paid any compensation to Plaintiff.  Plaintiff objects that the request is disproportionate to the needs of the case, considering the relevance of the particular information requested. Plaintiff's tips received from customers are not of issue in the claims and defenses alleged, as Defendants never classified Plaintiff or paid Plaintiff as a tipped employee. Plaintiff is withholding responsive documents, if any, based upon these objections.**

REQUEST FOR PRODUCTION NO. 23:

Any and all documents evidencing the hours you allegedly worked per week at the Club during the Relevant Period.

**RESPONSE: Responsive information, if any, can be made available for review at the office of Plaintiff's counsel on a mutually agreed upon date.**

REQUEST FOR PRODUCTION NO. 24:

Produce all documents and communications created or maintained by Claimant recording or memorializing in any way the days, hours, weeks, or months that she claims to have worked at the Club. This request includes, but is not limited to, calendar, notes, posting on social media, diary entries, bank statements or other similar documentation.

**RESPONSE: Responsive information, if any, can be made available for review at the**

office of Plaintiff's counsel on a mutually agreed upon date.

**SUPPLEMENTAL RESPONSE: Plaintiff does not have responsive materials.**

**REQUEST FOR PRODUCTION NO. 25:**
Produce all documents and communications created or maintained by Claimant recording or memorializing in any way the amount of money she earned in connection with her work as an exotic dancer at the Club, e.g., wages, fees, 'tips,' 'gratuities' or service charges. This request includes, but is not limited to, calendar, notes, diary entries, or other similar documentation.

**RESPONSE: Plaintiff objects to the extent this request assumes facts not in evidence, namely that Defendants paid any compensation to Plaintiff.  Plaintiff objects that the request is disproportionate to the needs of the case, considering the relevance of the particular information requested. Plaintiff's tips received from customers are not of issue in the claims and defenses alleged, as Defendants never classified Plaintiff or paid Plaintiff as a tipped employee. Plaintiff is withholding responsive documents, if any, based upon these objections.**

**SUPPLEMENTAL RESPONSE: Relevant responsive materials are not being withheld on the basis of the objections.**

**REQUEST FOR PRODUCTION NO. 26:**
Produce all documents and communications created or maintained by Claimant recording or memorializing in any way the amount of money she claims to have been required to pay according to any Rules at the Club. This request includes, but is not limited to, calendar, notes, diary entries, or other similar documentation.

**RESPONSE: Responsive information, if any, can be made available for review at the office of Plaintiff's counsel on a mutually agreed upon date.**

**SUPPLEMENTAL RESPONSE: Plaintiff does not have responsive materials.**

**REQUEST FOR PRODUCTION NO. 27:**
Produce copies of Claimant's federal and state income tax returns for all tax years during the Relevant Period. See Carrell v. Sunland Const., Inc., 998 F.2d 330,334 (5th Cir. 1993) (5th Cir. 1993). Please redact all sensitive information such as social security numbers.

**RESPONSE: Plaintiff incorporates her objections and response from no. 2. This request is redundant.**

**REQUEST FOR PRODUCTION NO. 28:**
Produce any sworn or unsworn statements in Claimant's possession, custody or control from individuals containing any information concerning or related to the claims asserted in the Original Complaint filed in the Case.

**RESPONSE: There are no responsive documents to this request.**

**REQUEST FOR PRODUCTION NO. 29:**
If Claimant reported or complained internally to the Club (including but not limited to managers, supervisors, or administrators) about the Rules or the subject matter of the claims asserted in Complaint during the Relevant Period, produce any documents or communications reflecting those reports or complaints.

**RESPONSE: There are no responsive documents to this request.**

**REQUEST FOR PRODUCTION NO. 30:**
Produce all documents that Claimant contends evidence Defendants' alleged willful violation(s) of the FLSA during the Relevant Period.

**RESPONSE: Plaintiff objects the request does not state with particularity the item of thing to be produced. Plaintiff further asserts that the request is tantamount to a request for the Plaintiff's counsel's entire file, which is an improper invasion of the attorney work product privilege. Plaintiff objects to the extent the information or materials are public records, and equally available and accessible to Defendant, therefore are disproportionate to the needs of this case.**

**Subject thereto, the items or information identified in response to interrogatory no. 22 are public records and/or arbitration records solely in the possession, custody and/or control of Defendants.**

**REQUEST FOR PRODUCTION NO. 31:**
Produce all communications (including e-mails, texts, social media messages) between Claimant and any other performers, Djs, bartenders, waitresses, house moms, or similar individuals at the Club, concerning or relating to any alleged Rules, the filing of this Case, or the subject matter of this Case during the Relevant Period.

**RESPONSE: Plaintiff objects that the request is vague and ambiguous as to the terms "similar individuals at the Club," "concerning or relating to any alleged Rules," or the "subject matter of this case." As worded, the request is overly broad and ambiguous, such that any attempt to respond would be disproportionate to the needs of the case, given the potential relevance of the requested documents. To the extent this request invades the joint defense privilege and/or attorney/client privilege, information and materials will be withheld.**

**Subject thereto, to the extent responsive documents exist as to the alleged Rules as set forth by Plaintiff herein, responsive information, if any, will be made available at Plaintiff's counsel's office on a mutually agreeable date and time.**

**SUPPLEMENTAL RESPONSE: Relevant responsive materials are not being withheld on the basis of the objections.**

**REQUEST FOR PRODUCTION NO. 32:**

Produce all documents or communications between Claimant and any of the Defendants concerning or relating to any alleged Rules, the filing of this Case, or the subject matter of this Case during the Relevant Period.

**RESPONSE: Plaintiff objects that the request is vague and ambiguous as to the terms "concerning or relating to any alleged Rules," "the filing of this case," or the "subject matter of this case." As worded, the request is overly broad and ambiguous, such that any attempt to respond would be disproportionate to the needs of the case, given the potential relevance of the requested documents. To the extent this request invades the joint defense privilege and/or attorney/client privilege, information and materials will be withheld.**

**Subject thereto, to the extent responsive documents exist as to the alleged Rules as set forth by Plaintiff herein, responsive information, if any, will be made available at Plaintiff's counsel's office on a mutually agreeable date and time.**

**REQUEST FOR PRODUCTION NO. 33:**
Produce all documents and communications between Claimant and any individual employed by, who works at, or who Claimant otherwise associates with the Club during the Relevant Period.

**RESPONSE: Plaintiff objects to the extent the individual(s) identified in this request are or may be unknown to Plaintiff. Plaintiff will answer only to the extent an individual is known as an employee of the Club. Otherwise, Plaintiff objects as vague. To the extent this request invades the joint defense privilege and/or attorney/client privilege, information and materials will be withheld.**

**Subject thereto, there is no responsive information to this request.**

**REQUEST FOR PRODUCTION NO. 34:**
Produce all documents and communications relating to any disciplinary actions taken against Claimant by Defendants during the Relevant Period.

**RESPONSE: There are no responsive documents to this request.**

**REQUEST FOR PRODUCTION NO. 35:**
Produce all documents and communications between Claimant and any dancer or entertainer who has performed at the Club concerning or relating to any alleged Rules, the filing of this Case, or the subject matter of this Case during the Relevant Period.

**RESPONSE: Plaintiff objects that the request is vague and ambiguous as to the terms "concerning or relating to any alleged Rules," "the filing of this case," or the "subject matter of this case." Plaintiff is unable to ascertain what the request is asking for and, therefore is unable to answer the request. To the extent this request invades the joint defense privilege and/or attorney/client privilege, information and materials will be**

withheld.

**REQUEST FOR PRODUCTION NO. 36:**

If Claimant contends that she was subject to any Rules, supervised, controlled or otherwise managed by any person she alleges had authority to act on behalf of or for the Club, produce all documents and communications between Claimant and such persons concerning those matters.

**RESPONSE: Plaintiff objects that the request is vague and ambiguous as to the terms "Rules," "person with authority to act on behalf of the Club." Plaintiff does not know all persons with authority, only who may have controlled her work such at to make her an employee. The request is overly broad, and potentially includes all documents at issue in this matter, which is an improper request for production and disproportionate to the needs of the case.**

**Subject thereto, non-privileged, relevant and responsive documents, if any, will be available for inspection at Plaintiff's counsel's office on a mutually agreeable date and time.**

**REQUEST FOR PRODUCTION NO. 37:**

For each social media account maintained by Claimant, please produce all messages, private messages, posts (public or private) concerning or relating to any alleged Rules, the filing of this Case, or the subject matter of this Case during the Relevant Period.

**RESPONSE: Plaintiff objects that the request is vague and ambiguous as to the terms "concerning or relating to any alleged Rules," "the filing of this case," or the "subject matter of this case." Plaintiff further asserts the information requested is disproportionate to the needs of the case given is relative importance in resolving the issues of this claim. It is burdensome, not limited in time or scope,such as to be relevant or proportionate to the claims and defenses asserted in this matter. *See McGowan v. Southern Methodist University*, Civil Action No. 3:19-cv-141-N, 2020 WL 2199189 at \*2 (N.D. Tex. May 6, 2020).**

**SUPPLEMENTAL RESPONSE: Relevant responsive materials are not being withheld on the basis of the objections.**

**REQUEST FOR PRODUCTION NO. 38:**

Produce all documents and communications relating to tips, gifts, or other monies Claimant claims to have paid to DJs, entertainers, dancers, bus boys, bartenders or managers at the Club.

**RESPONSE: Plaintiff asserts the information requested is disproportionate to the needsof the case given is relative importance in resolving the issues of this claim. It is burdensome, not limited in time or scope, such as to be relevant or proportionateto the claims and defenses asserted in this matter.**

**Subject thereto, responsive information, if any, can be made available for review at the**

**office of Plaintiff's counsel on a mutually agreed upon date.**

<u>**REQUEST FOR PRODUCTION NO. 39:**</u>
Produce all photographs and/or videos in Claimant's possession, custody or control that depict any portion of the interior or exterior of the Club taken at any point during the Relevant Period. This request includes photographs or videos of any signage, other performers, patrons, or club personnel.

**RESPONSE: Responsive information, if any, can be made available for review at the office of Plaintiff's counsel on a mutually agreed upon date.**

<u>**REQUEST FOR PRODUCTION NO. 40:**</u>
Produce a copy of every employment contract, independent contractor agreement, or other written agreement Claimant entered into with any and all topless clubs, gentlemen's clubs, or adult entertainment nightclubs at which she has performed during the Relevant Period.

**RESPONSE: Plaintiff objects the documents requested are disproportionate to theneeds of the case given is relative importance in resolving the issues of this claim. It is burdensome, not limited in time or scope, such as to be relevant or proportionate to the claims and defenses asserted in this matter.**

**Subject thereto, there are no responsive documents to this request.**

<u>**REQUEST FOR PRODUCTION NO. 41:**</u>
Produce a copy of the fee agreement(s) with your attorney(s) in this matter.

**RESPONSE: Responsive information, if any, can be made available for review at the office of Plaintiff's counsel on a mutually agreed upon date and time.**

<u>**REQUEST FOR PRODUCTION NO. 42:**</u>
Produce a copy of documents reflecting the amount of attorney's fees Plaintiff seeks to recover in this proceeding.

**RESPONSE: The information requested is the subject of expert testimony and opinion, and therefore improper to request in the form of a request for production. Additionally, the request is premature, as the amount Plaintiffs seeks to recover includes the reasonable and necessary attorneys' fees and expenses incurred up to the time of and through trial and will not be known until that point.**

<u>**REQUEST FOR PRODUCTION NO. 43:**</u>
Produce the location data from your cellular device for the dates you claim to have performed at the Club. This data may be exported and produced from a variety of sources, e.g. Facebook 'check- ins,' as a .km! file exported from Google Timeline, or if you use an iPhone, by accessing "Significant Locations" under "System Services".

**RESPONSE: Plaintiff objects to the extent the data requested is not a tangible thing or**

**document in existence for Plaintiff to produce. Plaintiff objects the information requested is disproportionate to the needs of the case given is relativeimportance in resolving the issues of this claim. Plaintiff does not have to create evidence. It is burdensome, not limited in time or scope, such as to be relevant or proportionate to the claims and defenses asserted in this matter. Plaintiff asserts this request improperly invades her constitutional right to privacy and is overly broad and not relevant to the claims or defenses asserted. Plaintiff is withholding information based on these objections.**

**SUPPLEMENTAL RESPONSE: Relevant responsive materials are not being withheld on the basis of the objections.**

**REQUEST FOR PRODUCTION NO. 44:**
Please produce a copy of your cell phone bills reflecting the transmission of communications (including text messages) during the Relevant Period.

**RESPONSE: Plaintiff objects the documents requested are disproportionate to the needs of the case given is relative importance in resolving the issues of this claim. It is burdensome, not limited in time or scope, such as to be relevant or proportionate to the claims and defenses asserted in this matter. Plaintiff asserts this request improperly invades her constitutional right to privacy, and is overly broad and not relevant to the claims or defenses asserted. Plaintiff is withholding information based on these objections.**

**SUPPLEMENTAL RESPONSE: Relevant responsive materials are not being withheld on the basis of the objections.**

**REQUEST FOR PRODUCTION NO. 45:**
Produce a copy of documents that support your contention that Nick Mehmeti is a joint employer of the Club.

**RESPONSE: Plaintiff objects to this document request as premature.  Plaintiff incorporates her objections to interrogatory 16 herein, as equally applicable.**

**Subject thereto, when any responsive information is available to Plaintiff, such information will be made available for inspection at Plaintiff's counsel's office on a mutually agreeable date and time.**

**REQUEST FOR PRODUCTION NO. 46:**
Produce a copy of any correspondence, inclusive of enclosures that relate to one or more of the Defendants.

**RESPONSE: Plaintiff objects to the phrase "relate to one or more of the Defendants," as vague, ambiguous and overly broad, such that any attempt at responding would be disproportionate to the needs of this case.**

**Subject thereto, responsive information related to correspondence relevant to the claims and defenses asserted, if any, will be made available for review at Plaintiff's counsel's**

office on a mutually agreeable date and time.

**REQUEST FOR PRODUCTION NO. 47:**
Produce any and all resumes and job applications during the Relevant Period.

**RESPONSE: There are no responsive documents in Plaintiff's possession, custody or control.**

**REQUEST FOR PRODUCTION NO. 48:**

Produce any and all calendars.

**RESPONSE: There are no responsive documents in Plaintiff's possession, custody or control.**

**REQUEST FOR PRODUCTION NO. 49:**
Produce your Facebook postings, comments, and images during the Relevant Period.

**RESPONSE: Plaintiff objects the documents requested are disproportionate to the needs of the case given is relative importance in resolving the issues of this claim. It is burdensome, not limited in time or scope, such as to be relevant or proportionate to the claims and defenses asserted in this matter. Plaintiff asserts this request improperly invades her constitutional right to privacy, and is overly broad and not relevant to the claims or defenses asserted. *See McGowan v. Southern Methodist University*, Civil Action No. 3:19-cv-141-N, 2020 WL 2199189 at \*2 (N.D. Tex. May 6, 2020). Plaintiff is withholding information based on these objections.**

**REQUEST FOR PRODUCTION NO. 50:**
Produce your Instagram postings, comments, and images during the Relevant Period.

**RESPONSE: Plaintiff objects the documents requested are disproportionate to the needs of the case given is relative importance in resolving the issues of this claim. It is burdensome, not limited in time or scope, such as to be relevant or proportionate to the claims and defenses asserted in this matter. Plaintiff asserts this request improperly invades her constitutional right to privacy and is overly broad and not relevant to the claims or defenses asserted.   Plaintiff is withholding information based on these objections. *See McGowan v. Southern Methodist University*, Civil Action No. 3:19-cv-141-N, 2020 WL 2199189 at \*2 (N.D. Tex. May 6, 2020).**

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| BROOKE LAYTON, individually and on behalf of all other similarly situated, | § | |
| *Plaintiff,* | § | |
| | § | |
| | § | |
| v. | § | |
| | § | CIVIL ACTION NO. 3:21-cv-01636-N |
| MAINSTAGE MANAGEMENT, INC., | § | |
| NICK'S MAINSTAGE, INC. – DALLAS | § | COLLECTIVE ACTION |
| PT'S d/b/a PT'S MEN'S CLUB and NICK | § | JURY DEMANDED |
| MEHMETI, | § | |
| *Defendants.* | § | |
| | § | |

**PLAINTIFF ASHLYNN SHIPLEY'S OBJECTIONS AND ANSWERS TO DEFENDANT
MAINSTAGE MANAGEMENT, INC.'S FIRST SET OF INTERROGATORIES**

TO:   Defendant, MAINSTAGE MANAGEMENT, INC., by and through its attorney of record, Latrice E. Andrews and Y. Craig Sheils, Sʜᴇɪʟs Wɪɴɴᴜʙsᴛ, PC, 1100 Atrium II 1701, N. Collins Blvd., Richardson, TX 75080.

Plaintiff Ashlynn Shipley, by and through the undersigned counsel of record, serves her

objections and answers to Defendant Mainstage Management, Inc.'s First Set of Interrogatories.

Dated: June 27, 2022                          Respectfully submitted,

                                              */s/ Leigh S. Montgomery*
                                              Jarrett L. Ellzey
                                              Texas Bar No. 24040864
                                              Leigh Montgomery
                                              Texas Bar No. 24052214
                                              **Eʟʟᴢᴇʏ & Assᴏᴄɪᴀᴛᴇs, PLLC**
                                              1105 Milford Street
                                              Houston, Texas 77006
                                              Telephone: (713) 554-2377
                                              Facsimile: (888) 276-3455
                                              jarrett@ellzeylaw.com
                                              leigh@ellzeylaw.com

                                              ***Attorneys for Plaintiff***

## CERTIFICATE OF SERVICE

I hereby certify that on June 27, 2022, a true and correct copy of the foregoing document was served on all counsel of record via Certified U.S. Mail, pursuant to the Federal Rules of Civil Procedure.

**Via CMRRR 7021 0950 0001 7128 8908**
Ms. Latrice E. Andrews
Mr. Roger Albright
Sheils Winnubst, PC
1100 Atrium II
1700 N. Collins Blvd
Richardson, Texas 75080
latrice@sheilswinnubst.com
ralbright@sheilswinnubst.com

*/s/ Leigh S. Montgomery*
Leigh S. Montgomery

### PLAINTIFF ASHLYNN SHIPLEY'S OBJECTIONS AND ANSWERS TO INTERROGATORIES

**INTERROGATORY NO. 1:**
Please state the legal name, address, phone number, and social security number of the person responding to these interrogatories.

**ANSWER: Plaintiff objects to the provision of her personal data as such violates her right to privacy. She can be contacted solely through counsel. Furthermore, the information requested is irrelevant to the claims and defenses asserted.**

**Subject thereto, Ashlynn Shipley, 9505 Royal Ln. Apt. 2120, Dallas, TX 75243, Phone: 214-770-6869, SSN (redacted): XXX-XX-X264, with the assistance of counsel.**

**INTERROGATORY NO. 2:**
Describe your work or employment history during the Relevant Period. In setting forth your answer, (i) identify the names and locations for each business where you have worked, (ii) your job title and classification (e.g., independent contractor, employee, owner, etc.), (iii) your pay structure (e.g., hourly, salaried, commission, tipped), (iv) the beginning and end dates of your work or employment relationship with such businesses, and (v) the reason for leaving each such employment or work relationships. The scope of this interrogatory includes any other adult cabarets or establishments similar to the Club where you have performed as an exotic dancer or entertainer.

**ANSWER: I worked as an entertainer for The Men's Club Dallas from January 25, 2018 to March 2020. I also worked as an entertainer at Bucks Cabaret from approximately December 2020 to March 2020. I only received tips for compensations from customers, but was also subject to fees, fines and tipout policies at both clubs. I stopped working at both locations due to the pandemic.**

**INTERROGATORY NO. 3:**
Describe the (i) work you engaged in at the Club during the Relevant Period, (ii) the principal activities of the work, (iii) describe how those activities were integral and indispensable parts of the work. (iv) identify for whose benefit you supplied your labor or services, and (v) each date you worked and the times your worked at the Club.

**ANSWER: Plaintiff objects to the extent this is a multiple part interrogatory, whose components are not related. Plaintiff will therefore answer the first part of the interrogatory only. Plaintiff objects to the terms "indispensable" and "integral" as vague and potentially requiring a legal conclusion.**

**Subject thereto, I worked as a dancer and entertainer, with my work consisting mostly of dancing for, communicating with, and generally entertaining and engaging with Defendants' customers. The focus of the Club is adult entertainment, and that is what I performed for Defendants. I worked for Defendants' benefit, the non-entertainer personnel of the Club's benefit, as well as for my own tips. Every time I worked, I had to pay a fee. For every dance I gave, a portion went to the Club. The Club also made**

money off of credit card sales for my dances and other methods from customers I was entertaining, taking portions of my tips, and the fees I had to pay to perform. The benefit was financial for myself, the Club, and the Club's non-entertainer personnel.  I worked at the Club from January 25, 2018 to March 2020. I typically worked 4 shifts per week and approximately 8 hours per shift.

**INTERROGATORY NO. 4:**
Describe all work or activities you allege to have engaged in at the club before commencement and/or after completion of the work or activities you described in response to Interrogatory No. 4 for which you seek compensation, if any.

**ANSWER: Plaintiff objects the interrogatory is vague and nonsensical.  The interrogatory references the answer in the same interrogatory, which makes it unanswerable at this time.  Plaintiff requires clarification prior to providing objections (if any) and a response to this interrogatory.**

**INTERROGATORY NO. 5:**
With regard to the work or activities set forth in your answers in Interrogatory Nos. 4 and 5, explain, identify, or quantify how much time you engaged in the work or activities on average each day.

**ANSWER: Plaintiff objects the interrogatory is vague and nonsensical.  The interrogatory references the answer in the same interrogatory, which makes it unanswerable at this time.  Plaintiff requires clarification prior to providing objections (if any) and a response to this interrogatory.**

**Subject thereto, to the extent the request asks how long Plaintiff engaged in her dancer/entertainer activities on average each day, the answer is approximately 8 hours per day.**

**INTERROGATORY NO. 6:**
Describe all alleged Rules you claim Defendants required you to comply with concerning or relating to the work activities set forth in your answers to Intenogato1y No. 4 and/or 5 (by way of example only, Rules concerning your behavior, appearance, attire, scheduling, performance or any other means, manner or methods of your work). In your answer, (i) describe how you lean1ed about theseRules, including identification of the participants, the circumstances, substance, andmanner of those communications *(e.g.,* electronic, in writing. or verbal). and (ii)describe the individuals, communications, and circumstances in which you claims those Rules were actually applied, enforced, or threatened  to be enforced  against you.

**ANSWER: Plaintiff objects to the term "Rules," as vague and ambiguous.  Plaintiff objects to the extent this request calls for a narrative, that is more appropriate for deposition testimony and Plaintiff specifically incorporates any responsive deposition testimony into this response.**

Subject thereto, Plaintiff asserts that some policies and procedures were in the application signed upon hiring. Other rules were only verbally provided by management as I was working. If you didn't comply with either set of rules, you would be terminated, fined or otherwise penalized.

Some of the "rules" (as Plaintiff understands that term) Defendants exerted over the dancers included (but are not limited to): 1) Mandatory tip out of at least $20; 2) the more you tip out the other employees, the better you were treated; 3) Club keeps a portion of entertainer's earnings if customer uses a credit card; 4) Pay a house fee each shift I worked; 5) Pay a fee to the manager at the end of each night; 6) Had to wear dance outfits, a thong, dance heels and must be topless on stage; 7) my outfits were subject to management veto and scrutiny; 8) your weight had to be managed or the managers wouldn't let you perform; 9) approval to work more than one shift/day and pay extra house fee; 10) $50 fine if you wanted to leave early, before the end of your shift; 11) $100 fine for not working at least 4 shifts per week.

To the extent discussed/responsive to other discovery responses herein, Plaintiff incorporates her responses in this interrogatory.

## INTERROGATORY NO. 7:

Describe all alleged Rules you claim Defendants required you to comply with concerning or relating to your reporting, remittance, and/or retention of Dance Fees,if any.  In your answer, (i) describe how you learned about these Rules, includingidentification of the participants, the circumstances, substance, and manner of those communications *(e.g.,* electronic, in writing, or verbal) and (ii) describe  the were actually applied, enforced, or threatened to be enforced against you.

ANSWER: Plaintiff objects to the term "Rules," as vague and ambiguous.  Plaintiff objects to the extent this request calls for a narrative, that is more appropriate for deposition testimony and Plaintiff specifically incorporates any responsive deposition testimony into this response.

Subject thereto, Plaintiff asserts that some policies and procedures were in the application signed upon hiring. Other rules were only verbally provided by management as I was working. If you didn't comply with either set of rules, you would be terminated, fined or otherwise penalized. Although customers paid the dancer/entertainer directly for any amount agreed upon, the Club would then require us to pay a portion back to them through house fees, fines and/or tipouts.  Additionally, if a customer paid via credit card, the Club would keep a portion of the agreed upon amounts paid by customers.  The Club also had the right to set a minimum fee charge for my entertainment and required such be paid by any customer I chose to entertain.

Additionally, Plaintiff incorporates her other responses herein as to the Rules imposed on her by Defendants.

## INTERROGATORY NO. 8:

Describe all alleged Rules you claim Respondents required you to comply with concerning or relating to monetary ·penalties.' 'kickbacks.' 'fees' and/or 'fines' that you claim to have paid.

In your answer. (i) describe how you learned about these Rules, including identification for the participants. the circumstances, substance, and manner of those communications *(e.g.,* electronic. in writing, or verbal) and (ii) describe the individuals, communications, and circumstances in which you claim those Rules were actually applied, enforced, or threatened to be enforced against you.

**ANSWER: Plaintiff objects to the term "Rules," as vague and ambiguous.  Plaintiff objects to the extent this request calls for a narrative, that is more appropriate for deposition testimony and Plaintiff specifically incorporates any responsive deposition testimony into this response.**

**Subject thereto, Plaintiff asserts that some policies and procedures were in the application signed upon hiring.  Other rules were only verbally provided by management as I was working. If you didn't comply with either set of rules, you would be terminated, fined or otherwise penalized.**

**Plaintiff incorporates her other responses herein as to the Rules imposed on her by Defendants. In addition to previous Rules discussed, as to fees or fines, including those identified in my responses to Interrogatories No. 6 and 7, Plaintiff alleges the following tipouts applied: 1) $10 tip out to the house mom each shift; 2) $10 tip out to the house mom each shift; 3) $4 tip out to the bartenders each shift; 4) $50 fine for leaving before the end of a shift; 5) $100 fine for not working 4 shifts per week.  All of the monies the dancer/entertainers paid in house fees, manager fees, fines and tipouts were paid solely to and for the benefit of the Club.  These fees and fines were not distributed back to the entertainers.**

### INTERROGATORY NO. 9:

Describe all alleged Rules you claim Respondents required you to comply with concerning or relating to 'sharing· or ·splitting' your Dance Fees with any personnel who you associated with the Club. In your answer, (i) describe how you learned about these Rules, including identification for the participants, the circumstances, substance, and manner of those communications {e.g., electronic, in writing, or verbal) and (ii) describe  the  individuals, communications,  and  circumstances  in which you claims those Rules were actually applied. enforced, or threatened to beenforced against you.

**ANSWER: Plaintiff objects to the term "Rules," as vague and ambiguous.  Plaintiff objects to the extent this request calls for a narrative, that is more appropriate for deposition testimony and Plaintiff specifically incorporates any responsive deposition testimony into this response.**

**Subject thereto, Plaintiff asserts that some policies and procedures were in the application signed upon hiring.  Other rules were only verbally provided by management as I was working. If you didn't comply with either set of rules, you would be terminated, fined or otherwise penalized.**

**Plaintiff incorporates her other responses herein describing the Rules imposed on her to this response. In addition to what I have previously explained, it was communicated**

verbally to me that there was a $20 mandatory tip-out to the DJ and $10 tip out to House Mom per shift. There was also a $50 fine for missing a stage rotation and $20 fine for leaving early.

## INTERROGATORY NO. 10:

Describe the items or services that you contend were necessary to perform your work at the Club, *e.g.,* facilities, goods, equipment, tools, personnel, processes, *etc.*  In your answer, (i) describe the basis for your contention that those items or services were necessary to perform your work, (ii) items or services, (iii) the cost of those items or services. and (iv) identify who bore the costs of those items or services.

**ANSWER: Plaintiff objects to the request as overly broad and that it does not describe with particularity the information to be produced.  Specifically, Plaintiff objects to the terms "items" and "services" as vague and ambiguous.**

**Subject thereto, I supplied/paid for my clothing, dancer heels, as well as my own beauty supplies for hair and makeup. Of course, for any job you work, you need to look presentable, so my hair and makeup were not dancer/entertainer specific costs. Defendants have very strict guidelines on our performance wear, which I was required to follow and was enforced by Club management.**

**Additionally, in order to perform and entertain, I also need a space/floor, dressing room, restroom facilities, poles, lighting, music, DJ, utilities, advertising/signage to inform patrons of the entertainment services, security and/or management, cash register/credit card machines (or other payment processing), custodial services, furniture, separation for VIP and/or private dances, all of whom Defendants are responsible for providing and, as such, I am unaware of the costs of those items.  Defendants also sold and served food and beverages to attract local and out-of-state customers to the club, but, again, Defendants were responsible for providing same and, as such, I am unaware of the costs of such items.**

## INTERROGATORY NO. 11:

Describe whether Respondents imposed any alleged Rules on you that you contend affected your ability to work at any other similar commercial establishments or elsewhere. In your answer, (i) describe how you learned about these Rules, including identification of the participants, the circumstances, substance, and manner of those communications (e.g., electronic, in writing, or verbal) and (describe the individuals, communications, and circumstances in which you claims those Rules were actually applied, enforced, or threatened to be enforced against you.

**ANSWER: No.**

## INTERROGATORY NO. 12:

Describe whether Respondents imposed any alleged Rules on you that you contend affected your ability or desire to promote, advertise, or market the work you described in Interrogatory No. 4. In your answer, (i) describe how you learned about these Rules, including identification of the

participants, the circumstances, substance, and manner of those communications (e.g., electronic, in writing, or verbal), and (ii) describe the individuals, communications, and circumstances in which you claim those Rules were actually applied, enforced, or threatened to be enforced against you.

**ANSWER: Plaintiff objects to the term "Rules," as vague and ambiguous. Plaintiff objects to the extent this request calls for a narrative, that is more appropriate for deposition testimony and Plaintiff specifically incorporates any responsive deposition testimony into this response. Plaintiff objects further as to the relevance of Plaintiff's desire to promote, advertise or market the work she performed for Defendants.**

**Subject thereto, Plaintiff asserts that some policies and procedures were in the application signed upon hiring. Other rules were only verbally provided by management as I was working. If you didn't comply with either set of rules, you would be terminated, fined or otherwise penalized. Plaintiff understood the Club would do the marketing and advertising for its customers/patrons that Plaintiff would then entertain. Plaintiff incorporates her other responses herein as to the Rules imposed on her by Defendants, to the extent applicable.**

## INTERROGATORY NO. 13:

If you contend that the Club's operational control, *e.g.,* control over maintenance of facilities, business hours, aesthetics, inventory of beverages or food, advertising, marketing, promotions, location, *etc.,* affected your opportunity to earn or lose money from your work, describe the facts and communications on which you base your contention.

**ANSWER: Plaintiff objects to the interrogatory as overly broad and unduly burdensome because it asks for 'facts and communications' to support Plaintiff's contention, which goes beyond the requirements of Fed. R. Civ. P. 33.  *See e.g. In & Out Welders, Inc. v. H&E Equip. Services, Inc.*, CV-16-86-JWD-RLB, 2018 WL 1370600, at \*7 (M.D. La. Mar. 16, 2018)("As with any interrogatory, however, a contention interrogatory may be overly broad where it seeks 'each and every' single fact upon which a party basis its case"); *Alexander v. Hartford Life and Acc. Ins. Co.,* No. 3-07-CV-1486, 2008 WL 906786, at \*4 (N.D. Tex. April 3, 2008)(Interrogatories only require a general explanation of the factual basis of the claimed contention). Additionally, this case is in the early stages of discovery, and this interrogatory may not be fully answerable until such time as discovery is complete. See Fed. R. Civ. P. 33, and Advisory Note ("Since interrogatories involving mixed questions of law and fact may create disputes between the parties which are bet resolved after much or all other discovery has been completed, the court is expressly authorized to defer an answer.")**

**Subject thereto, based on the information available to date, yes. The price of food and/or beverages would be a draw to customers. Additionally, advertising or marketing and promotions of big events or parties at the Club would draw more customers. The cleanliness, service, décor of the Club would keep customers coming in. More customers in the Club effected my ability to earn.**

## INTERROGATORY NO. 14:

Do you have accurate records or reliable documentation of the Entertainer Fees (as defined in the Licensing Agreement attached to your Arbitration Demand as Exhibit 1) you received while providing services or performing at the Club?

**ANSWER: Plaintiff objects to this request as inappropriately attempting to shift a burden of record keeping to Plaintiff, as opposed to her alleged Employers, as that term is defined by the FLSA.  Any answer Plaintiff would provide, would therefore be misleading to a jury as assuming Plaintiff had any obligation to do so or account for her tips as 'Entertainer Fees.'**

**<u>INTERROGATORY NO. 15:</u>**
Describe any and all communications between you and either Respondent regarding your claims in this Case, providing the dates, times persons involved and substance of the communications.

**ANSWER: Plaintiff objects to the request as overly broad and that it does not describe with particularity the information to be produced and potentially includes any conversation Plaintiff had with anyone at the Club or its ownership over the course of her work period.    Specifically,    Plaintiff   objects   to   the   terms "communications…regarding your claims in this Case" as vague and ambiguous.**

**Subject thereto, Plaintiff conversed with management of the Club on a regular basis when she was working at the Club.  It would be impossible to recall specific conversations that may relate to anything Plaintiff has claimed in this lawsuit.  To the extent Plaintiff has described her interactions with the Club in other responses, she incorporates such hereto.**

**<u>INTERROGATORY NO. 16:</u>**
If you contend that any of the Respondents bear liability to you under a 'joint employer' or similar theory of vicarious liability, please describe the factual and legal basis for your contentions as to each named Defendant.

**ANSWER: Plaintiff objects to the interrogatory as overly broad and unduly burdensome because it asks for 'all facts' to support Plaintiff's contention, which goes beyond the requirements of Fed. R. Civ. P. 33.  *See e.g. In & Out Welders, Inc. v. H&E Equip. Services, Inc.,* CV-16-86-JWD-RLB, 2018 WL 1370600, at \*7 (M.D. La. Mar. 16, 2018)("As with any interrogatory, however, a contention interrogatory may be overly broad where it seeks 'each and every' single fact upon which a party basis its case"); *Alexander v. Hartford Life and Acc. Ins. Co.,* No. 3-07-CV-1486, 2008 WL 906786, at \*4 (N.D. Tex. April 3, 2008)(Interrogatories only require a general explanation of the factual basis of the claimed contention.  Additionally, this case is in the early stages of discovery, and this interrogatory may not be fully answerable until such time as discovery is complete. See Fed. R. Civ. P. 33, and Advisory Note ("Since interrogatories involving mixed questions of law and fact may create disputes between the parties which are bet resolved after much or all other discovery has been completed, the court is expressly authorized to defer an answer.")**

**Subject thereto, the legal and factual basis for Plaintiff's contention Defendants bear**

liability to Plaintiff under a "joint employer" theory can be found in her operative Complaint and the text of the Fair Labor Standards Act, and any other codes/statutes referenced therein. The Club, and its officers/owners were Plaintiff's employer(s) as that term is defined by the FLSA. The officers/owners of the Club acted directly or indirectly in the interest of the Club, as relates to Plaintiff or any of the dancer/entertainers at the Club. Defendants jointly were required to maintain Plaintiff's employment records, as well as determine the conditions of Plaintiff's employment (including the facility and other terms imposed by management of the Club), were ultimately responsible for any earnings or classification of Plaintiff as an independent contractor, and supervised and/or controlled Club management.

**INTERROGATORY NO. 17:**
Provide the method of calculation and amount you claim is due and owing to you by the Club as wages, overtime, or any other amounts due.

 **ANSWER: See Plaintiff's Initial Disclosures, as well as any amendments or supplements thereto. Until such time as Defendants provide all documented evidence of Plaintiff's work (if any), this interrogatory and/or Plaintiff's disclosures will be based on Plaintiff's reasonable estimates of her dates/hours worked during the Relevant Period, as well as the average fees, fines and tipouts Plaintiff recalls paying per shift.**

**INTERROGATORYN0.18:**
Describe and quantify (i) the hours and days per workweek that you claim to have performed at the Club during the Relevant Period (e.g., #hours on# days between July 15, 2018 - July 15, 2021 (ii) identify each date and number of hours on each such date performed at the Club, and (iii) identify any and all documents, methods, or sources of information you relied upon or referred to in providing your answer.

**ANSWER: Plaintiff objects to the extent this interrogatory is actually multiple interrogatories concerning different subject matters. As such, Plaintiff will answer only one as it is enumerated.**

**Subject thereto, I typically worked at least 4 shifts per week per Defendants' requirements, 8 hours per shift.**

**INTERROGATORY NO. 19:**
Describe (i) whether you had a fixed workweek at the Club and how that workweek was established, (ii) identify the workweeks in which you claim to have worked in excess of forty (40) hours, and (iii) and quantify how many hours in excess of 40 you claimed to have worked in those workweeks (e.g.,# total overtime hours) July 15, 2018 - July 15, 2021.

**ANSWER: Plaintiff objects to the extent this interrogatory is actually multiple interrogatories concerning different subject matters. As such, Plaintiff will answer only one as it is enumerated.**

**Subject thereto, the Club requires you to work at least 4 days per week or you were subject to a $100 fine, so therefore I worked at least 4 shifts per week.**

## INTERROGATORY NO. 20:

Identify all usernames, hashtags, screennames, and/or handles you have used or created on any social media platform - including but not limited to Facebook, Twitter, WhatsApp, Tumblr, Instagram, Messenger, SnapChat, TikTok, biogs, etc. - during the Relevant Period through which you have communicated with anyone employed by or affiliated with the Club about your work or activities at the Club, the subject matter of this Case, or any Rules.

**ANSWER: Plaintiff objects to the request as overly broad and is not reasonably calculated to lead to the discovery of admissible evidence. The request is not proportionate to the needs of this case, in that it requests unfettered access to Plaintiff's private social media accounts without a particular limitation or description of the item or information requested.**

## INTERROGATORY NO. 21:

If you contend the Club is engaged in interstate commerce, please describe the legal and factual basis for your contention.

**ANSWER: Plaintiff objects to the interrogatory as overly broad and unduly burdensome because it asks for 'all facts' to support Plaintiff's contention, which goes beyond the requirements of Fed. R. Civ. P. 33. *See e.g. In & Out Welders, Inc. v. H&E Equip. Services, Inc.*, CV-16-86-JWD-RLB, 2018 WL 1370600, at \*7 (M.D. La. Mar. 16, 2018)("As with any interrogatory, however, a contention interrogatory may be overly broad where it seeks 'each and every' single fact upon which a party basis its case"); *Alexander v. Hartford Life and Acc. Ins. Co.,* No. 3-07-CV-1486, 2008 WL 906786, at \*4 (N.D. Tex. April 3, 2008)(Interrogatories only require a general explanation of the factual basis of the claimed contention. Additionally, this case is in the early stages of discovery, and this interrogatory may not be fully answerable until such time as discovery is complete. See Fed. R. Civ. P. 33, and Advisory Note ("Since interrogatories involving mixed questions of law and fact may create disputes between the parties which are bet resolved after much or all other discovery has been completed, the court is expressly authorized to defer an answer.")**

**Subject thereto, the legal and factual basis for Plaintiff's contention the Club is engaged in interstate commerce can be found in her operative Complaint and the text of the Fair Labor Standards Act, and any other codes/statutes referenced therein. Congress "has determined that certain classes of activities have a sufficient impact upon interstate commerce to warrant regulation of the entire class, regardless of whether an individual instance of the activity in question can be shown to be in or to affect commerce." *Gulf Oil Corp. v. Copp Paving Co., Inc.*, 419 U.S. 186, 208 (1974). On information and belief, the Club is engaged in interstate commerce either through use of streaming music, food and/or beverage sales (if any), or catering or advertising to patrons from outside the state, or the myriad of other ways the Club could be found to engage in interstate commerce pursuant to the FLSA.**

## INTERROGATORY NO. 22:

If you contend Respondents acted willfully in violating the Fair Labor Standards Act, describe the legal and factual basis for such contentions.

**ANSWER: Plaintiff objects to the interrogatory as overly broad and unduly burdensome because it asks for 'all facts' to support Plaintiff's contention, which goes beyond the requirements of Fed. R. Civ. P. 33.** *See e.g. In & Out Welders, Inc. v. H&E Equip. Services, Inc.*, **CV-16-86-JWD-RLB, 2018 WL 1370600, at \*7 (M.D. La. Mar. 16, 2018)("As with any interrogatory, however, a contention interrogatory may be overly broad where it seeks 'each and every' single fact upon which a party basis its case");** *Alexander v. Hartford Life and Acc. Ins. Co.*, **No. 3-07-CV-1486, 2008 WL 906786, at \*4 (N.D. Tex. April 3, 2008)(Interrogatories only require a general explanation of the factual basis of the claimed contention. Additionally, this case is in the early stages of discovery, and this interrogatory may not be fully answerable until such time as discovery is complete. See Fed. R. Civ. P. 33, and Advisory Note ("Since interrogatories involving mixed questions of law and fact may create disputes between the parties which are bet resolved after much or all other discovery has been completed, the court is expressly authorized to defer an answer.")**

**Subject thereto, the legal and factual basis for Plaintiff's contention Defendants' acted willfully in violating the FLSA can be found in her operative Complaint and the text of the Fair Labor Standards Act, and any other codes/statutes referenced therein. Plaintiff also refers Defendants to prior FLSA actions against Defendants, including but not limited to Case No. 3:20-cv-00513,** *Julia Predmore v. Nick's Clubs, Inc. d/b/a PT's Men's Club, et al.* **in the Northern District of Texas, and its later arbitration action.**

### INTERROGATORY NO. 23:

If you contend you are entitled to attorney's fees and costs, please describe the legal and factual basis for such contention, inclusive of the amount and basis of calculation.

**ANSWER: Plaintiff objects to the interrogatory as overly broad and unduly burdensome because it asks for 'all facts' to support Plaintiff's contention, which goes beyond the requirements of Fed. R. Civ. P. 33.** *See e.g. In & Out Welders, Inc. v. H&E Equip. Services, Inc.*, **CV-16-86-JWD-RLB, 2018 WL 1370600, at \*7 (M.D. La. Mar. 16, 2018)("As with any interrogatory, however, a contention interrogatory may be overly broad where it seeks 'each and every' single fact upon which a party basis its case");** *Alexander v. Hartford Life and Acc. Ins. Co.*, **No. 3-07-CV-1486, 2008 WL 906786, at \*4 (N.D. Tex. April 3, 2008)(Interrogatories only require a general explanation of the factual basis of the claimed contention. Additionally, this case is in the early stages of discovery, and this interrogatory may not be fully answerable until such time as discovery is complete. See Fed. R. Civ. P. 33, and Advisory Note ("Since interrogatories involving mixed questions of law and fact may create disputes between the parties which are bet resolved after much or all other discovery has been completed, the court is expressly authorized to defer an answer.")**

**Subject thereto, the legal and factual basis for Plaintiff's contention she is owed attorneys' fees and costs can be found in her operative Complaint and the text of the Fair Labor Standards Act, and any other codes/statutes referenced therein. Plaintiff has incurred court costs, expenses and attorneys' fees by prosecuting this action, for which**

the FLSA provides a successful Plaintiff a recovery. The amount of the expenses and fees claimed is the subject of expert testimony by Plaintiff's counsel and will be submitted in accordance with Federal law and the rules of this Court. See also Plaintiff's Initial Disclosures and any supplements thereto.

**INTERROGATORY NO. 24:**
State each of the dates and times you worked at the Club July 15, 2018 to July 15, 2021.

**ANSWER: I typically worked at least 4 shifts per week, 7-8 hours per shift.**

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| BROOKE LAYTON, individually and on behalf of all other similarly situated, *Plaintiff,* | § § § § | |
| v. | § § | CIVIL ACTION NO. 3:21-cv-01636-N |
| MAINSTAGE MANAGEMENT, INC., NICK'S MAINSTAGE, INC. – DALLAS PT'S d/b/a PT'S MEN'S CLUB and NICK MEHMETI, *Defendants.* | § § § § § § § | COLLECTIVE ACTION JURY DEMANDED |

**PLAINTIFF ASHLYNN SHIPLEY'S OBJECTIONS AND RESPONSES TO DEFENDANT MAINSTAGE MANAGEMENT, INC.'S FIRST REQUEST FOR ADMISSION**

TO:   Defendant, MAINSTAGE MANAGEMENT, INC., by and through its attorney of record, Latrice E. Andrews and Y. Craig Sheils, SHEILS WINNUBST, PC, 1100 Atrium II 1701, N. Collins Blvd., Richardson, TX 75080.

Plaintiff Ashlynn Shipley, by and through the undersigned counsel of record, serves her objections and responses to Defendant Mainstage Management, Inc.'s First Requests for Admission.

Dated: June 27, 2022                           Respectfully submitted,

                                               */s/ Leigh S. Montgomery*
                                               Jarrett L. Ellzey
                                               Texas Bar No. 24040864
                                               Leigh Montgomery
                                               Texas Bar No. 24052214
                                               **ELLZEY & ASSOCIATES, PLLC**
                                               1105 Milford Street
                                               Houston, Texas 77006
                                               Telephone: (713) 554-2377
                                               Facsimile: (888) 276-3455
                                               jarrett@ellzeylaw.com
                                               leigh@ellzeylaw.com

                                               ***Attorneys for Plaintiff***

## CERTIFICATE OF SERVICE

I hereby certify that on June 27, 2022, a true and correct copy of the foregoing document was served on all counsel of record via Certified U.S. Mail, pursuant to the Federal Rules of Civil Procedure.

**Via CMRRR 7021 0950 0001 7128 8908**
Ms. Latrice E. Andrews
Mr. Roger Albright
Sheils Winnubst, PC
1100 Atrium II
1700 N. Collins Blvd
Richardson, Texas 75080
latrice@sheilswinnubst.com
ralbright@sheilswinnubst.com

*/s/ Leigh S. Montgomery*
Leigh S. Montgomery

**PLAINTIFF ASHLYNN SHIPLEY'S OBJECTIONS AND RESPONSES
TO DEFENDANT'S REQUEST FOR ADMISSIONS**

**REQUEST FOR ADMISSION NO. 1.**
Admit that you signed an Independent Contractor Checklist with the Club on January 17, 2019.

**RESPONSE:  Plaintiff Admits to signing paperwork with the Club.  Otherwise, denied.**

**REQUEST FOR ADMISSION NO 2.**
Admit that you signed an Independent Contractor Agreement with the Club on January 25, 2018, January 2, 2019, and January 23, 2020.

**RESPONSE:  Plaintiff Admits to signing paperwork with the Club.  Otherwise, denied.**

**REQUEST FOR ADMISSION  NO. 3:**
Admit that the Exhibit A-2 of the Declaration of Nick Mehmeti filed as part of ECF No. 37 in this Case are true and correct copy of the Licensing Agreement between you and the Club.

**RESPONSE: Plaintiff does not have the memory to admit or deny this request, but it sounds accurate.**

**REQUEST FOR ADMISSION NO. 4:**
Admit that you consented to a Criminal History Record being provided to the Club.

**RESPONSE: Admit that it is usually required to perform.  Otherwise, deny.**

**REQUEST FOR ADMISSION NO. 5:**
Admit that you went to Bio Verify on January 31, 2018, March 16, 2019, and January 31, 2020 to have a criminal history record search performed.

**RESPONSE: Plaintiff does not have the memory to admit or deny this request, but it sounds accurate.**

**REQUEST FOR ADMISSION NO. 6:**
Admit that you began to perform at the Club on September 30, 2018.

**RESPONSE: Admit**

**REQUEST FOR ADMISSION NO. 7:**
Admit that you did not perform at the Club after 2020.

**RESPONSE: Admit**

**REQUEST FOR ADMISSION NO. 8:**
Admit that you were required to sign-in upon arriving at the Club to perform.

*Pltf's Obj & Answ. to
Defendant's Discovery*                                                        *Page 16 of 42*
**PLTFS APPX 000062**

**RESPONSE**: **Admit to the extent it was generally a Rule at some time during Plaintiff's work at the Club, but not enforced.  Otherwise, Deny.**

**REQUEST FOR ADMISSION NO. 9:**
Admit that you received payment from patrons or customers of the Club.

**RESPONSE:** **Admit to the extent I received tip money for my performance.  Otherwise, deny.**

**REQUEST FOR ADMISSION NO. 10:**
Admit that you did not have a set schedule at the Club.

**RESPONSE:**   **Admit the Club did not force a set schedule of days of the week I had to perform.  Otherwise, deny.**

**REQUEST FOR ADMISSION NO. 11:**
Admit that you purchased costumes and attire to perform your services at the Club.

**RESPONSE**:  **Admit**

**REQUEST FOR ADMISSION NO. 12:**
Admit that you determined how you would performance at the Club.

**RESPONSE:** **Admit to the extent I created my choreography for my performance. Deny, as to anything further.**

**REQUEST FOR ADMISSION NO. 13:**
Admit that you determined what days you would work at the Club.

**RESPONSE:** **Deny**

**REQUEST FOR ADMISSION NO. 14:**
Admit that you did not pay the Club any portion of the income you received from the patrons or customers of the Club.

**RESPONSE**:  **Deny**

**REQUEST FOR ADMISSION NO. 15:**
Admit that you received income related to your services at the Club.

**RESPONSE:** **Admit to the extent I received money for my performances. Otherwise, Deny.**

**REQUEST FOR ADMISSION NO. 16:**
Admit that you did not expect to paid by the Club for the services.

*Pltf's Obj & Answ. to*
*Defendant's Discovery*                                                      *Page 17 of 42*
**PLTFS APPX 000063**

**RESPONSE:** Plaintiff objects as vague to the term 'services.'  Plaintiff answers to the extent 'services' is her work at the Club. Subject thereto, admit to the extent the Club never paid me for my work at the Club.  Otherwise, deny.

**REQUEST  FOR ADMISSION NO. 17**
Admit that you agreed to be an independent contractor for the Club.

**RESPONSE:**  **Admit to the extent I thought I was going to be treated like an independent contractor, but I never was.  So, otherwise, deny.**

**REQUEST FOR ADMISSION NO. 18:**
Admit that you had a skill of dancing.

**RESPONSE: Admit**

**REQUEST FOR ADMISSION NO. 19:**
Admit that you practiced dancing for your performance.

**RESPONSE: Admit**

**REQUEST FOR ADMISSION NO. 20:**
Admit that you trained to perform your dances at the Club.

**RESPONSE: Deny**

**REQUEST  FOR  ADMISSION  NO. 21:**
Admit that you had a stage name.

**RESPONSE: Admit**

**REQUEST FOR  ADMISSION  NO. 22:**
Admit that you market your performances on social media sites such as Facebook and Instagram.

**RESPONSE: Deny**

**REQUEST FOR ADMISSION NO. 23:**
Admit that you advertise your performances

**RESPONSE: Deny**

**REQUEST  FOR  ADMISSION  NO. 24:**
Admit that you have sources of income related to dancing.

*Pltf's Obj & Answ. to*
*Defendant's Discovery*                                                                 *Page 18 of 42*
**PLTFS APPX 000064**

**RESPONSE: Admit as to exotic dancing.  Otherwise, deny.**

**REQUEST FOR ADMISSION NO. 25:**
Admit that you use social media (such as Facebook or Instagram) to make money related to your dancing.

**RESPONSE: Deny**

**REQUEST FOR ADMISSION NO. 26:**
Admit that you provide private events and performances related to your exotic dancing.

**RESPONSE: Deny**

**REQUEST FOR ADMISSION NO. 27:**
Admit or deny that you never worked in excess of forty (40) hours in a workweek during your time as a performer at the Club.

**RESPONSE: Deny**

**REQUEST FOR ADMISSION NO. 28:**
Admit or deny that no one with the Club ever instructed you what days of the week you were required to perform.

**RESPONSE: Deny**

**REQUEST FOR ADMISSION NO. 29:**
Admit or deny that no one with the Club ever instructed you what days of the week you were not allowed to perform.

**RESPONSE: Deny**

**REQUEST FOR ADMISSION NO. 30:**
Admit or deny that no one with the Club ever instructed you what hours of the day you were required perform.

**RESPONSE: Deny**

**REQUEST FOR ADMISSION NO. 31:**
Admit or deny that no one with the Club ever instructed you what hours of the day you were not allowed to perform.

**RESPONSE: Deny**

**REQUEST FOR ADMISSION NO. 32:**

*Pltf's Obj & Answ. to*
*Defendant's Discovery*                                                                              *Page 19 of 42*
**PLTFS APPX 000065**

Admit or deny that you have no documents (in either electronic or written form) in your possession, custody, or control related to your answer in Interrogatory No. 4.

**RESPONSE: Plaintiff can only provide a response to this request, subject to her objections to interrogatory No. 4, which are specifically incorporated herein. Plaintiff further objections to term "related to," as vague, overly broad, and unduly burdensome. Plaintiff also objects to this request as an improper request for admission because it does not request Plaintiff to admit to the truth of any facts, application of law to fact or opinions of such or the genuiness of described documents.**

### REQUEST FOR ADMISSION NO. 33:
Admit or deny that you have no documents (in either electronic or written form) in your possession, custody, or control related to your answer in Interrogatory No. 5.

**RESPONSE: Plaintiff can only provide a response to this request, subject to her objections to interrogatory No. 5, which are specifically incorporated herein. Plaintiff further objections to term "related to," as vague, overly broad, and unduly burdensome. Plaintiff also objects to this request as an improper request for admission because it does not request Plaintiff to admit to the truth of any facts, application of law to fact or opinions of such or the genuiness of described documents.**

### REQUEST FOR ADMISSION NO. 34:
Admit or deny that you have no documents (in either electronic or written form) in your possession, custody, or control related to your answer in Interrogatory No. 3.

**RESPONSE: Plaintiff can only provide a response to this request, subject to her objections to interrogatory No. 5, which are specifically incorporated herein. Plaintiff further objections to term "related to," as vague, overly broad, and unduly burdensome. Plaintiff also objects to this request as an improper request for admission because it does not request Plaintiff to admit to the truth of any facts, application of law to fact or opinions of such or the genuiness of described documents.**

### REQUEST FOR ADMISSION NO. 35:
Admit or deny that you have no documents (in either electronic or written form) in your possession, custody, or control related to your answer in Interrogatory No. 8.

**RESPONSE: Plaintiff can only provide a response to this request, subject to her objections to interrogatory No. 8, which are specifically incorporated herein. Plaintiff further objections to term "related to," as vague, overly broad, and unduly burdensome. Plaintiff also objects to this request as an improper request for admission because it does not request Plaintiff to admit to the truth of any facts, application of law to fact or opinions of such or the genuiness of described documents.**

### REQUEST FOR ADMISSION NO. 36:
Admit or deny that you have no documents (in either electronic or written form) in your possession, custody, or control related to your answer in Interrogatory No. 7.

**RESPONSE**: **Plaintiff can only provide a response to this request, subject to her objections to interrogatory No. 7, which are specifically incorporated herein.  Plaintiff further objections to term "related to," as vague, overly broad, and unduly burdensome. Plaintiff also objects to this request as an improper request for admission because it does not request Plaintiff to admit to the truth of any facts, application of law to fact or opinions of such or the genuiness of described documents.**

 **REQUEST  FOR ADMISSION  NO. 37:**
Admit or deny that you have no documents (in either electronic or written form) in your possession, custody, or control related to your answer in Interrogatory No. 9.

**RESPONSE**: **Plaintiff can only provide a response to this request, subject to her objections to interrogatory No. 9, which are specifically incorporated herein.  Plaintiff further objections to term "related to," as vague, overly broad, and unduly burdensome. Plaintiff also objects to this request as an improper request for admission because it does not request Plaintiff to admit to the truth of any facts, application of law to fact or opinions of such or the genuiness of described documents.**

 **REQUEST FOR ADMISSION NO. 38:**
Admit or deny that you have no documents (in either electronic or written form) in your possession, custody, or control related to your answer in Interrogatory No. 10.

**RESPONSE**: **Plaintiff can only provide a response to this request, subject to her objections to interrogatory No. 10, which are specifically incorporated herein.  Plaintiff further objections to term "related to," as vague, overly broad, and unduly burdensome. Plaintiff also objects to this request as an improper request for admission because it does not request Plaintiff to admit to the truth of any facts, application of law to fact or opinions of such or the genuiness of described documents.**

 **REQUEST FOR ADMISSION  NO. 39:**
Admit or deny that you have no documents (in either electronic or written form) in your possession, custody, or control related to your answer in Interrogatory No. 11.

**RESPONSE**: **Plaintiff can only provide a response to this request, subject to her objections to interrogatory No. 11, which are specifically incorporated herein.  Plaintiff further objections to term "related to," as vague, overly broad, and unduly burdensome. Plaintiff also objects to this request as an improper request for admission because it does not request Plaintiff to admit to the truth of any facts, application of law to fact or opinions of such or the genuiness of described documents.**

 **REQUEST FOR ADMISSION NO. 40:**
Admit or deny that you have no documents (in either electronic or written form) in your possession, custody, or control related to your answer in Interrogatory No. 12.

**RESPONSE**: **Plaintiff can only provide a response to this request, subject to her objections to**

*Pltf's Obj & Answ. to*
*Defendant's Discovery*                                               *Page 21 of 42*
**PLTFS APPX 000067**

interrogatory No. 12, which are specifically incorporated herein.  Plaintiff further objections to term "related to," as vague, overly broad, and unduly burdensome. Plaintiff also objects to this request as an improper request for admission because it does not request Plaintiff to admit to the truth of any facts, application of law to fact or opinions of such or the genuiness of described documents.

### REQUEST  FOR ADMISSION NO. 41:
Admit or deny that you have no documents (in either electronic or written form) in your possession, custody, or control related to your answer in Interrogatory No. 13.

**RESPONSE**: Plaintiff can only provide a response to this request, subject to her objections to interrogatory No. 13, which are specifically incorporated herein.  Plaintiff further objections to term "related to," as vague, overly broad, and unduly burdensome. Plaintiff also objects to this request as an improper request for admission because it does not request Plaintiff to admit to the truth of any facts, application of law to fact or opinions of such or the genuiness of described documents.

### REQUEST FOR ADMISSION NO. 42:
Admit or deny that you have no documents (in either electronic or written form) in your possession, custody, or control related to your answer in Interrogatory No. 18.

**RESPONSE**: Plaintiff can only provide a response to this request, subject to her objections to interrogatory No. 18, which are specifically incorporated herein.  Plaintiff further objections to term "related to," as vague, overly broad, and unduly burdensome. Plaintiff also objects to this request as an improper request for admission because it does not request Plaintiff to admit to the truth of any facts, application of law to fact or opinions of such or the genuiness of described documents.

### REQUEST  FOR  ADMISSION  NO. 43:
Admit or deny that you have no documents (in either electronic or written form) in your possession, custody, or control related to your answer in Interrogatory No. 19.

**RESPONSE**: Plaintiff can only provide a response to this request, subject to her objections to interrogatory No. 19, which are specifically incorporated herein.  Plaintiff further objections to term "related to," as vague, overly broad, and unduly burdensome. Plaintiff also objects to this request as an improper request for admission because it does not request Plaintiff to admit to the truth of any facts, application of law to fact or opinions of such or the genuiness of described documents.

### REQUEST FOR ADMISSION NO. 44:
Admit or deny that you reported to the Club all income you received during the Relevant Period.

**RESPONSE**: Deny

### REQUEST FOR ADMISSION NO. 45:
Admit that you never received any share of money from the Club's receipt of cover charges.

*Pltf's Obj & Answ. to*
*Defendant's Discovery*                                                  *Page 22 of 42*
**PLTFS APPX 000068**

**RESPONSE: Admit**

**REQUEST FOR ADMISSION NO. 46:**
Admit that you never received any share of money from the Club's sales of food.

**RESPONSE: Admit**

**REQUEST FOR ADMISSION NO. 47:**
Admit that you never received any share of money from the Club's sales of alcohol.

**RESPONSE: Admit**

**REQUEST FOR ADMISSION NO. 48:**
Admit that the amount of your income increased when the Club ran advertising.

**RESPONSE: Admit**

**REQUEST FOR ADMISSION NO. 49:**
Admit that the amount of your income increased when the Club ran promotions.

**RESPONSE: Admit**

**REQUEST FOR ADMISSION NO. 50:**
Admit that the amount of your income increased depending on the Club's choice of decor.

**RESPONSE: Plaintiff does not have the information to admit or deny this request. Plaintiff would need Defendant to specify the 'choice of décor,' at issue.**

**REQUEST FOR ADMISSION NO. 51:**
Admit that you asked the Club's DJs to have certain music played during your work.

**RESPONSE: Admit to the extent that I had to pay the DJ for certain music to be played during my work. Otherwise, deny.**

**REQUEST FOR ADMISSION NO. 52:**
Admit or deny there was a maximum amount you could charge for a lap dance.

**RESPONSE: Deny**

**REQUEST FOR ADMISSION NO. 53:**
Admit or deny there was a minimum amount you could charge for a lap dance.

**RESPONSE: Admit**

**REQUEST FOR ADMISSION NO. 54:**
Admit or deny that Respondents told you what kind of attire you were required to wear.

**RESPONSE:  Admit**

**REQUEST FOR ADMISSION NO. 55:**
Admit that Respondents never purchased any kind of clothing, apparel, or beauty products for you.

**RESPONSE:  Admit**

**REQUEST FOR ADMISSION NO. 56:**
Admit that your physical appearance affected your opportunity to make a profit.

**RESPONSE:  Admit, to the extent I earn my living by dancing.  Deny as to anything further.**

**REQUEST FOR ADMISSION NO. 57:**
Admit or deny that exotic dancers are integral to Respondents' business.

**RESPONSE:  Admit**

**REQUEST FOR ADMISSION NO. 58:**
Admit or deny that you rendered services to the public.

**RESPONSE: Plaintiff objects to the extent this request is vague and ambiguous as to the term 'public,' as utilized in this case.  Plaintiff admits to the extent she worked as an exotic dancer/entertainer at Defendant's club for the Club's patrons.  Otherwise, deny.**

**REQUEST FOR ADMISSION NO. 59:**
Admit or deny that customers paid money to the Club for each lap dance you performed.

**RESPONSE: Admit to the extent the Club took a portion of my tips from customers. Otherwise, deny.**

**REQUEST FOR ADMISSION NO. 60:**
Admit or deny that no one with the Club prevented you from performing at other gentlemen's clubs during the Relevant Period.

**RESPONSE:  Admit**

**REQUEST FOR ADMISSION NO. 61:**
Admit or deny that you used skill in the performance of the work you described in your answer to Interrogatory No. 4.

**RESPONSE:  Plaintiff incorporates her objections to interrogatory No. 4 herein.  Subject thereto, to the extent that term is understood applicable to dancer/entertainer FLSA cases,**

deny. *Reich v. Circle C Investments, Inc.*, 998 F.2d 324, 328 (5th Cir. 1993).

**REQUEST FOR ADMISSION NO. 62:**
Admit that you exercised initiative in the performance of the work you described in your answer to
Interrogatory No. 4.

**RESPONSE:  Plaintiff incorporates her objections to interrogatory No. 4 herein.  Subject
thereto, to the extent that term is understood applicable to dancer/entertainer FLSA cases,
deny.  *Reich v. Circle C Investments, Inc.*, 998 F.2d 324, 328 (5th Cir. 1993).**

**REQUEST FOR ADMISSION NO. 63:**
Admit or deny that you filed a tax return for tax year 2018.

**RESPONSE:  Admit**

**REQUEST FOR ADMISSION NO. 64:**
Admit or deny that you filed a tax return in 2019.

**RESPONSE: Admit**

**REQUEST FOR ADMISSION NO. 65:**
Admit or deny that you are responsible for reimbursing your attorneys for all out-of-pocket
expenses in connection with this matter.

**RESPONSE: Admit to the extent my contract requires if there is any sort of payment in
this case, I am responsible for reimbursing my counsel for any expenses incurred on my
behalf in this case.**

**REQUEST FOR ADMISSION NO. 66:**
Admit or deny that Claimant's cell phone had location services activated during the time she alleges
to have performed at the Club.

**RESPONSE:  Plaintiff does not have the information to admit or deny this request and
would not be able to get such information from that period in time.**

**REQUEST FOR ADMISSION NO. 67:**
Admit or deny that Claimant has never sent or received a text message to or from anyone affiliated
with Respondents concerning the Rules she identified in answer to her interrogatories during the
Relevant Period.

**RESPONSE:  Deny**

**REQUEST FOR ADMISSION NO. 68:**
Admit or deny that Claimant has never sent or received a text message to or from anyone affiliated
with Respondents concerning the subject matter of the Complaint during the Relevant Period.

*Pltf's Obj & Answ. to*
*Defendant's Discovery*                                                          *Page 25 of 42*
**PLTFS APPX 000071**

**RESPONSE:  Deny**

*Pltf's Obj & Answ. to*
*Defendant's Discovery*                                                      *Page 26 of 42*
**PLTFS APPX 000072**

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| BROOKE LAYTON, individually and on behalf of all other similarly situated, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | CIVIL ACTION NO. 3:21-cv-01636-N |
| MAINSTAGE MANAGEMENT, INC., | § | |
| NICK'S MAINSTAGE, INC. – DALLAS | § | COLLECTIVE ACTION |
| PT'S d/b/a PT'S MEN'S CLUB and NICK | § | JURY DEMANDED |
| MEHMETI, | § | |
| Defendants. | § | |
| | § | |

## PLAINTIFF ASHLYNN SHIPLEY'S OBJECTIONS AND RESPONSES TO DEFENDANT MAINSTAGE MANAGEMENT, INC.'S FIRST REQUEST FOR PRODUCTION

TO:     Defendant, MAINSTAGE MANAGEMENT, INC., by and through its attorney of record, Latrice E. Andrews and Y. Craig Sheils, Sheils Winnubst, PC, 1100 Atrium II 1701, N. Collins Blvd., Richardson, TX 75080.

Plaintiff Ashlynn Shipley, by and through the undersigned counsel of record, serves her

objections and responses to Defendant Mainstage Management, Inc.'s First Request for Production.

Dated: June 27, 2022                              Respectfully submitted,

                                                 /s/  Leigh S. Montgomery
                                                 Jarrett L. Ellzey
                                                 Texas Bar No. 24040864
                                                 Leigh Montgomery
                                                 Texas Bar No. 24052214
                                                 **ELLZEY & ASSOCIATES, PLLC**
                                                 1105 Milford Street
                                                 Houston, Texas 77006
                                                 Telephone: (713) 554-2377
                                                 Facsimile: (888) 276-3455
                                                 jarrett@ellzeylaw.com
                                                 leigh@ellzeylaw.com

                                                 ***Attorneys for Plaintiff***

*Pltf's Obj & Answ. to*
*Defendant's Discovery*                                    *Page 27 of 42*
**PLTFS APPX 000073**

## <u>CERTIFICATE OF SERVICE</u>

      I hereby certify that on June 27, 2022, a true and correct copy of the foregoing document was served on all counsel of record via Certified U.S. Mail, pursuant to the Federal Rules of Civil Procedure.

**Via CMRRR 7021 0950 0001 7128 8908**
Ms. Latrice E. Andrews
Mr. Roger Albright
Sheils Winnubst, PC
1100 Atrium II
1700 N. Collins Blvd
Richardson, Texas 75080
latrice@sheilswinnubst.com
ralbright@sheilswinnubst.com

*/s/ Leigh S. Montgomery*
Leigh S. Montgomery

*Pltf's Obj & Answ. to*
*Defendant's Discovery*                                    *Page 28 of 42*
**PLTFS APPX 000074**

## PLAINTIFF ASHLYNN SHIPLEY'S OBJECTIONS AND RESPONSES
## TO DEFENDANT'S REQUEST FOR PRODUCTION

### REQUEST FOR PRODUCTION NO. 1:

Claimant's identification, driver's license, passport and other identifying document issued by the United States government or the government of any state of the United States.

**RESPONSE: Plaintiff objects as irrelevant to the claims and defenses asserted. Plaintiff further objects this request is not proportional to the needs of the case, given the importance of the discovery in resolving the issues and the burden of the proposed discovery outweighs any possible benefit.**

**Subject thereto, a copy of Plaintiff's driver's license can be made available for review at the office of Plaintiff's counsel on a mutually agreed upon date and time.**

### REQUEST FOR PRODUCTION NO. 2:

All W-2 forms, 1099 forms, bank statements and other income reporting forms that evidence your income from the Club or any other person from whom your worked or provided services during the Relevant Period.

**RESPONSE: Plaintiff objects as irrelevant to the claims and defenses asserted. Plaintiff further objects this request is not proportional to the needs of the case, given the importance of the discovery in resolving the issues and the burden of the proposed discovery outweighs any possible benefit. Plaintiff responds only as to her earnings at Defendant's establishment.**

**Subject thereto, as to Plaintiff's earnings from this Club, responsive information, if any, can be made available for review at the office of Plaintiff's counsel on a mutually agreed upon date and time.**

### REQUEST FOR PRODUCTION NO. 3:

All U.S. individual tax returns (Form 1040) and accompanying schedules and documents used in connection with the preparation of such returns for the Relevant Period.

**RESPONSE: Plaintiff objects as irrelevant to the claims and defenses asserted. Plaintiff further objects this request is not proportional to the needs of the case, given the importance of the discovery in resolving the issues and the burden of the proposed discovery outweighs any possible benefit. Plaintiff responds only as to her earnings at Defendant's establishment.**

**Subject thereto, as to any 1040 form filed in which earnings from Defendant's establishment were listed by Plaintiff, if any, can be made available for review at the office of Plaintiff's counsel on a mutually agreed upon date and time.**

**REQUEST FOR PRODUCTION NO. 4:**

All documents pertaining to all income, distributions, wages, salaries, tips, commissions, earnings, monies, compensations, dividends, bonuses, royalties and remunerations in any other form received by you during the Relevant Period.

**RESPONSE: Plaintiff objects as irrelevant to the claims and defenses asserted. Plaintiff further objects this request is not proportional to the needs of the case, given the importance of the discovery in resolving the issues and the burden of the proposed discovery outweighs any possible benefit. Plaintiff responds only as to her earnings at Defendant's establishment.**

**Subject thereto, as to documents showing any earnings earned from Defendant's establishment, if any, can be made available for review at the office of Plaintiff's counsel on a mutually agreed upon date.**

**REQUEST FOR PRODUCTION NO. 5:**

All documents evidencing your rate of pay, including any changes thereto, during the period of your alleged employment during the Relevant Period.

**RESPONSE: Plaintiff objects to the extent this request assumes facts not in evidence, namely, that Defendants paid her.**

**Subject thereto, there are no responsive documents to this request as Defendants did not pay Plaintiff.**

**REQUEST FOR PRODUCTION NO. 6:**

All payroll statements, cleared checks, receipts, deposits, statements and pay stubs that evidence your earnings during the Relevant Period.

**RESPONSE: Plaintiff objects to the extent this request assumes facts not in evidence, namely, that Defendants paid her.**

**Subject thereto, documents responsive to this request, if any, can be made available for review at the office of Plaintiff's counsel on a mutually agreed upon date.**

**REQUEST FOR PRODUCTION NO. 7:**

All documents indicating or relating to your work schedule hours at the Club, including any changes thereto.

**RESPONSE: Plaintiff objects to the extent this request does not state with reasonable particularity the item or thing to be produced. Plaintiff objects as vague as to what 'documents,' may 'indicate or relate,' to work schedule hours. Plaintiff is responding**

based on her understanding of documents listing or specifying hours worked.

**Subject thereto, there are no responsive documents to this request in Plaintiff'spossession, custody and/or control.**

## REQUEST FOR PRODUCTION NO. 8:

All diaries, notes, memoranda, journals, or calendars, including electronic diaries, notes memoranda, journals, or calendars, or other written logs reflecting your daily routine, location, and activities during the Relevant Period.

**RESPONSE: There are no responsive documents to this request in Plaintiff's possession, custody and/or control.**

## REQUEST FOR PRODUCTION NO. 9:

All documents indicating or relating to your tardiness, attendance, unavailability and/or absences from the Club during the Relevant Period, including but not limited to medical, travel or other absences and emails or phone records to notify the Club of your tardiness, absence or unavailability.

**RESPONSE: Plaintiff objects as irrelevant to the claims and defenses asserted inthis action and to the extent the request is vague and ambiguous. Plaintiff furtherobjects to the extent the request assumes facts not in evidence and is speculative.**

**Subject thereto, there are no responsive documents to this request in Plaintiff's possession, custody and/or control.**

## REQUEST FOR PRODUCTION NO. 10:

All documents, including representation agreements, fee agreements, contracts, invoices and billing statements, evidencing the contractual relationship with attorneys, experts, and/or investigators in connection with this Case.

**RESPONSE: Plaintiff objects to the extent this request goes beyond the scope of claims in this case, and is therefore irrelevant, and not proportionate to the needs of the case, given the relevance of the requested information.**

**Subject thereto, as to any contractual relationship with Plaintiff's counsel, such information can be made available for review at the office of Plaintiff's counsel on a mutually agreed upon date and time.**

## REQUEST FOR PRODUCTION NO. 11:

Any and all payments, advances, or loans received in relation to pursuing or filing this Case.

**RESPONSE: There are no responsive documents to this request.**

**REQUEST FOR PRODUCTION NO. 12:**

All letters and correspondence, including electronic writings (e.g., e-mail), that constitute or contain matters relevant to the subject matter of this Case, excluding any privileged communications.

**RESPONSE: Plaintiff objects as the request does not state with particularity, the item or thing to be produced, specifically what constitutes 'relevant'matters to this case. Plaintiff further objects this request is not proportional to the needs of the case, given the importance of the discovery in resolving the issues and the burden of the proposed discovery outweighs any possiblebenefit.**

**Plaintiff further asserts the request invades the attorney-client and attorney work product privileges, despite claiming otherwise, to the extent it fails to define with specificity the documents to be produced. A general request to peruse a Plaintiff's file on a matter is an invasion of the work product privilege. Information will not be produced subject to these objections.**

**REQUEST FOR PRODUCTION NO. 13:**

Any and all documents pertaining to checking accounts, savings accounts, certificates of deposit and other accounts in any bank, savings and loan association or other financial institution, inclusive of CashApp, PayPal, Venmo, Zelle, Coinbase, and similar financial facilities, which stand in your name alone, individually or as trustee, or which are subject to withdrawal or control by you, or in which you claim or have claimed an interest, for the Relevant Period including but not limited to deposit slips, canceled checks, withdrawal slips, statements of account, passbooks and certificates of deposit.

**RESPONSE: Plaintiff objects as the request does not state with particularity,the item or thing to be produced. Plaintiff further objects this request is not proportional to the needs of the case, given the importance of the discovery inresolving the issues and the burden of the proposed discovery outweighs any possible benefit. Plaintiff objects to the extent this request creates such a burden on her and is such an invasion of her privacy, as the request is not limited in date or scope to the relevant claims and defenses before the Court, than any attempt to answer is impossible. Information will not be produced subject to these objections.**

**REQUEST FOR PRODUCTION NO. 14:**
Any contract of employment between you and the Club.

**RESPONSE: There are no responsive documents to this request.**

**REQUEST FOR PRODUCTION NO. 15:**

All documents relating to the work you performed for the Club regarding, referring to or

related to:

     a.     Overtime compensation;
     b.     Christmas or other bonuses;
     c.     Deferred compensation;
     d.     Business expenses paid by employer;
     e.     Other receipts arising out of employment;
     f.     Advances or loans;
     g.     Vacation and sick-leave benefits; and,
     h.     Severance pay.

**RESPONSE: Plaintiff objects to the extent this request assumes facts not in evidence, namely that Defendants paid for any of the above-referenced items for anyone at the Club. Plaintiff further objects to the extent the information requested would be in Defendant's possession, custody and/or control and thereby burdensome anddisproportionate to the needs of the case for Plaintiff to provide.**

**Subject thereto, there are no responsive documents in Plaintiff's possession,custody and/or control.**

## REQUEST FOR PRODUCTION NO. 16:

All documents reflecting on your credibility as a witness, including records of arrests, convictions, and sentencing for crimes involving theft, fraud, or moral turpitude at any time since 2011.

**RESPONSE: Plaintiff objects to the extent this request asks for information outside the scope of discovery. Fed. R. Evid. 609. Plaintiff further objects to the extent this request does not state with particularity the item or thing to be produced. Plaintiff further objects to the burdensomeness of this request, that it is disproportional to the needs of the case given Defendant's equal access to the requested information. Information regarding criminal convictions is publicly available.**

**Subject thereto, Plaintiff regards herself as a credible witness, and therefore there are no responsive documents to this request.**

## REQUEST FOR PRODUCTION NO. 17:

Produce a copy of all documents that support your contention that the Club is engaged in interstate commerce.

**RESPONSE: Plaintiff objects to the extent the information requested would be in Defendant's possession, custody and/or control and thereby burdensome and disproportionate to the needs of the case for Plaintiff to provide.**

**Subject thereto, all documents responsive to this request would be in Defendants' possession, custody and/or control. Such information will be available when Defendant**

provides the requested documents.

**REQUEST FOR PRODUCTION NO. 18:**

Legal actions, including demand letters, claim forms, arbitration demands, settlement offers and agreements, lawsuits, administrative proceedings, court proceedings and/or arbitrations in which you are or were a party from 2015 to present.

**RESPONSE: Plaintiff objects to the extent this request does not state with reasonable particularity the items or things to be produced. Plaintiff further objects this request is burdensome and expensive given the proportionate needs ofthe case given the importance of the discovery in resolving the issues and the burden of the proposed discovery outweighs any possible benefit. The information requested is publicly available, and as such equally available to Defendant, adding to the disproportionate needs for Plaintiff to produce suchinformation.**

**Furthermore, the information requested invades the attorney work product and attorney/client privilege, as well as potentially other confidential information, and as such, information or materials may be withheld.**

**Subject thereto, there are no applicable responsive documents for any employment/FLSA claims for Plaintiff, other than the instant matter.**

**REQUEST FOR PRODUCTION NO. 19:**

All documents reflecting your employment history from 2010 to date.

**RESPONSE: Plaintiff objects to the request in that it doesn't state the item or thing to be produced with reasonable particularity, such that Plaintiff does not know what documents may be responsive. Furthermore, Plaintiff objects to the request as disproportionate to the needs of the case, given the importance of the discovery in resolving the issues and the burden of the proposed discovery outweighs any possible benefit. Due to the breadth and ambiguity in this request, Plaintiff will not guess as to what may be a responsive document and rests on these objections.**

**REQUEST FOR PRODUCTION NO. 20:**

All documents reflecting your educational background and training, including but not limited to diplomas, degrees, certificates, licenses, and transcripts.

**RESPONSE: Plaintiff objects to the request in that it doesn't state the item or thing to be produced with reasonable particularity, such that Plaintiff does not know what documents may be responsive. Furthermore, Plaintiff objects to the request as disproportionate to the needs of the case, given the importance of the discovery in resolving the issues and the burden of the proposed discovery outweighs any possible benefit. Due to the breadth and ambiguity in this request, Plaintiff will not guess as to what may be a responsive document and rests on these objections.**

**REQUEST FOR PRODUCTION NO. 21:**

All documents and communications with the individually named Defendants during the Relevant Period.

**RESPONSE: Plaintiff objects to the request in that it doesn't state the item or thing to be produced with reasonable particularity, such that Plaintiff does not know what documents may be responsive. Furthermore, Plaintiff objects to the request as disproportionate to the needs of the case, given the importance of the discovery in resolving the issues and the burden of the proposed discovery outweighs any possible benefit.**

**Subject thereto, to the extent any such documents exist relevant to the claims and defenses assert, such will be made available at Plaintiff's counsel's office on a mutually agreeable date and time.**

**REQUEST FOR PRODUCTION NO. 22:**

Any and all documents evidencing any income received directly from or related to the performance of services at the Club during the Relevant Time Period.

**RESPONSE: Plaintiff objects to the extent this request assumes facts not in evidence, namely that Defendants paid any compensation to Plaintiff.  Plaintiff objects that the request is disproportionate to the needs of the case, considering the relevance of the particular information requested. Plaintiff's tips received from customers are not of issue in the claims and defenses alleged, as Defendants never classified Plaintiff or paid Plaintiff as a tipped employee. Plaintiff is withholding responsive documents, if any, based upon these objections.**

**REQUEST FOR PRODUCTION NO. 23:**

Any and all documents evidencing the hours you allegedly worked per week at the Club during the Relevant Period.

**RESPONSE: Responsive information, if any, can be made available for review at the office of Plaintiff's counsel on a mutually agreed upon date.**

**REQUEST FOR PRODUCTION NO. 24:**

Produce all documents and communications created or maintained by Claimant recording or memorializing in any way the days, hours, weeks, or months that she claims to have worked at the Club. This request includes, but is not limited to, calendar, notes, posting on social media, diary entries, bank statements or other similar documentation.

**RESPONSE: Responsive information, if any, can be made available for review at the office of Plaintiff's counsel on a mutually agreed upon date.**

**REQUEST FOR PRODUCTION NO. 25:**

Produce all documents and communications created or maintained by Claimant recording or memorializing in any way the amount of money she earned in connection with her work as an exotic dancer at the Club, e.g., wages, fees, 'tips,' 'gratuities' or service charges. This request includes, but is not limited to, calendar, notes, diary entries, or other similar documentation.

**RESPONSE: Plaintiff objects to the extent this request assumes facts not in evidence, namely that Defendants paid any compensation to Plaintiff. Plaintiff objects that the request is disproportionate to the needs of the case, considering the relevance of the particular information requested. Plaintiff's tips received from customers are not of issue in the claims and defenses alleged, as Defendants never classified Plaintiff or paid Plaintiff as a tipped employee. Plaintiff is withholding responsive documents, if any, based upon these objections.**

**REQUEST FOR PRODUCTION NO. 26:**

Produce all documents and communications created or maintained by Claimant recording or memorializing in any way the amount of money she claims to have been required to pay according to any Rules at the Club. This request includes, but is not limited to, calendar, notes, diary entries, or other similar documentation.

**RESPONSE: Responsive information, if any, can be made available for review at the office of Plaintiff's counsel on a mutually agreed upon date.**

**REQUEST FOR PRODUCTION NO. 27:**

Produce copies of Claimant's federal and state income tax returns for all tax years during the Relevant Period. See Carrell v. Sunland Const., Inc., 998 F.2d 330,334 (5th Cir. 1993) (5th Cir. 1993). Please redact all sensitive information such as social security numbers.

**RESPONSE: Plaintiff incorporates her objections and response from no. 2. This request is redundant.**

**REQUEST FOR PRODUCTION NO. 28:**

Produce any sworn or unsworn statements in Claimant's possession, custody or control from individuals containing any information concerning or related to the claims asserted in the Original Complaint filed in the Case.

**RESPONSE: There are no responsive documents to this request.**

**REQUEST FOR PRODUCTION NO. 29:**

If Claimant reported or complained internally to the Club (including but not limited to

managers, supervisors, or administrators) about the Rules or the subject matter of the claims asserted in Complaint during the Relevant Period, produce any documents or communications reflecting those reports or complaints.

**RESPONSE: There are no responsive documents to this request.**

**REQUEST FOR PRODUCTION NO. 30:**

Produce all documents that Claimant contends evidence Defendants' alleged willful violation(s) of the FLSA during the Relevant Period.

**RESPONSE: Plaintiff objects the request does not state with particularity the item of thing to be produced. Plaintiff further asserts that the request is tantamount to a request for the Plaintiff's counsel's entire file, which is an improper invasion of the attorney work product privilege. Plaintiff objects to the extent the information or materials are public records, and equally available and accessible to Defendant, therefore are disproportionate to the needs of this case.**

**Subject thereto, the items or information identified in response to interrogatory no. 22 are public records and/or arbitration records solely in the possession, custody and/or control of Defendants.**

**REQUEST FOR PRODUCTION NO. 31:**

Produce all communications (including e-mails, texts, social media messages) between Claimant and any other performers, Djs, bartenders, waitresses, house moms, or similar individuals at the Club, concerning or relating to any alleged Rules, the filing of this Case, or the subject matter of this Case during the Relevant Period.

**RESPONSE: Plaintiff objects that the request is vague and ambiguous as to the terms "similar individuals at the Club," "concerning or relating to any alleged Rules," or the "subject matter of this case." As worded, the request is overly broad and ambiguous, such that any attempt to respond would be disproportionate to the needs of the case, given the potential relevance of the requested documents. To the extent this request invades the joint defense privilege and/or attorney/client privilege, information and materials will be withheld.**

**Subject thereto, to the extent responsive documents exist as to the alleged Rules as set forth by Plaintiff herein, responsive information, if any, will be made available at Plaintiff's counsel's office on a mutually agreeable date and time.**

**REQUEST FOR PRODUCTION NO. 32:**

Produce all documents or communications between Claimant and any of the Defendants concerning or relating to any alleged Rules, the filing of this Case, or the subject matter of this Case during the Relevant Period.

**RESPONSE: Plaintiff objects that the request is vague and ambiguous as to the terms "concerning or relating to any alleged Rules," "the filing of this case," or the "subject matter of this case." As worded, the request is overly broad and ambiguous, such that any attempt to respond would be disproportionate to the needs of the case, given the potential relevance of the requested documents. To the extent this request invades the joint defense privilege and/or attorney/client privilege, information and materials will be withheld.**

**Subject thereto, to the extent responsive documents exist as to the alleged Rules as set forth by Plaintiff herein, responsive information, if any, will be made available at Plaintiff's counsel's office on a mutually agreeable date and time.**

<u>**REQUEST FOR PRODUCTION NO. 33:**</u>

Produce all documents and communications between Claimant and any individual employed by, who works at, or who Claimant otherwise associates with the Club during the Relevant Period.

**RESPONSE: Plaintiff objects to the extent the individual(s) identified in this request are or may be unknown to Plaintiff. Plaintiff will answer only to the extent an individual is known as an employee of the Club. Otherwise, Plaintiff objects as vague. To the extent this request invades the joint defense privilege and/or attorney/client privilege, information and materials will be withheld.**

**Subject thereto, there is no responsive information to this request.**

<u>**REQUEST FOR PRODUCTION NO. 34:**</u>

Produce all documents and communications relating to any disciplinary actions taken against Claimant by Defendants during the Relevant Period.

**RESPONSE: There are no responsive documents to this request.**

<u>**REQUEST FOR PRODUCTION NO. 35:**</u>

Produce all documents and communications between Claimant and any dancer or entertainer who has performed at the Club concerning or relating to any alleged Rules, the filing of this Caset, or the subject matter of this Case during the Relevant Period.

**RESPONSE: Plaintiff objects that the request is vague and ambiguous as to the terms "concerning or relating to any alleged Rules," "the filing of this case," or the "subject matter of this case." Plaintiff is unable to ascertain what the requestis asking for and, therefore is unable to answer the request. To the extent this request invades the joint defense privilege and/or attorney/client privilege, information and materials will be withheld.**

**REQUEST FOR PRODUCTION NO. 36:**

If Claimant contends that she was subject to any Rules, supervised, controlled or otherwise managed by any person she alleges had authority to act on behalf of or for the Club, produce all documents and communications between Claimant and such persons concerning those matters.

**RESPONSE: Plaintiff objects that the request is vague and ambiguous as to the terms "Rules," "person with authority to act on behalf of the Club."  Plaintiff does not know all persons with authority, only who may have controlled her work such at to make her an employee.  The request is overly broad, and potentially includes all documents at issue in this matter, which is an improper request for production and disproportionate to the needs of the case.**

**Subject thereto, non-privileged, relevant and responsive documents, if any, will be available for inspection at Plaintiff's counsel's office on a mutually agreeable date and time.**

**REQUEST FOR PRODUCTION NO. 37:**

For each social media account maintained by Claimant, please produce all messages, private messages, posts (public or private) concerning or relating to any alleged Rules, the filing of this Case, or the subject matter of this Case during the Relevant Period.

**RESPONSE: Plaintiff objects that the request is vague and ambiguous as to the terms "concerning or relating to any alleged Rules," "the filing of this case," or the "subject matter of this case." Plaintiff further asserts the information requested is disproportionate to the needs of the case given is relative importance in resolving the issues of this claim.  It is burdensome, not limited in time or scope,such as to be relevant or proportionate to the claims and defenses asserted in this matter. *See McGowan v. Southern Methodist University*, Civil Action No. 3:19-cv-141-N, 2020 WL 2199189 at \*2 (N.D. Tex. May 6, 2020).**

**REQUEST FOR PRODUCTION NO. 38:**

Produce all documents and communications relating to tips, gifts, or other monies Claimant claims to have paid to DJs, entertainers, dancers, bus boys, bartenders or managers at the Club.

**RESPONSE: Plaintiff asserts the information requested is disproportionate to the needsof the case given is relative importance in resolving the issues of this claim. It is burdensome, not limited in time or scope, such as to be relevant or proportionateto the claims and defenses asserted in this matter.**

**Subject thereto, responsive information, if any, can be made available for review at the office of Plaintiff's counsel on a mutually agreed upon date.**

**REQUEST FOR PRODUCTION NO. 39:**

Produce all photographs and/or videos in Claimant's possession, custody or control that depict any portion of the interior or exterior of the Club taken at any point during the Relevant Period. This request includes photographs or videos of any signage, other performers, patrons, or club personnel.

**RESPONSE: Responsive information, if any, can be made available for review at the office of Plaintiff's counsel on a mutually agreed upon date.**

**REQUEST FOR PRODUCTION NO. 40:**

Produce a copy of every employment contract, independent contractor agreement, or other written agreement Claimant entered into with any and all topless clubs, gentlemen's clubs, or adult entertainment nightclubs at which she has performed during the Relevant Period.

**RESPONSE: Plaintiff objects the documents requested are disproportionate to theneeds of the case given is relative importance in resolving the issues of this claim. It is burdensome, not limited in time or scope, such as to be relevant or proportionate to the claims and defenses asserted in this matter.**

**Subject thereto, there are no responsive documents to this request.**

**REQUEST FOR PRODUCTION NO. 41:**

Produce a copy of the fee agreement(s) with your attorney(s) in this matter.

**RESPONSE: Responsive information, if any, can be made available for review at the office of Plaintiff's counsel on a mutually agreed upon date and time.**

**REQUEST FOR PRODUCTION NO. 42:**

Produce a copy of documents reflecting the amount of attorney's fees Plaintiff seeks to recover in this proceeding.

**RESPONSE: The information requested is the subject of expert testimony and opinion, and therefore improper to request in the form of a request for production. Additionally, the request is premature, as the amount Plaintiffs seeks to recover includes the reasonable and necessary attorneys' fees and expenses incurred up to the time of and through trial and will not be known until that point.**

**REQUEST FOR PRODUCTION NO. 43:**

Produce the location data from your cellular device for the dates you claim to have performed at the Club. This data may be exported and produced from a variety of sources, e.g. Facebook 'check- ins,' as a .km! file exported from Google Timeline, or if you use an iPhone, by accessing

"Significant Locations" under "System Services".

**RESPONSE: Plaintiff objects to the extent the data requested is not a tangible thing or document in existence for Plaintiff to produce. Plaintiff objects the information requested is disproportionate to the needs of the case given is relativeimportance in resolving the issues of this claim. Plaintiff does not have to create evidence. It is burdensome, not limited in time or scope, such as to be relevant or proportionate to the claims and defenses asserted in this matter. Plaintiff asserts this request improperly invades her constitutional right to privacy and is overly broad and not relevant to the claims or defenses asserted. Plaintiff is withholding information based on these objections.**

## REQUEST FOR PRODUCTION NO. 44:

Please produce a copy of your cell phone bills reflecting the transmission of communications (including text messages) during the Relevant Period.

**RESPONSE: Plaintiff objects the documents requested are disproportionate to the needs of the case given is relative importance in resolving the issues of this claim. It is burdensome, not limited in time or scope, such as to be relevant or proportionate to the claims and defenses asserted in this matter. Plaintiff asserts this request improperly invades her constitutional right to privacy, and is overly broad and not relevant to the claims or defenses asserted.   Plaintiff is withholding information based on these objections.**

## REQUEST FOR PRODUCTION NO. 45:

Produce a copy of documents that support your contention that Nick Mehmeti is a joint employer of the Club.

**RESPONSE: Plaintiff objects to this document request as premature.  Plaintiff incorporates her objections to interrogatory 16 herein, as equally applicable.**

**Subject thereto, when any responsive information is available to Plaintiff, such information will be made available for inspection at Plaintiff's counsel's office on a mutually agreeable date and time.**

## REQUEST FOR PRODUCTION NO. 46:

Produce a copy of any correspondence, inclusive of enclosures that relate to one or more of the Defendants.

**RESPONSE: Plaintiff objects to the phrase "relate to one or more of the Defendants," as vague, ambiguous and overly broad, such that any attempt at responding would be disproportionate to the needs of this case.**

**Subject thereto, responsive information related to correspondence relevant to the claims and defenses asserted, if any, will be made available for review at Plaintiff's counsel's**

**office on a mutually agreeable date and time.**

**REQUEST FOR PRODUCTION NO. 47:**

Produce any and all resumes and job applications during the Relevant Period.

**RESPONSE: There are no responsive documents in Plaintiff's possession, custody or control.**

**REQUEST FOR PRODUCTION NO. 48:**

Produce any and all calendars.

**RESPONSE: There are no responsive documents in Plaintiff's possession, custody or control.**

**REQUEST FOR PRODUCTION NO. 49:**

Produce your Facebook postings, comments, and images during the Relevant Period.

**RESPONSE: Plaintiff objects the documents requested are disproportionate to the needs of the case given is relative importance in resolving the issues of this claim. It is burdensome, not limited in time or scope, such as to be relevant or proportionate to the claims and defenses asserted in this matter. Plaintiff asserts this request improperly invades her constitutional right to privacy, and is overly broad and not relevant to the claims or defenses asserted.** *See McGowan v. Southern Methodist University*, **Civil Action No. 3:19-cv-141-N, 2020 WL 2199189 at \*2 (N.D. Tex. May 6, 2020). Plaintiff is withholding information based on these objections.**

**REQUEST FOR PRODUCTION NO. 50:**

Produce your Instagram postings, comments, and images during the Relevant Period.

**RESPONSE: Plaintiff objects the documents requested are disproportionate to the needs of the case given is relative importance in resolving the issues of this claim. It is burdensome, not limited in time or scope, such as to be relevant or proportionate to the claims and defenses asserted in this matter. Plaintiff asserts this request improperly invades her constitutional right to privacy and is overly broad and not relevant to the claims or defenses asserted.  Plaintiff is withholding information based on these objections.** *See McGowan v. Southern Methodist University*, **Civil Action No. 3:19-cv-141-N, 2020 WL 2199189 at \*2 (N.D. Tex. May 6, 2020).**



CERTIFIED MAIL®

7021 0950 0001 7128 8908

ELLZEY & ASSOCIATES, PLLC

Milford Street
ston, Texas 77006

Latrice Andrews
Roger Albright
Sheils Winnubst, PC
1100 Atrium II
1701 N. Collins Blvd.
Richardson, TX 75080

**PLTFS APPX 000089**

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Latrice Andrews
Roger Albright, PC
Snells Wilmulbst. PC
1100 Atrium II
1701 N. Collins Blvd
Richardson, Tx 75080

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X ☐ Agent
☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery

D. Is delivery address different from item 1? ☐ Yes
   If YES, enter delivery address below: ☐ No

3. Service Type
☑ Certified Mail®   ☐ Priority Mail Express™
☐ Registered   ☐ Return Receipt for Merchandise
☐ Insured Mail   ☐ Collect on Delivery

4. Restricted Delivery? (Extra Fee)   ☐ Yes

50 0001 7128 8908

Return Receipt

---

**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

For delivery information, visit our website at www.usps.com®.

OFFICIAL USE

Certified Mail Fee
$

Extra Services & Fees (check box, add fee as appropriate)
☐ Return Receipt (hardcopy)   $
☐ Return Receipt (electronic)   $
☐ Certified Mail Restricted Delivery   $
☐ Adult Signature Required   $
☐ Adult Signature Restricted Delivery $

Postage
$

Total Postage and Fees
$

Postmark
Here

Sent To  Latrice Andrews
Street and Apt. No., or PO Box No. 1701 N. Collins Blvd
City, State, ZIP+4  Richardson, Tx 75080

PS Form 3800, April 2015 PSN 7530-02-000-9047   See Reverse for Instructions

7021 0950 0001 7128 8908

BROOKE LAYTON  November 2, 2021                          1

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF TEXAS
 2                     DALLAS DIVISION

 3   BROOKE LAYTON, individually and)
     on behalf of all others       )
 4   similarly situated,           )
                                   )
 5              Plaintiff,         )
                                   )
 6   VS.                           )CA-NO. 3:21-cv-01636-N
                                   )
 7   MAINSTAGE MANAGEMENT, INC,    )
     NICK'S MAINSTAGE, INC. - DALLAS)
 8   PT'S d/b/a PT'S MENS CLUB and )
     NICK MEHMETI,                 )
 9                                 )
                Defendants.        )
10

11

12            * * * * * * * * * * * * * *

13                  ORAL DEPOSITION OF

14                    BROOKE LAYTON

15                  NOVEMBER 2, 2021

16            * * * * * * * * * * * * * *

17

18            ANSWERS AND DEPOSITION of BROOKE LAYTON, taken

19   at the instance of the Defendant on the 2ND day of

20   NOVEMBER, 2021, in the above styled and numbered cause,

21   in the City of Dallas, County of Dallas and State of

22   Texas before Donna L. Johnston, a Certified Shorthand

23   Reporter in and for the State of Texas, pursuant to the

24   Federal Rules of Civil Procedure and the provisions

25   stated on the record.
```

PLTFS APPX 000091

BROOKE LAYTON  November 2, 2021                                   2

1                    A P P E A R A N C E S

2

3    On Behalf of Plaintiff, BROOKE LAYTON, individually and
     on behalf of all others similarly situated:
4
     Ms. Ghazzaleh Rezazadeh, Esq.
5    ELLZEY & ASSOCIATES, PLLC
     1105 Mildord Street
6    Houston, Texas 77066
     Phone:  (888) 350-3931
7    E-mail:  firm@ellzeylaw.com

8
     On Behalf of Defendants, MAINSTAGE MANAGEMENT, INC.,
9    NICK'S MAINSTAGE, INC. - DALLAS PT'S d/b/a PT'S MENS
     CLUB and NICK MEHMETI:
10
     Ms. Latrice E. Andrews, Esq.
11   SHEILS WINNUBST
     1100 Atrium II
12   1701 N. Collins Boulevard
     Richardson, Texas 75080
13   Phone:  (972) 644-8181
     E-mail: latrice@sheilswinnubst.com
14

15

16

17

18

19

20

21

22

23

24

25

PLTFS APPX 000092

BROOKE LAYTON   November 2, 2021                                    3

1                        I N D E X

2    Appearances                                         2

3    Stipulations                                        5

4    BROOKE LAYTON

5    EXAMINATION
         By Ms. Andrews                                  5
6        By Ms. Rezazadeh                               88
         By Ms. Andrews                                 91
7        By Ms. Rezazadeh                               94
         By Ms. Andrews                                 95
8
     Signature and changes sheet                       100
9
     Reporter's certificate                            101
10
                       E X H I B I T S
11
     DEFENDANT'S DESCRIPTION                            PAGE
12
     Exhibit 1    Second Amended Notice Of              23
13                Intention To Take Oral
                  Deposition Of Brooke Layton
14
     Exhibit 2    Complaint –                           69
15                Summons in a Civil Action

16   Exhibit 3    Bio-Verify                            24

17   Exhibit 4    PT's Mens Club License And            25
                  Lease Agreement
18
     Exhibit 5    Plaintiff Brooke Layton's             77
19                Initial Disclosures

20   Exhibit 6    Plaintiff Brooke Layton's             92
                  Objections And Responses To
21                Defendant Mainstage Management,
                  Inc.'s First Request For Admission
22
     Exhibit 7    Plaintiff Brooke Layton's             93
23                Objections And Responses To
                  Defendant Mainstage Management,
24                Inc.'s First Set Of Interrogatories

25   Exhibit 8    Sign-in sheets                        68

PLTFS APPX 000093

BROOKE LAYTON  November 2, 2021                           4

E X H I B I T S (cont.)

DEFENDANT'S DESCRIPTION                           PAGE

Exhibit 9  Plaintiff Brooke Layton's          93
           Objections And Responses To
           Defendant Mainstage Management,
           Inc.'s First Request
           For Production

---

BROOKE LAYTON  November 2, 2021                           5

1               P R O C E E D I N G S

2

3                    BROOKE LAYTON,
4    having been first duly sworn, testified as follows:
5         MS. ANDREWS:  Before we begin, I just wanted
6    to state we agree that we are taking the deposition
7    pursuant to the Federal Rules of Procedure as well as
8    the local rules of the Northern District of Texas, if
9    that's correct?
10        MS. REZAZADEH:  Correct.
11        MS. ANDREWS:  Thank you.
12                    EXAMINATION
13   BY MS. ANDREWS:
14        Q.   Ms. Layton, just so that you're aware of some
15   background stuff, obviously, I represent the defendants
16   that have been named in this case.  My name is Latrice
17   Andrews, and I'm located in the Dallas area; that's
18   where I practice.  The deposition today, when I ask you
19   yes-or-no questions, if you can make sure that you're
20   not nodding and you actually verbalize a yes or no for
21   the court reporter, that would be very helpful; are you
22   able to do that?
23        A.   Yes, ma'am.
24        Q.   And are you under any medication or influence or
25   anything that would prevent you from being able to tell

---

BROOKE LAYTON  November 2, 2021                           6

1    the truth today?
2         A.   No, ma'am.
3         Q.   Have you ever had your deposition taken before?
4         A.   No, ma'am.
5         Q.   Okay.  And Ms. Donna over here will be writing
6    down everything that we'll be saying back and forth, and
7    so she needs to make sure we don't talk over each other,
8    okay?
9         A.   Yes, ma'am.
10        Q.   So if you'll allow for me to finish my question
11   and I will do the courtesy of allowing you to finish
12   your answer, Donna won't get mad at us, okay?
13        A.   Yes, ma'am.
14        Q.   All right.  Can you please state your full name
15   for the record?
16        A.   My name is Brooke Ashlee Elizabeth Kiannejad,
17   K-I-A-N-N-E-J-A-D.  My maiden name is Layton,
18   L-A-Y-T-O-N.
19        Q.   Okay.  And where do you live now; what's your
20   address?
21        A.   I'm in Plano, Texas at 1509 Huron Trail,
22   H-U-R-O-N, Trail, Plano, Texas 75075.
23        Q.   Okay.  And how long have you lived there?
24        A.   Since June of 2021.  My permanent -- My
25   permanent address is 990 Crystal Cove, Oak Point, Texas.

---

BROOKE LAYTON  November 2, 2021                           7

1    I don't know --
2         Q.   And why do you say that's your permanent
3    address?
4         A.   Because I do not own a home, so that's my
5    family's -- my mom's address, so yeah.
6         Q.   Okay.  But you're currently residing in Plano,
7    Texas?
8         A.   Yes, ma'am.
9         Q.   And you're renting that home there with your
10   husband?
11        A.   Yes, we live with his father or his mother.
12        Q.   And prior to living where you're at in Plano,
13   where did you live?
14        A.   We lived in Carrollton, Texas.
15        Q.   When did you -- what time frame did you live
16   there?
17        A.   February 2020 to the end of May of 2021.
18        Q.   Okay.  And then prior to that, where did you
19   live?
20        A.   In Dallas, Texas from February 2019 to the end
21   of 2019.
22        Q.   Okay.  And so from December 2019 to February
23   2020, where were you living?
24        A.   In Plano with my husband's mother.
25        Q.   Okay.  And was that the Plano address that you

4 of 39 sheets

BROOKE LAYTON  November 2, 2021                    8

1   previously provided?
2        A.   Yes, ma'am.
3        Q.   Okay.  What was the address that you were at in
4   Dallas, Texas?
5        A.   I can't remember.  I know it was off Summer
6   Creek in Dallas, but that's all I remember.
7        Q.   Okay.  And then prior to living at that address
8   off of Summer Creek, where were you living?
9        A.   I was living in Mesquite at apartments off of
10  Galloway Avenue.
11       Q.   Okay.  And how long did you live there?
12       A.   Probably February 2018 to February 2019.
13       Q.   Okay.  And do you know the exact address of
14  those apartments?
15       A.   No, ma'am.
16       Q.   And the Oak -- The 990 Crystal Cove address is
17  the address that you provided to the defendants in this
18  case as your residence; is that correct?
19       A.   Yes, ma'am.
20       Q.   And when is it that you started, that you
21  believe you started working at the defendant's place of
22  business?
23       A.   July 2018.
24       Q.   Okay.  And when do you believe you stopped
25  working there?

BROOKE LAYTON  November 2, 2021                    9

1        A.   December 2019.
2        Q.   And do you know what day in July you started
3   working there, according to your memory?
4        A.   I don't know.
5        Q.   Okay.  Do you know what date in December you
6   last worked there, December of 2019?
7        A.   I also don't know.
8        Q.   Do you know if it was the beginning of the
9   month; was it before Christmas; do you have any
10  recollection?
11       A.   Potentially, you know, the middle or beginning
12  of the month for December.
13       Q.   Okay.  Do you know just kind of what it means to
14  have your deposition taken, for purposes of this case?
15       A.   To provide answers for the court in their
16  decision.
17       Q.   Kind of.  You understand the importance of the
18  oath that Donna administered and how to tell the truth,
19  correct?
20       A.   Yes, ma'am.
21       Q.   Okay.  I wanted to make sure we have that on the
22  record.
23            All right.  Are you aware of completing some
24  initial or reviewing some initial disclosures that you
25  served in this case?

BROOKE LAYTON  November 2, 2021                    10

1        A.   Can you elaborate?
2        Q.   Do you know what discovery is?
3        A.   Yes, ma'am.
4        Q.   Okay.  Have you been asked to review any
5   discovery responses or prepare any discovery responses?
6        A.   I was given questions that I was asked to answer
7   in regards to discovery.
8        Q.   Okay.  Were you -- Do you recall asking about
9   getting any documents together and providing those?
10       A.   Yes, ma'am.
11       Q.   Okay.  Did you do that?
12       A.   I gathered what I could find.
13       Q.   Okay.  And those have been provided to your
14  attorney?
15       A.   Yes, ma'am.
16       Q.   Okay.  What documents did you get together?
17       A.   There was a couple of photos and some videos,
18  maybe one video, and I think that could be it; I can't
19  remember.
20       Q.   What about your 2018 tax return?
21       A.   I believe maybe I did provide that.
22            THE WITNESS:  Did I?
23            MS. REZAZADEH:  I don't -- You can go ahead
24  and answer what you recall.
25            THE WITNESS:  Okay.

BROOKE LAYTON  November 2, 2021                    11

1        A.   I may or may not have.
2        Q.   (BY MS. ANDREWS)  Did you file a tax return in
3   2018 and 2019?
4        A.   Yes.
5        Q.   What about your bank statements, did you provide
6   those?
7        A.   No.
8        Q.   Do you have bank statements for 2018 and 2019?
9        A.   No.
10       Q.   Do you have access to bank statements for 2018
11  and 2019?
12       A.   Possibly.  I wasn't actively using a bank
13  account for work at that time.
14       Q.   Were you using Venmo?
15       A.   No.
16       Q.   Were you using a bank at all in 2018 and 2019?
17       A.   Yes.
18       Q.   What bank was that?
19       A.   Credit Union of Texas.
20       Q.   Do you still bank there?
21       A.   Yes, ma'am.
22       Q.   Do you have any social media accounts?
23       A.   Not that are relevant to this case.
24       Q.   Do you have any social media accounts?
25       A.   Yes, ma'am.

BROOKE LAYTON November 2, 2021                    12

1    Q.   And what social media accounts are those?
2    A.   All of them -- our Instagram is under The Pinup
3    Agent, which is -- My Tic Tock is also under The Pinup
4    Agent.
5    Q.   I'm sorry? A Pinup Agent?
6    A.   The Pinup Agent.
7    Q.   The, okay.  And what is The Pinup Agent; what is
8    that?
9    A.   It's my real estate account.
10   Q.   And what do you mean by a real estate account?
11   A.   I'm a Realtor in the Dallas-Fort Worth area, and
12   I use that for social media purposes in regards to real
13   estate.
14   Q.   Okay.  In 2018 and in 2019, did you have a
15   social media account?
16   A.   Yes, ma'am.
17   Q.   And what were the handles and hashtags used on
18   those accounts?
19   A.   I believe --
20   Q.   What? I'm sorry.  Go ahead.
21   A.   I believe it was under Shirley Poisin,
22   P-O-I-S-I-N.  And before that, it was KimberFoxOfficial.
23   But those were used for modeling purposes.
24   Q.   Was Kimber also your stage name?
25   A.   Kimber was my stage name, but Kimber Fox was my

BROOKE LAYTON November 2, 2021                    13

1    modeling name.  I never used Kimber Fox for dancing.
2    Q.   And you speak about modeling, were you modeling
3    in 2018 and 2019?
4    A.   Yes, I have modeled since 2013.
5    Q.   And did you make money from modeling?
6    A.   Yes.
7    Q.   Were you an independent contractor as a model?
8         MS. REZAZADEH:  Objection, form.
9         You can answer, Brooke.
10   A.   Okay.  What was the question again?
11   Q.   (BY MS. ANDREWS)  Were you an independent
12   contractor as a model?
13        MS. REZAZADEH:  The same objection.
14   A.   I was my own boss.
15   Q.   (BY MS. ANDREWS)  When you -- Who did you work
16   for, like what contracts did you have?
17   A.   I did not have any contracts while I was
18   modeling.
19   Q.   Were you modeling at the same time you were --
20   you claim you were working at the defendant's business?
21   A.   Yes.
22   Q.   And the Kimber Fox account, do you still have
23   access to it?
24   A.   No, that account has been deleted, as well as
25   Shirley Poisin has been deactivated.  There is a fake

BROOKE LAYTON November 2, 2021                    14

1    profile of me under Kimber Fox right now that I've tried
2    to have removed since 2018.
3    Q.   Are -- Have you contacted or made any efforts or
4    attempts to retrieve the data in those deleted accounts?
5    A.   No, ma'am.
6    Q.   Do you understand you have the ability to do
7    that?
8         MS. REZAZADEH:  Objection, form.
9    A.   No, I don't.
10   Q.   (BY MS. ANDREWS)  When did you delete this
11   account?
12   A.   Shirley Poisin was deleted maybe March of 2020,
13   but I hadn't been actively using the account; that's why
14   I deleted it or deactivated it.
15   Q.   Right.  So can you explain the difference
16   between deactivating and deleting?
17        MS. REZAZADEH:  Objection, form.
18   A.   When I got a new phone, I didn't ever log into
19   that Shirley Poisin account, so I don't have access to
20   it at this time or...
21   Q.   (BY MS. ANDREWS)  So but you can reset the
22   password, correct?
23        MS. REZAZADEH:  Objection, form.
24   A.   I'm unsure.  I haven't tried.  I don't -- I
25   don't have anything -- I wouldn't have had a reason to

BROOKE LAYTON November 2, 2021                    15

1    try.
2    Q.   (BY MS. ANDREWS)  You understand that we served
3    a request for production in this case?
4         MS. REZAZADEH:  Objection, form.
5    A.   Can you elaborate on that?
6    Q.   (BY MS. ANDREWS)  Do you remember when we asked
7    for documents, and you gathered the documents for your
8    attorney?
9    A.   Yes.
10   Q.   We asked about there being social media
11   accounts; do you recall that question?
12   A.   No.
13   Q.   Do you recall responding you had no social media
14   accounts?
15   A.   I can't remember.
16   Q.   So now you're saying that you for 2018 and 2019,
17   you did have active social media accounts, correct?
18   A.   I've had social media accounts since 2013.
19   Q.   And you are also saying that you used the name
20   Kimber Fox, which -- on one of those social media
21   accounts, right?
22   A.   Briefly.  I've also used the name Roxie Vixen.
23   These are primarily --
24        MS. ANDREWS:  I'm going to object to the
25   non-responsive portion.

PLTFS APPX 000096

BROOKE LAYTON  November 2, 2021                                16

1        MS. REZAZADEH:  Will you let her finish her
2  answer, please.  Thanks.
3        Go ahead.
4     A.  I've had many names for Burlesque, and that
5  would be Roxie Vixen, Kimber Crimson Fox, Shirley
6  Poisin; those were the primary accounts that were tied
7  to whatever name I was using for Burlesque, not
8  stripping names at that time.
9     Q.  (BY MS. ANDREWS)  So there was also a Kimber
10  Crimson Fox?
11     A.  Yes.  I don't believe that I had my Instagram to
12  that, though.  I can't recall, but...
13     Q.  Did you also have a Facebook account?
14     A.  My personal page.
15     Q.  Is that still active?
16     A.  It's as Kimber Fox, yes.
17     Q.  I'm sorry?  It's what?
18     A.  It's as Kimber Fox for real estate purposes.
19     Q.  Do you have a Facebook page under your legal
20  name of Brooke Layton?
21     A.  No.
22     Q.  And these accounts are currently active?
23     A.  My Kimber Fox one is, yes, on Facebook.  And I
24  do actually have The Pinup Agent on Facebook as well.
25     Q.  Okay.

BROOKE LAYTON  November 2, 2021                                17

1        MS. ANDREWS:  Can we go off the record for a
2  second?
3        MS. REZAZADEH:  Sure, you want to take a
4  break?
5        MS. ANDREWS:  I just wanted to --
6        THE REPORTER:  Going off the record at
7  10:26.
8        (Recess taken)
9        THE REPORTER:  Going back on the record at
10  10:27.
11     Q.  (BY MS. ANDREWS)  Are you aware of whether you
12  signed documents when you first started having a working
13  relationship with PT's, we'll call the defendant's club?
14     A.  Yes, I signed something.
15     Q.  Okay.  What is it that you believe you signed?
16     A.  When I first started working there, I believe
17  that it may have been an independent contractor form,
18  but I was also -- I remember distinctly trying to read
19  through the form and have a manager come back and shame
20  me and say I didn't know that you could read when it
21  took me 30 minutes to go through the contract.  So I
22  felt rushed and I couldn't actually complete the
23  contract.
24     Q.  So you were capable of reading the contract?
25     A.  I was attempting to read the contract to see

BROOKE LAYTON  November 2, 2021                                18

1  what I was signing but did not make it all the way
2  through before the manager came in and shamed me for
3  trying to read the contract.
4     Q.  So and that was 2018 you're alleging this
5  happened?
6     A.  Correct.
7     Q.  So you chose to sign it even though you didn't
8  feel like you had enough time to read it?
9     A.  Yes, this is common.  You are given documents to
10  sign and no one explains what those documents are.
11     Q.  Did you have to undertake work at this place or
12  sign a licensing agreement at this facility?
13     A.  What would a licensing agreement be?
14     Q.  For the -- What you're referring to, the
15  document that you signed or you're saying you signed,
16  did you have to sign it or could you -- or did you have
17  to choose to work there; could you have worked somewhere
18  else?
19        MS. REZAZADEH:  Objection, form.
20     A.  It is standard at all clubs that this form has
21  to be signed.  And never once, has anyone ever
22  explained.  They just say if you want to work here, you
23  have to sign this form.  And I was in need of work, so I
24  signed the form.
25     Q.  (BY MS. ANDREWS)  If you -- Were there other

BROOKE LAYTON  November 2, 2021                                19

1  clubs to work at?
2     A.  Yes, that also would require the same form to be
3  signed.
4     Q.  And you know that about every single one of
5  them?
6     A.  I have worked at a few clubs now and every one
7  has to sign this.  It is standard knowledge within the
8  industry; this form is signed.
9     Q.  And that's the choice that you make to sign it
10  or not do that, correct?
11     A.  I would like to eat, so yes, I had to sign the
12  form.  And again, it's standard at all clubs that this
13  form is signed.  The only other option they had was an
14  actual employee contract, and that one was given to the
15  bartenders and people that were actual employees of the
16  clubs, not people that were working as independent
17  contractors.
18     Q.  Weren't you given the option to be an employee?
19     A.  I had no bartending experience.
20     Q.  Weren't you as part -- So weren't you given the
21  option to choose between being an employee, an
22  entertainer, or being an independent contractor?
23     A.  The way that they presented the employee
24  contract was not suitable for dancers and independent
25  contractor, people that were relying on making money

PLTFS APPX 000097

BROOKE LAYTON  November 2, 2021                    20

1  each shift rather than a paycheck.
2      Q.  Because employees are different than independent
3  contractors, right?
4      A.  Absolutely.
5      Q.  And y'all earn money differently, right?
6      A.  It depends.  Because employees also receive tips
7  as well.
8      Q.  Not all employees, correct?
9      A.  Well, not a lot of independent contractors
10  receive tips either.
11     Q.  Right, but not all employees receive tips,
12  correct?
13     A.  I'm not an employee there, so I'm not sure how
14  many tips they received, but I know that the bartenders
15  received tips as well as the house mom and the DJ and
16  sometimes the managers who were considered employees.
17     Q.  So you don't really know the terms of the
18  employment relationship and who got tips and who did not
19  get tips, correct; you just speculate, correct?
20         MS. REZAZADEH:  Objection, form.
21     A.  Since I did not read the employee contract, I
22  was just given a briefing of what it was, I do not know
23  the specifics.
24     Q.  (BY MS. ANDREWS)  Did you ask to come back the
25  next day to see if you could sign the contract the next

BROOKE LAYTON  November 2, 2021                    21

1  day?
2      A.  No.  The day that I went in --
3         MS. ANDREWS:  Objection, non-responsive.
4         MS. REZAZADEH:  I'm sorry.  Could she finish
5  her answer, Latrice?  No?  She's under oath; if she
6  wants to give a full answer, she's entitled to.
7         Go ahead, Brooke.
8         MS. ANDREWS:  I don't think that is correct.
9  And this is the deposition that I called.  And if you'd
10  like to ask her questions --
11        MS. REZAZADEH:  That's fine.  You're not
12  going to interrupt my client.
13        THE REPORTER:  I'm sorry, ladies.
14        MS. REZAZADEH:  You're not going to
15  interrupt my client in the middle of providing
16  testimony.  So you can either allow her to speak and
17  she'll allow you to speak like you said you were going
18  to or then we can take it to the court.  Because I
19  believe you interrupting her mid-answer is inappropriate
20  and improper.  You can object non-responsive nature of
21  her answer after she gives it.
22        MS. ANDREWS:  Then the objection is
23  untimely.
24        MS. REZAZADEH:  No, it's not.  It's after
25  she finishes her answer, you can say I object to the

BROOKE LAYTON  November 2, 2021                    22

1  non-responsive portion.  That is how it works.
2         Go ahead, Brooke.
3         MS. ANDREWS:  That is incorrect.
4         MS. REZAZADEH:  She's already throne you
5  off.  The question you were answering, you said, no.
6         MS. ANDREWS:  I'm going to object to counsel
7  testifying or putting words into her client's mouth.
8         MS. REZAZADEH:  If you're not going to let
9  her finish her question or answer, then you can stop the
10  deposition.  I'm not going to let you interrupt her
11  mid-answer.
12        MS. ANDREWS:  She's not answering the
13  question.
14        MS. REZAZADEH:  She did answer the question.
15  She started with a yes or a no, specifically --
16        MS. ANDREWS:  That was the answer.
17        MS. REZAZADEH:  -- to the question.  And
18  then she was providing details about her answer.  So I
19  don't know what you're trying to get at here other than
20  cutting my -- being rude and cutting off my client.
21        So go ahead, Brooke.
22        MS. ANDREWS:  If I ask a yes-or-no question
23  and she answers yes or no, the question is answered.  If
24  you want to let her elaborate subsequently, you are more
25  than welcome.

BROOKE LAYTON  November 2, 2021                    23

1         MS. REZAZADEH:  You are entitled to object
2  to the non-responsive portion of her question.  That's
3  all.
4         Go ahead, Brooke.
5      A.  I did not go back the next day to read the
6  contract.  The way that it worked, I was also not given
7  an audition.  So whenever I went in, the manager
8  literally told me to get naked from head to toe so he
9  could check out my naked body, and then said at that
10  point that I was hired and to sign the contract.  And
11  that was it.
12        I did not go back the next time after being
13  humiliated like that and already having to expose
14  myself.  I felt pressured at that point that if I was
15  going to work there that I needed to sign that day.
16     Q.  (BY MS. ANDREWS)  And if that were true, you
17  thought it was a good idea to work there?
18     A.  People in power hold -- People in power exploit
19  vulnerable individuals, so yes, at the time --
20        MS. ANDREWS:  Objection to the
21  non-responsive portion.
22        (Defendant's Exhibit No. 1 was marked.)
23     Q.  (BY MS. ANDREWS)  Let's look at Exhibit 2, which
24  is -- Actually, I'll go back.  Did you ever see this,
25  which is the notice of the intent to take your

BROOKE LAYTON  November 2, 2021                              24

1  deposition, which was at -- I think it was the second
2  time we noticed it.  It's set for November, for today at
3  10:00.  Did you see this document?
4     A.  **Briefly, yes.**
5     Q.  Okay.
6        MS. ANDREWS:  And this will be Exhibit 1 for
7  the deposition.  And I'm going to skip really fast to --
8        (Defendant's Exhibit No. 3 was marked.)
9     Q.  (BY MS. ANDREWS)  Is this a true and correct
10  image of you?
11     A.  Yes.
12     Q.  And did you -- Do you recall going to Bio-Verify
13  to get a background check done?
14     A.  Yes.
15     Q.  Okay.  And does it sound correct that you did
16  this on or about July 9, 2018?
17     A.  Yes.
18     Q.  Okay.  And this is the Oak Point address that
19  you had previously referenced on the first page of
20  Exhibit 3?
21     A.  Yes.
22     Q.  Okay.  Let's see.
23        MS. REZAZADEH:  Exhibit 3?  What was Exhibit
24  2?
25        MS. ANDREWS:  I'll come back to that.

BROOKE LAYTON  November 2, 2021                              25

1        MS. REZAZADEH:  All right.
2     Q.  (BY MS. ANDREWS)  Let's see.  And you did
3  provide your fingerprints as part of the application
4  process?
5     A.  Yes.
6     Q.  And then do you recall seeing this document
7  that's the Written Authorization of Employer/Independent
8  Contractor?
9     A.  Yes.
10     Q.  So at this point, you know that you were given
11  an option as to being one or the other?
12     A.  **There's no "or" on that; it's just a slash, so**
13  **to me, it could have been either.  But to me, I know I**
14  **signed the independent contractor form.**
15     Q.  And then is this the Mesquite address that you
16  had referred to that you couldn't remember the exact
17  address?
18     A.  Yes, ma'am.
19        (Defendant's Exhibit No. 4 was marked.)
20     Q.  (BY MS. ANDREWS)  And then Exhibit 4, is this
21  the License And Lease Agreement that you're referring to
22  that you signed?
23     A.  Yes.
24     Q.  And are you aware that part of this agreement
25  says that you're choosing to be treated as an employee

BROOKE LAYTON  November 2, 2021                              26

1  or that you're being -- you're choosing to be treated as
2  an independent contractor?
3     A.  **Yes, but I was not treated as such.**
4     Q.  Was your understanding that this contract was
5  for you to be an independent contractor, correct?
6     A.  **In order to keep working there, yes, they**
7  **required everyone --**
8        MS. ANDREWS:  Object to the non-responsive
9  portion.
10        MS. REZAZADEH:  Will you please let her
11  finish.  Please stop interrupting her.  She's not been
12  interrupting you.  Thank you.
13        MS. ANDREWS:  I'm just asking her to answer
14  the question.  It would go a lot faster if the question
15  would just be answered.  It's a simple question.
16        MS. REZAZADEH:  She's entitled to give you
17  her testimony the way she feels fit, and you're not
18  entitled to interrupt her.
19        MS. ANDREWS:  She's entitled to answer the
20  question as asked; she's not entitled to change
21  questions.
22        MS. REZAZADEH:  Because she's not answering
23  your question, you can't cut her off, okay?  She is
24  answering your question.  Are you saying she's not
25  answering your questions?

BROOKE LAYTON  November 2, 2021                              27

1        MS. ANDREWS:  I'm saying she's rambling on
2  about additional things, and I'm just asking simple
3  questions.
4        MS. REZAZADEH:  I'll also convey to you that
5  you're going to have to be polite and exercise
6  appropriate etiquette and let her finish speaking when
7  she's speaking.  I mean, you can object again if you --
8  to non-responsiveness, but otherwise, please stop
9  interrupting her.  It's not good for the court reporter,
10  and it's rude.
11        MS. ANDREWS:  It would be helpful if you
12  would ask your client to just answer the question.
13        MS. REZAZADEH:  I can't instruct my client.
14        MS. ANDREWS:  Thank you.
15     Q.  (BY MS. ANDREWS)  Okay.  Ms. Layton, If I ask
16  you a yes-or-no question if you can respond with yes or
17  no, to just answer the question I ask.
18        MS. REZAZADEH:  Objection.
19        MS. ANDREWS:  Are you trying to instruct
20  your client now?
21        MS. REZAZADEH:  I am objecting to you
22  instructing her that she has to answer yes or no to your
23  questions only; that is not appropriate.
24        MS. ANDREWS:  I'm not instructing her.  A
25  yes or no question, I just need an answer.

9 of 39 sheets

BROOKE LAYTON  November 2, 2021                    28

1   MS. REZAZADEH: I'm not -- That's fine. Go
2   ahead. You can ask her whatever you want.
3   Q.   (BY MS. ANDREWS) And do you recognize the
4   initials at the bottom of each and every page down here;
5   are those your initials signing this document?
6   A.   Yes.
7   Q.   And do you know prior to filing this lawsuit,
8   did you ever discuss your intent to no longer be treated
9   as an independent contractor with any of the defendants?
10   A.   No.
11   Q.   Prior to filing this lawsuit, did you ever
12   assert that they weren't treating you like an
13   independent contractor?
14   THE WITNESS: Am I allowed to elaborate?
15   MS. REZAZADEH: Yes, you're under oath. You
16   can answer.
17   Q.   (BY MS. ANDREWS) I ask you to just answer the
18   question.
19   MS. REZAZADEH: Go ahead, Brooke. Answer
20   how you feel you need to; you're under oath.
21   A.   I don't recall specifically but know that I
22   thought it. I don't know if I vocalized it.
23   Q.   (BY MS. ANDREWS) Did they set your schedule?
24   A.   Yes.
25   Q.   Are you aware that's directly opposite of the

BROOKE LAYTON  November 2, 2021                    29

1   response you had in your request for admission?
2   A.   What was my response?
3   Q.   The opposite. Like, so I'm confused now.
4   So you're now saying they did set your work
5   schedule?
6   A.   Am I able to see what the previous responses
7   that you're talking about?
8   Q.   I'd like --
9   MS. REZAZADEH: You are, actually, Brooke.
10   Thank you.
11   Latrice, please show her the document you're
12   referring to. She's asked to refresh her recollection
13   and to see the document you're referring to. She's
14   entitled to see it.
15   MS. ANDREWS: I don't have an obligation to
16   do that now.
17   MS. REZAZADEH: If you want to ask her a
18   question about it, then you need to show it.
19   THE REPORTER: I'm sorry. I can't take it
20   down when you are both speaking at the same time. I'm
21   sorry I just cannot.
22   MS. ANDREWS: Understood. We will try to
23   slow down the overtalking.
24   Q.   (BY MS. ANDREWS) Is it your testimony right now
25   that they set your schedule?

BROOKE LAYTON  November 2, 2021                    30

1   A.   They --
2   Each week before the next week of work, they
3   came in. You had to work a -- what was considered a
4   first of the week shift, which was a Saturday, Sunday or
5   Monday during specific times. And then I was required
6   to work three days the following week that I -- that
7   schedule was set with them. And then if I did not work
8   one of those days, if I did not work a first, I would
9   automatically be charged $100. If I did not work a
10   fourth shift, I would also be charged $100.
11   Q.   So you had the option of paying or working
12   certain shifts?
13   A.   I had to pay to work every shift. If I missed a
14   shift, it also cost me $100, so I tried not to miss any
15   shifts so I wouldn't have to owe the club money.
16   Q.   Speaking of that, did you get tips or get
17   entertainment fees from working when you were dancing?
18   MS. REZAZADEH: Objection, form.
19   A.   What is constituted as entertainment fees?
20   Q.   (BY MS. ANDREWS) I believe it --
21   Did you work for free at the club?
22   A.   No, I had to pay to work.
23   Q.   Did you earn any money at the club?
24   A.   Yes, the club had a standard set fee for $20 per
25   dances. They also had a set fee if -- for VIP.

BROOKE LAYTON  November 2, 2021                    31

1   MS. ANDREWS: Objection, non-responsive.
2   MS. REZAZADEH: Go ahead and finish, Brooke.
3   A.   They also had a fee for a Champaign Room, so
4   there were multiple fees that the club did set that I
5   was able to work with, that I had to work with what the
6   club's standards were.
7   Q.   (BY MS. ANDREWS) So my question was, did you
8   earn money when you worked at the club?
9   A.   Yes.
10   Q.   If you did not earn money, would you have still
11   worked there?
12   A.   No.
13   Q.   Did you lose money working at the club, or did
14   you make more money working at the club?
15   MS. REZAZADEH: Objection, form.
16   A.   All of that varies because there were days that
17   I was literally going into work to pay my mandatory
18   leave fee and my mandatory tip-out in order to not owe
19   the additional $100. So there would be days I would be
20   leaving negative just so I wouldn't owe the club more
21   money. On average, I was spending $75 a shift -- $76 a
22   shift to work.
23   Q.   (BY MS. ANDREWS) And how much were you making a
24   shift?
25   A.   Again, its varies. Sometimes I would leave

BROOKE LAYTON  November 2, 2021                    32

1  negative; sometimes a standard day may be, you know, I
2  leave with $100.  But there were many times that, again,
3  I didn't leave with any money; I paid the club money.
4      Q.   So your testimony is that you -- on average, you
5  paid $100 a day?
6      A.   Again, it varies with the times that I would
7  leave negative to other times.  It just depends on the
8  day.  It literally just depended on the day.
9      Q.   Like any other business, correct?
10     A.   I don't know.  Some -- I wouldn't say like any
11 other business.  Most people know exactly what they're
12 leaving with and what they're making each week.
13     Q.   Employees, yes, but independent contractors, no,
14 correct?
15         MS. REZAZADEH:  Objection, form.
16     Q.   (BY MS. ANDREWS)  What was the most you ever
17 made in a shift?
18     A.   I don't recall.
19     Q.   You don't remember the best days you ever had?
20     A.   One time, I made $700, and that was a one-time
21 thing.  And out of my years or like how long I was
22 working there, that was, again, a one-time thing so I
23 would not say that is the average or the norm.
24     Q.   So what is the average or norm?
25         MS. REZAZADEH:  Objection, asked and

BROOKE LAYTON  November 2, 2021                    33

1  answered.
2         Go ahead, Brooke.
3      A.   Anywhere from 100 to $200, and it really -- it
4  just depends.  But again, I'm paying $100.  I'm paying
5  anywhere from 76 to $100 to work.
6      Q.   (BY MS. ANDREWS)  So you made or --
7         And you said you worked four shifts a week?
8      A.   Four shifts a week.  Again, if I missed a shift,
9  then I owed the club money.  In order to be able to work
10 there, they would put a hold --
11        MS. ANDREWS:  Objection, non-responsive.
12     A.   They would put a hold on your funds that you
13 would have to come in and pay before you could work
14 again.
15     Q.   (BY MS. ANDREWS)  So you worked four shifts a
16 week on average, correct?
17     A.   That was mandatory, yes.
18     Q.   And how long was each shift?
19     A.   Each shift was eight hours.  Often times, I
20 would leave early, and that would require a $50 pay-out
21 to the club in order to leave early.  I always got there
22 before 11, and I usually left around 5 because it just
23 wasn't conducive for my mental health to continue
24 working into the later part.  So I would pay $50 to
25 leave, and then I had a mandatory $26.  $10 to the house

BROOKE LAYTON  November 2, 2021                    34

1  mom, $10 to the DJ, 6 to the bar that I had to pay every
2  shift, regardless.
3      Q.   Do you think it's odd that you remember all of
4  this but you don't remember how much money you would
5  make on average?
6         MS. REZAZADEH:  Objection, form.
7      A.   No, I don't think it's odd.
8      Q.   (BY MS. ANDREWS)  Okay.  And how long is -- The
9  normal shift that you worked was how long?
10     A.   Six hours.  But again, it was required to work
11 eight if I didn't want to have to pay to leave.  So it
12 was a mandatory eight-hour shift, and it was $50 to
13 leave before then, which there was no way around that.
14 I paid it to the house, went up to the front to get my
15 ticket, had to have mom sign off on it and the DJ, then
16 I was able to leave at that point.
17     Q.   Okay.  So just so that I understand your
18 testimony, you're saying that on average you made 100
19 and $200 a night, correct?
20     A.   During the day, I was a daytime worker.
21     Q.   Okay.  And you're saying that you worked on
22 average four shifts per week, correct?
23     A.   Yes.
24     Q.   And you're saying on average that your shifts
25 were six hours?

BROOKE LAYTON  November 2, 2021                    35

1      A.   Give or take, yes.  There were days I worked a
2  fifth shift because management would say that if you
3  worked an additional shift that they would be willing to
4  forgo any fees and penalties that you had accrued, which
5  they were still getting $75 even if I did work the next
6  day.  The $76 dollars never changed.
7      Q.   So you're saying.
8         -- Your testimony is on average you worked
9  24 hours a week, correct?
10     A.   Twenty-four to 32 hours a week.
11     Q.   You testified six hours on average, and you
12 testified four shifts a week on average, correct?
13     A.   Yes, and that varies.
14     Q.   Okay.  And you're testifying that you would
15 leave with 100 to $200 each shift, correct?
16     A.   Yes.
17        MS. REZAZADEH:  Objection, form.
18     Q.   (BY MS. ANDREWS)  Is it your testimony that on
19 average you would receive 100 to $200 per shift?
20        MS. REZAZADEH:  Objection, form.
21     A.   Again, it all depends on who was in the club
22 that day, how many workers there were, the competition,
23 if anyone was at the club.  Again, I made money
24 because there would be days that I left negative.
25     Q.   (BY MS. ANDREWS)  So on average, being taking in

PLTFS APPX 000101

BROOKE LAYTON  November 2, 2021                    36

1  all of the variations, what is your testimony that you
2  made each shift?
3            MS. REZAZADEH:  Objection, form.
4      A.  **I thought I already answered that.**
5      Q.  (BY MS. ANDREWS)  I thought you did, but now
6  it's changing, so I'm trying to make sure I understand
7  your testimony.  So I keep asking you on average, it was
8  100 to $200 a shift.  And then you keep saying it
9  varied.  So I'm saying what it means -- to mean on
10 average is when you take into account all of the
11 fluctuations, this is what we're normally at.
12           So I'm trying to find out on average how
13 much are you saying that you took home?
14     A.  **100 to $200.**
15           MS. REZAZADEH:  Objection, form.
16           THE WITNESS:  Can we take a break?
17           MS. ANDREWS:  Sure.
18           MS. REZAZADEH:  Sure.
19           MR. ANDREWS:  Five minutes, ten minutes?
20 Back on at 11?
21           MS. REZAZADEH:  Sure.
22           THE REPORTER:  Going off of the record at
23 10:54.
24           (Recess taken)
25           THE REPORTER:  Going back on the record at

BROOKE LAYTON  November 2, 2021                    37

1  11:06.
2      Q.  (BY MS. ANDREWS)  With regard to your criminal
3  history background, do you have any arrests?
4      A.  **No.**
5      Q.  Have you been involved in any other lawsuits?
6      A.  **No.**
7      Q.  Arbitrations?
8      A.  **No.**
9      Q.  Have you made any other demands under the FLSA?
10     A.  **No.**
11     Q.  Have you ever been sued?
12     A.  **No.**
13     Q.  Did you create your own choreography when you
14 worked at the club?
15     A.  **Can you elaborate on that?**
16     Q.  Did you have choreography when you performed at
17 the club?
18     A.  **No.**
19     Q.  So you didn't create your own choreography?
20     A.  **No, I danced to whatever music I was given.**
21     Q.  Did you prepare or review the request for
22 admission responses?
23     Q.  **Do you have a copy of those?**
24     Q.  I do.  I'm just asking, did you prepare or
25 review the admission responses?

BROOKE LAYTON  November 2, 2021                    38

1            MS. REZAZADEH:  Latrice, she would like to
2  see a copy of document you're asking her if she
3  reviewed.  She is entitled to see it or else she can't
4  answer your question.
5            MS. ANDREWS:  If she says she doesn't know,
6  then that's fine too.
7            MS. REZAZADEH:  No, if she asks you to see a
8  document you're asking her about; you're required to
9  show it to her.
10           MS. ANDREWS:  I'm just asking if she did or
11 didn't.  If she says she doesn't know --
12           MS. REZAZADEH:  She can't answer your
13 question unless you show her the document she
14 specifically requested you're asking about, and she
15 asked you to see so she knows that she's talking about
16 the right document.  Not everybody knows what request
17 for admission or request for production, off the top of
18 their head.
19           MS. ANDREWS:  I understand that.  I'm just
20 trying to figure out the truth here.
21           MS. REZAZADEH:  Perfect.  Then show her the
22 document, and you'll get the truth.  She asked you to
23 show her the document.  So --
24           MS. ANDREWS:  I'm going to move on to my
25 next question.

BROOKE LAYTON  November 2, 2021                    39

1            MS. REZAZADEH:  Perfect.
2      Q.  (BY MS. ANDREWS)  Did you or did you not create
3  your own choreography?
4            MS. REZAZADEH:  Objection, asked and
5  answered.
6            Go ahead, Brooke.
7      A.  **I've already answered that.**
8            MS. REZAZADEH:  Go ahead.  You can answer
9  for her.
10     A.  **I did not create choreography; it was whatever**
11 **music I was given to dance to.**
12     Q.  (BY MS. ANDREWS)  Okay.  Do you have any
13 background or training in dance?
14     A.  **I was a Burlesque performer, so yes.**
15     Q.  Where were you a Burlesque performer?
16     A.  **With Her, H-E-R, Sins Burlesque & Cabaret.**
17     Q.  And when was this?
18     A.  **Since 2013.**
19           THE REPORTER:  I'm sorry.  Could you repeat
20 the name of the place
21     A.  **Her, H-E-R, Sins Burlesque & Cabaret.**
22     Q.  (BY MS. ANDREWS)  And when did you stop working
23 there?
24     A.  **I still work with Her Sins Burlesque & Cabaret**
25 **using the name Shirley Poisin.**

12 of 39 sheets

BROOKE LAYTON  November 2, 2021                                40

1    Q.   And you deactivated that Instagram account?
2    A.   I do not have access to that account.
3    Q.   It's deactivated, correct?
4    A.   Yes.
5    Q.   And you just didn't port the login information
6  to your new phone, correct?
7            MS. REZAZADEH:  Objection, form.
8    A.   I have not logged on to that account since I've
9  had my new phone.
10   Q.   (BY MS. ANDREWS)  You could get the login
11  information, correct?
12           MS. REZAZADEH:  Objection, form.
13   A.   I don't know.
14   Q.   (BY MS. ANDREWS)  Have you tried to get the
15  login information?
16   A.   No, I've also deleted all photos before I
17  deactivated that account.  I deleted all photos from
18  that account.
19   Q.   When did you --
20        Why did you delete all of your photos and
21  deactivate all of your social media accounts?
22   A.   Because I'm a Realtor, and it was not conducive
23  to my work now.
24   Q.   But you're also still a Burlesque dancer?
25   A.   Yes, I didn't perform for 18 months.  I just

BROOKE LAYTON  November 2, 2021                                41

1  recently performed under Shirley Poisin this past
2  weekend.  But I did not promote that on any form of
3  social media page.
4    Q.   At the time you deleted all of your social media
5  photos and potential evidence in this case, were -- had
6  you consulted attorneys about filing this case?
7            MS. REZAZADEH:  Objection, form.
8    A.   No.
9    Q.   (BY MS. ANDREWS)  Do you still have your old
10  phone?
11   A.   Possibly, but I'm unsure of where it would be.
12   Q.   Is your data stored on a cloud?
13   A.   No.  I previously had an Android phone.
14   Q.   What's your e-mail address?
15   A.   For what?
16   Q.   Well, what are your e-mail addresses?
17   A.   Kimberfoxrealestate@gmail.com and Kimberlayton
18  -- L-A-Y-T-O-N -- 921@gmail.com.
19   Q.   Are your photos backed up automatically on
20  Google Photos since it's an Android?
21   A.   No.
22   Q.   Is it your testimony that you have no photos or
23  videos from prior to 2019 in your possession, custody
24  and control?
25           MS. REZAZADEH:  Objection, form.

BROOKE LAYTON  November 2, 2021                                42

1    A.   Correct, everything that I had, I sent to my
2  attorney; everything that I could find, I sent to my
3  attorney.
4    Q.   (BY MS. ANDREWS)  Except for your tax returns,
5  correct, and bank statements?
6    A.   Can you show me the form that was asking for
7  those.
8    Q.   But to be clear, you did not provide your tax
9  returns?
10   A.   Again, can I see where it was asking for those?
11   Q.   I'm asking that.  I'm just asking you if you
12  provided them or not.
13           MS. REZAZADEH:  That's fine, Brooke, go
14  ahead; you can answer whatever you recall.
15   A.   I don't know.
16   Q.   (BY MS. ANDREWS)  Okay.  And it was requested
17  for production number 3 that I asked for all tax returns
18  but.
19   A.   Again, can I see that document?
20   Q.   All right.  I think you previously testified you
21  didn't provide it, but that's -- I don't know why
22  we're --
23   A.   You keep asking, so I just want to make sure
24  that I'm recalling correctly.
25   Q.   You said that you didn't give them, so if you

BROOKE LAYTON  November 2, 2021                                43

1  didn't give them, you didn't give them.  I haven't
2  received anything.
3            MS. REZAZADEH:  She testified that --
4            MS. ANDREWS:  All the tax returns and
5  schedules.
6            MS. REZAZADEH:  You can have the court
7  reporter read it back.  She actually testified.  You're
8  misstating her testimony.  What she said was she wasn't
9  sure.  First she said I thought I did, maybe I didn't; I
10  don't know now.
11           MS. ANDREWS:  I'm talking about when I asked
12  her this the first time.
13           MS. REZAZADEH:  Yeah, that's what I'm
14  talking about, too.  You can have the court reporter
15  read it back if you like.
16           MS. ANDREWS:  I just want to get questions
17  answered and be done but.
18           MS. REZAZADEH:  Move on.
19  BY MS. ANDREWS:  Okay.  I don't know why
20  this is --
21   Q.   (BY MS. ANDREWS)  Okay.  And is it your
22  testimony that you did receive money for performing at
23  the club?
24   A.   Not from the club; from the customers, yes.  The
25  club never paid me.

BROOKE LAYTON  November 2, 2021                    44

1  Q.  So is it your testimony that you received money
2  for dancing at the club?
3          MS. REZAZADEH:  Objection, asked and
4  answered.
5          MS. ANDREWS:  She rephrased my question, so
6  she hasn't actually answered the question.
7  A.  Can you elaborate on your question?  If you're
8  referring to did the club pay me or did I receive money
9  from the clients at the club?
10  Q.  (BY MS. ANDREWS) I'm just asking at all.  Did
11  you receive money at all based upon your performances at
12  the club?
13          MS. REZAZADEH:  And she answered you.  So
14  why are you asking her again?  Because she didn't say it
15  the way you like.  Like, she's not going to change her
16  answer for you.  This isn't going to go on.
17          Go ahead, Brooke, just answer her the same
18  question again and again.
19  A.  I never received money from the club, but I did
20  receive money from the clients at the club; the club
21  never paid me.
22  Q.  (BY MS. ANDREWS) Did you do any kind of
23  practicing for any of the performances that you had?
24  A.  No.
25  Q.  Did you use any of your skills from your history

BROOKE LAYTON  November 2, 2021                    45

1  or training in Burlesque dancing at the club?
2  A.  Yes.
3  Q.  Can anybody be an exotic dancer?
4  A.  Anyone can if they get hired by the club.
5  There's no required skill set for the club to hire you
6  other than looking attractive.
7  Q.  Can you be earn money doing it if you're without
8  any specific skills?
9  A.  Yes, absolutely.
10  Q.  Do you have to know how to manage money?
11  A.  No.
12          MS. REZAZADEH:  Objection, form.
13  Q.  (BY MS. ANDREWS) Do you have to know how to
14  charge and the amounts to charge certain individuals?
15  A.  Again, these were guidelines; it was the
16  standard.  The club required $20 per dances -- was what
17  everyone had to charge.
18  Q.  Do you recall --
19          So your testimony now is that the club set
20  all prices, is that correct, for the dances?
21          MS. REZAZADEH:  Objection, form.
22  A.  For the dances, yes, they -- The standard was a
23  $20 dance; you were not allowed to charge more.
24  Q.  (BY MS. ANDREWS) I'm just -- Okay.
25          Did you report all the income that you

BROOKE LAYTON  November 2, 2021                    46

1  received from club in your -- on your tax returns?
2          MS. REZAZADEH:  Objection, form.
3          Go ahead, Brooke, you can answer.
4  A.  Yes, but I also recorded all of my losses on my
5  tax returns as well.
6  Q.  (BY MS. ANDREWS) So what deductions did you
7  take on your losses on your tax returns?
8  A.  Fees paid to the club, as well as any outfits or
9  dance materials required for the club.
10  Q.  Did you deduct, like, hair/makeup?
11  A.  Not if those were things I was using outside of
12  the club.
13  Q.  So sometimes?
14          MS. REZAZADEH:  Objection, form.
15  A.  If it wasn't used inside the club specifically,
16  then no.
17  Q.  (BY MS. ANDREWS) If it was used inside the
18  club, did you deduct for hair and makeup?
19          MS. REZAZADEH:  Objection, form.
20  A.  No.
21  Q.  (BY MS. ANDREWS) Then why did you say that you
22  -- So your testimony is that you did not take any
23  deductions for hair and makeup on your tax returns?
24  A.  Correct.
25  Q.  And then mentioned materials; what kind of

BROOKE LAYTON  November 2, 2021                    47

1  materials did you take deductions for?
2  A.  Outfits, shoes.
3  Q.  Have you had cosmetic surgery?
4  A.  No.
5  Q.  Botox?
6  A.  No.
7  Q.  Any other injections?
8  A.  Any injections that I have received were when I
9  wasn't working at the club anymore.
10  Q.  Did you adver -- Do you have any expenses for
11  advertising, social media, yourself phone that deducted?
12  A.  I deducted my cell phone, but that was just so I
13  could communicate with clients.  Like, hey, I'm coming
14  in today; can you come see me?
15  Q.  What about any advertising expenses?
16  A.  No.
17  Q.  Did you select the music that you wanted to be
18  played when you were dancing?
19  A.  No, you can give a genere, and that was it.  The
20  DJ chose all the music we danced to.
21  Q.  So it's not correct to say that you had to pay
22  the DJ for certain music?
23  A.  I had to pay the DJ a $10 tip-out to leave.  But
24  if a client wanted to hear certain music, then they
25  could pay the DJ $20 to hear that music.

PLTFS APPX 000104

BROOKE LAYTON  November 2, 2021                    48

1    Q.   So you didn't have to pay the DJ for certain
2    music to be played?
3    A.   Correct.
4    Q.   Was there a maximum amount you could charge for
5    a lap dance?
6    A.   No, $20 was the rate.  We weren't allowed to
7    solicit tips or charge more for dances.
8    Q.   What's the relationship or --
9        When you would deduct the outfits, how would
10   you select these outfits?
11   A.   I would go to the dancer store and buy outfits
12   that fit the club.  We were not allowed to wear any
13   fishnets or anything like that.  We were also required
14   on certain days every month that there would be a
15   costume day, and if you did not show up in the costume
16   that was suitable to the club, you would not be allowed
17   to work and a day would be deducted against you.
18   Q.   Did you have head shots done in 2018/2019?
19   A.   No.
20   Q.   Were you working with a photographer in 2018 and
21   2019?
22   A.   That's right around the time that I was stopping
23   modeling as much, but I never had head shots.  They were
24   always studio set body shots.
25   Q.   And were you paying for those?

BROOKE LAYTON  November 2, 2021                    49

1    A.   No.
2    Q.   Who was paying for those?
3    A.   No one.  It was a trade between me and the
4    photographer.
5    Q.   Who was the photographer?
6    A.   There was many; I don't recall.
7    Q.   Well, can you name any?
8    A.   2018, so Sisoliz Images, S-I-S-O-L-I-Z, and that
9    was for Pinup Modeling.
10   Q.   And you were with Pinup Modeling in 2018 and
11   2019, correct?
12   A.   Yes, I have been a Pinup model since 2013, but I
13   would not go in Pinup attire in the club.
14   Q.   You claim that the club took a portion of tips
15   -- of your tips; explain that to me.
16   A.   It was mandatory tip-out of before you leave,
17   you had to do a mandatory $26 tip-out, $10 to mom, $10
18   to the DJ, $6 to the bar; that was mandatory every
19   shift.
20   Q.   So you paid out funds not to the club, but to
21   the DJ, the house mom and the bar, correct?
22   A.   To employees of the club, yes, I paid out $26
23   every shift.
24   Q.   Do you know whether or not the house mom and the
25   DJ and the bar that you were tipping were employees?

BROOKE LAYTON  November 2, 2021                    50

1    A.   I assume since they weren't dancers that they
2    were employees.
3    Q.   Okay.  It was your assumption that they are
4    employees, correct?
5    A.   Correct.
6    Q.   Is your testimony that it took no skills to be
7    -- to do what you did?
8    A.   Yes, you just had to look good naked.
9    Q.   With regard to the attorney's fees incurred in
10   this case, have you had to pay any?
11        MS. REZAZADEH:  Objection, form.
12   A.   No.
13   Q.   (BY MS. ANDREWS)  Do you know how much you owe
14   in attorney's fees?
15   A.   No.
16   Q.   Do you know the extent of the costs that have
17   been incurred in this case?
18   A.   No.
19   Q.   Have you received any invoice or billing
20   statement related to this case?
21   A.   No.
22   Q.   Is it your understanding that this is a
23   contingency case?
24   A.   I believe so, yes.
25   Q.   Is it your understanding that you don't have to

BROOKE LAYTON  November 2, 2021                    51

1    pay anything unless you win or get a settlement?
2    A.   Correct.
3        MS. REZAZADEH:  Objection, form.
4    A.   That is correct.
5    Q.   (BY MS. ANDREWS)  And prior to filing this
6    lawsuit, you never reached out to claim that you were an
7    employee or reached out to the club to claim that you
8    were an employee, correct?
9        MS. REZAZADEH:  Objection, form.
10   A.   Can you repeat the question?  I'm sorry.
11   Q.   (BY MS. ANDREWS)  So rather than talking to the
12   club first, you just filed a lawsuit claiming you're an
13   employee, correct?
14        MS. REZAZADEH:  Objection, form.
15   A.   I never brought this to the owner's attention.
16   I remember a conversation once with mom of just asking
17   in general if -- just bringing up, are we employees or
18   independent contractors, because I had been sent home
19   for not wearing the mandatory outfit.
20   Q.   (BY MS. ANDREWS)  And again, did you ever bring
21   this to the club owner's attention?
22   A.   No, I was fearful of being fired during the
23   time.
24   Q.   What other clubs have you worked at?
25   A.   During my time at PT's, I had a couple of months

15 of 39 sheets

BROOKE LAYTON  November 2, 2021          52

1  of breaks where I worked at the Mens Club in Dallas;
2  that was not suitable for me, so I tried Bucks Cabaret
3  in Dallas. After the Mens Club, I tried to go back to
4  PT's, and that's when they told me that I owed $300. So
5  at that point in time, I went to a different club, which
6  was Bucks Wild in Dallas.
7      Q.   When did you stop or leave PT's and start going
8  to Mens Club?
9      A.   I was maybe at Mens Club from maybe just July
10  and August.
11      Q.   Of 2000 --
12      A.   -- of 2019.
13      Q.   Okay. When were you at Bucks Cabaret?
14      A.   After I left PT's Mens Club in January, so I
15  started working at Bucks in January of 2020.
16      Q.   Have you sued these clubs, too?
17      A.   No, I did not work there long enough. They also
18  didn't have a mandatory fee to leave or a required
19  tip-out.
20      Q.   And where are you --
21          Are you working at any clubs now?
22      A.   No, I haven't worked at any clubs since March of
23  2020.
24      Q.   So can you describe what you did when you were
25  working at -- we'll start at PT's; what did you do?

BROOKE LAYTON  November 2, 2021          53

1      A.   I entertained guests or customers that came in.
2      Q.   How?
3      A.   By dancing.
4      Q.   And how would you --
5          Was there any way that you would make more
6  or less money?
7      A.   By providing more dances.
8      Q.   And how could you provide more dances?
9      A.   By the client asking for more dances.
10      Q.   Is it your testimony that you didn't receive any
11  tips?
12      A.   I received tips while on stage, and sometimes
13  walking through the club, people that were tipping would
14  give you a dollar or two.
15      Q.   How much would you normally receive in just the
16  tips each night?
17      A.   Again, I was a daytime worker so tips weren't as
18  lucrative as they would have been at night, so.
19      Q.   How much did you receive in tips during your
20  shift?
21      A.   Average 20 to $30.
22      Q.   Did you engage in any inappropriate conduct
23  while working at the club?
24      A.   No.
25      Q.   Were you involved in using drugs?

BROOKE LAYTON  November 2, 2021          54

1      A.   No.
2      Q.   Were you involved in illegal sexual activities?
3      A.   No.
4      Q.   Did you work over 40 hours a week?
5      A.   When?
6      Q.   Well, you've got a claim for overtime, so I'm
7  trying to figure out how.
8          So did you work more than 40 hours in a
9  week?
10      A.   Can I see what you're referencing?
11      Q.   Did you -- I'm just asking did you work -- like,
12  did you work more than 40 hours a week?
13          MS. REZAZADEH: Again, Latrice, when she
14  asks to see a document you're referring to --
15          MS. ANDREWS: I'm not referring to a
16  document. I'm asking her her recollection.
17          MS. REZAZADEH: She wants to see the
18  document. I mean, I just want to make it clear for the
19  record that you have repeatedly declined her request to
20  see documents you're specifically asking her about, so,
21  you know, that's fine. That's how you want to obtain
22  your testimony from her by misleading her or not
23  providing her all the information she needs to answer
24  your questions, but I just want to make it clear for the
25  record.

BROOKE LAYTON  November 2, 2021          55

1          Go ahead, Brooke, she's not going to show it
2  to you.
3      Q.   (BY MS. ANDREWS) I'm asking a question. If you
4  worked more than 40 hours a week. That's my question.
5  It's not about a document. I'm asking a question.
6          MS. REZAZADEH: You brought in the document
7  into question by saying you made a claim for it. And
8  she asked to see the document you're referring to that
9  she made the claim for it. So you --
10          MS. ANDREWS: If she's not making a claim
11  for it, then I don't need to worry about it.
12          MS. REZAZADEH: All right.
13      Q.   (BY MS. ANDREWS) My question is do you claim
14  that you worked 40 hours a week or more than 40 hours a
15  week?
16      A.   So again, you said that that is one of the
17  claims that is in this case, and I would just like to
18  verify that claim, a claim for over -- for overtime.
19      Q.   Did you work overtime?
20      A.   On average, I worked 32 hours a week. But
21  again, that varies on how long I stayed. If I came in
22  for additional shifts. There would be some days that I
23  worked six days; there would be some days I would go in
24  and work all seven days.
25      Q.   Are you aware you just changed your testimony

BROOKE LAYTON  November 2, 2021                                56

1  again?

2         MS. REZAZADEH: Objection, form,

3  argumentative, I mean.

4     Q.   (BY MS. ANDREWS) Are you aware that you just

5  changed your testimony regarding the amount of hours you

6  said you worked on average?

7         MS. REZAZADEH: She did not, so I don't know

8  why you're misstating the record. She said the same --

9         MS. ANDREWS: That's not an objection.

10  That's not true. She testified in here that she worked

11  24 hours or worked an average of 24 hours, 32 hours --

12  shifts.

13         MS. REZAZADEH: We can pull it back on the

14  record. You can have the court reporter read it back to

15  you. Is 24 to 32 is what she said. So if you're going

16  to nitpick on it, she said the number 32 earlier. So

17  she is not changing her testimony as you are

18  misrepresenting to her. And she's entitled to know.

19     A.   At that time, I wasn't being asked about

20  overtime as well. And again, all of these are averages,

21  so there would be days that I did work more. On

22  average, it was required that I had to work at least

23  four shifts or I would owe the club money. But often

24  times if I had missed a week before or missed a shift

25  before or missed a first, the club would require that I

BROOKE LAYTON  November 2, 2021                                57

1  came in for an additional shift or additional shifts in

2  order to forgo that $100 that I owed them or sometimes

3  more money.

4     Q.   (BY MS. ANDREWS) What are you claiming your

5  damages are in this case?

6     A.   I haven't calculated any damages.

7     Q.   How much are you --

8         It's your testimony that you don't know how

9  much you're owed?

10     A.   Correct.

11     Q.   How do you plan on coming up with the amount

12  that you're allegedly owed?

13     A.   By discussing with my attorney. This was not

14  something that we prepared ahead of time. We didn't sit

15  down and write all of this down together.

16     Q.   You're suing for money, correct?

17     A.   Yes.

18     Q.   You want money?

19     A.   Correct. Money that is owed to me under the law

20  of what being -- money that is owed for me being

21  misclassified as an independent contractor whenever I

22  was doing employee based work.

23     Q.   I understand that's your allegation. But you're

24  saying you don't know how much money you want, correct?

25         MS. REZAZADEH: Objection, form.

BROOKE LAYTON  November 2, 2021                                58

1     A.   That is correct. I answered that.

2     Q.   (BY MS. ANDREWS) Do you have a calendar or any

3  records of time that you're saying that you worked at

4  the club?

5     A.   No, but the club keeps diligent records, so you

6  would have all of those records.

7     Q.   It is your testimony that you recall having to

8  sign in or sign out?

9     A.   I had to sign in every day and I had to sign out

10  every day to leave.

11     Q.   And in those times and those time records would

12  be accurate, correct?

13         MS. REZAZADEH: Objection, form.

14     A.   It depends on what records the club has kept and

15  also what records they have provided to you.

16     Q.   (BY MS. ANDREWS) How would you know if they

17  were accurate or not?

18     A.   Based off of me signing in and providing the

19  last four digits of my social with my stage name.

20     Q.   And how were you paid by customers for the

21  dances that you provided?

22     A.   Cash.

23     Q.   Who would know how much money you would make a

24  night other than you?

25     A.   I wouldn't know that.

BROOKE LAYTON  November 2, 2021                                59

1     Q.   Have you kept any record of exactly how much

2  money you made while working at the club?

3     A.   No.

4     Q.   Did you understand that that was part of the

5  contract or an obligation that you had under the

6  contract?

7     A.   Again, no one went over the contract with me.

8  No one told me that -- it wasn't like an introduction to

9  independent contractor class that they sat everyone down

10  and said these are the requirements. Those were not

11  enforced. So if it was in the contract that I signed,

12  no one enforced it and no one made sure that that's what

13  we were doing.

14     Q.   What did the club, I guess, do for you such that

15  you thought it was a good idea to keep coming back?

16     A.   It wasn't the club; it was the clients and the

17  potential to make money. There's also not a lot of day

18  shifts in the Dallas-Fort Worth area that are lucrative

19  such as PT's. Most daytime clubs, there's no activity

20  or most clubs during the daytime, there is no activity.

21     Q.   So it was lucrative to work there?

22     A.   Lucrative to my survival, yes.

23     Q.   And what do you mean by "potential to make

24  money"?

25     A.   Again, it depends on how well the club

PLTFS APPX 000107

BROOKE LAYTON  November 2, 2021                    60

1   advertised, what promotions the club did to bring
2   customers in.  But just going in on a day shift, you
3   were more likely to have more people; that didn't
4   necessarily mean those people were tipping or buying
5   dances from you.
6       Q.   Did you make a determination that you had the
7   potential to make more money at PT's than other clubs in
8   town?
9       A.   PT's hired me, so that's where I stayed to work.
10  Again, I tried working at other clubs during the day,
11  and that was not -- there wasn't money there.  So PT's
12  is where I did my day shift.  I also tried to get hired
13  at another club that would not hire me because I have
14  tattoos.  So my options were very limited.
15      Q.   So it's your testimony you made more money at
16  PT's than you did at Mens Club, correct?
17      A.   Correct.
18      Q.   How much money did you make at Mens Club?
19      A.   I didn't.  I would go multiple days without
20  making any money whatsoever.
21      Q.   What about at Bucks Cabaret?
22      A.   That's why I left PT's was because Bucks had a
23  better daytime shift.
24      Q.   You're able to move around like that from job to
25  job, correct?

BROOKE LAYTON  November 2, 2021                    61

1       A.   You're not allowed to work at other clubs for
2   the same shift.  Because again, PT's has a standard four
3   days that you have to work, potentially more, so it
4   doesn't really leave room to work at other clubs while
5   working at PT's.
6       Q.   Who have you talked to regarding this lawsuit?
7       A.   My attorney, my husband knows.  I had mentioned
8   to one person that there may be a lawsuit, someone else
9   that had let me know that they were already part of a
10  lawsuit against PT's.
11      Q.   And who was that person?
12      A.   Julia Predmoore.  But I'm not familiar with that
13  case.
14      Q.   And when did you have this discussion?
15      A.   A few months ago.
16      Q.   And what did y'all talk about specifically?
17      A.   She had actually asked me if I would be
18  interested in joining a lawsuit that her lawyer set, and
19  I never got back to her.
20      Q.   Do you understand that this was filed as a
21  collective action?
22      A.   Yes, I believe that Julia has also spoken with
23  Ghazzaleh now, but I don't know if they've made contact.
24  I'm not sure because I don't know what other clients
25  Ghazzaleh has.

BROOKE LAYTON  November 2, 2021                    62

1       Q.   Are you aware that there's a collective action
2   waiver that you signed?
3       A.   May I see the document?  Is this my --
4       Q.   See understands and agrees -- Understands and
5   acknowledges, do you see that paragraph?
6       A.   Yes.  At the time, that's not what I realized I
7   was signing.  And again, I didn't join the lawsuit with
8   Julia Predmoore, and I don't know if she's part of this
9   one.
10      Q.   But you understand this is a collective action,
11  correct?
12      A.   If I'm the only one, is it a collective action?
13      Q.   Is it your understanding you're the only person
14  in this lawsuit?
15      A.   Yes.
16      Q.   Do you know who Ashland Shipley is?
17      A.   Yes, but I don't know anything — I don't know
18  if she's actually joining the lawsuit and will go
19  through with it.
20      Q.   Have you spoken to Ashland Shipley?
21      A.   I let her know that this was happening, and that
22  was as far as it got.
23      Q.   Have you solicited any other individuals to join
24  your lawsuit?
25      A.   No.

BROOKE LAYTON  November 2, 2021                    63

1       Q.   What else did you say about this lawsuit?
2            MS. REZAZADEH:  Objection, vague.
3            MS. ANDREWS:  That's fair.
4       Q.   (BY MS. ANDREWS)  What else did you tell Ashland
5   about this lawsuit?
6            MS. REZAZADEH:  Objection, misstates
7   testimony.
8            Go ahead, Brooke, you can answer.
9       A.   Again, I didn't really tell her anything.  I
10  just told her that there's a potential lawsuit going on.
11  But I, again, don't know how far she is in her process
12  with this.  And since all this has become more serious,
13  I haven't really talked with her, not about this
14  lawsuit.
15      Q.   (BY MS. ANDREWS)  When did you speak with her?
16      A.   In regards to this lawsuit?
17      Q.   Yes.
18      A.   Maybe like two months ago.
19      Q.   Have you spoken with her about anything else
20  since then?
21            MS. REZAZADEH:  Objection, vague, too
22  general.
23      Q.   (BY MS. ANDREWS)  Have you spoken with Ashland
24  at all since your conversation two months ago?
25      A.   I asked her if she had any photos of us when we

PLTFS APPX 000108

BROOKE LAYTON  November 2, 2021                    64

1  were working together.
2  Q.  And what was her response?
3  A.  She never sent me any, so.
4  Q.  How did you reach out to her?
5  A.  I called her, messaged her; I'm not sure.
6  Q.  Did you produce any of those communications to
7  your attorney?
8  A.  No, I wasn't asked to.
9  Q.  Request for production number -- do you know --
10     What do you know about Mainstage Management,
11  Inc.?
12  A.  Based off the lawsuit, that is the company that
13  owns PT's.  Before that, I had no knowledge about the
14  company.
15  Q.  It's not the entity that owns PT's.
16     Do you know of anybody at Mainstage
17  Management, Inc. that hired or fired or had any
18  involvement with your tenure there?
19  A.  I'm assuming the owner Nick, but no.
20  Q.  Do you --
21  A.  I don't know -- I don't know if people were
22  employees of Mainstage that also controlled my work.  I
23  wasn't privileged to that information.
24  Q.  Do you have any information regarding Mainstage
25  Management, Inc. that would make you think or that makes

BROOKE LAYTON  November 2, 2021                    65

1  you think they were involved in setting your rate of pay
2  or hiring and firing or anything related to your
3  relationship with PT's?
4  A.  I'm not sure who set the club standard of the
5  $20 plus the 50 or the $76 that was mandatory.  Again, I
6  don't know the inner workings of the club on that level,
7  so that information was not readily available to the
8  workers.
9  Q.  So to be clear, you do not have any information
10  about Mainstage Management, Inc. and it being involved
11  with your employment or alleged employment?
12     MS. REZAZADEH:  Objection, form.
13  A.  Again, I wasn't given that information.
14  Q.  (BY MS. ANDREWS)  And since the filing of this
15  lawsuit, have you become aware of any information that
16  makes you think Mainstage Management, Inc. was involved
17  with the hiring and firing, setting any practices or
18  involved with your relationship with the club?
19  A.  Who owns the club?  And if Mainstage isn't the
20  person that owns the club or the entity that owns it,
21  then I don't know why I would have information from
22  them, I guess.  So do they own PT's?
23  Q.  That's part of why I'm trying to find out why
24  they're in the case.  So that's why I'm asking if
25  there's a reason that --

BROOKE LAYTON  November 2, 2021                    66

1     MS. REZAZADEH:  If you're presenting that
2  there's another entity that owns the club that we're
3  discussing, then you should have identified them in your
4  disclosures, right, potential parties.  So the defendant
5  owns the club.
6     Brooke, just answer based on what you
7  remember because you can't rely on what she's telling
8  you.  I mean, so I'm just going to recommend.  I mean
9  she won't show you the documents either, so.
10  A.  I -- Again, I was not aware that Mainstage was
11  involved with PT's, so I do not have that information.
12  But is PT's owned by Mainstage Entertainment?
13  Q.  (BY MS. ANDREWS)  So you don't know what
14  Mainstage Entertainment is?
15  A.  I'm sorry.  What was that?
16     MS. REZAZADEH:  Talking about the owner of
17  the club.  Answer the questions based on whoever the
18  owner of the club is even though we don't -- she's not
19  going to clarify for you who is the owner and who is
20  not, so all you can do is answer.
21  Q.  (BY MS. ANDREWS)  Will you identify any of the
22  managers and/or people that you know were involved with
23  setting these policies or fees or the basis of your
24  claims.
25  A.  Are you asking if I know which managers I worked

BROOKE LAYTON  November 2, 2021                    67

1  with?
2  Q.  Can you identify -- if you can identify the
3  people who were involved in hiring, firing day-to-day?
4  A.  The manager that was there most consistently was
5  Jessie.  I don't know his last name.  And I only
6  remember his name because there was multiple Jessie's
7  that worked at the club.
8  Q.  Okay.
9     THE WITNESS:  Would we be able to take
10  another break?  I'm sorry.
11     MS. ANDREWS:  Sure.
12     (Recess taken)
13     THE REPORTER:  Going back on the record.
14  Q.  (BY MS. ANDREWS)  Ms. Layton, are you aware of a
15  counter-claim having been filed in this case?
16  A.  Like a claim from the people that you represent?
17  Q.  Correct.
18  A.  I believe so, yes.
19  Q.  Okay.  I'm going to try to share my screen.
20  Okay.  Do you have records of how much money you made
21  when you were working at the club?
22  A.  No.
23  Q.  Do you have any accurate or reliable information
24  regarding the entertainment fees you made while you were
25  working at the club?

BROOKE LAYTON  November 2, 2021                68

1    A.   No.

2    Q.   Okay. Do you recall testifying earlier about

3    there being sign-in sheets?

4    A.   Yes, that is correct.

5    Q.   Okay. I'm going to open -- Let me share my

6    screen. If I can get it to rotate. Let's see what

7    happens when I press this; no, that did not do it.

8    There we go.

9         Are these kind of the type of sign-in sheets

10   that you were discussing?

11   A.   Yes, these are the sign-in sheets for the club

12   while I was working there.

13   Q.   And can you tell me how this was used?

14   A.   It was used for the club's records to verify

15   that you worked your required shifts, as well as what

16   time you clocked in and clocked out.

17   Q.   Okay. And the first timesheet they have for you

18   is --

19        MS. ANDREWS:  And this will be marked as

20   Exhibit 8. And I'm going to go back and try to fill in

21   all my exhibits really fast.

22        (Defendant's Exhibit No. 8 was marked.)

23   Q.   (BY MS. ANDREWS)  So the first timesheet they

24   actually have you coming in would be on July 15, 2018?

25        MS. REZAZADEH:  Has that been produced?

BROOKE LAYTON  November 2, 2021                69

1         MS. ANDREWS:  I actually got them today or

2    yesterday. We've been going through them.

3         MS. REZAZADEH:  I'm not going to be able to

4    have you question her about them. I haven't had the

5    chance to -- We haven't had the chance to review them.

6    I haven't had a chance to review them. So if you want

7    to take a break so I can review them with her?

8         MS. ANDREWS:  I have a packet coming to

9    y'all and hopefully y'all will produce some documents to

10   me because I don't have anything.

11        MS. REZAZADEH:  We're not going to be able

12   to allow you to ask her questions about documents that

13   you haven't produced and --

14        MS. ANDREWS:  I already got the one I wanted

15   on the record.

16        (Defendant's Exhibit No. 2 was marked.)

17   Q.   (BY MS. ANDREWS)  So with regard to the

18   complaint we discussed earlier, did you ever -- have you

19   had a chance to look at the complaint that was filed in

20   this case?

21   A.   No, I have not reviewed it.

22   Q.   So you don't know the allegations that have been

23   and the basis of the claim in the lawsuit that you're

24   asserting against my clients?

25   A.   Just to clarify, you're saying that this is the

BROOKE LAYTON  November 2, 2021                70

1    counter-claim?

2    A.   No, this is this complaint that your attorney's

3    filed on your behalf against --

4    A.   Yes, I have. Yes, I have seen this.

5    Q.   Okay. So earlier, we were discussing overtime

6    allegations; do you recall that discussion?

7    A.   Yes.

8    Q.   And one of the claims in the case -- I thought I

9    had written down the page number, but I have not.

10        So the second cause of action in your

11   complaint is there was a failure to pay overtime wages;

12   do you see that?

13   A.   Yes.

14   Q.   And do you have any specific week that you can

15   identify where you worked 40 hours?

16   A.   Without seeing the club records, no.

17   Q.   Other than the club records, would you have any

18   way to identify whether there were overtime hours due?

19   A.   Not that I recall.

20   Q.   And if the club records don't show that you ever

21   worked 40 hours a week, is it your contention that that

22   would be correct?

23        MS. REZAZADEH:  Objection, form. I'm going

24   to instruct her not to answer. The question is

25   misleading. She can't answer when she hasn't seen the

BROOKE LAYTON  November 2, 2021                71

1    club records you're relying on.

2         MS. ANDREWS:  I don't think that's

3    misleading.

4    Q.   (BY MS. ANDREWS)  And are you stating that the

5    club records are the only records that would be able to

6    prove or disprove whether you had overtime?

7         MS. REZAZADEH:  Objection.

8         You can answer, Brooke, if you can.

9    A.   I don't know how to answer this one.

10        MS. REZAZADEH:  You're fine. Just answer

11   whatever you know.

12   A.   Just depending on how well of records the club

13   kept, then yes.

14   Q.   (BY MS. ANDREWS)  Can you independently identify

15   a week that you worked more than 40 hours?

16   A.   No, not off the top of my head.

17   Q.   Was there a week that you know of that you

18   actually worked more than 40 hours?

19        MS. REZAZADEH:  Objection, asked and

20   answered.

21   A.   Not off the top of my head, but I know there

22   were some weeks that I did go in and work five to six

23   shifts, potentially more.

24   Q.   (BY MS. ANDREWS)  Okay. What weeks were those?

25   A.   Typically rent weeks.

BROOKE LAYTON  November 2, 2021                72

1   Q.   When was a rent week?

2   A.   Usually the end of the month and the first week

3   of the month, depending on when rent was due, which was

4   typically the third or the fifth?

5   Q.   And if that is not reflected in any of the

6   records, do you have any other way to prove that you

7   worked overtime?

8   A.   No.

9   Q.   According to their records, the first day that

10  you worked would have been July 15, 2018; does that

11  sound correct to you?

12          MS. REZAZADEH:  Objection, form.  Again, I'm

13  not going to allow her to answer questions about records

14  she's not had an opportunity to review, neither have I.

15  Q.   (BY MS. ANDREWS)  Does July 15, 2018 sound like

16  the first date you may have worked?

17  A.   Potentially.  It depends on the contract that I

18  signed for 2018 and when that date was.

19  Q.   And then November 27, 2000 -- November 27, 2019

20  is the last time they have you signed in in 2019; does

21  that sound like the correct date -- last date you

22  worked?

23          MS. REZAZADEH:  I'm going to object and

24  instruct my client not to answer.  This is misleading

25  questioning because she has not had the benefit of

---

BROOKE LAYTON  November 2, 2021                73

1   reviewing the records you're relying on, neither have I.

2   Q.   (BY MS. ANDREWS)  Do you recall testifying

3   earlier that your last day was sometime in December

4   2019?

5          MS. REZAZADEH:  Go ahead, Brooke.

6   A.   Yes.

7   Q.   (BY MS. ANDREWS)  Could it actually have been

8   November 27, 2019?

9   A.   Without seeing the records, I don't know.

10  Q.   Do you have anything to show or prove that you

11  worked at all in December of 2019?

12  A.   Not at this time.

13  Q.   Not at this time or there is not anything?

14  A.   Not at this time.

15  Q.   What documents do you think you have that could

16  prove that you worked in December 2019?

17  A.   I don't actually know.

18  Q.   What would you --

19          What are you wanting to look at and refer to

20  to prove that you worked in December of 2019?

21  A.   I remember having a show with my Burlesque group

22  for December.  December was usually whenever we were

23  traveling for shows.  And I remember I had to miss a

24  show that was in Denton on December 6, 2019 because I

25  had come from a club drunk, so I could not perform.  So

---

BROOKE LAYTON  November 2, 2021                74

1   that would be my for sure date.

2   Q.   And you testified earlier that you didn't work

3   in June or July because you were working at the Mens

4   Club, correct?

5          MS. REZAZADEH:  Objection, misstating

6   testimony.

7   A.   Again, I don't know the for sure months; that is

8   my best guess, but I do know it was during the summer at

9   some point.

10  Q.   (BY MS. ANDREWS)  Okay.  Would it be accurate to

11  say it was from about May 15th until August 3rd you did

12  not provide services?

13          MS. REZAZADEH:  Objection, asked and

14  answered.

15  A.   Do you have documentation stating those dates?

16  Q.   (BY MS. ANDREWS)  Yeah, I do but your attorney

17  doesn't want for you to look at them yet.

18          MS. REZAZADEH:  She didn't want to produce

19  them.

20          MS. ANDREWS:  As I stated on the record, I

21  received them yesterday.

22          MS. REZAZADEH:  While we're on the record, I

23  saw that's like a 100-page document.  Are you going to

24  serve those on plaintiffs today?

25          MS. ANDREWS:  Yeah, I actually have a

---

BROOKE LAYTON  November 2, 2021                75

1   printed copy and I'll get those out to you.

2          MS. REZAZADEH:  Thank you.

3          MS. ANDREWS:  You're welcome.  And I would

4   really appreciate if y'all would produce any documents

5   because we have nothing from y'all and it's not

6   appropriate to say that you'll produce it at an agreed

7   upon time under the Federal Rules of Civil Procedure.

8   So if y'all could actually produce them, that would be

9   fantastic so that we're all in compliance.

10  Q.   (BY MS. ANDREWS)  With regard to -- We've

11  discussed, I think -- I think Exhibit 3 is --

12          MS. ANDREWS:  Donna, is Exhibit 4 the

13  contract?  I believe that's already been marked.  Can

14  you confirm?

15  Q.   (BY MS. ANDREWS)  And in 2018, you testified

16  that you signed the contract and you started working,

17  correct?

18  A.   Whatever form you showed me, that's what I

19  signed.

20  Q.   And this is actually the 2019 version, so this

21  is the second time that you signed the contract?

22  A.   This does not -- To my recollection, this wasn't

23  the same club or the same agreement that I signed when I

24  start working in 2018.  This was a new agreement that if

25  they decided to rehire you, you had to sign it in order

BROOKE LAYTON  November 2, 2021          76

1  to be an independent contractor.
2     Q.   But you signed this one in 2019, correct?
3     A.   Yes.
4     Q.   And it wasn't forced on you to be there; you
5  chose to sign again, correct?
6          MS. REZAZADEH:  Objection, form.
7     A.   If I wanted to continue working at PT's, it was
8  required that I had to sign this.
9     Q.   (BY MS. ANDREWS)  And this would have been the
10  second time you signed a License And Lease Agreement
11  with them, correct?
12         MS. REZAZADEH:  Objection, I'm going to
13  instruct her not answer because if you have an agreement
14  she signed in 2018 then you need to show it to her.  You
15  haven't produced it.  She hasn't had the benefit of
16  reviewing it.
17         MS. ANDREWS:  She's already testified she
18  signed the document in 2018.
19         MS. REZAZADEH:  Yeah, but she doesn't --
20         MS. ANDREWS:  She's already testified she
21  signed the document in 2018, that it was the license and
22  lease agreement.
23         MS. REZAZADEH:  You're misleading.  Go
24  ahead.
25     A.   Can I see the 2018 document that you're

BROOKE LAYTON  November 2, 2021          77

1  referring to?
2     Q.   (BY MS. ANDREWS)  I don't have that one.  I have
3  the 2019 one, which is the one, the second document
4  you're saying you signed in January of 2019.
5     A.   Yes, this is the document I signed in 2019.  The
6  club, again, the first one that I signed, I don't
7  remember it being like this.  It was just me putting in
8  my name, and I thought it was...
9     Q.   Okay.
10         (Defendant's Exhibit No. 5 was marked.)
11         MS. ANDREWS:  This is what's Exhibit 5 or
12  will be marked as Exhibit 5.
13     Q.   (BY MS. ANDREWS)  Have you seen these initial
14  disclosures before?
15     A.   I can't say for certain.  This is the 2019 or
16  this is the case??
17     Q.   This is the case.  This is the thing your
18  attorneys prepared on your behalf, and I'm trying to
19  find out if you reviewed it so I can ask you about it.
20  But if you've never seen it, then we're wasting our
21  time.  So does any of this look familiar to you?
22     A.   Again, I got a lot of documents, and I reviewed
23  them as they came in.  But I can't really have in detail
24  understanding that an attorney would on the documents.
25     Q.   Have you seen this before?

BROOKE LAYTON  November 2, 2021          78

1          MS. REZAZADEH:  Objection, asked and
2  answered.
3          MS. ANDREWS:  It has not been answered.
4     Q.   (BY MS. ANDREWS)  Have you seen this particular
5  document before?
6     A.   I believe so.
7     Q.   Okay.  Other than your assumption that the
8  Mainstage Management, Inc. has ownership of PT's, is
9  there any other reason that you would consider them an
10  employer?
11    A.   Yes, they gave directions to management or
12  anyone that worked for the club on what was supposed to
13  happen.  If this is Nick's company, then Nick is the
14  owner, he created the requirements.
15    Q.   So what specifically are you saying that
16  Mainstage Management, Inc. did related to PT's?
17         MS. REZAZADEH:  Objection, vague, too
18  general.
19         You can answer, Brooke, if you can.
20    A.   I mean, this is the company that -- It says at
21  the top, it says Mainstage Management for d/b/a PT's
22  Club for Nick.  So they are the LLC that holds the
23  company.
24    Q.   (BY MS. ANDREWS)  Is it your understanding that
25  because Nick may or may not own an interest in Mainstage

BROOKE LAYTON  November 2, 2021          79

1  Management, Inc., that's enough for it to be an
2  employer?
3          MS. REZAZADEH:  Objection, vague, ambiguous,
4  confusing.
5     A.   Can you scroll back up to top of this, please?
6  Based off of what the defendants or who the defendants
7  are, then yes, I would say they are the management for
8  this club.  Nick's Mainstage, Inc. Dallas PT's d/b/a
9  PT's Mens Club and Nick Mehmeti like...
10    Q.   (BY MS. ANDREWS)  Are you reading -- So I think
11  I'm -- There are two corporations that are being sued,
12  one being Mainstage Management, Inc., the other being,
13  Nick's Mainstage, Inc., which is Dallas PT's d/b/a PT's
14  Mens Club; do you see that?
15    A.   Yes.  And if it says the management is in the
16  name.  So again, if this is someone that is a part owner
17  of PT's, then yes, I would say that they have a say in
18  how the club is run and how employees are treated versus
19  independent contractors.
20    Q.   And if that entity does not have any ownership
21  of Nick's Mainstage, Inc. PT's, then you would agree
22  that they are not -- should not be in this case,
23  correct?
24         MS. REZAZADEH:  Objection, form, objection,
25  too general, calls for a legal conclusion.

22 of 39 sheets

PLTFS APPX 000112

BROOKE LAYTON  November 2, 2021                    80

1    MS. ANDREWS: It's not a proper objection.
2    MS. REZAZADEH: You can go ahead, Brooke.
3  **A.  So does Mainstage Management have an ownership**
4  **in PT's club? Do they have a stake in PT's club with**
5  **Nick?**
6    **Q.**  (BY MS. ANDREWS) Is that your understanding?
7    **A.  It is my understanding that the management club**
8  **as well as Nick's Mainstage would be the owners of the**
9  **club and would dictate what an employee does and how the**
10 **property is run.**
11   **Q.**  So it's your belief that Mainstage Management,
12 Inc. has an ownership in Nick's Mainstage, Inc. at PT's,
13 and therefore that's why they're a party; is that
14 correct?
15    MS. REZAZADEH: Objection, misstates
16 testimony.
17   **A.  I feel I've already answered that question, so I**
18 **don't know how else to answer it.**
19   **Q.**  (BY MS. ANDREWS) Have you received a document
20 ever signed by Mainstage Management, Inc. related when
21 you were working at PT's?
22   **A.  Without seeing documentation, I can't say for**
23 **sure.**
24   **Q.**  Did you ever communicate with someone from
25 Mainstage Management, Inc.?

BROOKE LAYTON  November 2, 2021                    81

1    **A.  Unless they were an employee at PT's and also**
2  **Mainstage Management, Inc., I wouldn't have that**
3  **information.**
4    **Q.**  But do you have any interaction with anyone from
5  Mainstage Management, Inc.?
6    **A.  Without them disclosing that they are part of**
7  **Mainstage Management, Inc., I would not be given that**
8  **information.**
9    **Q.**  Were you supervised by anybody from Mainstage
10 Management, Inc.?
11   **A.  Again, without knowing that they are represented**
12 **by Mainstage Management as an employee, then that**
13 **information is not readily given to independent**
14 **contractors.**
15   **Q.**  Other than the name of the entity, is there any
16 reason for you to believe that Mainstage Management,
17 Inc. was an employer of yours?
18   **A.  Again, we weren't given the owners names for the**
19 **club or who runs the club. I know that Nick is the**
20 **owner of the club, but that doesn't mean other companies**
21 **don't have stakeholds within the same club and also**
22 **provide the requirements for independent contractors and**
23 **how the club is ran.**
24   **Q.**  My question was other than the name Mainstage
25 Management, Inc., is there anything that makes you think

BROOKE LAYTON  November 2, 2021                    82

1  that Mainstage Management, Inc. was an employer of
2  yours?
3    MS. REZAZADEH: Objection, vague, objection
4  and too general, plus asked and answered.
5    Brooke, go ahead just keep repeating
6  yourself, I guess.
7    **A.  Yeah, again, I wasn't given information. It's**
8  **not like whenever as an independent contractor you're**
9  **not given here are all of the owners; here's every**
10 **single person that has stakehold.**
11   MS. ANDREWS: Objection, non-responsive.
12   **Q.**  (BY MS. ANDREWS) Do you have anything other
13 than the name of the entity that causes you to believe
14 that Mainstage Management, Inc. was your employer?
15    MS. REZAZADEH: I'm going to ask you not to
16 interrupt my client and to move on. Because now you're
17 just harassing. You've asked her, and she's answered
18 you repeatedly.
19    MS. ANDREWS: She has not answered my
20 question. It's a simple yes-or-no question. She's
21 saying I didn't have this information; I didn't have
22 that. I'm just asking if there's something that forms
23 her basis and belief other than the name of the company.
24 And she's not answered the question.
25    MS. REZAZADEH: Like, just because she's not

BROOKE LAYTON  November 2, 2021                    83

1  giving you the answer you want doesn't mean you get to
2  ask it over and over again. She told you she doesn't
3  know; she can't tell you.
4    MS. ANDREWS: That's not what I'm -- I'm
5  asking if there is anything other than the name of the
6  company that causes her to believe they're involved.
7    MS. REZAZADEH: Anything other than what?
8  What other things would it be? Too general, too vague.
9    MS. ANDREWS: I'm asking why are they being
10 sued. That's all I'm asking. If she doesn't have
11 anything other than the name, she can say no. Is there
12 something other than the name, tell me yes.
13    MS. REZAZADEH: She doesn't know what you're
14 talking about. She's answered your bad question the
15 best way she can.
16    You don't have to answer unless she asks you
17 a question. She can re-ask the question again --
18    If you want.
19    -- and you can answer.
20   **Q.**  (BY MS. ANDREWS) When was the first time you
21 heard of Mainstage Management, Inc.?
22   **A.  Am I allowed to see the document that I signed**
23 **in 2019 or the one in 2018?**
24   **Q.**  I'm just asking you when you first heard the
25 name Mainstage Management, Inc.

PLTFS APPX 000113

BROOKE LAYTON  November 2, 2021                      84

1    A.   I know, and I'm under -- Like this is, like,
2    there -- you know, like I'm under oath right now.  I
3    just want to make sure if I signed something in 2018 or
4    2019 that states Mainstage Management, I would just like
5    to see that to make sure that I'm answering correctly.
6    Q.   If you don't know, you don't know.  Like I
7    really -- That's fine, too.  Like, if you don't know,
8    say I don't know, and then we'll move on.
9         MS. REZAZADEH:  That's fine.  Go ahead,
10   Brooke.  If you don't remember, you don't remember.  If
11   you don't know, you don't know.  Like, it's okay; it's
12   not the end of the world.
13   Q.   (BY MS. ANDREWS)  If this helps at all, I'm
14   scrolling PT's Mens Club to the signatory on that.
15        MS. REZAZADEH:  If you want to represent to
16   her and I can represent to her, I don't think Mainstage
17   Management, Inc. is named in this contract, right,
18   Latrice?
19        MS. ANDREWS:  I don't believe it's named in
20   this contract either.
21   A.   Is Nick's Mainstage in this contract?
22   Q.   (BY MS. ANDREWS)  Probably not.  It's signed by
23   PT's Mens Club.
24   A.   But is it under Nick Mehmeti?
25   Q.   It's signed as d/b/a PT's Mens Club?

BROOKE LAYTON  November 2, 2021                      85

1         MS. REZAZADEH:  Yeah, it's fine, Brooke, if
2    you don't remember.  I mean, it's not on these contracts
3    if that's what you were worried about, like it not being
4    on one of these contracts and you potentially not
5    acknowledging that.
6    Q.   (BY MS. ANDREWS)  Yeah, I just want to know when
7    the first time you heard of Mainstage Management, Inc.
8         MS. REZAZADEH:  Brooke.
9    A.   When this lawsuit was brought.  Because again, I
10   wasn't given the parent company information whenever I
11   signed a contract with PT's Mens Club.
12        MS. ANDREWS:  Objection to the
13   non-responsive portion.
14   Q.   (BY MS. ANDREWS)  Did you ever receive any money
15   or payment from the club?
16   A.   No.
17   Q.   Did the club ever, the club itself, ever take
18   any money from you?
19   A.   Yes, the $76 in which I've referenced where 10
20   goes to mom, that was mandatory; $10 goes to Rubin,
21   which was mandatory; the 6 goes to the bar, which was
22   mandatory, and then a mandatory $50 if I wanted to leave
23   before 7.  And I also -- If I missed a shift, then it
24   would be $100 that I had to pay them.  So every time I
25   went to work, I paid the club to work; they never paid

BROOKE LAYTON  November 2, 2021                      86

1    me.
2    Q.   And you made more -- Most of the time, you would
3    make more than you spent, correct?
4    A.   No, there were many a days -- there were many a
5    days that I either left negative or broke even.  So
6    those -- Again, that's why that factor when you asked on
7    average how much I made, those were factored in there as
8    the variables.
9    Q.   And your average was 100 to $200 a shift,
10   correct?
11   A.   Yes, with all of those factors included.  Either
12   --
13   Q.   On average, you would make money, correct?
14        MS. REZAZADEH:  Objection, too vague, calls
15   for calculations; she's not a mathematician.
16   Q.   (BY MS. ANDREWS)  Well, $100 is a positive
17   number, correct?
18   A.   Yes.
19   Q.   And $200 is a positive number, correct?
20   A.   Yes, but I've also given you negative numbers
21   that I have received as well by leaving the club owing
22   them money or having to pay that additional $100 fee if
23   I missed a shift or having to pay my tip-out.
24   Q.   Your testimony was that on average, you would
25   make $100 to $200.  This is on average, you would make

BROOKE LAYTON  November 2, 2021                      87

1    100 to $200 a shift; is that correct?
2         MS. REZAZADEH:  Objection, vague.
3    A.   Based off of my previous testimony, yes, that is
4    correct.
5    Q.   (BY MS. ANDREWS)  So on average, you made money
6    when you would work at the club?
7         MS. REZAZADEH:  Objection, vague, too
8    general, confusing.
9         Go ahead, Brooke.
10   A.   I don't know how to answer that.
11   Q.   (BY MS. ANDREWS)  If you would lose money or you
12   always got negative money, would you have gone somewhere
13   else?
14   A.   Yes, most people do not keep working at a job if
15   they're repeatedly losing money.  Again, PT's was my
16   only option for a while, so that is where I worked.
17   Everyone's survival level is different.  That was what
18   my survival level was at.
19        MS. ANDREWS:  And, Donna, can you find in
20   the transcript -- I just want to confirm when she talked
21   about six -- her average shifts being six hours and read
22   it back?
23        THE REPORTER:  Give me one second.
24        MS. ANDREWS:  Thank you.
25        (The requested portion was read.)

PLTFS APPX 000114

BROOKE LAYTON November 2, 2021    88

1    MS. ANDREWS: That's what I needed to know.
2  I pass the witness.
3    MS. REZAZADEH: Thanks for your time,
4  Brooke. I just have a few questions for you.
5    EXAMINATION
6  BY MR. REZAZADEH:
7    Q.  So Exhibit 4, that agreement that Latrice
8  showed you earlier, when was that signed?
9    A.  The one that was signed in January, January 3,
10  2019?
11    Q.  Uh-huh.
12    A.  Yes.
13    Q.  So do you recall signing an agreement at PT's
14  prior to that agreement?
15    MS. ANDREWS: Objection.
16    Q.  (BY MS. REZAZADEH)  Huh?  Go ahead.
17    A.  Not that looked like the one I signed in 2019.
18    Q.  Okay.  Did you -- Could you perform in flats or
19  flip-flops at PT's?  What was the answer?
20    A.  No, it was required that I had to wear what were
21  considered dancer heels.
22    Q.  Okay.  Were there any other dress code
23  requirements like that?
24    A.  It was mandatory that we had to dress up for the
25  -- whatever monthly theme there was.  And if you were

BROOKE LAYTON November 2, 2021    89

1  not dressed up even if that fell during one of your
2  first shifts, you had to wear a costume or you would be
3  asked to leave.  And that did happen to me once.  I was
4  trying to come in to get either my first or my last
5  shift for that week before the week started again, and
6  was told I could not work because did not have the
7  costume.
8    Q.  Who told you that?
9    A.  Management.
10    Q.  Okay.  What about the -- You had to wear dancer
11  heels; who told you that?
12    A.  Management.  I was...
13    Q.  You said earlier you got tips performing on
14  stage?
15    A.  Yes.
16    Q.  How did that work performing on stage?
17    A.  People would come up to the stage with cash to
18  tip you or to set it on stage.  But you -- Stage
19  rotation was mandatory.  The only times that you could
20  -- If they skipped you, maybe you didn't hear them or
21  you were with a client, they would charge you $60 for
22  each set that you skipped.
23    Q.  Was there any exception to that?
24    A.  If you had bought -- if your customer had bought
25  a skybox, you got one skip, but there had been multiple

BROOKE LAYTON November 2, 2021    90

1  times that you only get one skip.  So if you're trying
2  to either extend the skybox or there's not enough girls,
3  you would still have to go down for your second shift or
4  you would be charged $60.
5    Q.  Who collected the $60?
6    A.  The club did.
7    Q.  Like who, specifically, you know, the person?
8    A.  Either the manager or the house mom.
9    Q.  Okay.  Did you get to pick the music you
10  performed to on stage?
11    A.  Typically, no.  If -- We could say a genere, but
12  we couldn't give specifics.  Often times -- The only
13  time you could dance to a specific song was if your
14  customer paid $20 to the DJ for him to play it.
15    Q.  When you arrived at work at PT's, did you have
16  to -- What did you do?  What did you have to do?
17    A.  If you got there and were on stage or on the
18  floor before 11, your house fees were free.  And then
19  you -- So you come in, you get ready, you sign in with
20  mom; they verify who's in there and on the floor by 11.
21  If you're not on the floor by, I think it was honestly
22  like 10:55, then you would have to pay a house fee.
23    So typically if you came in and it was after
24  11 and you couldn't get ready on time, then you had to
25  check in with the door girl and get the slip which shows

BROOKE LAYTON November 2, 2021    91

1  that you paid that fee, and then you would go and take
2  it to mom and the DJ so they would know that you're
3  there and about to get ready.  And then in order to
4  leave, I would go and pay the door girl $50 to leave
5  and then had to have mom and the DJ sign it only after I
6  gave them my $26 tip-out.
7    Q.  Did we look at some records, sign-in records
8  from PT's together prior to your deposition?
9    A.  Yes, the ones that were -- I think there were
10  three dates in December for 2018 that we have had.
11    Q.  Are those the only ones you've seen prior to
12  your deposition today?
13    A.  Yes.
14    Q.  Okay.  So you haven't had the opportunity to
15  review any other sign-in records from PT's?
16    A.  Correct.
17    MS. REZAZADEH: Pass the witness.
18    EXAMINATION
19  BY MS. ANDREWS:
20    Q.  The sign-in records that you did look at, did it
21  have a column that talks about what the contract damages
22  were or how much you were charged for when you left?
23    A.  Can you show those records, please?
24    Q.  I don't have the three that she's referring to
25  in my things, so I don't have them.

25 of 39 sheets

PLTFS APPX 000115

BROOKE LAYTON  November 2, 2021                                92

1    I'm just asking if you recall seeing
2  anything about damages or the amounts that you paid on
3  those sign-in sheets?
4    A.   **Those were typically -- That would be your fee**
5  **to leave.**
6    Q.   So it wasn't always the same amount, correct?
7    A.   **After January 2019, they changed it the standard**
8  **$50. Before that, it was $8 every 30 minutes that had**
9  **to be paid to the club, so that would vary.**
10   Q.   So it's not always as you previously testified,
11 correct?
12   A.   **In regards to the contract that I signed for**
13 **2019, the $50 is accurate.**
14   Q.   But it wasn't accurate for the entire term that
15 you were there, correct?
16   A.   **Under the 2018 agreement that I signed, it was**
17 **at the time the standard $60 or $8 every 30 minutes.**
18        (Defendant's Exhibit No. 6 was marked.)
19   Q.   (BY MS. ANDREWS)  Okay.  And just for purposes
20 that we've got all of the exhibits, I'm going to share
21 screen and ask if you have seen any of the discovery.
22 We talked about the initial discovery disclosures, I
23 think, which were Exhibit 5.  The request for admissions
24 that you served your responses to, did you -- it's dated
25 -- Well, it's dated October 18th.  I don't --

BROOKE LAYTON  November 2, 2021                                93

1    Do you recall seeing these before?
2    A.   **I may have opened it, but I'm not sure I've gone**
3  **through this. It's a 42-page document.**
4    Q.   All right.  I'm just asking.  And so that's
5  Exhibit 6.  Exhibit -- I think this is 7.  Seven is the
6  interrogs.  Do you recall preparing these or being --
7  participating in the preparation of the request for the
8  interrogatory responses?
9        (Defendant's Exhibit No. 7 was marked.)
10   A.   **Yes.**
11   Q.   (BY MS. ANDREWS)  Did you prepare verification
12 for these interrogatory responses?
13   A.   **What do you mean by verification?**
14   Q.   Did you sign a notarized statement saying that
15 these responses were true and correct?
16   A.   **Not that I can recall.**
17        (Defendant's Exhibit No. 9 was marked.)
18   Q.   (BY MS. ANDREWS)  And this will be Exhibit 9,
19 which are the production responses, and you have
20 provided all -- These are the requests for production,
21 which will be Exhibit 9.
22        And you testified previously that you
23 provided all the responsive documents that you had to
24 your counsel, correct?
25   A.   **Yes.**

BROOKE LAYTON  November 2, 2021                                94

1        MS. REZAZADEH:  Objection, misleading.
2    Q.   (BY MS. ANDREWS)  And you provided the responses
3  documents that you gave to counsel, correct?
4    A.   **Yes.**
5    Q.   And you recognize this document as well?
6    A.   **It looks like the other one, so possibly.**
7    Q.   Then this is request for production number 3,
8  which specifically requested your tax returns, do you
9  see that?
10   A.   **Yes.**
11   Q.   And if you have not, could you please provide
12 those to counsel so they can be produced whenever
13 counsel produces documents?  I'm going to stop share.
14        MS. ANDREWS:  I pass the witness.
15             EXAMINATION
16 BY MS. REZAZADEH:
17   Q.   Brooke, you testified -- how did you make money
18 at PT's?
19   A.   **By -- primarily by giving dances.**
20   Q.   Right, so who would you get money from?
21   A.   **The customers.**
22   Q.   What gets a customer to come to a club like
23 PT's?
24   A.   **Whatever advertising, marketing specials.  I**
25 **don't know the extent of what all that they do, but it's**

BROOKE LAYTON  November 2, 2021                                95

1  not my job to get people into the club; I'm just there
2  to entertain people that come in.
3    Q.   Okay.  So you didn't have any say at the
4  promotional events that they ran?
5    A.   **Absolutely not.**
6    Q.   Their advertising?
7    A.   **No.**
8    Q.   Specials, group specials?
9    A.   **No.**
10        MS. REZAZADEH:  Pass the witness.
11             EXAMINATION
12 BY MS. ANDREWS:
13   Q.   Who decided how many lap dances you could give
14 during a shift?
15   A.   **The clients.  I did get as many lap dances as**
16 **clients bought.**
17   Q.   Did you also decide whether you wanted to give a
18 lap dance to somebody or not?
19   A.   **Yes.**
20   Q.   Were you also able to do things to increase the
21 amount of tips or money that was paid to you for a lap
22 dance?
23        MS. REZAZADEH:  Objection, vague.
24   A.   **I mean, so PT's is a nude club, so you were more**
25 **likely to get more dances if you were nude, but that's**

PLTFS APPX 000116

BROOKE LAYTON  November 2, 2021          96

1   it.
2       Q.   (BY MS. ANDREWS)  Was that something you could
3   choose to do?
4       A.   Yes, it was up to the dancers.  But it was
5   required that when you were on stage by the second song,
6   you had to have your top off and you could not put it
7   back on; you would get in trouble.
8       Q.   So and your testimony is that if you were nude,
9   you would make more money?
10      A.   Not always.  It's up to the dancer's
11  comfortability.
12      Q.   Is it your experience that ladies that were nude
13  would make more money than ladies who were not?
14      A.   I can't speak for other workers and how they
15  work, but there would be some shifts where I would make
16  more money if I kept my underwear on.  So it really just
17  depended on who came in that day.
18      Q.   And did you have the flexibility to figure out
19  what would make you the most money?
20           MS. REZAZADEH:  Objection, vague, too
21  general.
22      Q.   (BY MS. ANDREWS)  Did you have flexibility in
23  deciding whether underwear on was more profitable that
24  day than off?
25      A.   Yes.

BROOKE LAYTON  November 2, 2021          97

1       Q.   Did you have the ability to determine whether
2   being nude was more profitable than wearing any, you
3   know, lingerie or something like that?
4            MS. REZAZADEH:  Objection, too general.
5       A.   Again, it depends on what you're wearing.  And
6   some people really like the lingerie look.  Again, it
7   just depends on the clientele.
8       Q.   (BY MS. ANDREWS)  And those were decisions that
9   you got to make?
10           MS. REZAZADEH:  Objection, vague.
11      A.   Again, it just depends.  Because we were not
12  allowed to wear fishnet tights or anything like that, so
13  there was still some control even when we were
14  considered nude of like we couldn't walk around the club
15  topless or anything like that.  Like, we always had to
16  have our clothes on.  We couldn't wear fishnets even if
17  there was nothing else on them.  So it just depends.
18      Q.   (BY MS. ANDREWS)  You've just testified that
19  people were nude, so I'm confused.
20      A.   It is a nude-optional club.  That is primarily
21  why people go in is because it's known for being a
22  nude-optional club.  That does not mean that everyone is
23  nude, though.  And that means that depending on the day
24  and just how I was feeling, maybe I was menstruating or
25  maybe I was just having a bad body day that would

BROOKE LAYTON  November 2, 2021          98

1   determine what I decided to wear.
2           MS. ANDREWS:  I pass the witness.
3           MS. REZAZADEH:  Reserve for trial.
4           Thanks, Brooke.  You can log off.
5   Appreciate you.
6           Oh, do you have any spelling questions for
7   her, Donna, before she logs off?
8           THE REPORTER:  No.
9           MS. REZAZADEH:  Thanks, Brooke, I'll touch
10  base with you later.
11          THE WITNESS:  Okay.  Thank you.
12          MS. REZAZADEH:  Thanks so much.
13          Latrice, do you have any housekeeping for
14  me?  I think we got all the exhibits.
15          MS. ANDREWS:  I think I tried to get all
16  that squared away.
17          MS. REZAZADEH:  All right.  I think we're
18  good.  Donna, do you need anything from me?  You know
19  our order and you have our e-mail address, so you're
20  good?
21          THE REPORTER:  I think we're good.
22          MS. REZAZADEH:  In the event defendant's
23  order an expedited transcript, we ask that you notify us
24  so that we can order one as well.
25          THE REPORTER:  Absolutely.

BROOKE LAYTON  November 2, 2021          99

1           MS. REZAZADEH:  Thank you.  All right.
2   Latrice, have a good day.
3           MS. ANDREWS:  All right.  Thanks, you too.
4           Thank you, Donna.  If you need me, call me.
5           THE REPORTER:  Okay.  Do you have any
6   questions --
7           MS. ANDREWS:  Or e-mail me.  Sorry?
8           THE REPORTER:  Do you have any questions for
9   me?
10          MS. ANDREWS:  No, I think -- how much do you
11  think an expedited would be?
12          THE REPORTER:  You know what it depends on
13  how quickly you want it.  I can send you a rate sheet so
14  that you can look at it and you'll know exactly if you
15  would like.
16          MS. ANDREWS:  Yeah, what would be the
17  standard turnaround?
18          THE REPORTER:  Seven to ten business days.
19          MS. ANDREWS:  Oh, that's perfect; I don't
20  need it expedited.
21          THE REPORTER:  Okay.  Going off the record
22  at 1:13.
23          (Deposition concluded at 1:13 p.m.)
24
25

PLTFS APPX 000117

BROOKE LAYTON  November 2, 2021                    100
1                   CORRECTIONS AND SIGNATURE
2    PAGE  LINE      CORRECTION      REASON FOR CHANGE
3
4
5
6
7
8
9
10
11
12
13
14       I, BROOKE LAYTON, have read the foregoing
15    deposition and hereby affix my signature that same is
16    true and correct, except as noted herein.
17
18                     BROOKE LAYTON
19       SUBSCRIBED AND SWORN to before me this the
20          day of               , 2021.
21
22                NOTARY PUBLIC IN AND FOR THE
23                     STATE OF TEXAS
24    My commission expires:
25

BROOKE LAYTON  November 2, 2021                    101
1    COUNTY OF DALLAS    )
2    STATE  OF  TEXAS    )
3         I, Donna L. Johnston, certified shorthand
4    reporter in and for the State of Texas, do hereby
5    certify that the facts as stated by me in the caption
6    hereto are true; that there came before me the
7    aforementioned named person, who was by me duly sworn to
8    testify the truth concerning the matters in controversy
9    in this cause; and that the examination was reduced to
10    writing by computer transcription under my supervision;
11    that the deposition is a true record of the testimony
12    given by the witness.
13         I further certify that I am neither attorney or
14    counsel for, nor related to or employed by, any of the
15    parties to the action in which this deposition is taken,
16    and further that I am not a relative or employee of any
17    attorney or counsel employed by the parties hereto, or
18    financially interested in the action.
19         Given under my hand and seal of office on this,
20    the 17th day of November, 2021.
21         _____
              Donna L. Johnston, Texas CSR 6115
22            Expiration Date 04-30-2022
              DEPOSITION REPORTING SERVICES
23            6309 Preston Road, Suite 1300
              Plano, Texas 75024
24            214-202-6237
              dljcsr6115@gmail.com
25

PLTFS APPX 000118

**$**

$10 [6] - 33:24, 33:25, 47:22, 49:16, 85:19
$100 [13] - 30:8, 30:9, 30:13, 31:18, 32:1, 32:4, 33:3, 33:4, 57:1, 85:23, 86:15, 86:21, 86:24
$20 [7] - 30:23, 45:15, 45:22, 47:24, 48:5, 65:4, 90:13
$200 [10] - 33:2, 34:18, 35:14, 35:18, 36:7, 36:13, 86:8, 86:18, 86:24, 86:25
$26 [4] - 33:24, 49:16, 49:21, 91:5
$30 [1] - 53:20
$300 [1] - 52:3
$50 [7] - 33:19, 33:23, 34:11, 85:21, 91:3, 92:7, 92:12
$60 [4] - 89:20, 90:3, 90:4, 92:16
$700 [1] - 32:19
$75 [2] - 31:20, 35:4
$76 [4] - 31:20, 35:5, 65:4, 85:18

**0**

04-30-2022 [1] - 101:22

**1**

1 [3] - 3:12, 23:21, 24:5
10 [1] - 85:18
100 [8] - 3:8, 33:2, 34:17, 35:14, 35:18, 36:7, 36:13, 86:8, 86:25
100-page [1] - 74:22
101 [1] - 3:9
10:00 [1] - 24:2
10:26 [1] - 17:7
10:27 [1] - 17:10
10:54 [1] - 36:22
10:55 [1] - 90:21
11 [5] - 33:21, 36:19, 90:17, 90:19, 90:23
1100 [1] - 2:11
1105 [1] - 2:5
11:06 [1] - 36:25
1300 [1] - 101:23
15 [3] - 68:23, 72:9, 72:14
1509 [1] - 6:21

15th [1] - 74:10
1701 [1] - 2:12
17th [1] - 101:20
18 [1] - 40:24
18th [1] - 92:24
1:13 [2] - 99:21, 99:22

**2**

2 [6] - 1:15, 3:2, 3:14, 23:22, 24:23, 69:15
20 [1] - 53:20
2000 [2] - 52:10, 72:18
2013 [4] - 13:4, 15:18, 39:17, 49:11
2018 [30] - 8:12, 8:23, 10:20, 11:3, 11:8, 11:10, 11:16, 12:14, 13:3, 14:2, 15:16, 18:4, 24:15, 48:19, 49:7, 49:9, 68:23, 72:9, 72:14, 72:17, 75:14, 75:23, 76:13, 76:17, 76:20, 76:24, 83:22, 84:2, 91:9, 92:15
2018/2019 [1] - 48:17
2019 [37] - 7:20, 7:21, 7:22, 8:12, 9:1, 9:6, 11:3, 11:8, 11:11, 11:16, 12:14, 13:3, 15:16, 41:22, 48:20, 49:10, 52:11, 72:18, 72:19, 73:3, 73:7, 73:10, 73:15, 73:19, 73:23, 75:19, 76:1, 77:2, 77:3, 77:4, 77:14, 83:22, 84:3, 88:9, 88:16, 92:6, 92:12
2020 [6] - 7:17, 7:23, 14:12, 52:14, 52:22
2021 [6] - 1:15, 1:20, 6:24, 7:17, 100:20, 101:20
214-202-6237 [1] - 101:24
22 [1] - 3:12
23 [1] - 3:16
24 [5] - 3:17, 35:8, 56:10, 56:14
27 [3] - 72:18, 73:7
2ND [1] - 1:19

**3**

3 [8] - 3:16, 24:7, 24:19, 24:22, 42:16, 75:10, 88:8, 94:6
30 [3] - 17:21, 92:7,

92:16
32 [5] - 35:9, 55:19, 56:10, 56:14, 56:15
350-3931 [1] - 2:6
3:21-cv-01636-N [1] - 1:6
3rd [1] - 74:10

**4**

4 [5] - 3:17, 25:18, 25:19, 75:11, 88:6
40 [10] - 54:3, 54:7, 54:11, 55:3, 55:13, 70:14, 70:20, 71:14, 71:17
42-page [1] - 93:2

**5**

5 [8] - 3:3, 3:5, 3:18, 33:21, 77:9, 77:10, 77:11, 92:22
50 [1] - 65:4

**6**

6 [7] - 3:20, 33:25, 49:17, 73:23, 85:20, 92:17, 93:4
6115 [1] - 101:21
6309 [1] - 101:23
644-8181 [1] - 2:13
67 [1] - 3:25
68 [1] - 3:14

**7**

7 [4] - 3:22, 85:22, 93:4, 93:8
75024 [1] - 101:23
75075 [1] - 6:22
75080 [1] - 2:12
76 [2] - 3:18, 33:4
77066 [1] - 2:6

**8**

8 [5] - 3:25, 68:19, 68:21, 92:7, 92:16
88 [1] - 3:6
888 [1] - 2:6

**9**

9 [5] - 4:3, 24:15, 93:16, 93:17, 93:20
91 [2] - 3:6, 3:20
92 [2] - 3:22, 4:3
921@gmail.com [1] -

41:17
94 [1] - 3:7
95 [1] - 3:7
972 [1] - 2:13
990 [2] - 6:25, 8:16

**A**

ability [2] - 14:6, 96:25
able [12] - 5:22, 5:25, 29:5, 31:4, 33:8, 34:15, 60:23, 67:8, 69:2, 69:10, 71:4, 95:19
absolutely [3] - 20:4, 45:8, 95:4
Absolutely [1] - 98:24
access [4] - 11:10, 13:23, 14:19, 40:17
according [2] - 9:3, 72:8
account [16] - 11:13, 12:9, 12:10, 12:15, 13:22, 13:24, 14:11, 14:13, 14:19, 16:13, 36:9, 39:25, 40:1, 40:7, 40:16, 40:17
accounts [13] - 11:22, 11:24, 12:1, 12:18, 14:4, 15:11, 15:14, 15:17, 15:18, 15:21, 16:6, 16:22, 40:20
accrued [2] - 35:3
accurate [8] - 58:11, 58:16, 67:22, 74:9, 92:12, 92:13
acknowledges [1] - 62:4
acknowledging [1] - 85:4
Action [1] - 3:15
action [7] - 61:20, 61:25, 62:9, 62:11, 70:9, 101:15, 101:18
active [5] - 15:17, 16:15, 16:22
actively [2] - 11:12, 14:13
activities [1] - 54:1
activity [2] - 59:18, 59:19
actual [2] - 19:14, 19:15
additional [7] - 27:1, 31:18, 35:2, 55:21, 56:25, 86:21
address [15] - 6:20, 6:25, 7:3, 7:5, 7:25, 8:3, 8:7, 8:13, 8:16, 8:17, 24:17, 25:14,

25:16, 41:13, 98:18
addresses [1] - 41:15
administered [1] - 9:18
Admission [1] - 3:21
admission [4] - 28:25, 37:21, 37:24, 38:16
admissions [1] - 92:22
adver [1] - 47:9
advertised [1] - 59:25
advertising [4] - 47:10, 47:14, 94:23, 95:5
affix [1] - 100:15
aforementioned [1] - 101:7
Agent [6] - 12:3, 12:4, 12:5, 12:6, 12:7, 16:24
ago [3] - 61:14, 63:17, 63:23
agree [2] - 5:6, 79:20
agreed [1] - 75:5
Agreement [3] - 3:17, 25:20, 76:9
agreement [11] - 18:12, 18:13, 25:23, 75:22, 75:23, 76:12, 76:21, 88:6, 88:12, 88:13, 92:15
agrees [1] - 62:3
ahead [26] - 10:23, 12:20, 16:3, 21:7, 22:2, 22:21, 23:4, 28:1, 28:18, 31:1, 33:1, 39:5, 39:7, 42:13, 44:16, 46:2, 54:25, 57:13, 63:7, 73:4, 76:23, 80:1, 82:4, 84:8, 87:8, 88:15
allegation [1] - 57:22
allegations [2] - 69:21, 70:5
alleged [1] - 65:10
allegedly [1] - 57:11
alleging [1] - 18:4
allow [5] - 6:10, 21:16, 21:17, 69:11, 72:12
allowed [8] - 28:13, 45:22, 48:5, 48:11, 48:15, 60:25, 83:21, 97:11
allowing [1] - 6:11
ambiguous [1] - 79:2
Amended [1] - 3:12
amount [6] - 48:3, 56:4, 57:10, 92:5, 95:20

amounts [2] - 45:13, 92:1
AND [4] - 1:18, 100:1, 100:19, 100:22
Andrews [4] - 2:10, 3:5, 3:7, 5:17
ANDREWS [181] - 5:5, 5:11, 5:13, 11:2, 13:11, 13:15, 14:10, 14:21, 15:2, 15:6, 15:24, 16:9, 17:1, 17:5, 17:11, 18:25, 20:24, 21:3, 21:8, 21:22, 22:3, 22:6, 22:12, 22:16, 22:22, 23:15, 23:19, 23:22, 24:5, 24:8, 24:24, 25:1, 25:19, 26:7, 26:12, 26:18, 26:25, 27:10, 27:13, 27:14, 27:18, 27:23, 28:2, 28:16, 28:22, 29:14, 29:21, 29:23, 30:19, 30:25, 31:6, 31:22, 32:15, 33:5, 33:10, 33:14, 34:7, 35:17, 35:24, 36:4, 36:16, 36:18, 37:1, 38:4, 38:9, 38:18, 38:23, 39:1, 39:11, 39:21, 40:9, 40:13, 41:8, 42:3, 42:15, 43:3, 43:10, 43:15, 43:18, 43:20, 44:4, 44:9, 44:21, 45:12, 45:23, 46:5, 46:16, 46:20, 50:12, 51:4, 51:10, 51:19, 54:14, 55:2, 55:9, 55:12, 56:3, 56:8, 57:3, 58:1, 58:15, 63:2, 63:3, 63:14, 63:22, 65:13, 66:12, 66:20, 67:10, 67:13, 68:18, 68:22, 68:25, 69:7, 69:13, 69:16, 71:1, 71:3, 71:13, 71:23, 72:14, 73:1, 73:6, 74:9, 74:15, 74:19, 74:24, 75:2, 75:9, 75:11, 75:14, 76:8, 76:16, 76:19, 77:1, 77:10, 77:12, 78:2, 78:3, 78:23, 79:9, 79:25, 80:5, 80:18, 82:10, 82:11, 82:18, 83:3, 83:8, 83:19, 84:12, 84:18, 84:21, 85:5, 85:11, 85:13, 86:15, 87:4, 87:10, 87:18, 87:23, 87:25, 88:14,

91:18, 92:18, 93:10, 93:17, 94:1, 94:13, 95:11, 96:1, 96:21, 97:7, 97:17, 98:1, 98:14, 99:2, 99:6, 99:9, 99:15, 99:18
andrews [1] - 3:6
Android [2] - 41:12, 41:19
answer [51] - 6:12, 10:6, 10:24, 13:9, 16:2, 21:5, 21:6, 21:19, 21:21, 21:25, 22:9, 22:11, 22:14, 22:16, 22:18, 26:12, 26:18, 27:11, 27:16, 27:21, 27:24, 28:15, 28:16, 28:18, 38:3, 38:11, 39:7, 42:13, 44:15, 44:16, 46:2, 54:22, 63:7, 66:5, 66:16, 66:19, 70:23, 70:24, 71:7, 71:8, 71:9, 72:12, 72:23, 76:12, 78:18, 80:17, 82:25, 83:15, 83:18, 87:9, 88:18
answered [21] - 22:23, 26:14, 32:25, 36:3, 39:4, 39:6, 43:16, 44:3, 44:5, 44:12, 57:25, 71:19, 74:13, 78:1, 78:2, 80:16, 82:3, 82:16, 82:18, 82:23, 83:13
answering [6] - 22:5, 22:12, 26:21, 26:23, 26:24, 84:4
answers [2] - 9:15, 22:23
ANSWERS [1] - 1:18
apartments [2] - 8:9, 8:14
Appearances [1] - 3:2
application [1] - 25:2
appreciate [2] - 75:3, 98:4
appropriate [3] - 27:5, 27:22, 75:5
arbitrations [1] - 37:6
area [3] - 5:17, 12:11, 59:17
argumentative [1] - 56:2
arrests [1] - 37:2
arrived [1] - 90:14
Ashland [4] - 62:15, 62:19, 63:3, 63:22
Ashlee [1] - 6:16
assert [1] - 28:11

asserting [1] - 69:23
ASSOCIATES [1] - 2:5
assume [1] - 49:25
assuming [1] - 64:18
assumption [2] - 50:2, 78:6
Atrium [1] - 2:11
attempting [1] - 17:25
attempts [1] - 14:4
attention [2] - 51:14, 51:20
attire [1] - 49:12
attorney [11] - 10:14, 15:8, 42:1, 42:2, 57:12, 61:6, 64:6, 74:15, 77:23, 101:13, 101:17
attorney's [5] - 50:8, 50:13, 70:1
attorneys [2] - 41:5, 77:17
attractive [1] - 45:5
audition [1] - 23:7
August [2] - 52:9, 74:10
Authorization [1] - 25:6
automatically [2] - 30:8, 41:18
available [1] - 65:6
Avenue [1] - 8:10
average [29] - 31:20, 32:3, 32:22, 32:23, 33:15, 34:4, 34:17, 34:21, 34:23, 35:7, 35:10, 35:11, 35:18, 35:24, 36:6, 36:9, 36:11, 53:20, 55:19, 56:5, 56:10, 56:21, 86:6, 86:8, 86:12, 86:23, 86:24, 87:4, 87:20
averages [1] - 56:19
aware [14] - 5:14, 9:23, 17:11, 25:23, 28:24, 55:24, 56:3, 61:25, 65:14, 66:9, 67:13

**B**

backed [1] - 41:18
background [4] - 5:15, 24:12, 37:2, 39:12
bad [2] - 83:13, 97:24
bank [8] - 11:5, 11:8, 11:10, 11:12, 11:16, 11:18, 11:20, 42:4
bar [5] - 33:25, 49:17,

49:20, 49:24, 85:20
bartenders [2] - 19:15, 20:14
bartending [1] - 19:19
base [1] - 98:9
based [8] - 44:10, 57:21, 58:17, 64:11, 66:5, 66:16, 79:5, 87:2
basis [3] - 66:22, 69:22, 82:22
become [2] - 63:11, 65:14
begin [1] - 5:5
beginning [2] - 9:8, 9:11
Behalf [2] - 2:3, 2:8
behalf [4] - 1:3, 2:3, 70:2, 77:17
belief [2] - 80:10, 82:22
benefit [2] - 72:24, 76:14
best [3] - 32:18, 74:7, 83:14
better [1] - 60:22
between [3] - 14:16, 19:21, 49:2
billing [1] - 50:18
Bio [2] - 3:16, 24:11
Bio-Verify [2] - 3:16, 24:11
body [3] - 23:9, 48:23, 97:24
boss [1] - 13:14
botox [1] - 47:4
bottom [1] - 28:3
bought [3] - 89:23, 95:15
Boulevard [1] - 2:12
break [4] - 17:4, 36:15, 67:9, 69:6
breaks [1] - 51:25
briefing [1] - 20:22
briefly [2] - 15:22, 24:3
bring [2] - 51:19, 59:25
bringing [1] - 51:16
broke [1] - 86:4
BROOKE [8] - 1:3, 1:14, 1:18, 2:3, 3:4, 5:3, 100:14, 100:18
Brooke [32] - 3:13, 3:18, 3:20, 3:22, 4:3, 6:16, 13:9, 16:20, 21:7, 22:2, 22:21, 23:4, 28:18, 29:8, 31:1, 33:1, 39:5, 42:12, 44:16, 46:2,

54:25, 63:7, 71:7, 73:4, 78:18, 80:1, 84:9, 84:25, 87:8, 88:3, 98:3, 98:8
brooke [4] - 66:5, 82:4, 85:7, 94:16
brought [3] - 51:14, 55:5, 85:8
Bucks [6] - 52:1, 52:5, 52:12, 52:14, 60:20, 60:21
Burlesque [10] - 16:4, 16:7, 39:13, 39:14, 39:15, 39:20, 39:23, 40:23, 44:25, 73:20
business [5] - 8:22, 13:20, 32:8, 32:10, 99:17
but.. [1] - 16:12
buy [1] - 48:10
buying [1] - 60:3
BY [108] - 5:13, 11:2, 13:11, 13:15, 14:10, 14:21, 15:2, 15:6, 16:9, 17:11, 18:25, 20:24, 23:15, 23:22, 24:8, 25:1, 25:19, 27:14, 28:2, 28:16, 28:22, 29:23, 30:19, 31:6, 31:22, 32:15, 33:5, 33:14, 34:7, 35:17, 35:24, 36:4, 37:1, 39:1, 39:11, 39:21, 40:9, 40:13, 41:8, 42:3, 42:15, 43:18, 43:20, 44:9, 44:21, 45:12, 45:23, 46:5, 46:16, 46:20, 50:12, 51:4, 51:10, 51:19, 55:2, 55:12, 56:3, 57:3, 58:1, 58:15, 63:3, 63:14, 63:22, 65:13, 66:12, 66:20, 67:13, 68:22, 69:16, 71:3, 71:13, 71:23, 72:14, 73:1, 73:6, 74:9, 74:15, 75:9, 75:14, 76:8, 77:1, 77:12, 78:3, 78:23, 79:9, 80:5, 80:18, 82:11, 83:19, 84:12, 84:21, 85:5, 85:13, 86:15, 87:4, 87:10, 88:5, 91:18, 92:18, 93:10, 93:17, 94:1, 94:15, 95:11, 96:1, 96:21, 97:7, 97:17

## C

CA [1] - 1:6
CA-NO [1] - 1:6
Cabaret [8] - 39:15, 39:20, 39:23, 52:1, 52:12, 60:20
calculated [1] - 57:5
calculations [1] - 86:14
calendar [1] - 58:1
cannot [1] - 29:20
capable [1] - 17:24
caption [1] - 101:5
Carrollton [1] - 7:14
case [22] - 5:16, 8:18, 9:14, 9:25, 11:23, 15:3, 41:4, 41:5, 50:9, 50:16, 50:19, 50:22, 55:16, 57:4, 61:12, 65:23, 67:14, 69:19, 70:7, 77:15, 77:16, 79:21
cash [2] - 58:21, 89:16
causes [2] - 82:12, 83:5
cell [1] - 47:11
certain [7] - 30:11, 45:13, 47:21, 47:23, 47:25, 48:13, 77:14
certificate [1] - 3:9
Certified [1] - 1:22
certified [1] - 101:3
certify [2] - 101:5, 101:13
Champaign [1] - 31:2
chance [4] - 69:4, 69:5, 69:18
change [2] - 26:19, 44:14
CHANGE [1] - 100:2
changed [4] - 35:5, 55:24, 56:4, 92:6
changes [1] - 3:8
changing [2] - 36:5, 56:16
charge [7] - 45:13, 45:16, 45:22, 48:3, 48:6, 89:20
charged [4] - 30:8, 30:9, 90:3, 91:21
check [3] - 23:9, 24:12, 90:24
choice [1] - 19:9
choose [3] - 18:17, 19:21, 96:2
choosing [2] - 25:24, 25:25
choreography [5] - 37:12, 37:15, 37:18,

39:2, 39:9
chose [3] - 18:7, 47:19, 76:4
Christmas [1] - 9:9
City [1] - 1:21
Civil [3] - 1:24, 3:15, 75:6
claim [15] - 13:20, 49:13, 51:5, 51:6, 54:5, 55:6, 55:8, 55:9, 55:12, 55:17, 67:14, 67:15, 69:22, 69:25
claiming [2] - 51:11, 57:3
claims [3] - 55:16, 66:23, 70:7
clarify [2] - 66:18, 69:24
class [1] - 59:8
clear [4] - 42:7, 54:17, 54:23, 65:8
client [11] - 21:12, 21:15, 22:20, 27:11, 27:12, 27:19, 47:23, 53:8, 72:23, 82:15, 89:20
client's [1] - 22:7
clientele [1] - 97:6
clients [8] - 44:8, 44:19, 47:12, 59:15, 61:23, 69:23, 95:14, 95:15
clocked [2] - 68:15
clothes [1] - 97:15
cloud [1] - 41:11
Club [16] - 3:17, 51:25, 52:2, 52:7, 52:8, 52:13, 60:15, 60:17, 74:3, 78:21, 79:8, 79:13, 84:13, 84:22, 84:24, 85:10
club [110] - 17:13, 30:14, 30:20, 30:22, 30:23, 31:3, 31:7, 31:12, 31:13, 31:19, 32:2, 33:8, 33:20, 35:20, 35:22, 37:13, 37:16, 43:22, 43:23, 43:24, 44:1, 44:7, 44:8, 44:11, 44:18, 44:19, 44:25, 45:3, 45:4, 45:15, 45:18, 45:25, 46:7, 46:8, 46:11, 46:14, 46:17, 47:8, 48:11, 48:15, 49:12, 49:13, 49:19, 49:21, 51:6, 51:11, 51:20, 52:4, 53:12, 53:22, 56:22, 56:24,

58:3, 58:4, 58:13, 59:1, 59:13, 59:15, 59:24, 59:25, 60:12, 65:3, 65:5, 65:17, 65:18, 65:19, 66:1, 66:4, 66:16, 66:17, 67:6, 67:20, 67:24, 68:10, 70:15, 70:16, 70:19, 70:25, 71:4, 71:11, 73:24, 75:22, 77:5, 78:11, 79:7, 79:17, 80:3, 80:6, 80:8, 81:18, 81:19, 81:20, 81:22, 85:14, 85:16, 85:24, 86:20, 87:5, 90:5, 92:8, 94:21, 94:25, 95:23, 97:13, 97:19, 97:21
CLUB [2] - 1:8, 2:9
club's [2] - 31:5, 68:13
clubs [15] - 18:20, 19:1, 19:6, 19:12, 19:16, 51:23, 52:15, 52:20, 52:21, 59:18, 59:19, 60:6, 60:9, 60:25, 61:3
code [1] - 88:21
collected [1] - 90:4
collective [4] - 61:20, 61:25, 62:9, 62:11
Collins [1] - 2:12
column [1] - 91:20
comfortability [1] - 96:10
coming [5] - 47:12, 57:10, 59:14, 68:23, 69:7
commission [1] - 100:24
common [1] - 18:9
communicate [2] - 47:12, 80:23
communications [1] - 64:5
companies [1] - 81:19
company [8] - 64:11, 64:13, 78:12, 78:19, 78:22, 82:22, 83:5, 85:9
competition [1] - 35:21
complaint [4] - 69:17, 69:18, 70:1, 70:10
Complaint [1] - 3:14
complete [1] - 17:22
completing [1] - 9:23
compliance [1] - 75:8
computer [1] - 101:10
concerning [1] - 101:8
concluded [1] - 99:22

conclusion [1] - 79:24
conducive [2] - 33:22, 40:21
conduct [1] - 53:21
confirm [2] - 75:13, 87:19
confused [2] - 29:2, 97:18
confusing [2] - 79:3, 87:7
consider [1] - 78:8
considered [4] - 20:16, 30:2, 88:20, 97:13
consistently [1] - 67:3
constituted [1] - 30:18
consulted [1] - 41:5
cont [1] - 4:1
contact [1] - 61:22
contacted [1] - 14:3
contention [1] - 70:20
contingency [1] - 50:22
continue [2] - 33:22, 76:6
contract [26] - 17:21, 17:23, 17:24, 17:25, 18:3, 19:14, 19:24, 20:21, 20:25, 23:6, 23:10, 26:3, 59:4, 59:5, 59:6, 59:10, 72:16, 75:12, 75:15, 75:20, 84:16, 84:19, 84:20, 85:10, 91:20, 92:11
Contractor [1] - 25:7
contractor [14] - 13:7, 13:12, 17:17, 19:22, 19:25, 25:13, 26:1, 26:4, 28:8, 28:12, 57:20, 59:8, 75:25, 82:7
contractors [8] - 19:17, 20:3, 20:9, 32:12, 51:17, 79:18, 81:13, 81:21
contracts [4] - 13:16, 13:17, 85:1, 85:3
control [2] - 41:23, 97:12
controlled [1] - 64:21
controversy [1] - 101:8
conversation [2] - 51:15, 63:23
convey [1] - 27:3
copy [3] - 37:22, 38:1, 74:25
corporations [1] - 79:10

correct [78] - 5:9, 5:10, 8:18, 9:19, 14:22, 15:17, 18:6, 19:10, 20:8, 20:12, 20:19, 21:8, 24:8, 24:14, 26:4, 32:8, 32:13, 33:15, 34:18, 34:21, 35:8, 35:11, 35:14, 40:2, 40:5, 40:10, 41:25, 42:4, 45:19, 46:23, 47:20, 48:2, 49:10, 49:20, 50:3, 50:4, 51:1, 51:3, 51:7, 51:12, 57:9, 57:15, 57:18, 57:23, 57:25, 58:11, 60:15, 60:16, 60:24, 62:10, 67:16, 68:3, 70:21, 72:10, 72:20, 74:3, 75:16, 76:1, 76:4, 76:10, 79:22, 80:13, 86:2, 86:9, 86:12, 86:16, 86:18, 86:25, 87:3, 91:15, 92:5, 92:10, 92:14, 93:14, 93:23, 94:2, 100:16
CORRECTION [1] - 100:2
CORRECTIONS [1] - 100:1
correctly [2] - 42:23, 84:4
cosmetic [1] - 47:2
cost [1] - 30:13
costs [1] - 50:15
costume [4] - 48:14, 89:1, 89:6
counsel [7] - 22:6, 93:23, 94:2, 94:11, 94:12, 101:14, 101:17
countor [2] - 67:14, 69:25
counter-claim [2] - 67:14, 69:25
County [1] - 1:21
COUNTY [1] - 101:1
couple [2] - 10:17, 51:24
COURT [1] - 1:1
court [7] - 5:21, 9:15, 21:18, 27:8, 43:5, 43:13, 56:13
courtesy [1] - 6:11
Cove [2] - 6:25, 8:16
create [4] - 37:12, 37:18, 39:1, 39:9
created [1] - 78:13
credit [1] - 11:19

Creek [2] - 8:6, 8:8
criminal [1] - 37:1
Crimson [2] - 16:5, 16:10
Crystal [2] - 6:25, 8:16
CSR [1] - 101:21
custody [1] - 41:22
customer [3] - 89:23, 90:13, 94:21
customers [5] - 43:23, 52:25, 58:19, 60:1, 94:20
cut [1] - 26:22
cutting [2] - 22:20

**D**

d/b/a [6] - 1:8, 2:9, 78:20, 79:7, 79:12, 84:24
DALLAS [4] - 1:2, 1:7, 2:9, 101:1
Dallas [13] - 1:21, 5:17, 7:20, 8:4, 8:6, 12:11, 51:25, 52:2, 52:5, 59:17, 79:7, 79:12
Dallas-Fort [2] - 12:11, 59:17
damages [4] - 57:4, 57:5, 91:20, 92:1
dance [8] - 39:10, 39:12, 45:22, 46:8, 48:4, 90:12, 95:17, 95:21
danced [2] - 37:19, 47:19
dancer [5] - 40:23, 45:2, 48:10, 88:20, 89:9
dancer's [1] - 96:9
dancers [3] - 19:24, 49:25, 96:3
dances [14] - 30:24, 45:15, 45:19, 45:21, 48:6, 53:6, 53:7, 53:8, 58:20, 60:4, 94:18, 95:12, 95:14, 95:24
dancing [6] - 13:1, 30:16, 44:1, 44:25, 47:17, 53:2
data [2] - 14:4, 41:11
date [6] - 9:5, 72:15, 72:17, 72:20, 73:25
Date [1] - 101:22
dated [2] - 92:23, 92:24
dates [2] - 74:14, 91:9
day-to-day [1] - 67:2

days [16] - 30:5, 30:7, 31:15, 31:18, 32:18, 34:25, 35:23, 48:13, 55:21, 55:22, 55:23, 56:20, 60:18, 61:2, 86:3, 86:4, 99:17
daytime [3] - 34:19, 53:16, 59:18, 59:19, 60:22
deactivate [1] - 40:20
deactivated [5] - 13:25, 14:14, 39:25, 40:2, 40:16
deactivating [1] - 14:16
December [13] - 7:22, 9:1, 9:5, 9:6, 9:12, 73:2, 73:10, 73:15, 73:19, 73:21, 73:23, 91:9
decide [1] - 95:16
decided [2] - 75:24, 95:12, 97:25
deciding [1] - 96:22
decision [1] - 9:16
decisions [1] - 97:7
declined [1] - 54:18
deduct [3] - 46:9, 46:17, 48:8
deducted [3] - 47:10, 47:11, 48:16
deductions [3] - 46:5, 46:22, 46:25
Defendant [4] - 1:19, 3:21, 3:23, 4:4
defendant [1] - 66:3
defendant's [4] - 8:21, 13:20, 17:13, 98:21
Defendant's [9] - 23:21, 24:7, 25:18, 68:21, 69:15, 77:9, 92:17, 93:8, 93:16
DEFENDANT'S [2] - 3:11, 4:2
defendants [6] - 5:15, 8:17, 28:8, 79:5
Defendants [2] - 1:9, 2:8
delete [2] - 14:10, 40:19
deleted [7] - 13:24, 14:4, 14:12, 14:14, 40:15, 40:16, 41:3
deleting [1] - 14:16
demands [1] - 37:8
Denton [1] - 73:23
depended [2] - 32:7, 98:16
Deposition [1] - 3:13
deposition [14] - 5:6,

5:18, 6:3, 9:14, 21:9, 22:10, 23:25, 24:6, 91:7, 91:11, 99:22, 100:15, 101:11, 101:15
DEPOSITION [3] - 1:13, 1:18, 101:22
describe [1] - 52:23
DESCRIPTION [2] - 3:11, 4:2
detail [1] - 77:22
details [1] - 22:18
determination [1] - 60:5
determine [2] - 96:25, 97:25
dictate [1] - 80:8
difference [1] - 14:15
different [3] - 20:2, 52:4, 87:16
differently [1] - 20:5
digits [1] - 58:18
diligent [1] - 58:4
directions [1] - 78:10
directly [1] - 28:24
disclosing [1] - 81:5
Disclosures [1] - 3:19
disclosures [4] - 9:24, 66:3, 77:13, 92:21
discovery [8] - 10:2, 10:5, 10:7, 92:20, 92:21
discuss [1] - 28:7
discussed [2] - 69:17, 75:10
discussing [4] - 57:12, 66:12, 68:9, 70:4
discussion [2] - 61:13, 70:5
disprove [1] - 71:5
distinctly [1] - 17:18
District [1] - 5:8
DISTRICT [2] - 1:1, 1:1
DIVISION [1] - 1:2
DJ [14] - 20:15, 33:25, 34:14, 47:19, 47:21, 47:22, 47:24, 47:25, 49:17, 49:20, 49:24, 90:13, 91:1, 91:4
dljcsr6115@gmail.com [1] - 101:24
document [31] - 18:15, 24:2, 25:5, 28:4, 29:10, 29:12, 38:1, 38:7, 38:12, 38:15, 38:21, 38:22, 42:18, 54:13, 54:15, 54:17, 55:4, 55:5, 55:7, 62:2, 74:22,

76:17, 76:20, 76:24, 77:2, 77:4, 78:4, 80:18, 83:21, 93:2, 94:4
documentation [2] - 74:14, 80:21
documents [18] - 10:9, 10:16, 15:7, 17:12, 18:9, 18:10, 54:19, 66:8, 69:8, 69:11, 73:14, 75:3, 77:21, 77:23, 93:22, 94:2, 94:12
dollar [1] - 53:13
dollars [1] - 35:5
done [3] - 24:12, 43:16, 48:17
donna [1] - 98:17
Donna [10] - 1:22, 6:5, 6:12, 9:18, 75:11, 87:18, 98:6, 99:3, 101:3, 101:21
door [2] - 90:24, 91:3
down [2] - 6:6, 28:3, 29:19, 29:22, 57:14, 59:8, 70:8, 90:2
dress [2] - 88:21, 88:23
dressed [1] - 88:25
drugs [1] - 53:24
drunk [1] - 73:24
due [2] - 70:17, 72:2
duly [2] - 5:4, 101:7
during [10] - 30:4, 34:19, 51:21, 51:24, 53:18, 59:19, 60:9, 74:7, 88:25, 95:13

**E**

E-mail [2] - 2:7, 2:13
e-mail [4] - 41:13, 41:15, 98:18, 99:6
early [2] - 33:19, 33:20
earn [5] - 20:5, 30:22, 31:7, 31:9, 45:6
eat [1] - 19:11
efforts [1] - 14:3
eight [3] - 33:18, 34:10, 34:11
eight-hour [1] - 34:11
either [10] - 20:10, 21:16, 25:12, 66:8, 84:19, 86:4, 86:10, 89:3, 90:1, 90:7
elaborate [6] - 10:1, 15:5, 22:24, 28:13, 37:14, 44:6
Elizabeth [1] - 6:16
ELLZEY [1] - 2:5

employed [2] - 101:14, 101:17
employee [15] - 19:14, 19:18, 19:21, 19:23, 20:13, 20:21, 25:24, 51:6, 51:7, 51:12, 57:21, 80:8, 80:25, 81:11, 101:16
employees [14] - 19:15, 20:2, 20:6, 20:8, 20:11, 20:16, 32:12, 49:21, 49:24, 50:1, 50:3, 51:16, 64:21, 79:17
employer [5] - 78:9, 79:1, 81:16, 81:25, 82:13
Employer/ Independent [1] - 25:6
employment [2] - 20:18, 65:10
end [4] - 7:17, 7:20, 72:1, 84:11
enforced [2] - 59:10, 59:11
engage [1] - 53:21
entertain [1] - 95:1
entertained [1] - 52:25
entertainer [1] - 19:22
Entertainment [2] - 66:11, 66:13
entertainment [3] - 30:16, 30:18, 67:23
entire [1] - 92:13
entitled [9] - 21:6, 23:1, 26:15, 26:17, 26:18, 26:19, 29:13, 38:2, 56:17
entity [6] - 64:14, 65:19, 66:1, 79:19, 81:14, 82:12
Esq [2] - 2:4, 2:10
estate [4] - 12:9, 12:10, 12:13, 16:18
etiquette [1] - 27:5
event [1] - 98:21
events [1] - 95:3
evidence [1] - 41:4
exact [2] - 8:13, 25:15
exactly [3] - 32:10, 58:25, 99:13
EXAMINATION [6] - 3:5, 5:12, 88:4, 91:17, 94:14, 95:10
examination [1] - 101:9
Except [1] - 42:3
except [1] - 100:16
exception [1] - 89:22

PLTFS APPX 000122

BROOKE LAYTON   November 2, 2021                    5

exercise [1] - 27:4
exhibit [1] - 93:4
Exhibit [34] - 3:12,
3:14, 3:16, 3:17,
3:18, 3:20, 3:22,
3:25, 4:3, 23:21,
23:22, 24:5, 24:7,
24:19, 24:22, 25:18,
25:19, 68:19, 68:21,
69:15, 75:10, 75:11,
77:9, 77:10, 77:11,
88:6, 92:17, 92:22,
93:4, 93:8, 93:16,
93:17, 93:20
exhibits [3] - 68:20,
92:19, 98:13
exotic [1] - 45:2
expedited [3] - 98:22,
99:10, 99:19
expenses [2] - 47:9,
47:14
experience [2] -
19:19, 96:11
Expiration [1] -
101:22
expires [1] - 100:24
explain [2] - 14:15,
49:14
explained [1] - 18:22
explains [1] - 18:10
exploit [1] - 23:17
expose [1] - 23:12
extend [1] - 90:1
extent [2] - 50:15,
94:24

**F**

Facebook [4] - 16:13,
16:19, 16:23, 16:24
facility [1] - 18:12
factor [1] - 86:5
factored [1] - 86:6
factors [1] - 86:10
facts [1] - 101:5
failure [1] - 70:10
fair [1] - 63:2
fake [1] - 13:25
familiar [2] - 61:11,
77:20
family's [1] - 7:5
fantastic [1] - 75:8
far [2] - 62:21, 63:10
fast [2] - 24:6, 68:20
faster [1] - 26:13
father [1] - 7:11
fearful [1] - 51:21
February [5] - 7:17,
7:20, 7:22, 8:12
Federal [3] - 1:24, 5:7,

75:6
fee [3] - 30:23, 30:24,
31:2, 31:17, 52:17,
86:21, 90:21, 90:25,
92:3
fees [10] - 30:16,
30:18, 31:3, 35:3,
46:7, 50:8, 50:13,
66:22, 67:23, 90:17
fell [1] - 88:25
felt [2] - 17:22, 23:13
few [3] - 19:6, 61:14,
88:3
fifth [2] - 35:1, 72:3
figure [3] - 38:19,
54:6, 96:17
file [1] - 11:2
filed [5] - 51:11, 61:19,
67:14, 69:18, 70:2
filing [5] - 28:6, 28:10,
41:5, 51:4, 65:13
fill [1] - 68:19
financially [1] - 101:18
fine [9] - 21:11, 27:25,
38:5, 42:12, 54:20,
71:9, 84:6, 84:8,
84:25
fingerprints [1] - 25:2
finish [6] - 6:10, 6:11,
16:1, 21:4, 22:9,
26:10, 27:5, 31:1
finishes [1] - 21:25
fired [2] - 51:21, 64:16
firing [3] - 65:1, 65:16,
67:2
firm@elizeylaw.com
[1] - 2:7
First [3] - 3:21, 3:24,
4:5
first [21] - 5:4, 17:12,
17:16, 24:18, 30:3,
30:7, 43:8, 43:11,
51:11, 56:24, 68:16,
68:22, 72:1, 72:8,
72:15, 77:5, 83:19,
83:23, 85:6, 89:1,
89:3
fishnet [1] - 97:11
fishnets [2] - 48:12,
97:15
fit [2] - 26:16, 48:11
five [2] - 36:18, 71:21
flats [1] - 88:17
flexibility [2] - 96:17,
96:21
flip [1] - 88:18
flip-flops [1] - 88:18
floor [3] - 90:17,
90:19, 90:20
flops [1] - 88:18

FLSA [1] - 37:8
fluctuations [1] -
36:10
following [1] - 30:5
follows [1] - 5:4
FOR [3] - 1:1, 100:2,
100:22
forced [1] - 76:3
foregoing [1] - 100:14
forgo [2] - 35:3, 57:1
form [49] - 13:8, 14:8,
14:17, 14:23, 15:4,
17:17, 17:19, 18:19,
18:20, 18:23, 18:24,
19:2, 19:8, 19:12,
19:13, 20:20, 25:13,
30:17, 31:14, 32:14,
34:5, 35:16, 35:19,
36:2, 36:14, 40:6,
40:11, 41:1, 41:6,
41:24, 42:5, 45:11,
45:20, 46:1, 46:13,
46:18, 50:10, 51:2,
51:8, 51:13, 56:1,
57:24, 58:12, 65:11,
70:22, 72:11, 75:17,
76:5, 79:23
forms [1] - 82:21
Fort [2] - 12:11, 59:17
forth [1] - 6:6
four [6] - 33:6, 33:7,
33:14, 34:21, 35:9,
35:11, 56:22, 58:18,
61:1
fourth [1] - 30:9
Fox [10] - 12:25, 13:1,
13:22, 14:1, 15:20,
16:5, 16:10, 16:16,
16:18, 16:23
frame [1] - 7:15
free [2] - 30:20, 90:17
front [1] - 34:13
full [2] - 6:14, 21:6
funds [2] - 33:11,
49:19

**G**

Galloway [1] - 8:10
gathered [2] - 10:12,
15:7
general [9] - 51:16,
63:21, 78:17, 79:24,
82:3, 83:7, 87:7,
96:20, 97:3
genere [2] - 47:18,
90:10
Ghazzaleh [3] - 2:4,
61:22, 61:24
girl [2] - 90:24, 91:3

girls [1] - 90:1
given [19] - 10:6, 18:9,
19:14, 19:18, 19:20,
20:22, 23:6, 25:9,
37:19, 39:10, 65:12,
81:6, 81:12, 81:17,
82:6, 82:8, 85:9,
86:19, 101:12
Given [1] - 101:19
Google [1] - 41:19
group [2] - 73:20, 95:7
guess [4] - 59:13,
65:21, 74:7, 82:5
guests [1] - 52:25
guidelines [1] - 45:14

**H**

hair [2] - 46:17, 46:22
hair/makeup [1] - 46:9
hand [1] - 101:19
handles [1] - 12:17
harassing [1] - 82:16
hashtags [1] - 12:17
head [8] - 23:8, 38:17,
48:17, 48:22, 71:15,
71:20
health [1] - 33:22
hear [3] - 47:23,
47:24, 89:19
heard [1] - 83:20,
83:23, 85:6
heels [2] - 88:20,
89:10
helpful [2] - 5:21,
27:10
helps [1] - 84:12
HER [2] - 39:15, 39:20
hereby [1] - 100:15,
101:4
herein [1] - 100:16
hereto [2] - 101:6,
101:17
hire [2] - 45:4, 60:12
hired [5] - 23:10, 45:3,
60:8, 60:11, 64:16
hiring [3] - 65:1,
65:16, 67:2
history [2] - 37:2,
44:24
hold [3] - 23:17, 33:9,
33:11
holds [1] - 78:21
home [4] - 7:4, 7:9,
38:12, 51:17
honestly [1] - 90:20
hopefully [1] - 69:8
hour [1] - 34:11
hours [23] - 33:18,
34:9, 34:24, 35:8,

35:9, 35:10, 54:3,
54:7, 54:11, 55:3,
55:13, 55:19, 56:4,
56:10, 70:14, 70:17,
70:20, 71:14, 71:17,
87:20
house [8] - 20:15,
33:24, 34:13, 49:20,
49:23, 90:7, 90:17,
90:21
housekeeping [1] -
98:12
Houston [1] - 2:6
humiliated [1] - 23:12
Huron [1] - 6:21
HURON [1] - 6:22
husband [2] - 7:10,
61:6
husband's [1] - 7:24

**I**

idea [2] - 23:16, 59:14
identified [1] - 66:2
identify [6] - 66:20,
67:1, 70:14, 70:17,
71:13
II [1] - 2:11
illegal [1] - 54:1
image [1] - 24:9
images [1] - 49:7
importance [1] - 9:17
improper [1] - 21:20
IN [2] - 1:1, 100:22
inappropriate [2] -
21:19, 53:21
Inc [26] - 64:10, 64:16,
64:24, 65:9, 65:15,
78:7, 78:15, 78:25,
79:7, 79:11, 79:12,
79:20, 80:11, 80:19,
80:24, 81:1, 81:4,
81:6, 81:9, 81:16,
81:24, 81:25, 82:13,
83:20, 83:24, 84:16,
85:6
INC [4] - 1:7, 1:7, 2:8,
2:9
Inc.'s [3] - 3:21, 3:24,
4:5
included [1] - 86:10
income [1] - 45:24
incorrect [1] - 22:3
increase [1] - 95:19
incurred [2] - 50:8,
50:16
independent [22] -
13:7, 13:11, 17:17,
19:16, 19:22, 19:24,
20:2, 20:9, 25:13,

PLTFS APPX 000123

26:1, 26:4, 28:8,
28:12, 32:12, 51:17,
57:20, 59:8, 75:25,
79:18, 81:12, 81:21,
82:7
**independently** [1] -
71:13
**individually** [2] - 1:3,
2:3
**individuals** [3] -
23:18, 45:13, 62:22
**industry** [1] - 19:8
**influence** [1] - 5:24
**Information** [19] -
40:4, 40:10, 40:14,
54:22, 64:22, 64:23,
65:6, 65:8, 65:12,
65:14, 65:20, 66:10,
67:22, 81:2, 81:7,
81:12, 82:6, 82:20,
85:9
**initial** [4] - 9:24, 77:12,
92:21
**initial** [1] - 3:19
**initials** [2] - 28:3, 28:4
**injections** [2] - 47:6,
47:7
**inner** [1] - 65:5
**inside** [2] - 46:14,
46:16
**Instagram** [3] - 12:2,
16:11, 39:25
**instance** [1] - 1:19
**instruct** [5] - 27:12,
27:18, 70:23, 72:23,
76:12
**instructing** [2] -
27:21, 27:23
**intent** [2] - 23:24, 28:7
**intention** [1] - 3:13
**interaction** [1] - 81:3
**interest** [1] - 78:24
**interested** [2] - 61:17,
101:18
**interrogatories** [1] -
3:24
**interrogatory** [2] -
93:7, 93:11
**interrogs** [1] - 93:5
**interrupt** [5] - 21:12,
21:15, 22:10, 26:17,
82:15
**interrupting** [4] -
21:19, 26:10, 26:11,
27:8
**introduction** [1] - 59:7
**invoice** [1] - 50:18
**involved** [11] - 37:4,
53:24, 54:1, 64:25,
65:9, 65:15, 65:17,

66:10, 66:21, 67:2,
83:5
**involvement** [1] -
64:17
**itself** [1] - 85:16

## J

**January** [6] - 52:13,
52:14, 77:3, 88:8,
92:6
**Jessie** [1] - 67:4
**Jessie's** [1] - 67:5
**job** [6] - 60:23, 60:24,
87:13, 94:25
**Johnston** [3] - 1:22,
101:3, 101:21
**join** [2] - 62:6, 62:22
**joining** [2] - 61:17,
62:17
**Julia** [3] - 61:11,
61:21, 62:7
**July** [8] - 8:23, 9:2,
24:15, 52:8, 68:23,
72:9, 72:14, 74:2
**June** [2] - 6:24, 74:2

## K

**K-I-A-N-N-E-J-A-D** [1]
- 6:17
**keep** [7] - 26:5, 36:6,
36:7, 42:22, 59:14,
82:4, 87:13
**keeps** [1] - 58:4
**kept** [4] - 58:13, 58:25,
71:12, 96:15
**Kiannejad** [1] - 6:16
**Kimber** [1] - 16:5
**kimber** [11] - 12:24,
12:25, 13:1, 13:22,
14:1, 15:20, 16:9,
16:16, 16:18, 16:23
**kimberFoxOfficial** [1]
- 12:22
**kimberfoxrealestate
@gmail.com** [1] -
41:16
**Kimberlayton** [1] -
41:16
**kind** [5] - 9:13, 9:17,
44:21, 46:24, 68:8
**knowing** [1] - 81:10
**knowledge** [2] - 19:7,
64:12
**known** [1] - 97:20
**knows** [3] - 38:14,
38:15, 61:6

## L

**L-A-Y-T-O-N** [1] - 6:18
**ladies** [3] - 21:13,
96:11, 96:12
**lap** [5] - 48:4, 95:12,
95:14, 95:17, 95:20
**last** [7] - 9:6, 58:18,
67:4, 72:19, 72:20,
73:2, 89:3
**Latrice** [7] - 2:10,
5:16, 21:5, 37:25,
54:12, 84:17, 88:6
**latrice** [3] - 29:10,
98:12, 99:1
**latrice@
shellswinnubst.
com** [1] - 2:13
**law** [1] - 57:18
**lawsuit** [21] - 28:6,
28:10, 51:5, 51:11,
61:5, 61:7, 61:9,
61:17, 62:6, 62:13,
62:17, 62:23, 62:25,
63:4, 63:9, 63:13,
63:15, 64:11, 65:14,
69:22, 85:8
**lawsuits** [1] - 37:4
**lawyer** [1] - 61:17
**layton** [1] - 67:13
**Layton** [5] - 3:13,
5:14, 6:17, 16:20,
27:14
**LAYTON** [5] - 1:3,
1:14, 1:18, 2:3, 3:4,
5:3, 4:17, 100:14,
100:18
**Layton's** [4] - 3:18,
3:20, 3:22, 4:3
**lease** [1] - 76:21
**Lease** [3] - 3:17,
25:20, 76:9
**least** [1] - 56:21
**leave** [23] - 31:17,
31:24, 32:1, 32:2,
32:6, 33:19, 33:20,
33:24, 34:10, 34:12,
34:15, 35:14, 47:22,
49:15, 52:6, 52:17,
58:9, 61:3, 85:21,
89:2, 91:3, 92:4
**leaving** [3] - 31:19,
32:11, 86:20
**left** [6] - 33:21, 35:23,
52:13, 60:21, 86:4,
91:21
**legal** [2] - 16:19, 79:24
**less** [1] - 53:5
**level** [3] - 65:5, 87:16,
87:17

**License** [3] - 3:17,
25:20, 76:9
**license** [1] - 76:20
**licensing** [2] - 18:12,
18:13
**like..** [1] - 79:8
**likely** [2] - 60:2, 95:24
**limited** [1] - 60:13
**LINE** [1] - 100:2
**lingerie** [2] - 97:2,
97:5
**literally** [3] - 23:8,
31:16, 32:7
**live** [6] - 6:19, 7:11,
7:13, 7:15, 7:19,
8:11
**lived** [2] - 6:23, 7:14
**living** [5] - 7:12, 7:23,
8:7, 8:8, 8:9
**LLC** [1] - 78:21
**local** [1] - 5:8
**located** [1] - 5:17
**log** [2] - 14:18, 98:3
**logged** [1] - 40:7
**login** [3] - 40:4, 40:9,
40:14
**logs** [1] - 98:6
**look** [10] - 23:22, 50:7,
69:18, 73:18, 74:16,
77:20, 91:6, 91:19,
97:5, 99:13
**looked** [1] - 88:16
**looking** [1] - 45:5
**looks** [1] - 94:5
**lose** [2] - 31:12, 87:10
**losing** [1] - 87:14
**losses** [2] - 46:3, 46:6
**lucrative** [4] - 53:17,
59:17, 59:20, 59:21

## M

**ma'am** [16] - 5:23, 6:2,
6:4, 6:9, 6:13, 7:8,
8:2, 8:15, 8:19, 9:20,
10:3, 10:10, 10:15,
11:21, 11:25, 12:16,
14:5, 25:17
**mad** [1] - 6:12
**maiden** [1] - 6:17
**mail** [6] - 2:7, 2:13,
41:13, 41:15, 98:18,
99:6
**MAINSTAGE** [4] - 1:7,
1:7, 2:8, 2:9
**Mainstage** [32] - 3:21,
3:23, 4:4, 64:9,
64:15, 64:21, 64:23,
65:9, 65:15, 65:18,
66:9, 66:11, 66:13,

78:7, 78:15, 78:20,
78:24, 79:7, 79:11,
79:12, 79:20, 80:2,
80:7, 80:10, 80:11,
80:19, 80:24, 81:1,
81:4, 81:6, 81:8,
81:11, 81:15, 81:23,
81:25, 82:13, 83:20,
83:24, 84:3, 84:15,
84:20, 85:6
**makeup** [2] - 46:17,
46:22
**manage** [1] - 45:9
**management** [7] -
35:1, 78:10, 79:6,
79:14, 80:6, 89:8,
89:11
**Management** [31] -
3:21, 3:23, 4:4, 64:9,
64:16, 64:24, 65:9,
65:15, 78:7, 78:15,
78:20, 78:25, 79:11,
80:2, 80:10, 80:19,
80:24, 81:1, 81:4,
81:6, 81:9, 81:11,
81:15, 81:24, 81:25,
82:13, 83:20, 83:24,
84:3, 84:16, 85:6
**MANAGEMENT** [2] -
1:7, 2:8
**manager** [5] - 17:19,
18:2, 23:7, 67:3,
90:7
**managers** [3] - 20:16,
66:21, 66:24
**mandatory** [17] -
31:16, 31:17, 33:16,
33:24, 34:11, 49:15,
49:16, 49:17, 51:18,
52:17, 65:4, 85:19,
85:20, 85:21, 88:23,
89:18
**March** [2] - 14:12,
52:21
**marked** [12] - 23:21,
24:7, 25:18, 68:18,
68:21, 69:15, 75:12,
77:9, 77:11, 92:17,
93:8, 93:16
**marketing** [1] - 94:23
**materials** [3] - 46:8,
46:24, 46:25
**mathematician** [1] -
86:14
**matters** [1] - 101:8
**maximum** [1] - 48:3
**mean** [16] - 12:10,
27:6, 36:8, 54:17,
56:2, 59:22, 60:3,
66:7, 78:19, 81:19,

PLTFS APPX 000124

82:25, 85:1, 93:12, 95:23, 97:21
means [3] - 9:13, 36:8, 97:22
media [14] - 11:22, 11:24, 12:1, 12:12, 12:15, 15:10, 15:13, 15:17, 15:18, 15:20, 40:20, 41:2, 41:3, 47:10
medication [1] - 5:24
Mehmeti [2] - 79:8, 84:23
MEHMETI [2] - 1:8, 2:9
memory [1] - 9:3
Mens [15] - 3:17, 51:25, 52:2, 52:7, 52:8, 52:13, 60:15, 60:17, 74:2, 79:8, 79:13, 84:13, 84:22, 84:24, 85:10
MENS [2] - 1:8, 2:9
menstruating [1] - 97:23
mental [1] - 33:22
mentioned [2] - 46:24, 61:6
Mesquite [2] - 8:9, 25:14
messaged [1] - 64:4
mid [2] - 21:19, 22:11
mid-answer [2] - 21:19, 22:11
middle [2] - 9:11, 21:15
Mildord [1] - 2:5
minutes [5] - 17:21, 36:18, 92:7, 92:16
misclassified [1] - 57:20
misleading [8] - 54:21, 70:24, 71:2, 72:23, 76:22, 93:25
misrepresenting [1] - 56:17
miss [2] - 30:13, 73:22
missed [7] - 30:12, 33:7, 56:23, 56:24, 85:22, 86:22
misstates [2] - 63:5, 80:14
misstating [3] - 43:7, 56:7, 74:4
model [3] - 13:7, 13:12, 49:11
modeled [1] - 13:4
Modeling [2] - 49:8, 49:9
modeling [8] - 12:23, 13:1, 13:2, 13:5,

13:18, 13:19, 48:22
mom [12] - 20:15, 33:25, 34:14, 49:16, 49:20, 49:23, 51:15, 85:19, 90:7, 90:19, 91:1, 91:4
mom's [1] - 7:5
Monday [1] - 30:4
money [55] - 13:5, 19:25, 20:5, 30:14, 30:22, 31:7, 31:9, 31:12, 31:13, 31:20, 32:2, 33:8, 34:3, 43:21, 43:25, 44:7, 44:10, 44:18, 44:19, 45:6, 45:9, 53:5, 56:22, 57:2, 57:15, 57:17, 57:18, 57:19, 57:23, 58:22, 59:1, 59:16, 59:23, 60:6, 60:10, 60:14, 60:17, 60:19, 67:19, 85:13, 85:17, 86:12, 86:21, 87:4, 87:10, 87:11, 87:14, 94:16, 94:19, 95:20, 96:8, 96:12, 96:15, 96:18
month [5] - 9:9, 9:12, 48:13, 72:1, 72:2
monthly [1] - 88:24
months [6] - 40:24, 51:24, 61:14, 63:17, 63:23, 74:6
Most [1] - 86:1
most [7] - 32:10, 32:15, 59:18, 59:19, 67:3, 87:13, 96:18
mother [2] - 7:11, 7:24
mouth [1] - 22:7
move [5] - 38:23, 43:17, 60:23, 82:15, 84:7
MR [2] - 36:18, 88:5
MS [321] - 5:5, 5:10, 5:11, 5:13, 10:23, 11:2, 13:8, 13:11, 13:13, 13:15, 14:8, 14:10, 14:17, 14:21, 14:23, 15:2, 15:4, 15:6, 15:24, 16:1, 16:9, 17:1, 17:3, 17:5, 17:11, 18:19, 18:25, 20:20, 20:24, 21:3, 21:4, 21:8, 21:11, 21:14, 21:22, 21:24, 22:3, 22:4, 22:6, 22:8, 22:12, 22:14, 22:16, 22:17, 22:22, 23:1, 23:15, 23:19, 23:22, 24:5,

24:8, 24:22, 24:24, 24:25, 25:1, 25:19, 26:7, 26:9, 26:12, 26:15, 26:18, 26:21, 26:25, 27:3, 27:10, 27:12, 27:13, 27:14, 27:17, 27:18, 27:20, 27:23, 27:25, 28:2, 28:14, 28:16, 28:18, 28:22, 29:8, 29:14, 29:16, 29:21, 29:23, 30:17, 30:19, 30:25, 31:1, 31:6, 31:14, 31:22, 32:14, 32:15, 32:24, 33:5, 33:10, 33:14, 34:5, 34:7, 35:16, 35:17, 35:19, 35:24, 36:2, 36:4, 36:14, 36:16, 36:17, 36:20, 37:1, 37:25, 38:4, 38:6, 38:9, 38:11, 38:18, 38:20, 38:23, 38:25, 39:1, 39:3, 39:7, 39:11, 39:21, 40:6, 40:9, 40:11, 40:13, 41:6, 41:8, 41:24, 42:3, 42:12, 42:15, 43:2, 43:3, 43:5, 43:10, 43:12, 43:15, 43:17, 43:18, 43:20, 44:2, 44:4, 44:9, 44:12, 44:21, 45:11, 45:12, 45:20, 45:23, 46:1, 46:5, 46:13, 46:16, 46:18, 46:20, 50:10, 50:12, 51:2, 51:4, 51:8, 51:10, 51:13, 51:19, 54:12, 54:14, 54:16, 55:2, 55:5, 55:9, 55:11, 55:12, 56:1, 56:3, 56:6, 56:8, 56:12, 57:3, 57:24, 58:1, 58:12, 58:15, 63:1, 63:2, 63:3, 63:5, 63:14, 63:20, 63:22, 65:11, 65:13, 65:25, 66:12, 66:15, 66:20, 67:10, 67:13, 68:18, 68:22, 68:24, 68:25, 69:2, 69:7, 69:10, 69:13, 69:16, 70:22, 71:1, 71:3, 71:6, 71:9, 71:13, 71:18, 71:23, 72:11, 72:14, 72:22, 73:1, 73:4, 73:6, 74:4, 74:9, 74:12, 74:15, 74:17, 74:19, 74:21, 74:24, 75:1, 75:2, 75:9, 75:11,

75:14, 76:5, 76:8, 76:11, 76:16, 76:18, 76:19, 76:22, 77:1, 77:10, 77:12, 77:25, 78:2, 78:3, 78:16, 78:23, 79:2, 79:9, 79:23, 79:25, 80:1, 80:5, 80:14, 80:18, 82:2, 82:10, 82:11, 82:14, 82:18, 82:24, 83:3, 83:6, 83:8, 83:12, 83:19, 84:8, 84:12, 84:14, 84:18, 84:21, 84:25, 85:5, 85:7, 85:11, 85:13, 86:13, 86:15, 87:1, 87:4, 87:6, 87:10, 87:18, 87:23, 87:25, 88:2, 88:14, 88:15, 91:16, 91:18, 92:18, 93:10, 93:17, 93:25, 94:1, 94:13, 94:15, 95:9, 95:11, 95:22, 96:1, 96:19, 96:21, 97:3, 97:7, 97:9, 97:17, 98:1, 98:2, 98:8, 98:11, 98:14, 98:21, 98:25, 99:2, 99:6, 99:9, 99:15, 99:18
multiple [4] - 31:3, 60:18, 67:5, 89:24
music [8] - 37:19, 39:10, 47:16, 47:19, 47:21, 47:23, 47:24, 48:1, 90:8

## N

naked [3] - 23:8, 23:9, 50:7
name [27] - 5:16, 6:14, 6:16, 6:17, 12:24, 12:25, 13:1, 15:19, 15:22, 16:7, 16:20, 39:19, 39:24, 49:6, 58:18, 67:4, 67:5, 77:7, 79:15, 81:14, 81:23, 82:12, 82:22, 83:4, 83:10, 83:11, 83:24
named [4] - 5:16, 84:16, 84:18, 101:7
names [2] - 16:4, 81:17
nature [1] - 21:20
necessarily [1] - 60:3
need [9] - 18:23, 27:24, 28:19, 29:17, 55:10, 76:13, 98:17,

99:3, 99:19
needed [2] - 23:14, 87:25
needs [2] - 6:7, 54:22
negative [7] - 31:19, 31:25, 32:6, 35:23, 86:4, 86:19, 87:11
never [13] - 13:1, 18:21, 35:5, 43:24, 44:18, 44:20, 48:22, 51:5, 51:14, 61:18, 64:2, 77:19, 85:24
new [4] - 14:18, 40:5, 40:8, 75:23
next [7] - 20:25, 23:5, 23:11, 30:1, 35:4, 38:24
NICK [2] - 1:8, 2:9
Nick [8] - 64:18, 78:12, 78:21, 78:24, 79:8, 80:4, 81:18, 84:23
Nick's [7] - 78:12, 79:7, 79:12, 79:20, 80:7, 80:11, 84:20
NICK'S [2] - 1:7, 2:9
night [4] - 34:18, 53:15, 53:17, 58:23
nitpick [1] - 56:15
NO [1] - 1:6
non [12] - 15:25, 21:3, 21:20, 22:1, 23:2, 23:20, 26:7, 27:7, 30:25, 33:10, 82:10, 85:12
non-responsive [11] - 15:25, 21:3, 21:20, 22:1, 23:2, 23:20, 26:7, 30:25, 33:10, 82:10, 85:12
non-responsiveness [1] - 27:7
norm [1] - 32:22, 32:23
normal [1] - 34:8
normally [2] - 36:10, 53:14
NORTHERN [1] - 1:1
Northern [1] - 5:8
notarized [1] - 93:13
NOTARY [1] - 100:22
noted [1] - 100:16
nothing [2] - 75:4, 97:16
Notice [1] - 3:12
notice [1] - 23:24
noticed [1] - 24:1
notify [1] - 98:22
November [5] - 24:1, 72:18, 73:7, 101:20

PLTFS APPX 000125

NOVEMBER [2] -
1:15, 1:20
nude [10] - 95:23,
95:24, 96:7, 96:11,
97:1, 97:13, 97:18,
97:19, 97:21, 97:22
nude-optional [2] -
97:19, 97:21
number [7] - 42:16,
56:15, 64:8, 70:8,
86:16, 86:18, 94:6
numbered [1] - 1:20
numbers [1] - 86:19

## O

Oak [3] - 6:25, 8:16,
24:17
oath [5] - 9:18, 21:5,
28:14, 28:19, 84:1
object [6] - 15:24,
21:20, 21:25, 22:6,
23:1, 26:7, 27:6,
72:22
objecting [1] - 27:20
Objection [3] - 30:17,
74:12, 87:1
objection [71] - 13:8,
13:13, 14:8, 14:17,
14:23, 15:4, 18:19,
20:20, 21:3, 21:22,
23:19, 27:17, 30:25,
31:14, 32:14, 32:24,
33:10, 34:5, 35:16,
35:19, 36:2, 36:14,
39:3, 40:6, 40:11,
41:6, 41:24, 44:2,
45:11, 45:20, 46:1,
46:13, 46:18, 50:10,
51:2, 51:8, 51:13,
56:1, 56:8, 57:24,
58:12, 63:1, 63:5,
63:20, 65:11, 70:22,
71:6, 71:18, 72:11,
74:4, 76:5, 76:11,
77:25, 78:16, 79:2,
79:23, 79:25, 80:14,
82:2, 82:10, 85:11,
86:13, 87:6, 88:14,
93:25, 95:22, 96:19,
97:3, 97:9
Objections [3] - 3:20,
3:23, 4:4
obligation [2] - 29:14,
59:4
obtain [1] - 54:20
obviously [1] - 5:15
October [1] - 92:24
odd [2] - 34:2, 34:6
OF [5] - 1:1, 1:13,

100:23, 101:1, 101:2
office [1] - 101:19
often [3] - 33:18,
56:22, 90:11
old [1] - 41:8
once [3] - 18:21,
51:15, 89:2
one [40] - 10:18,
15:20, 16:23, 18:10,
19:4, 19:6, 19:14,
25:10, 30:7, 32:19,
32:21, 49:2, 55:15,
59:6, 59:7, 59:11,
61:7, 62:8, 62:11,
69:13, 70:7, 71:8,
76:1, 77:1, 77:2,
77:5, 79:11, 83:22,
85:3, 87:22, 88:8,
88:16, 88:25, 89:24,
89:25, 94:5, 98:23
one-time [2] - 32:19,
32:21
ones [2] - 91:8, 91:10
open [1] - 68:4
opened [1] - 93:1
opportunity [2] -
72:13, 91:13
opposite [2] - 28:24,
29:2
option [9] - 19:13,
19:18, 19:21, 25:10,
30:10, 87:15
optional [2] - 97:19,
97:21
options [1] - 60:13
or.. [1] - 14:20
Oral [1] - 3:13
ORAL [1] - 1:13
order [10] - 26:5,
31:17, 33:8, 33:20,
57:1, 75:24, 91:2,
98:18, 98:22, 98:23
otherwise [1] - 27:7
outfit [1] - 51:18
outfits [5] - 46:7, 47:1,
48:8, 48:9, 48:10
outside [1] - 46:10
overtalking [1] - 29:22
overtime [9] - 54:5,
55:17, 55:18, 56:19,
70:4, 70:10, 70:17,
71:5, 72:6
owe [5] - 30:14, 31:17,
31:19, 50:12, 56:22
owed [7] - 33:8, 52:3,
57:1, 57:8, 57:11,
57:18, 57:19
owing [1] - 86:20
own [7] - 7:4, 13:14,
37:12, 37:18, 39:2,

65:21, 78:24
owned [1] - 66:11
owner [7] - 64:18,
66:15, 66:17, 66:18,
78:13, 79:15, 81:19
owner's [2] - 51:14,
51:20
owners [3] - 80:7,
81:17, 82:8
ownership [4] - 78:7,
79:19, 80:2, 80:11
owns [7] - 64:12,
64:14, 65:18, 65:19,
66:1, 66:4

## P

P-O-I-S-I-N [1] - 12:22
p.m [1] - 99:22
packet [1] - 69:7
page [6] - 16:14,
16:19, 24:18, 28:3,
41:2, 70:8
PAGE [3] - 3:11, 4:2,
100:2
paid [10] - 32:2, 32:4,
34:13, 43:24, 44:20,
46:7, 49:19, 49:21,
58:19, 85:24, 90:13,
90:25, 92:1, 92:8,
95:20
paragraph [1] - 62:4
parent [1] - 85:9
part [10] - 19:20, 25:2,
25:23, 33:23, 59:3,
61:8, 62:7, 65:22,
79:15, 81:5
participating [1] -
93:6
particular [1] - 78:3
parties [3] - 66:3,
101:15, 101:17
party [1] - 80:12
pass [5] - 88:1, 91:16,
94:13, 95:9, 98:1
password [1] - 14:22
past [1] - 40:25
pay [22] - 30:12,
30:21, 31:16, 33:12,
33:19, 33:23, 33:25,
34:10, 44:7, 47:20,
47:22, 47:24, 47:25,
50:9, 50:25, 64:25,
70:10, 85:23, 86:21,
86:22, 90:21, 91:3
pay-out [1] - 33:19
paycheck [1] - 20:1
paying [5] - 30:10,
33:3, 48:24, 49:1
payment [1] - 85:14

penalties [1] - 35:3
People [1] - 23:17
people [19] - 19:15,
19:16, 19:25, 23:17,
32:10, 53:12, 60:2,
60:3, 64:20, 66:21,
67:2, 67:15, 87:13,
89:16, 94:25, 95:1,
97:5, 97:18, 97:20
per [4] - 30:23, 34:21,
35:18, 45:15
Perfect [2] - 38:20,
38:25
perfect [1] - 99:18
perform [3] - 40:24,
73:24, 88:17
performances [2] -
44:10, 44:22
performed [3] - 37:15,
40:25, 90:9
performer [2] - 39:13,
39:14
performing [3] -
43:21, 89:12, 89:15
permanent [3] - 6:24,
6:25, 7:2
person [7] - 61:7,
61:10, 62:12, 65:19,
82:9, 90:6, 101:7
personal [1] - 16:14
Phone [2] - 2:6, 2:13
phone [7] - 14:18,
40:5, 40:8, 41:9,
41:12, 47:10, 47:11
photographer [3] -
48:19, 49:3, 49:4
photos [8] - 10:17,
40:15, 40:16, 40:19,
41:4, 41:18, 41:21,
63:24
Photos [1] - 41:19
pick [1] - 90:8
Pinup [10] - 12:2,
12:3, 12:5, 12:6,
12:7, 16:24, 49:8,
49:9, 49:11, 49:12
place [3] - 8:21, 18:11,
39:19
Plaintiff [8] - 1:5, 2:3,
3:18, 3:20, 3:22, 4:3
plaintiffs [1] - 74:23
plan [1] - 57:10
Plano [7] - 6:21, 6:22,
7:6, 7:12, 7:24, 7:25,
101:23
play [1] - 90:13
played [2] - 47:17,
48:1
PLLC [1] - 2:5
plus [2] - 65:4, 82:3

point [6] - 23:10,
23:13, 25:9, 34:15,
52:4, 74:8
Point [2] - 6:25, 24:17
Poisin [7] - 12:21,
13:25, 14:12, 14:19,
16:6, 39:24, 40:25
policies [1] - 66:22
polite [1] - 27:4
port [1] - 4:10
portion [8] - 15:25,
22:1, 23:2, 23:20,
26:8, 49:13, 85:12,
87:24
positive [2] - 86:15,
86:18
possession [1] -
41:22
possibly [3] - 11:12,
41:10, 94:5
potential [5] - 41:4,
59:16, 59:22, 60:6,
63:9, 66:3
potentially [5] - 9:11,
61:2, 71:22, 72:16,
85:3
power [2] - 23:17
practice [1] - 5:18
practices [1] - 65:16
practicing [1] - 44:22
Predmoore [2] -
61:11, 62:7
preparation [1] - 93:6
prepare [4] - 10:5,
37:20, 37:23, 93:10
prepared [2] - 57:13,
77:17
preparing [1] - 93:5
presented [1] - 19:23
presenting [1] - 65:25
press [1] - 68:6
pressured [1] - 23:13
Preston [1] - 101:23
prevent [1] - 5:25
previous [2] - 29:5,
87:2
previously [6] - 8:1,
24:18, 41:12, 42:19,
92:9, 93:21
prices [1] - 45:19
primarily [3] - 15:23,
94:18, 97:19
primary [1] - 16:6
printed [1] - 74:25
privileged [1] - 64:22
Procedure [3] - 1:24,
5:7, 75:6
process [2] - 25:3,
63:10
produce [6] - 64:5,

69:8, 74:17, 75:3, 75:5, 75:7
**produced** [4] - 68:24, 69:12, 76:14, 94:11
**produces** [1] - 94:12
**production** [7] - 15:3, 38:16, 42:16, 64:8, 93:18, 93:19, 94:6
**Production** [1] - 4:5
**profile** [1] - 14:1
**profitable** [2] - 96:22, 97:1
**promote** [1] - 41:1
**promotional** [1] - 95:3
**promotions** [1] - 59:25
**proper** [1] - 79:25
**property** [1] - 80:9
**prove** [5] - 71:5, 72:5, 73:9, 73:15, 73:19
**provide** [10] - 9:15, 10:21, 11:5, 25:2, 42:7, 42:20, 53:7, 74:11, 81:21, 94:10
**provided** [9] - 8:1, 8:17, 10:13, 42:11, 58:14, 58:20, 93:19, 93:22, 94:1
**providing** [6] - 10:9, 21:15, 22:18, 53:6, 54:22, 58:17
**provisions** [1] - 1:24
**PT's** [50] - 3:17, 17:13, 51:24, 52:3, 52:6, 52:13, 52:24, 59:18, 60:6, 60:8, 60:10, 60:15, 60:21, 61:1, 61:4, 61:9, 64:12, 64:14, 65:2, 65:21, 66:10, 66:11, 76:6, 78:7, 78:15, 78:20, 79:7, 79:8, 79:12, 79:16, 79:20, 80:3, 80:11, 80:20, 80:25, 84:13, 84:22, 84:24, 85:10, 87:14, 88:12, 88:18, 90:14, 91:7, 91:14, 94:17, 94:22, 95:23
**PT'S** [4] - 1:8, 2:9
**PUBLIC** [1] - 100:22
**pull** [1] - 56:12
**purposes** [6] - 9:14, 12:12, 12:23, 16:8, 16:18, 92:18
**pursuant** [2] - 1:23, 5:7
**put** [3] - 33:9, 33:11, 96:5
**putting** [2] - 22:7, 77:6

## Q

**questioning** [1] - 72:24
**questions** [16] - 5:19, 10:6, 21:10, 26:20, 26:24, 27:2, 27:22, 43:15, 54:23, 66:16, 69:11, 72:12, 88:3, 98:5, 99:5, 99:7
**quickly** [1] - 99:12

## R

**rambling** [1] - 26:25
**ran** [2] - 81:22, 95:3
**rate** [3] - 48:5, 64:25, 99:12
**rather** [2] - 20:1, 51:10
**re** [1] - 83:16
**re-ask** [1] - 83:16
**reach** [1] - 64:3
**reached** [2] - 51:5, 51:6
**read** [13] - 17:18, 17:20, 17:25, 18:3, 18:8, 20:21, 23:5, 43:6, 43:14, 56:13, 87:20, 87:24, 100:14
**readily** [2] - 65:6, 81:12
**reading** [2] - 17:24, 79:9
**ready** [3] - 90:18, 90:23, 91:2
**real** [4] - 12:9, 12:10, 12:12, 16:18
**realized** [1] - 62:5
**really** [13] - 20:17, 24:6, 33:2, 35:22, 61:3, 63:8, 63:12, 68:20, 75:3, 77:22, 84:6, 96:15, 97:5
**Realtor** [2] - 12:11, 40:21
**REASON** [1] - 100:2
**reason** [4] - 14:25, 65:24, 78:8, 81:15
**recalling** [1] - 42:23
**receive** [12] - 20:6, 20:10, 20:11, 35:18, 43:21, 44:7, 44:10, 44:19, 53:9, 53:14, 53:18, 85:13
**received** [12] - 20:14, 20:15, 43:1, 43:25, 44:18, 45:25, 47:7, 50:18, 53:11, 74:20, 80:18, 86:20
**recently** [1] - 40:25

**recess** [1] - 17:8
**Recess** [2] - 36:23, 67:11
**recognize** [2] - 28:2, 94:4
**recollection** [4] - 9:10, 29:11, 54:15, 75:21
**recommend** [1] - 66:7
**record** [19] - 1:25, 6:15, 9:22, 17:1, 17:6, 17:9, 36:21, 36:24, 54:18, 54:24, 56:7, 56:13, 58:25, 67:12, 69:14, 74:19, 74:21, 99:20, 101:11
**recorded** [1] - 46:3
**records** [25] - 58:2, 58:4, 58:5, 58:10, 58:13, 58:14, 67:19, 68:13, 70:15, 70:16, 70:19, 70:25, 71:4, 71:11, 72:5, 72:8, 72:12, 72:25, 73:8, 91:6, 91:14, 91:19, 91:22
**reduced** [1] - 101:9
**refer** [1] - 73:18
**referenced** [2] - 24:18, 85:18
**referencing** [1] - 54:9
**referred** [1] - 25:15
**referring** [10] - 18:14, 25:20, 29:11, 29:12, 44:7, 54:13, 54:14, 55:7, 76:25, 91:23
**reflected** [1] - 72:4
**refresh** [1] - 29:11
**regard** [4] - 37:1, 50:8, 69:16, 75:9
**regarding** [4] - 56:4, 61:5, 64:23, 67:23
**regardless** [1] - 34:1
**regards** [4] - 10:7, 12:12, 63:15, 92:11
**rehire** [1] - 75:24
**related** [5] - 50:19, 65:1, 78:15, 80:19, 101:14
**relationship** [5] - 17:13, 20:18, 48:7, 65:2, 65:17
**relative** [1] - 101:16
**relevant** [1] - 11:23
**reliable** [1] - 67:22
**rely** [1] - 66:6
**relying** [3] - 19:25, 70:25, 72:25
**remember** [19] - 8:5, 8:6, 10:19, 15:6, 15:15, 17:18, 25:15,

32:18, 34:2, 34:3, 51:15, 66:6, 67:5, 73:20, 73:22, 77:6, 84:9, 85:1
**removed** [1] - 14:2
**rent** [3] - 71:24, 71:25, 72:2
**renting** [1] - 7:9
**repeat** [2] - 39:18, 51:9
**repeatedly** [3] - 54:18, 82:17, 87:14
**repeating** [1] - 82:4
**rephrased** [1] - 44:4
**report** [1] - 45:24
**REPORTER** [17] - 17:6, 17:9, 21:13, 29:18, 36:21, 36:24, 39:18, 67:12, 87:22, 98:7, 98:20, 98:24, 99:4, 99:7, 99:11, 99:17, 99:20
**reporter** [5] - 5:21, 27:8, 43:6, 43:13, 56:13, 101:4
**Reporter** [1] - 1:23
**Reporter's** [1] - 3:9
**REPORTING** [1] - 101:22
**represent** [4] - 5:15, 67:15, 84:14, 84:15
**represented** [1] - 81:10
**request** [10] - 15:3, 28:25, 37:20, 38:15, 38:16, 54:18, 64:8, 92:22, 93:6, 94:6
**Request** [2] - 3:21, 4:5
**requested** [4] - 38:13, 42:15, 87:24, 94:7
**requests** [1] - 93:19
**require** [3] - 19:2, 33:19, 56:24
**required** [14] - 26:6, 30:4, 34:9, 38:7, 45:4, 45:15, 46:8, 48:12, 52:17, 56:21, 68:14, 76:7, 88:19, 96:4
**requirements** [4] - 59:9, 78:13, 81:21, 88:22
**reserve** [1] - 98:2
**reset** [1] - 14:21
**residence** [1] - 8:18
**residing** [1] - 7:6
**respond** [1] - 27:15
**responding** [1] - 15:13
**response** [3] - 28:25,

29:1, 64:1
**Responses** [3] - 3:20, 3:23, 4:4
**responses** [11] - 10:5, 29:5, 37:21, 37:24, 92:23, 93:7, 93:11, 93:14, 93:18, 94:1
**responsive** [12] - 15:25, 21:3, 21:20, 22:1, 23:2, 23:20, 26:7, 30:25, 33:10, 82:10, 85:12, 93:22
**responsiveness** [1] - 27:7
**retrieve** [1] - 14:4
**return** [2] - 10:20, 11:2
**returns** [9] - 42:3, 42:8, 42:16, 43:3, 45:25, 46:4, 46:6, 46:22, 94:7
**review** [6] - 10:4, 37:20, 37:24, 69:4, 69:5, 69:6, 72:13, 91:14
**reviewed** [4] - 38:2, 69:20, 77:18, 77:21
**reviewing** [3] - 9:24, 72:25, 76:15
**Rezazadeh** [3] - 2:4, 3:6, 3:7
**REZAZADEH** [143] - 5:10, 10:23, 13:8, 13:13, 14:8, 14:17, 14:23, 15:4, 16:1, 17:3, 18:19, 20:20, 21:4, 21:11, 21:14, 21:24, 22:4, 22:8, 22:14, 22:17, 23:1, 24:22, 24:25, 26:9, 26:15, 26:21, 27:3, 27:12, 27:17, 27:20, 27:25, 28:14, 28:18, 29:8, 29:16, 30:17, 31:1, 31:14, 32:14, 32:24, 34:5, 35:16, 35:19, 36:2, 36:14, 36:17, 36:20, 37:25, 38:6, 38:11, 38:20, 38:25, 39:3, 39:7, 40:6, 40:11, 41:6, 41:24, 42:12, 43:2, 43:5, 43:12, 43:17, 44:2, 44:12, 45:11, 45:20, 46:1, 46:13, 46:18, 50:10, 51:2, 51:8, 51:13, 54:12, 54:16, 55:5, 55:11, 56:1, 56:6, 56:12, 57:24, 58:12, 63:1, 63:5, 63:20, 65:11,

PLTFS APPX 000127

BROOKE LAYTON   November 2, 2021                    10

65:25, 66:15, 68:24, 69:2, 69:10, 70:22, 71:6, 71:9, 71:18, 72:11, 72:22, 73:4, 74:4, 74:12, 74:17, 74:21, 75:1, 76:5, 76:11, 76:18, 76:22, 77:25, 78:16, 79:2, 79:23, 80:1, 80:14, 82:2, 82:14, 82:24, 83:6, 83:12, 84:8, 84:14, 84:25, 85:7, 86:13, 87:1, 87:6, 88:2, 88:5, 88:15, 91:16, 93:25, 94:15, 95:9, 95:22, 96:19, 97:3, 97:9, 98:2, 98:8, 98:11, 98:16, 98:21, 98:25
Richardson [1] - 2:12
Road [1] - 101:23
room [1] - 61:3
Room [1] - 31:2
rotate [1] - 68:5
rotation [1] - 89:18
Roxie [2] - 15:22, 16:5
Rubin [1] - 85:19
rude [2] - 22:20, 27:9
Rules [3] - 1:24, 5:7, 75:6
rules [1] - 5:8
run [2] - 79:17, 80:9
runs [1] - 81:18
rushed [1] - 17:22

**S**

sat [1] - 59:8
Saturday [1] - 30:3
saw [1] - 74:22
schedule [4] - 28:22, 29:4, 29:24, 30:6
schedules [1] - 43:4
screen [3] - 67:18, 68:5, 92:20
scroll [1] - 79:4
scrolling [1] - 84:13
seal [1] - 101:19
Second [1] - 3:12
second [6] - 17:2, 23:25, 70:9, 75:20, 76:9, 77:2, 87:22, 90:2, 96:4
see [31] - 17:25, 20:25, 23:23, 24:2, 24:21, 25:1, 29:5, 29:12, 29:13, 38:1, 38:2, 38:6, 38:14, 42:9, 42:18, 47:13, 54:9, 54:13, 54:16, 54:19,

55:7, 62:2, 62:3, 62:4, 68:5, 70:11, 76:24, 79:13, 83:21, 84:4, 94:8
seeing [6] - 25:5, 70:15, 73:8, 80:21, 91:25, 92:25
select [2] - 47:16, 48:9
send [1] - 99:12
sent [4] - 41:25, 42:1, 51:17, 64:2
serious [1] - 63:11
serve [1] - 74:23
served [3] - 9:25, 15:2, 92:23
services [1] - 74:11
SERVICES [1] - 101:22
Set [1] - 3:24
set [15] - 24:1, 28:22, 29:3, 29:24, 30:6, 30:23, 30:24, 31:3, 45:4, 45:18, 48:23, 61:17, 65:3, 89:17, 89:21
setting [3] - 64:25, 65:16, 66:22
settlement [1] - 50:25
seven [3] - 55:23, 93:4, 99:17
sexual [1] - 54:1
shame [1] - 17:19
shamed [1] - 18:2
share [4] - 67:18, 68:4, 92:19, 94:12
sheet [2] - 3:8, 99:12
sheets [5] - 3:25, 68:2, 68:8, 68:10, 92:2
sHEILS [1] - 2:11
shift [37] - 20:1, 30:3, 30:9, 30:12, 30:13, 31:20, 31:21, 31:23, 32:16, 33:7, 33:17, 33:18, 34:1, 34:8, 34:11, 35:1, 35:2, 35:14, 35:18, 36:1, 36:7, 49:18, 49:22, 53:19, 56:23, 56:25, 60:1, 60:11, 60:22, 61:1, 85:22, 86:8, 86:22, 86:25, 89:4, 90:2, 95:13
shifts [18] - 30:11, 30:14, 33:6, 33:7, 33:14, 34:21, 34:23, 35:11, 55:21, 56:11, 56:22, 56:25, 59:17, 68:14, 71:22, 87:20, 89:1, 96:14
Shipley [2] - 62:15,

62:19
shirley [1] - 14:12
Shirley [6] - 12:21, 13:25, 14:19, 16:5, 39:24, 40:25
shoes [1] - 47:1
shorthand [1] - 101:3
Shorthand [1] - 1:22
shots [3] - 48:17, 48:22, 48:23
show [16] - 29:10, 29:17, 38:8, 38:12, 38:20, 38:22, 42:5, 48:14, 54:25, 66:8, 70:19, 73:9, 73:20, 73:23, 76:13, 91:22
showed [2] - 75:17, 88:7
shows [2] - 73:22, 90:24
sign [29] - 18:7, 18:10, 18:12, 18:16, 18:23, 19:7, 19:9, 19:11, 20:25, 23:10, 23:14, 34:14, 58:7, 58:8, 68:2, 68:8, 68:10, 75:24, 76:4, 76:7, 90:18, 91:4, 91:6, 91:14, 91:19, 92:2, 93:13
Sign [1] - 3:25
sign-in [7] - 68:2, 68:8, 68:10, 91:6, 91:14, 91:19, 92:2
Sign-in [1] - 3:25
signatory [1] - 84:13
SIGNATURE [1] - 100:1
Signature [1] - 3:8
signature [1] - 100:15
signed [30] - 17:12, 17:14, 17:15, 18:15, 18:21, 18:24, 19:3, 19:8, 19:13, 25:13, 25:21, 59:10, 62:1, 72:17, 72:19, 75:15, 75:18, 75:20, 75:22, 76:1, 76:9, 76:13, 76:17, 76:20, 77:3, 77:4, 77:5, 80:19, 83:21, 84:2, 84:21, 84:24, 85:10, 88:7, 88:8, 88:16, 92:11, 92:15
signing [5] - 18:1, 28:4, 58:17, 62:6, 88:12
similarly [2] - 1:4, 2:3
simple [3] - 26:14, 27:1, 82:19

single [2] - 19:4, 82:9
Sins [3] - 39:15, 39:20, 39:23
Sisoliz [1] - 49:7
SISOLIZ [1] - 49:7
sit [1] - 57:13
situated [2] - 1:4, 2:3
six [7] - 34:9, 34:24, 35:10, 55:22, 71:21, 87:20
skill [1] - 45:4
skills [3] - 44:24, 45:7, 50:5
skip [3] - 24:6, 89:24, 89:25
skipped [2] - 89:19, 89:21
skybox [2] - 89:24, 90:1
slash [1] - 25:11
slip [1] - 90:24
slow [1] - 29:22
social [19] - 11:22, 11:24, 12:1, 12:12, 12:15, 15:10, 15:13, 15:17, 15:18, 15:20, 40:20, 41:2, 41:3, 47:10, 58:18
solicit [1] - 48:6
solicited [1] - 62:22
someone [3] - 61:7, 79:15, 80:23
sometime [1] - 73:2
sometimes [6] - 20:16, 31:24, 31:25, 46:12, 53:11, 57:1
somewhere [2] - 18:17, 87:11
song [2] - 90:12, 96:4
sorry [12] - 12:5, 12:20, 16:17, 21:14, 21:13, 29:18, 29:20, 39:18, 51:9, 66:14, 67:9, 99:6
sound [4] - 24:14, 72:10, 72:14, 72:20
speaking [4] - 27:5, 27:6, 29:19, 30:15
specials [3] - 94:23, 95:7
specific [4] - 30:4, 45:7, 70:13, 90:12
specifically [9] - 22:15, 28:20, 38:13, 46:14, 54:19, 61:15, 78:14, 90:6, 94:7
specifics [2] - 20:23, 90:11
speculate [1] - 20:19
spelling [1] - 98:5

spending [1] - 31:20
spent [1] - 86:2
spoken [4] - 61:21, 62:19, 63:18, 63:22
squared [1] - 98:15
Stage [1] - 89:17
stage [11] - 12:24, 12:25, 53:11, 58:18, 89:13, 89:15, 89:16, 89:17, 90:9, 90:16, 96:4
stake [1] - 80:3
stakehold [1] - 82:9
stakeholds [1] - 81:20
standard [12] - 18:20, 19:7, 19:12, 30:23, 31:25, 45:15, 45:21, 61:1, 65:3, 92:6, 92:16, 99:16
standards [1] - 31:5
start [3] - 52:6, 52:24, 75:23
started [9] - 8:20, 8:21, 9:2, 17:12, 17:16, 22:15, 52:14, 75:15, 89:4
state [2] - 5:6, 6:14
State [3] - 1:21, 1:23, 101:4
STATE [2] - 100:23, 101:2
statement [2] - 50:19, 93:13
statements [4] - 11:5, 11:8, 11:10, 42:4
states [1] - 84:3
STATES [1] - 1:1
stating [2] - 71:3, 74:14
stayed [1] - 55:20, 60:8
still [10] - 11:20, 13:22, 16:15, 31:9, 35:4, 39:23, 40:23, 41:8, 90:2, 97:12
Stipulations [1] - 3:3
stop [6] - 22:9, 26:10, 27:7, 39:21, 52:6, 94:12
stopped [1] - 8:24
stopping [1] - 48:21
store [1] - 48:10
stored [1] - 41:11
Street [1] - 2:5
stripping [1] - 16:8
studio [1] - 48:23
stuff [1] - 5:15
styled [1] - 1:20
SUBSCRIBED [1] - 100:19

PLTFS APPX 000128

subsequently [1] - 22:24
sued [4] - 37:10, 52:15, 79:10, 83:9
suing [1] - 57:15
suitable [3] - 19:24, 48:15, 52:1
Suite [1] - 101:23
Summer [2] - 8:5, 8:8
summer [1] - 74:7
Summons [1] - 3:15
Sunday [1] - 30:3
supervised [1] - 81:8
supervision [1] - 101:10
supposed [1] - 78:11
surgery [1] - 47:2
survival [3] - 59:21, 87:16, 87:17
SWORN [1] - 100:19
sworn [2] - 5:4, 101:7

**T**

talks [1] - 91:20
tattoos [1] - 60:13
tax [11] - 10:20, 11:2, 42:3, 42:7, 42:16, 43:3, 45:25, 46:4, 46:6, 46:22, 94:7
ten [2] - 36:18, 99:17
tenure [1] - 64:17
term [1] - 92:13
terms [1] - 20:17
testified [15] - 5:4, 35:10, 35:11, 42:19, 43:2, 43:6, 56:9, 74:1, 75:14, 76:16, 76:19, 92:9, 93:21, 94:16, 97:17
testify [1] - 101:8
testifying [4] - 22:7, 35:13, 68:1, 73:1
testimony [31] - 21:16, 26:16, 29:23, 32:3, 34:17, 35:7, 35:17, 35:25, 36:6, 41:21, 43:7, 43:21, 43:25, 45:18, 46:21, 50:5, 53:9, 54:21, 55:24, 56:4, 56:16, 57:7, 58:6, 60:14, 63:6, 74:5, 80:15, 86:23, 87:2, 96:7, 101:11
TEXAS [3] - 1:1, 100:23, 101:2
Texas [16] - 1:22, 1:23, 2:6, 2:12, 5:8, 6:21, 6:22, 6:25, 7:7, 7:14, 7:20, 8:4,

11:19, 101:4, 101:21, 101:23
THE [25] - 1:1, 1:1, 10:22, 10:25, 17:9, 21:13, 28:13, 29:18, 36:15, 36:21, 36:24, 39:18, 67:8, 67:12, 87:22, 98:7, 98:10, 98:20, 98:24, 99:4, 99:7, 99:11, 99:17, 99:20, 100:22
theme [1] - 88:24
therefore [1] - 80:12
they've [1] - 61:22
third [1] - 72:3
three [3] - 30:5, 91:9, 91:23
throne [1] - 22:4
Tic [1] - 12:3
ticket [1] - 34:14
tied [1] - 16:6
tights [1] - 97:11
timesheet [2] - 68:16, 68:22
tip [3] - 31:17, 47:22, 49:15, 49:16, 52:18, 86:22, 89:17, 91:5
tip-out [7] - 31:17, 47:22, 49:15, 49:16, 52:18, 86:22, 91:5
tipping [3] - 49:24, 53:12, 60:3
tips [16] - 20:6, 20:10, 20:11, 20:14, 20:15, 20:18, 20:19, 30:15, 48:6, 49:13, 49:14, 53:10, 53:11, 53:15, 53:16, 53:18, 89:12, 95:20
Tock [1] - 12:3
today [7] - 5:18, 6:1, 24:1, 47:13, 68:25, 74:23, 91:11
toe [1] - 23:8
together [5] - 10:9, 10:16, 57:14, 63:25, 91:7
took [4] - 17:21, 36:12, 49:13, 50:5
top [6] - 38:16, 71:15, 71:20, 78:20, 79:4, 96:5
topless [1] - 97:14
touch [1] - 98:8
town [1] - 60:7
trade [1] - 49:2
Trail [2] - 6:21, 6:22
training [2] - 39:12, 44:25
transcript [2] - 87:19,

98:22
transcription [1] - 101:10
traveling [1] - 73:22
treated [5] - 25:24, 25:25, 26:2, 28:7, 79:17
treating [1] - 28:11
trial [1] - 98:2
tried [9] - 14:1, 14:24, 30:13, 40:13, 52:1, 52:2, 60:9, 60:11, 98:14
trouble [1] - 96:6
true [7] - 23:15, 24:8, 56:9, 93:14, 100:16, 101:6, 101:11
truth [5] - 6:1, 9:18, 38:19, 38:21, 101:8
try [4] - 15:1, 29:21, 67:18, 68:19
trying [12] - 17:18, 18:3, 22:19, 27:18, 36:5, 36:11, 38:19, 54:6, 65:22, 77:17, 89:3, 89:25
turnaround [1] - 99:16
twenty [1] - 35:9
twenty-four [1] - 35:9
two [4] - 53:13, 63:17, 63:23, 79:10
type [1] - 68:8
typically [5] - 71:24, 72:3, 90:10, 90:22, 92:3

**U**

under [20] - 5:24, 12:2, 12:3, 12:21, 14:1, 16:19, 21:5, 28:14, 28:19, 37:8, 40:25, 57:18, 59:4, 75:6, 83:25, 84:1, 84:23, 92:15, 101:10, 101:19
Understood [1] - 29:21
undertake [1] - 18:11
underwear [2] - 96:15, 96:22
Union [1] - 11:19
UNITED [1] - 1:1
unless [4] - 38:12, 50:25, 80:25, 83:15
unsure [2] - 14:24, 41:10
untimely [1] - 21:23
up [11] - 34:13, 41:18, 48:14, 51:16, 57:10,

79:4, 88:23, 88:25, 89:16, 96:3, 96:9

**V**

vague [12] - 63:1, 63:20, 78:16, 79:2, 82:2, 83:7, 86:13, 87:1, 87:6, 95:22, 96:19, 97:9
variables [1] - 86:7
variations [1] - 35:25
varied [1] - 36:8
varies [5] - 31:15, 31:24, 32:5, 35:12, 55:20
vary [1] - 92:8
Venmo [1] - 11:14
verbalize [1] - 5:20
verification [2] - 93:10, 93:12
Verify [2] - 3:16, 24:11
verify [3] - 55:17, 68:13, 90:19
version [1] - 75:19
versus [1] - 79:17
video [1] - 10:18
videos [2] - 10:17, 41:22
VIP [1] - 30:24
Vixen [2] - 15:22, 16:5
vocalized [1] - 28:21
VS [1] - 1:6
vulnerable [1] - 23:18

**W**

wages [1] - 70:10
waiver [1] - 62:1
walk [1] - 97:13
walking [1] - 53:12
wants [2] - 21:6, 54:16
was.. [2] - 77:7, 89:11
wasting [1] - 77:19
wear [7] - 48:11, 88:19, 89:1, 89:9, 97:11, 97:15, 97:25
wearing [3] - 51:18, 97:1, 97:4
week [28] - 30:1, 30:3, 30:5, 32:11, 33:6, 33:7, 33:15, 34:21, 35:8, 35:9, 35:11, 54:3, 54:8, 54:11, 55:3, 55:13, 55:14, 55:19, 56:23, 70:13, 70:20, 71:14, 71:16, 71:25, 72:1, 89:4
weekend [1] - 41:1
weeks [3] - 71:21,

71:23, 71:24
welcome [2] - 22:25, 75:2
whatsoever [1] - 60:19
Wild [1] - 52:5
willing [1] - 35:2
win [1] - 50:25
WINNUBST [1] - 2:11
WITNESS [6] - 10:22, 10:25, 28:13, 36:15, 67:8, 98:10
witness - 88:1, 91:16, 94:13, 95:9, 98:1, 101:12
words [1] - 22:7
worker [2] - 34:19, 53:16
workers [3] - 35:21, 65:7, 96:13
workings [1] - 65:5
works [1] - 22:1
world [1] - 84:11
worried [1] - 85:2
worry [1] - 55:10
Worth [2] - 12:11, 59:17
write [1] - 57:14
writing [2] - 6:5, 101:10
written [1] - 70:8
Written [1] - 25:6

**Y**

y'all [7] - 20:5, 61:15, 69:8, 75:3, 75:4, 75:7
years [1] - 32:20
yes-or-no [4] - 5:19, 22:22, 27:15, 82:19
yesterday [2] - 69:1, 74:20
yourself [2] - 47:10, 82:5

PLTFS APPX 000129

**AMERICAN ARBITRATION ASSOCIATION**
**Commercial Arbitration Tribunal**

In the Matter of the Arbitration between

Case Number: 01-21-0002-3409

Julia Predmore
-vs-
Nick's Management, Inc., Nick's Clubs, Inc., f/k/a
Adventure Plus Enterprises, Inc., d/b/a PT's Men's
Club and Nick Mehmeti

**FINAL AWARD OF ARBITRATOR**

I, THE UNDERSIGNED ARBITRATOR, having been designated under the personnel manual or employment agreement entered into by the above-named parties and dated February 13, 2019, and having been duly sworn and having duly heard the proof and allegations of the parties, and Julie Predmore being represented by Matthew Thomson of Lichten & Liss-Riordan, P.C. and Drew Herrmann and Pamela Hermann of Herrmann Law, PLLC and Respondents Nick's Management, Inc., Nick's Clubs, Inc. f/k/a Adventure Plus Enterprises, Inc. d/b/a PT's Men's Club and Nick Mehmeti being represented by Latrice Andrews of Sheils Winnubst, AWARD:

### I. Introduction

This arbitration was held before Karen K. Fitzgerald on June 14 and 15, 2022 in Dallas, Texas. After presentation of the evidence, the parties submitted post-hearing briefs and the arbitration was formally closed on June 22, 2022. The Arbitrator issued an Interim Award on August 17, 2022.

Claimant submitted her fee application within 30 days. Respondents filed their responses within 30 days and Claimant had an opportunity to file her reply.

The parties then participated in a management conference on November 14, 2022. Claimant requested to reopen the arbitration due to the discovery of additional time records not produced by Respondent. The Arbitrator found that there was good cause to reopen the evidence to allow for production of all time sheets concerning shifts

1

 PLTFS 001938

worked by Claimant. The parties submitted the additional evidence to the Arbitrator by December 16, 2022 with their calculation of the damages each party contended was owed based on the updated time records. The arbitration was then closed on December 19, 2022.

Because additional evidence was produced concerning the damages incurred by Claimant, this Final Award supersedes the Interim Award and also addresses the issues presented by the fee application.

## II. Issues Presented

Claimant Julia Predmore asserts claims under the Fair Labor Standards Act. Predmore contends she was misclassified as an independent contractor when she should have been classified as an employee. Predmore contends that she was not paid minimum wage as an employee and that she may have minimum wage for all hours worked and overtime for all hours worked over 40 hours per week. Predmore also contends that she inappropriately had to pay fees and tip outs and that she should recover the illegal tip outs and house fees she paid from Respondents.

Respondents deny liability to Predmore. Respondents contend Predmore was an independent contractor who breached her contract in a variety of ways that damaged Respondents. Respondents also assert a claim for unjust enrichment.

Predmore seeks an award of $229,678.87 in attorney's fees from Respondents PT's Men's Club and Nick Mehmeti. Respondents oppose this request.

Respondent Nick's Management Inc, seeks an award of costs against Claimant Predmore in the amount of $13,749.30. Claimant opposed this request.

## III. Factual Background.

Predmore worked for Nick's Clubs, Inc. f/k/a Adventure Plus Enterprises, Inc. d/b/a PT's Men's Club ("PT's") as an exotic dancer. Predmore has worked in the exotic dancing industry since 2011. She originally worked for PT's in 2016, but left to attend college. Predmore returned to PT's in 2019. Predmore signed a License and Lease Agreement (CX 1) with PT's on February 13, 2019 and began work that day. Predmore worked intermittently at PT's until her last day in September 2019. Predmore testified that she worked in February, March, April, August and September 2019.

Predmore testified that she paid a house set fee (or "rent") when she arrived at work. Predmore would give her house fee receipt to the house mom, who would enter the set fee collected and record Predmore's time in and time out on the sign in sheet. The sign in sheets are CX 15 and RX 11 (with redactions).

PLTFS APPX 000134    EFS 001939

3e73e326ad9e573b5

Predmore testified that, while she did not have to work in any week, if she chose to work, she had to work a certain number of shifts per week. Predmore also testified that if she arrived for a shift late or left a shift early, she had to pay a fine for doing so. Predmore testified that she would be put on a stage rotation list and called up to dance on stage. If Predmore missed a stage rotation, she paid a fine. When Predmore was not dancing on stage, she would mingle with PT's customers and perform private dances. Predmore testified she had to charge $20 for a private lap dance and that she could not change that price.

Predmore contended that PT's had rules about a dancer's appearance and did not allow tattoos or for a dancer to wear her hair up. She testified that she had to be topless while on stage and to wear a t-back. Predmore testified that she had to wear themed costumes on certain days. If her outfit did not fit the theme, she would have to buy a new costume for the day. However, there was evidence that showed dancers who did not wear t-backs, who had tattoos and who wore their hair up in a ponytail.

Predmore testified that she did not get paid directly by PT's. Instead, Predmore was paid only through customer tips and charges for private lap dances. Predmore testified that she averaged approximately $250 per shift after she paid her house fees and required tip-outs of $24 ($10 to the D, $10 to the House Mom and $4 to the bartender). The deposits to Predmore's bank account did not necessarily match those estimates. (RX 21).

The hours Predmore worked were recorded on the sign in sheets. RX 42 summarized the hours worked by Predmore based on the sign in sheets.

Per the sign in sheets introduced into evidence at the hearing, Predmore worked 277.42 hours in 35 shifts. (RX 42). That was an average of 7.9 hours per shift. However, the supplemental time sheets added significant additional time to the hours worked. (Claimant's Brief in Support of Increased Damages). The additional time sheets located after the hearing showed that Ms. Predmore worked a total of 575.29 hours for Respondents with 101 hours in overtime. (Claimant's Brief in Support of Increased Damages, Ex. 1).

Predmore testified that she worked at more than one club at a time and that there was a period when she danced at both Buck's Wild and PT's. Predmore contended she would alternate weeks at PT's and Buck's when she did so.

Two other dancers, Atoria Cooper and Svetlana Kuvenko, also testified in support of Predmore's claims. Both corroborated that they had to work a required number of shifts in a week and pay a mandatory house fee or "rent" to work a shift. Both corroborated there were rules about a dancer's appearance and fines if a dancer left a shift early. Both corroborated there was a set fee of $20 for a lap dance and that

3

they had to pay a tip-out to the DJ and the house mom. Both confirmed there was a dancer stage rotation and a dancer had to pay a fee if she missed her rotation.

Kuvenko testified that there was not always a sign in sheet available when she arrived for a shift and that the sign in sheet was not always presented to her for signature.

Nick Mehmeti, owner of PT's, testified. Mehmeti testified that Nick's Clubs, Inc. does business as PT's Men's Club. Mehmeti testified that Nick's Management, Inc. is an accounting and bookkeeping company that does accounting and payroll for PT's and other companies. Mehmeti testified that Adventures Plus had been the entity that operated PT's until about two years ago.

Mehmeti testified that PT's gross receipts reflected on the 2019 tax return were approximately $4.7 million. (CX 16). Mehmeti testified that PT's is adult entertainment business offering live nude entertainment. PT's hires as employees the waitresses, bartenders, cooks, doormen, DJ, dishwashers, barbacks, and the club managers. The dancers sign an Independent Contractor agreement though Mehmeti contends that dancers are given the option to be employees instead of independent contractors.

Mehmeti testified that the dancers are not paid any wages by PT's and that the dancers do not receive a paycheck or W-2 from PT's. Instead, the dancers earn money from performing on the stage and floor. PT's does not keep track of the money earned by any dancer. The club has no records to show what any dancer earns in entertainment fees or lap dances.

Mehmeti testified that dancers used to be employees in the past. However, at some point in time, the industry switched to an independent contractor model. Mehmeti testified that he was generally familiar with federal labor laws and tried to comply with federal labor laws. Mehmeti testified that someone reviews Department of Labor fact sheets in deciding whether dancers can be treated as independent contractors. However, Mehmeti testified that he personally has not communicated with the Department of Labor regarding the rules. Though Mehmeti knows of industry standards, Mehmeti also knows of other clubs sued for FLSA violations involving the independent contractor arrangement with dancers. Mehmeti included Section 7(d) in the independent contractor agreement because of a concern that a dancer would sue PT's for violating the FLSA.

Mehmeti testified that the independent contractor agreement required the dancers to keep records of their earnings if the dancer converted from an independent contractor to an employee. There, the dancer would have to return the entertainment fees received from customers and give that to the club. Mehmeti testified that Predmore has not given PT's any of the entertainment fees she received.

 PLTFS 001941

Mehmeti testified that PT's did not "fine" dancers for coming in late or leaving early. However, it offered them "incentives" in the form of discounts to their rent if they worked certain early in the week shifts or arrived on time for shifts.

Mehmeti testified that PT's seeks damages from Predmore for breaches of her independent contractor agreement and reimbursement of the fees it incurred in compelling arbitration of her claims.

One of the PT's Manager, Gerard Cordova, testified. According to Cordova, there are dancers with tattoos, piercings and who may work with their hair up. Cordova testified that costumes were not required, but were strongly advised for certain themed events.

Cordova testified that a dancer does not have to work every week. However, if a dancer works in a week, the dancer must work three shifts that week. PT's discounts dancer rent fees if a dancer will work a shift early in the week when business is typically slower. Cordova testified that a dancer may come in and leave when the dancer wishes, but the dancer may have to pay contract damages to leave early. Cordova testified that some dancers only work weekend shifts because they view it as more beneficial to them and they pay the higher house fee to do so.

Cordova testified that the club did the advertising and he believed no dancers did advertising for PT's. Cordova also testified that a dancer could change the price of the lap dance, but the contract required the dancer to notify the club of any price change. This provision avoided disputes with the customer about the price of a lap dance.

## IV. Analysis of Claims and Counterclaims

While not every legal and factual argument set forth by the parties is addressed in this Award, each was considered. Each legal argument and pleading will not be recited in this Award, but each was considered. Not every fact or reason supporting the ruling is recited in this Award. The testimony of each witness was considered. Every exhibit admitted into evidence was read and considered. Implicit in every factual determination is an evaluation of the witnesses' credibility and the evidence. References to exhibits, arguments or cases do not necessarily list every one which supports the statements.

As a threshold issue, Predmore sued multiple respondents. The evidence established that Nick's Management, Inc. is an accounting and bookkeeping company that works for PT's Men's Club and other customers. It did not own or run any part of PT's Men's Club. Accordingly, Plaintiff takes nothing on her claims against Nick's Management, Inc.

PLTFS APPX 000134 EFS 001942

However, as to Predmore's claims against PT's and Mehmeti in his individual capacity, the Arbitrator rules:

### A.    Fair Labor Standards Act violation

The preponderance of the evidence establish that Predmore was misclassified as an independent contractor.

PT's had revenue sufficient to be covered under the FLSA since it had revenues in excess of $500,000. (CX 16).

In determining whether a person is an employee for FLSA purposes, courts use the "economic realities" test to determine if the person is, as a matter of economic reality, economically dependent on the business to which he/she renders services. *Reich v. Circle C. Investments, Inc.,* 998 F.2d 324, 327 (5th Cir. 1993).

To determine a worker's dependence, courts look at these factors:

1.    the degree of control exercised by the alleged employer.

2.    the extent of the relative investment of the worker and the alleged employer.

3.    the degree to which the worker's opportunity for profit or loss is determined by the alleged employer.

4.    The skill and initiative required in performing the relationship.

5.    the permanency of the relationship.

6.    whether the worker's job was an integral part of the company's business.

*Reich,* 998 F.2d at 327; *Hobbs v. Petroplex Pipe & Constr., Inc.,* 946 F.3d 824, 836 (5th Cir. 2020).

Many cases involve exotic dancers in which courts have analyzed whether a dancer is economically dependent on the club in which she performs services. In the vast majority of these, courts concluded that the dancer should have been treated as an employee and was not a true independent contractor. These cases include, among others, *Reich,* 998 F.2d at 327; *Johnson v. N. Tex. Dancers, LLC,* No. 7:20-CV-00116-O, 2021 WL 2077649 (N.D. Tex. May 24, 2021)(O'Connor, J.); *Gilbo v. Agment, LLC,* 831 Fed. Appx. 772, 778 (6th Cir. 2020); *Verma v. 3001 Castor, Inc.,* 937 F.3d 221, 232 (3d Cir. 2019); *Hart v. Rick's Cabaret Intern., Inc.,* 967 F. Supp. 2d 901, 919 (S.D.N.Y. 2013).

6

PLTFS 001943

## 1. Degree of Control

This factor favors Predmore.

In analyzing the claims, these courts cited, *supra,* all had facts similar to Predmore's situation demonstrating that the club held a degree of control over the dancers, such as:

- the dancer had to comply with a weekly schedule;
- the dancer had to pay some fines or fees for absences, tardiness or leaving early;
- there was a set price for lap dances;
- the dancer had no final say in the music used;
- the club set minimum standards for dancer costumes.

The preponderance of the evidence presented demonstrated that the club exercised control over Predmore when she performed services for the club.

## 2. Relative Investment

Predmore's investment in costumes, shoes, and makeup is far less than the cost of operating the nightclub. *See Reich,* 998 F.2d at 327–28; *Johnson,* 2021 WL at * 4. This factor favors Predmore.

## 3. Opportunity for profit and loss

When courts evaluate this factor, they note that the nightclub has the most significant role in drawing customers to the nightclub by overseeing the advertising, location selection, business hours, maintenance of facilities, aesthetics and food. *Reich,* 998 F.2d at 328; *Johnson,* 2021 WL at *4. Faced with an argument that a dancer can "hustle" more to increase her opportunity for profit, most courts have rejected that argument. *Verma,* 937 F.3d at 231. This factor favors Predmore.

## 4. Skill and initiative required to perform the job

Virtually all courts find that exotic dancers require no specific skill to perform the job. The preponderance of the evidence established that PT's does not require its dancers to have any experience or training. This factor favors Predmore.

## 5. Permanency of the relationship

The evidence established that dancers do not maintain a permanent relationship with a club. The dancers often float between clubs and even work for multiple clubs at a time. Here, Predmore worked for PT's between February 2019 and September 2019 and only worked on a sporadic basis in that period. There were months when Predmore was out of state and did not work for PT's. This factor favors PT's.

7

DEFS 001944

## 6. Whether the worker is an integral part of the business

Though the Fifth Circuit does not always include this final element in its economic realities test, Predmore and the other dancers are integral to PT's business. PT's is, as Mehmeti testified, a sexually oriented business offering live nude entertainment to its customers. PT's customers do not come for its food and non-alcoholic beverages. The services provided by Predmore are integral to PT's business. *Verma*, 937 F.3d at 232. This factor favors Predmore.

The preponderance of the evidence compels the conclusion that Predmore was misclassified for FLSA purposes and that Predmore should have been classified as an employee.

The one case relied on by Respondents, *Nelson v. Tex. Sugars, Inc.*, 838 Fed. Appx. 39 (5th Cir. 2020) differs. There, a jury held, after hearing the evidence, that exotic dancers were not employees within the meaning of the FLSA. While there are similarities between the evidence presented by Predmore and that in the *Nelson* case, there are also differences in the evidence. The preponderance of the evidence submitted at this hearing supports the conclusion that Predmore is an employee under the FLSA.

Because Predmore was misclassified, Predmore was not paid any minimum wage and received no overtime for the weeks in which she worked more than 40 hours per week in violation of the FLSA. Predmore may have damages under the FLSA.

## B. Predmore's Damages

Respondents did not maintain a record of the hours worked by Predmore. Thus, Predmore is entitled to submit evidence of work she performed. *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687–88, 66 S. Ct. 1187, 90 L. Ed. 1515 (1946).

Predmore testified that she worked an average of 50 hours per week at PT's during the weeks she worked there and that the average length of a shift was 10 hours. Predmore supported her claimed damages on the spreadsheet marked as CX 8. Claimant continues to seek damages at this rate in Claimant's Brief in Support of Increased Damages. However, Predmore's estimate is a gross overestimate of the overtime hours she worked. Even the text messages produced by Predmore do not support this estimate.

The actual sign in sheets (including the supplemental sign-in sheets) do not support that testimony. Of the weeks Predmore worked at PT's, the sign in sheets show she worked more than 40 hours in only eight of the fourteen weeks she worked for PT's. In some of those weeks, she worked as little as 1 to 4 hours of overtime. See Claimant's Brief in Support of Increased Damages and Respondents' Calculation of Time Claimant Performed in Club..

8

 EFS 001945

Based on the evidence presented, Predmore may recover minimum wage on 575.29 hours, for **$4,170.85.**

Predmore worked overtime only during eight weeks. Predmore worked overtime for 101.42 hours. (Claimant's Brief in Support of Increased Damages, Ex. 2). At the half-time rate of $3.62[1] per overtime hour, Predmore may have overtime damages of **$367.14** for those 101.42 hours.

Respondents may not have an offset of any lap dance fees paid to Predmore as a "service charge" or tips received by Predmore. Under the FLSA, tips received are not wages and belong solely to the employee. 29 C.F.R. § 531.52. The lap dance fees are not "service charges" under the FLSA because the lap dance fees are not recorded in the company's gross receipts and distributed by the company to the employees. 29 C.F.R. § 531.55(b). *See also Hart v. Rick's Cabaret Intern., Inc.*, 967 F. Supp. 2d 901, 928–29 (S.D.N.Y. 2013); *McFeeley v. Jackson St. Entm't, LLC*, 825 F.3d 235, 246 (4th Cir. 2016).

Besides the minimum wage and overtime pay, Predmore may also recover of **$2,800.00** in house fees and **$1,680.00** in tip-outs. (CX 8).

The preponderance of the evidence established that this was a willful violation. Mehmeti is well-experienced in this industry. Though he testified that he tries to fully comply with the law, Mehmeti also testified that he was aware of the litigation involving the independent contractor arrangement and that it has found to violate the FLSA.

Predmore may recover these damages from PT's Men's Club and Nick Mehmeti:

| Element of Damages | Amount |
| --- | --- |
| Minimum Wages | $4,170.85 |
| Overtime | $367.14 |
| House Fees | $2,800.00 |
| Tip outs | $1,680.00 |
| Sub-Total | $9,017.99 |
| | |

[1] In Claimant's Brief in Support of Increased Damages, Claimant acknowledges that overtime should be calculated at the half-time rate since Claimant received the $7.25 base wage for those overtime hours through her minimum wage.

PLTFS APPX 000138 PLTFS 001946

| Liquidated Damages | $9,017.99 |
|---|---|
| | |
| Total | $18,035.98 |

Because Predmore has been awarded damages on her FLSA claim, Predmore was allowed to seek her reasonable attorney's fees as the prevailing party.

### C. Respondents' affirmative defenses

In reaching this conclusion, Respondents' affirmative defenses have been considered and rejected.

Respondents asserted a variety of affirmative defenses including: (1) good faith/reasonable grounds for believing they did not violate the FLSA; (2) good faith and acted in conformity with DOL guidance; (3) waiver, equitable estoppel, consent and ratification; (4) statute of limitations; (5) failure of condition precedent because Predmore made no notification before asserting her claim; (6) failure to mitigate damages; (7) unclean hands; (8) windfall, unjust enrichment and offset; (9) estoppel by contract; (1) failure of condition precedent per the requirements in the Licensing Agreement; and (11) *pari delicto*.

As for the first and second affirmative defenses, Mehmeti testified that someone reviews DOL material to insure that PT's complies with federal labor laws. However, Mehmeti also testified that he is familiar with industry arrangements and the multiple lawsuits within the industry in which the independent contractor arrangement used has been challenged and found to violate the FLSA. The evidence does not support that Respondents had a good faith/reasonable ground for believing this arrangement did not violate the FLSA and that they were acting in conformity with DOL guidance.

Likewise, Respondents' defenses of waiver, equitable estoppel, consent and ratification are likewise rejected. Predmore did not waive her rights to seek proper pay under the FLSA. That Predmore has been a plaintiff in other FLSA lawsuits does not estop her from seeking what she is legally owed in this case. Predmore did not consent to nor ratify Respondents violations of the law.

Predmore's claims are not barred by the statute of limitation. Predmore worked for PT's between February and September 2019. The FLSA has a 2 year statute of limitations extended to 3 years for willful violations. Predmore timely filed her lawsuit

when she sued on February 28, 2020 and her arbitration claim was timely when it was filed on March 17, 2021.

Many of Respondents affirmative defenses appear to be an effort to circumvent the purposes of the FLSA by contract. The FLSA was specifically design to prevent private contracts from waiving the rights granted by the FLSA. *Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 706, 65 S. Ct. 895, 89 L. Ed. 1296 (1945). The affirmative defense of failure of condition precedent because the licensing agreement required notification before the assertion of a claim was asserted twice. Yet this affirmative defense fails. Though Predmore did not notify PT's before she filed her claim, as a matter of public policy, the FLSA does not require her to do so. PT's suffered no harm from Predmore's failure to provide this notification. For the same reason, Respondent's estoppel by contract affirmative defense also fails. Predmore has not attempted to deny the terms of the contract as would be required for estoppel by contract. Instead, Predmore has merely contended that the contract cannot override her rights under the FLSA—which is correct.

Likewise, Respondents' failure to mitigate damages argument fails. That Predmore continued to work for PT's even knowing that PT's independent contractor arrangement may violate the FLSA does not mean that PT's does not have to comply with the FLSA for the time in which Predmore worked for it.

Respondents' developed no evidence to show that Predmore had unclean hands. This defense fails. That Predmore has been a plaintiff in other FLSA cases in the exotic dancer industry does not give her unclean hands such that her claims are barred here. Likewise, there is no windfall or unjust enrichment to Predmore and courts have specifically rejected claims for an offset. *Martin v. PepsiAmericas, Inc.*, 628 F.3d 738, 741 (5th Cir. 2010).

Finally, Respondents affirmative defense of *pari delicto*—meaning equal fault or wrong—also fails. As between the parties, there is no equal fault here. The independent contractor arrangement created by Respondent's has been challenged and found to violate the FLSA in the vast majority of the cases. There is no equal fault here.

None of Respondents affirmative defenses alter the conclusion that Predmore was improperly classified and is owed damages under the FLSA.

## II.  Respondents' Counterclaims

Respondent PT's asserted a counterclaim against Predmore for breach of contract and unjust enrichment.

PT's argues that Predmore breached her Licensing Agreement in these ways:

PLTFS APPX 000140 EFS 001948

1. Claimant failed to keep a record of income earned from the club.

2. Claimant breached the licensing agreement by seeking to compel certification.

3. Claimant breached the licensing agreement by filing a lawsuit.

4. Respondents may have attorney's fees because of the contract and claimant's bad faith.

However, multiple cases have considered such a counterclaim in a FLSA case and have rejected it. In the Fifth Circuit, this type of counterclaim has been soundly rejected. As the Fifth Circuit has noted, set offs and counterclaims are inappropriate in a case brought to enforce the FLSA's minimum wage and overtime provision because they cause the plaintiff to lose the substantive rights granted by the FLSA. *Martin*, 628 F.3d at 741; *McCaig v. Maverick Field Services, LLC*, No. 21-CV-00173-DC-RCG, 2022 WL 2782798 (W.D. Tex. May 26, 2022). *See also Waginer v, NYNY, LeCompte v. Chrysler Credit Corp.*, 780 F.2d 1260, 1264 (5th Cir. 1986); *Coronado v. D.N. W. Houston, Inc.*, No. CIV.A. H-13-2179, 2015 WL 5781375 (S.D. Tex. Sept. 30, 2015); *Craig v. Bridges Bros. Trucking LLC*, 823 F.3d 382 (6th Cir. 2016).

This counterclaim interferes with Predmore's ability to seek her rights to receive minimum wage and overtime under the FLSA.

Respondents contend they incurred attorney's fees after Predmore filed suit and they had to compel arbitration. However, there are legitimate reasons for first filing a lawsuit—even in the face of a contract compelling arbitration. In the event that the arbitration got dismissed for some reason, filing an arbitration claim does not preserve the statute of limitations. *Fonseca v. USG Ins. Services, Inc.*, 467 Fed. Appx. 260 (5th Cir. 2012). Thus, it is prudent to sue first and then move to arbitration to insure that the dispute has been timely filed before the statute of limitations expires.

Courts have also rejected counterclaims that seek to recover lap dance fees or entertainment fees such as those Predmore received directly from customers. This counterclaim has been rejected in other FLSA cases. *See De Angelis v. Nat'l Entm't Group, LLC*, No. 2:17-CV-924, 2018 WL 4334553 (S.D. Ohio Sept. 11, 2018); *Wagoner v. N.Y.N.Y., Inc.*, No. 1:14-CV-480, 2015 WL 1468526 (S.D. Ohio Mar. 30, 2015). The reason these counterclaims have been rejected is because it causes a dancer to waive their rights under the FLSA to recover a minimum wage.

In Texas, contractual provisions requiring a dancer to return tips if the dancer ever filed suit have been found to be unenforceable because it waives the substantive right to be paid a minimum wage. *Coronado v. D.N. W. Houston, Inc.*, No. CIV.A. H-13-2179, 2015 WL 5781375 (S.D. Tex. Sept. 30, 2015).

12

For the reasons cited in these cases, Respondents are not entitled to recover by contract any tips or entertainment fees paid to Predmore. Otherwise, Predmore would be required to waive her substantive FLSA rights to recover a minimum wage and/or overtime wages.

Respondents take nothing on the counterclaim for breach of contract against Predmore. Because they are not a prevailing party, Respondents are not entitled to attorney's fees.

Likewise, Respondents take nothing on its claim against Predmore for unjust enrichment. This equitable claim is based on the legal theory that no party should benefit at the expense of another party. Generally, unjust enrichment is not available as a claim when a valid contract exists between the parties. Because there was a contract in place between Predmore and Respondents, an unjust enrichment claim is not available to Respondents. *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671 (Tex. 2000). Respondents take nothing on their unjust enrichment claim.

## V.    Attorney's Fee Award

Predmore now seeks an award of $229,678.87 in attorney's fees from Respondents PT's Men's Club and Nick Mehmeti. Respondents oppose this request. With the filing of Claimant's Brief in Support of Increased Damages Award, Predmore sought an additional 8.2 hours in attorney's fees for the work of Matthew Thomson.

Respondent Nick's Management Inc, seeks an award of costs against Claimant Predmore in the amount of $13,749.30. Claimant opposed this request.

This litigation has been hotly contested by all parties for over two and a half years. This case has involved extensive motion practice by both sides, including motion practice in federal court before this arbitration was initiated. Once the arbitration proceeding started, the litigation continued to be hotly contested. It included dueling motions to compel. It included dueling and detailed motions for summary judgment. It included a two day in person hearing. It included detailed post-hearing briefing prior to the current fee application being filed.

### A.    Predmore is the prevailing party and may receive an award of fees and costs.

Claimant is the prevailing party in this case on the FLSA claims.

PLTFS APPX 000142EFS 001950

An award of fees and costs is mandatory for the plaintiff who prevails under the FLSA *Tyler v. Union Oil Co. of California*, 304 F.3d 379, 404 (5th Cir. 2002). Claimant supported her fee application with the time sheets of her counsel setting forth the contemporaneous time entries of her counsel. Claimant reduced its request in its Reply in Support of Motion for Attorney's Fees and Costs.

**B.     Respondents challenge Predmore's requested fee award on a variety of grounds.**

Respondents challenge Predmore's request for fees on a variety of grounds that include:

- Claimant did not prevail on all of her claims and did not prevail against Nick's Management, Inc.
- The fees and costs sought are excessive given the award to Claimant.
- Claimant should not recover for any fees incurred in the federal court litigation.
- Claimant cannot recover for excessive or duplicative hours or for time spent on unsuccessful motions or for vague time entries.
- Claimant can recover no fees relating to the breach of contract counterclaims.
- Claimant can recover no legal assistant fees since those time entries were not part of the contemporaneous time records.
- Claimant failed to provide evidence of her requested fees in response to discovery requests and did not timely supplement its responses.

For a variety of reasons, Respondents' arguments fail.

Predmore is the prevailing party.  Predmore prevailed on her FLSA claims against two of the three respondents.  Predmore prevailed on the counterclaims asserted against her by all three respondents, including Nick's Management, Inc.

The only claim on which Predmore did not prevail was her FLSA claim against Nick's Management, Inc.  During the hearing, at the most, approximately 10 to 15 minutes of testimony was devoted to that claim.  The small amount of time devoted to this issue at the hearing does not justify Respondents' request to cut Claimant's requested fees by one third—especially because Claimant had to defend counterclaims from Nick's Management, Inc.

Though Predmore received an award of only **$18,035.98**, that does not necessarily make the fees sought unreasonable. In FLSA cases, the fee award will often

14

 PEFS 001951

be substantially more than the FLSA award to the plaintiff. The FLSA's fee-shifting provision recognizes that it is important for individuals with relatively small claims to have the ability to effectively enforce their rights. For example, on remand from the Fifth Circuit, in the case of *Black v. SettlePou, P.C.*, No. 3:10-CV-1418-K, 2014 WL 3534991 (N.D. Tex. July 17, 2014), the trial court awarded the Plaintiff $11,873.79 in actual damages, $11,873.79 in liquidated damages and $313,552.31 in attorney's fees and $725.20 in costs. *Black*, 2014 WL 3534991, at *9.

In reviewing the fee application, the relevant inquiry is whether the fees were reasonably incurred in this arbitration--not at the degree of success as compared to a party's initial demand. *See, e.g., Jacobson v. Persolve, LLC*, No. 14-CV-00735-LHK, 2016 WL 7230873 (N.D. Cal. Dec. 14, 2016). A party may recover for time spent on unsuccessful motions so long as it succeeds in the overall claim. *DP Solutions, Inc. v. Rollins, Inc.*, 353 F.3d 421, 434 (5th Cir. 2003).

Respondents argue that Claimant should not recover attorney's fees for clerical work or for work that is excessive or duplicative. Appropriate deductions for work determined to be clerical in nature or unnecessarily excessive or duplicative work were made.

Respondents argue that Claimant cannot recover attorney's fees incurred in defending against Respondents' counterclaims. Tex. Civ. Prac. & Rem. Code § 38.001 does not allow Predmore to recover fees for successfully defending a counterclaim. Thus, Respondents contend Predmore should have segregated the defensive work from her claim for fees and that the failure to segregate such work is fatal to her claimed fees.

However, Texas law does not require fees to be segregated when the services rendered related to multiple claims arising out of the same facts or transactions that the prosecution or defense entails proof or denial of the same facts so as to render attorney's fees inseparable. *DP Sols., Inc. v. Rollins, Inc.*, 353 F.3d at 433-34. Here, the claims were so intertwined. These claims—both FLSA and breach of contract--arose out of the interpretation of the License and Lease Agreement.

Respondents argue that *Naranjo v. Nick's Mgmt., Inc.*, No. 3:21-CV-2883, 2022 WL 3139755 (N.D. Tex. Aug. 5, 2022), Civil Action No. 3:21-CV-2883 (N.D. Tex. Aug. 5 2022) held that breach of contract claims are not so intertwined as to be compulsory counterclaims. Thus, Respondents contend Predmore cannot argue her defense of the counterclaims was inextricably intertwined with the prosecution of her claims.

Respondents misread *Naranjo*.

In *Naranjo,* the court applied the holding of *Brennan v. Heard,* 491 F.2d 1, 4 (5th Cir. 1974), *rev'd on other grounds* by *McLaughlin v. Richland Shoe Co.,* 486 U.S. 128, 108 S. Ct. 1677, 100 L. Ed. 2d 115 (1988). The *Heard* case holds that the FLSA bars counterclaims against an FLSA plaintiff because setoffs and counterclaims are inappropriate in any case brought to enforce the FLSA's minimum wage and overtime provisions. *Naranjo* at *3. Recognizing that some courts apply *Heard* only to permissive counterclaims, after an analysis, Judge Godbey determined that he would apply *Heard* <u>without deciding</u> whether the Defendants' counterclaims were permissive or compulsory. *Naranjo,* 2022 WL 3139755, at *4.

Judge Godbey then explained *Heard* barred all of the Defendants' counterclaims for (1) breach of the Licensing Agreement collective action waiver, (2) breach of the Licensing Agreement notice and record-keeping mandates, and (3) attorney fees. Judge Godbey explained that no counterclaims were for "wages" that Defendants prepaid to Naranjo to fall within the *Singer v. City of Waco, Tex.,* 324 F.3d 813, 828 (5th Cir. 2003), n. 9 (5th Cir. 2003) exception. *Naranjo,* 2022 WL 3139755, at *5. The court then concluded that *all* of Defendant's counterclaims are barred by Fifth Circuit precedent. *Id.* at 5. The Arbitrator made this same conclusion—that these same counterclaims against Predmore were barred by the FLSA—in the Interim Award.

As Claimant notes, because Claimant proved she had been misclassified as an independent contractor and was entitled to FLSA protections, Claimant then proved Respondents counterclaims are barred by the FLSA. These claims were inextricably intertwined. Claimant does not have to segregate the fees for prosecution of her FLSA claims from the defense of the counterclaims.

Respondents argue strenuously that Claimant should not be allowed to recover more than $50,000 in attorney's fees because Claimant failed to (1) identify counsels' hourly rates, (2) supplement her production of fee statements, and (3) estimated fees at only $50,000 in the May 2022 interrogatory responses. The implication from this argument is that Respondents might have made more of an effort to settle if they understood the full scope of Claimant's fee request earlier.

Claimant's production of information concerning its fees in March and May 2022 was sparse at best. Claimant failed to disclose its hourly rate. She provides no explanation for this failure. Claimant did not supplement this production before the hearing. While Claimant should have supplemented and updated her production of fee invoices before the hearing, nothing in this pattern of very aggressive litigation indicates Respondents would have explored settlement more seriously earlier in the

PLTFS APPX 000145 PLTFS 001953

case had the information been produced earlier. And, in this case, even Respondents' failed to produce relevant information in the form of 23 time sheets until after the hearing.

As set forth in the motion and response, efforts to settle at reasonable amounts were rebuffed by Respondents. Even when a settlement offer was made on the first day of the hearing, it did not include a reasonable amount for attorney's fees based on the fees Claimant estimated at that time.

**B.       The *Lodestar* fee is the appropriate method to compute the fee award.**

The lodestar is computed by multiplying the number of hours reasonably expended by the reasonable hourly rate. *Black v. SettlePou, P.C.*, 732 F.3d 492, 502 (5th Cir. 2013). There is a strong presumption in the reasonableness of the lodestar amount. *Saizan v. Delta Concrete Products Co., Inc.*, 448 F.3d 795, 800 (5th Cir. 2006).

**1.       The hourly rates requested by counsel.**

Claimant seeks these hourly rates for her counsel:

| | |
|---|---|
| Matthew Thomson | $525.00 per hour |
| Olena Savytska | $475.00 per hour |
| Drew Herrmann | $475.00 per hour |
| Pamela Herrmann | $425.00 per hour |
| Legal Assistants | $175.00 per hour |
| Law clerk | $ 175.00 per hour |

Predmore's counsel support their request for these rates through their affidavit testimony. Respondents challenge these requested rates as inflated for the Northern District of Texas and cites to the State Bar of Texas 2015 and 2019 fact sheets on attorney income and hourly rates as evidence of appropriate hourly rates.

Claimant's proposed hourly rates were supported by affidavit testimony and citations to reported decisions. The rates are within the ranges approved by Courts in the Northern District of Texas.

Respondents challenge Drew Herrmann's rate of $475.00 since he was approved in 2021 for a rate of $395.00 per hour. However, that is explained by Mr. Herrmann in that the $395 rate approved was his 2019 rate.

17

EFS 001954

Respondents cite to the 2015 or 2019 Texas Bar Fact Sheet as evidence of appropriate rates. Yet, Texas State Bar's Department of Research and Analysis itself specifically advises against reliance on this report for that purpose. On the website, it notes "The hourly rate information is not designed for nor intended to be used for setting appropriate attorney fees. There are other factors that should be considered in determining attorney hourly rate fees that are outside the scope of these reports."[2]

Considering all of the evidence cited by the parties, the Arbitrator finds that the hourly rates requested are reasonable.

### 2.    The time spent working on this case for which counsel seek fees.

Respondents challenge Claimant's requested fees on a variety of factors as excessive or unwarranted. Respondents also challenge some of the time entries as not sufficiently detailed. Many of Respondents' arguments are without merit. For example, Respondents fault Claimant for moving for summary judgment—arguing Claimant should have known that factual issues existed. Yet Respondents filed their own motion when Respondents should have known that factual issues existed.

There are areas in which some time spent may have been excessive or unnecessary. There are also areas where the time entries could benefit from additional detail or description of the work done. Some descriptions are extremely brief. Recognizing that Predmore agreed to make additional adjustments and deleted some additional time from that requested, the Arbitrator makes these additional adjustments:

- 41.5 hours seeking conditional certification. Claimant agreed to reduce 20.6 hours from Ms. Savytska's time for this. However, the arbitrator will deduct another **10 hours** on this item.
- The Claimant spent 15 hours fighting the arbitration provision. The arbitrator will deduct another **5** hours from Ms. Savytska, **2** hours from Mr. Thomson and **2** hours from Mr. Herrmann.
- There was extensive fighting over discovery with motions to compel filed by both sides. While there were issues that required those motions, both sides asserted many inappropriate and boilerplate objections that did not move the arbitration process forward efficiently. Both sides failed to timely supplement discovery responses quickly. Both sides have complained mightily about the other side's failure to supplement. Because of this, the

---

[2] https://www.texasbar.com/AM/Template.cfm?Section=Archives.

PLTFS APPX 000147 EFS 001955

Arbitrator deducts **15** hours from Mr. Thomson's time and **5** hours from Ms. Savytska's time.

- The 11.50 LSS hours charged by the Herrmann firm appears to be clerical in nature and will be deleted.
- The 22.95 hours of Law Clerk time charged does not all appear to be necessary to advance the case. Much of the time appears to be attending client meetings and the descriptions of completing research tasks as assigned is not sufficient to determine if this work was necessary or not. The Arbitrator will deduct **15** hours of law clerk time.
- LLR did not keep contemporaneous records of the paralegal time worked on the case and made an estimate of 36 hours, later reduced to 32.40 hours. While it may be a conservative estimates, other than one paragraph in Mr. Thomson's affidavit, there is no detailed description of the work performed by the LLR paralegals. The Arbitrator will deduct **15** hours of LLR paralegal time.
- Between Mr. Herrmann and Mr. Thomson, Claimant spent 19.2 hours on the post-hearing brief. The Arbitrator will deduct **4** hours from Mr. Thomson and Mr. Herrmann each.
- The Claimant spent approximately 30 hours of time preparing the fee motion and supporting affidavits between Mr. Thomson and Mr. Herrmann. The Arbitrator will deduct **7** hours of time from Mr. Thomson and from Mr. Herrmann each.

These deductions will be reflected in the final fee calculation.

Respondents challenge Claimant's travel costs as unreasonable. However, Claimant suggested conducting the hearing by Zoom to avoid the travel costs. Respondents rejected this suggestion out of hand. Claimant agreed to remove the hotel cost for local counsel   Given this deduction, the costs sought are reasonable.

## C. The *Johnson* Factors support the lodestar amount.

The lodestar amount is supported after the application of the twelve factors in *Johnson v. Georgia Highway Exp., Inc.,* 488 F.2d 714 (5th Cir. 1974), abrogated by Blanchard v. Bergeron, 489 U.S. 87, 109 S. Ct. 939, 103 L. Ed. 2d 67 (1989). The 12 *Johnson* factors are:

1. the time and labor required;
2. the novelty and difficulty of the issues in the case;
3. the skill requisite to perform the legal services properly;

19

PLTFS 001956

4. the preclusion of other employment by the attorney due to the acceptance of this case;
5. the customary fee charged for those services in the relevant community;
6. whether the fee is fixed or contingent;
7. time limitations imposed by the client or the circumstances;
8. the amount involved and the results obtained;
9. the experience, reputation, and ability of the attorneys;
10. the undesirability of the case;
11. the nature and length of the professional relationship with the client;
12. awards in similar cases.

*Id.* After the application of these factors to the requested lodestar amount, the Arbitrator finds that the lodestar amount is supported.

This case took over 2 years and was hotly contested at every stage—even after the hearing was closed due to the discovery of the additional time sheets. The issues related to the FLSA claim and the counterclaims are complicated and, in some cases, novel. Prosecuting this claim took knowledgeable and experienced FLSA practitioners. Each moment spent working on this case is a moment in which Claimant's counsel cannot work on other cases. Claimant's counsel took this case on a contingent fee, which meant that they were risking nonpayment for all of their time if Claimant did not prevail.

Respondents argue that the amount and results obtained do not justify the fees sought. However, as noted above, the FLSA's fee-shifting provision recognizes that it is important for individuals with relatively small claims to have the ability to effectively enforce their rights. For example, in the case of *Black v. SettlePou, P.C.*, following remand from the Fifth Circuit, the trial court awarded the Plaintiff $11,873.79 in actual damages, $11,873.79 in liquidated damages and $313,552.31 in attorney's fees and $725.20 in costs. *Black v. SettlePou, P.C.*, No. 3:10-CV-1418-K, 2014 WL 3534991, at *9 (N.D. Tex. July 17, 2014).

Claimants correctly notes that this arbitration is not a desirable case. One reason employers regularly include a class action/collective action waiver in arbitration agreements is that employers know that a single plaintiff wage case is an unattractive case because the attorney time required and costs of litigation will often exceed the employee's unpaid wages.

Under the *Johnson* factors, the lodestar fees requested are supported.

20

## D. Fees Awarded.

The fees awarded to Claimant's counsel are:

| Attorney | Total Hours Sought after Reduction | Additional Hour reduction | Total Hours Awarded after Additional Reductions | Rate | Lodestar |
|---|---|---|---|---|---|
| Olena Savytska | 77.98 | -20 hours | 57.98 | $475 | $27,540.50 |
| Matt Thomson | 253.72[3] | -28 hours | 225.72 | $525 | $118,503.00 |
| Law Clerk | 22.95 | - 15 hours | 7.95 | $175 | $1,391.25 |
| Paralegal | 32.40 | -15 hours | 17.40 | $175 | $3,045.00 |
| | | | | | |
| **LRR** | | - 64 hours | | | **$150,479.75** |
| | | | | | |
| Drew Herrmann | 89.01 | - 13 hours | 76.01 | $475 | $36,104.75 |
| Pamela Herrmann | 32.13 | | 32.13 | $425 | $13,655.25 |

---

[3] This includes an additional 8.2 hours of time relating to obtaining the additional time sheets and presenting the evidence related to the additional time sheets.

 DEFS 001958

| | | | | | |
|---|---|---|---|---|---|
| Legal Support Staff | 11.50 | -11.50 | 0 | | $0 |
| | | | | | |
| **Hermann Law** | | | | | **$49,760.00** |
| | | | | | |
| **Grand Total** | | | | | **$200,239.75** |

The costs awarded to Claimant are **$10,353.80**.

### E. Nick's Management, Inc.'s Motion for Costs.

Respondent Nick's Management, Inc. ("Nick's") seeks an award of costs as a prevailing party on Predmore's FLSA claims against it.

Nick's admits that section 216(b) of the FLSA is silent on whether costs may be awarded to a prevailing defendant. Thus, Nick's seeks an award of costs, arguing the Arbitrator has the discretion to award costs when a statute or rule does not preclude it. *Lochridge v. Lindsey Mgmt. Co., Inc.*, 824 F.3d 780, 782 (8th Cir. 2016). In *Lochridge,* the court remanded the issue to the district court for a decision on costs, pointedly noting that whether to award costs ultimately lies within the sound discretion of the district court. *Id.* at 783.

Here, Claimant has overcome any presumption that Nick's should recover its costs for successfully fending off Claimant's claim. Nick's asserted a counterclaim against Plaintiff. Nick's was an active participant in asserting this claim against Claimant. The bulk of the costs Nick's seeks are its purported share of the arbitration costs and fees. However, because Nick's asserted a counterclaim against Claimant, it would have always incurred those costs.

Under these circumstances, Claimant has overcome the presumption that Nick's, by prevailing on Claimant's FLSA claim, is entitled to the requested costs.

PLTFS APPX 000154 PLTFS 001959

Nick's takes nothing on its motion for costs.

## VI.    Final Award

It is ordered that Predmore may recover the following damages from PT's Men's Club and Nick Mehmeti:

| Element of Damages | Amount |
|---|---|
| Minimum Wages | $4,170.85 |
| Overtime | $367.14 |
| House Fees | $2,800.00 |
| Tip outs | $1,680.00 |
| Sub-Total | $9,017.99 |
| | |
| Liquidated Damages | $9,017.99 |
| | |
| Sub-Total | $18,035.98 |
| | |
| Claimant's fee award | $200,239.75 |
| Costs awarded to Claimant | $10,353.80 |
| | |
| Total final award to Claimant | $228,629.53 |

The administrative fees and expenses of the American Arbitration Association totaling $2,950.00 and the compensation and expenses of the arbitrator totaling $29,750.00 shall be borne as incurred.

23

All relief not granted herein is denied.

_____
Jan. 9, 2023
Date

_____
Karen K Fitzgerald

I, Karen K Fitzgerald, hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is my Award.

_____
Jan. 9, 2023
Date

_____
Karen K Fitzgerald

24

EFS 001961

JS 44 (Rev. 10/20) - TXND (10/20)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Julia Predmore

## DEFENDANTS

Nick's Clubs, Inc., f/k/a Adventure Plus Enterprises, Inc., d/b/a PT's Men's Club, and Nick Mehmeti

**(b)** County of Residence of First Listed Plaintiff    Santa Barbara, CA
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Dallas County
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Drew Herrmann, Herrmann Law, PLLC
801 Cherry St Suite 2365, Forth Worth, TX 76102
817-479-9229, drew@herrmannlaw.com

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [x] 3 Federal Question *(U.S. Government Not a Party)*
- [ ] 2 U.S. Government Defendant
- [ ] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [x] 4 |
| Citizen of Another State | [x] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 365 Personal Injury - Product Liability | [ ] 690 Other | [ ] 423 Withdrawal 28 USC 157 | [ ] 376 Qui Tam (31 USC 3729(a)) |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability | [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | [ ] 400 State Reapportionment |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | [ ] 410 Antitrust |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | [ ] 330 Federal Employers' Liability | | | [ ] 820 Copyrights | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 340 Marine | [ ] 368 Asbestos Personal Injury Product Liability | | [ ] 830 Patent | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans) | [ ] 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | [ ] 835 Patent - Abbreviated New Drug Application | [ ] 460 Deportation |
| | [ ] 350 Motor Vehicle | [ ] 370 Other Fraud | [ ] 710 Fair Labor Standards Act | [ ] 840 Trademark | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 355 Motor Vehicle Product Liability | [ ] 371 Truth in Lending | [ ] 720 Labor/Management Relations | [ ] 880 Defend Trade Secrets Act of 2016 | [ ] 480 Consumer Credit (15 USC 1681 or 1692) |
| [ ] 160 Stockholders' Suits | [ ] 360 Other Personal Injury | [ ] 380 Other Personal Property Damage | [ ] 740 Railway Labor Act | | [ ] 485 Telephone Consumer Protection Act |
| [ ] 190 Other Contract | [ ] 362 Personal Injury - Medical Malpractice | [ ] 385 Property Damage Product Liability | [ ] 751 Family and Medical Leave Act | **SOCIAL SECURITY** | [ ] 490 Cable/Sat TV |
| [ ] 195 Contract Product Liability | | | [ ] 790 Other Labor Litigation | [ ] 861 HIA (1395ff) | [ ] 850 Securities/Commodities/ Exchange |
| [ ] 196 Franchise | **CIVIL RIGHTS** | **PRISONER PETITIONS** | [ ] 791 Employee Retirement Income Security Act | [ ] 862 Black Lung (923) | [ ] 890 Other Statutory Actions |
| **REAL PROPERTY** | [ ] 440 Other Civil Rights | **Habeas Corpus:** | | [ ] 863 DIWC/DIWW (405(g)) | [ ] 891 Agricultural Acts |
| [ ] 210 Land Condemnation | [ ] 441 Voting | [ ] 463 Alien Detainee | | [ ] 864 SSID Title XVI | [ ] 893 Environmental Matters |
| [ ] 220 Foreclosure | [ ] 442 Employment | [ ] 510 Motions to Vacate Sentence | | [ ] 865 RSI (405(g)) | [ ] 895 Freedom of Information Act |
| [ ] 230 Rent Lease & Ejectment | [ ] 443 Housing/ Accommodations | [ ] 530 General | | **FEDERAL TAX SUITS** | [x] 896 Arbitration |
| [ ] 240 Torts to Land | [ ] 445 Amer. w/Disabilities - Employment | [ ] 535 Death Penalty | | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| [ ] 245 Tort Product Liability | [ ] 446 Amer. w/Disabilities - Other | **Other:** | **IMMIGRATION** | [ ] 871 IRS—Third Party 26 USC 7609 | [ ] 950 Constitutionality of State Statutes |
| [ ] 290 All Other Real Property | [ ] 448 Education | [ ] 540 Mandamus & Other | [ ] 462 Naturalization Application | | |
| | | [ ] 550 Civil Rights | [ ] 465 Other Immigration Actions | | |
| | | [ ] 555 Prison Condition | | | |
| | | [ ] 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
9 U.S.C. § 13

Brief description of cause:
Petition to Confirm Arbitration Award

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: [ ] Yes [x] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*
JUDGE _____ DOCKET NUMBER _____

DATE
2/4/2023

SIGNATURE OF ATTORNEY OF RECORD
/s/ Drew Herrmann

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS

Julia Predmore
_____
Plaintiff

v.  Nick's Clubs, Inc., f/k/a Adventure Plus
    Enterprises, Inc., d/b/a PT's Men's Club, and
    Nick Mehmeti
_____
Defendant

Case 3:23-cv-00253
_____
Civil Action No.

## CERTIFICATE OF INTERESTED PERSONS/DISCLOSURE STATEMENT

(This form also satisfies Fed. R. Civ. P. 7.1)

Pursuant to Fed. R. Civ. P. 7.1 and LR 3.1(c), LR 3.2(e), LR 7.4, LR 81.1(a)(4)(D), and LR 81.2,

Julia Predmore

_____

provides the following information:

For a nongovernmental corporate party, the name(s) of its parent corporation and any publicly held corporation that owns 10% or more of its stock (if none, state "None"):
*Please separate names with a comma. Only text visible within box will print.*

None

A complete list of all persons, associations of persons, firms, partnerships, corporations, guarantors, insurers, affiliates, parent or subsidiary corporations, or other legal entities that are financially interested in the outcome of the case:
*Please separate names with a comma. Only text visible within box will print.*

Julia Predmore
Drew N. Herrmann, Pamela Herrmann, and Allison Peregory of Herrmann Law, PLLC
Matthew Thomson and Olena Savytska of Lichten & Liss-Riordan, P.C.
Nick's Clubs, Inc. f/k/a Adventure Plus Enterprises, Inc. d/b/a PT'Men's Clubs
Nick Mehmeti

 DEFS 001963

| | |
|---|---|
| Date: | 2/6/2023 |
| Signature: | /s/ Drew N. Herrmann |
| Print Name: | Drew N. Herrmann |
| Bar Number: | 24086523 |
| Address: | 801 Cherry St Suite 2365 |
| City, State, Zip: | Fort Worth, TX 76102 |
| Telephone: | 817-479-9229 |
| Fax: | 817-887-1878 |
| E-Mail: | drew@herrmannlaw.com |

**NOTE:** To electronically file this document, you will find the event in our Case Management (CM/ECF) system, under Civil => Other Documents => Certificate of Interested Persons/Disclosure Statement.

EFS 001964

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF TEXAS

JULIA PREDMORE, )
)
             Petitioner )
)
      v. )     C.A. No. 3:23-cv-00253
)
NICK'S CLUBS, INC., )
f/k/a ADVENTURE PLUS ENTERPRISES, INC., )
d/b/a PT'S MEN'S CLUB, and NICK MEHMETI, )
)
          Respondents. )
)

## PETITIONER'S MOTION TO CONFIRM ARBITRATION AWARD

Petitioner Julia Predmore hereby moves to confirm the arbitration award she obtained in

connection with her claims against Respondents Nick's Clubs, Inc. and Nick Mehmeti, finding

that Respondents willfully violated the federal Fair Labor Standards Act and awarding her

damages pursuant to the statute. The Final Award entered on her claim on January 9, 2023, is

attached here as Exhibit 1. Petitioner moves to confirm her arbitration award pursuant to the

parties' arbitration agreement, as well as the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et*

*seq.*

Respondents' arbitration agreement provides that "ANY AWARD BY THE

ARBITRATOR MAY BE ENTERED AS A JUDGMENT IN ANY COURT HAVING

JURISDICTION." See Exhibit 2, at page 9 or 14. "Under the FAA, the court must confirm an

award unless the award is vacated under Section 10 or modified or corrected under Section 11."

Cooper v. WestEnd Cap. Mgmt., L.L.C., 832 F.3d 534, 544 (5th Cir. 2016) (internal quotation

marks and citation omitted); see also Teamsters Local 177 v. United Parcel Service, 966 F.3d

245, 248 (3d. Cir. 2020) ("The FAA not only authorizes, but mandates, that district courts

EFS 001965

confirm arbitration awards by converting them into enforceable judgments through a summary proceeding."). "[T]he confirmation of an arbitration award is a summary proceeding that merely makes what is already a final arbitration award a judgment of the court." <u>Florasynth, Inc. v. Pickholz</u>, 750 F.2d 171, 176 (2d Cir. 1984).

Here, there are no grounds for vacatur or modification. "Judicial review of arbitrators' decisions is … extraordinarily narrow and highly deferential." <u>Sullivan v. Feldman</u>, 2022 WL 17822451, at *9 (S.D. Tex. Dec. 20, 2022) (internal quotation marks omitted). An arbitrator's factual findings "are unreviewable" and "must be accepted as true." <u>Id.</u> at *11. An Arbitrator's legal error is not subject to review. <u>See United Paperworkers Intern. Union, AFL-CIO v. Misco, Inc.</u>, 484 U.S. 29, 38 (1987) ("Courts ... do not sit to hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts.").

In this case, the Arbitrator's Order was consistent with the terms of the Parties' agreement as well as the caselaw governing the FLSA. For example, Petitioner claimed that she was misclassified as an independent contractor when she worked as an exotic dancer for Respondents and that she was actually an employee for purposes of the FLSA. After a full evidentiary hearing, the Arbitrator held that Ms. Predmore was an employee, consistent with binding Fifth Circuit precedent. <u>Reich v. Circle C. Invest., Inc.</u>, 998 F.2d 324 (5th Cir.1993) (affirming decision that dancer was employee of club under the FLSA). The Arbitrator awarded damages in the form of minimum wage, overtime, as well as unlawfully withheld tips (in the form of house fees and tip-outs), which is consistent with numerous federal court decisions. <u>See, e.g.</u>, <u>Johnson v. N. Texas Dancers, LLC</u>, 2021 WL 2077649, at *6 (N.D. Tex. May 24, 2021) (concluding dancer was not paid any wages at all, and awarding minimum wage damages as well as "tip-out" or "house fees" that "altered the employer's minimum wage obligations"). The

PLTFS APPX 000158 EFS 001966

Arbitrator held that Respondents would "take nothing" on their counterclaims against Ms. Predmore, consistent with the Fifth Circuit's holding in Martin v. PepsiAmericas, Inc., 628 F.3d 738 (5th Cir. 2010). And the Arbitrator entered an award of attorney's fees, as required by the FLSA, taking into consideration a number of factors, including that Respondents had obstructed the discovery process and withheld essential evidence of Ms. Predmore's damages at the hearing in violation of the Arbitrator's Discovery Orders.

Accordingly, this Court should confirm the attached arbitration award, pursuant to 9 U.S.C. § 9 and provide Petitioner with 21 days to file a petition for attorney's fees associated with obtaining judgment on the Award.[1] See generally Ashton v. PJ Louisiana, Inc., No. CV 19-901, 2020 WL 1068161, at *2 (W.D. La. Mar. 3, 2020) (awarding attorney's fees to prevailing plaintiff in FLSA action for time incurred confirming the award in court and noting that "[a]ttorney's fees incurred in confirming and defending arbitration in an FLSA suit have been awarded by other district courts.").

Dated: February 6, 2023          Respectfully submitted,

Julia Predmore,

By her attorneys,

/s/ Drew Herrmann
Drew N. Herrmann
Texas Bar No. 24086523
drew@herrmannlaw.com
Pamela G. Herrmann
Texas Bar No. 24104030
pamela@herrmannlaw.com

---

[1]    Given the summary nature of the confirmation process, Plaintiff may forego filing her fee petition in order to streamline this proceeding. However, because it is not clear whether Defendants intend to oppose the motion seeking confirmation of the Award, Plaintiff reserves all rights in regard to an award of reasonable attorney's fees.

PLTFS APPX 000159 EFS 001967

Allison H. Peregory
Texas Bar No. 24121294
aperegory@herrmannlaw.com
HERRMANN LAW, PLLC
801 Cherry St., Suite 2365
Fort Worth, Texas 76102
(817) 479-9229

and

Matthew Thomson (*pro hac vice forthcoming*)
mthomson@llrlaw.com
Olena Savytska (*pro hac vice forthcoming*)
osavytska@llrlaw.com
LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116
(617) 994-5800

4

PLTFS 001968

# AMERICAN ARBITRATION ASSOCIATION

|  |  |  |
|---|---|---|
| JULIA PREDMORE, | : | |
| | : | |
| Claimant, | : | |
| | : | |
| v. | : | |
| | : | AAA Case No. 01-21-0002-3409 |
| NICK'S MANAGEMENT, INC., | : | |
| NICK'S CLUBS, INC., | : | |
| f/k/a ADVENTURE PLUS | : | |
| ENTERPRISES, INC., | : | |
| d/b/a PT'S MEN'S CLUB, | : | |
| and NICK MEHMETI. | : | |
| | : | |
| Respondents. | : | |
| | : | |

## DECLARATION OF JULIA PREDMORE IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

1.      My name is Julia Predmore and I am the Claimant in the above-captioned matter.

2.      I make this Declaration based on my own personal knowledge and experience.

3.      When I started working as an exotic dancer at PT's Mens Club in Dallas, I signed a "License and Lease Agreement."

4.      The Agreement that I signed referred to "Specifications" that I had to follow regarding scheduling shifts and paying house fees in order to work.

5.      My understanding is that the Respondents have not produced the "Specifications" document referenced in my Agreement as part of this case.

6.      However, I have reviewed the Specifications page of another dancer, Svetlana Kuzenko.  The "Specifications" page of Ms. Kuzenko is attached hereto as "Attachment A."

1

DEFS 00408

7.      The Specifications described in Attachment A are the same rules and policies that I had to follow when I worked at PT's in 2019, with the only difference being that I was required to work a minimum of four "sets" per week.

8.      For example, the Specifications state that the price of a "private performance/table dance is $20 per dance at PT's Mens Club."

9.      The price was also $20 during the time period that I worked and -- consistent with that requirement -- I never charged more than $20 for a private dance on the main floor of the club during the entire time that I worked.


Signed under the pains and penalties of perjury on _03/25/2022_____.


_Julia Predmore_
_____
Julia Predmore

PLTFS APPX 000162   DEFS 00407

# Attachment A

(_g_ December 2018)

## SPECIFICATIONS

The agreed minimum number of "Sets" per week is 3 at PT's Mens Club.

THE TYPE OF SETS ARE:

(a)  an eight (8) consecutive hour period for day shifts (11:00 a.m. to 7:00 p.m.);
(b)  a seven (7) consecutive hour period for night shift (7:00 p.m. to 2:00 a.m.);
(c)  an seven (7) consecutive hour period for late night shift (7:00 p.m. to 4:00 a.m.);
(d)  an eight (8) consecutive hour period for "cross" shift (any eight (8) consecutive hour period from 11:00 a.m. to closing).

The agreed Rental charges OR "SET FEES" for day shift (11:00 a.m. to 7:00 p.m.) is $25.00 per shift/set with discount.
The agreed Rental charges OR "SET FEES" for night shift (7:00 p.m. to 2:00 a.m.), is $25.00 per shift with discount.
The agreed Rental charges OR "SET FEES" for late night shift (8:00 p.m. to 4:00 a.m.), is $25.00 per shift with discount.
The agreed Rental charges OR "SET FEES" for cross shift (any eight (8) consecutive hour period from 4:00 p.m. to closing time) is $25.00 per shift with discount.

The agreed-Rental charges OR "SET FEES" for all shifts is $100.00 per shift without discount.

Discounts will be applied to Rental charges if the Licensee performs a Set on at least one: FIRST of the week shift before an END of the week shift, per schedule week. Discounts will still apply on the MIDDLE of the week shifts Sets without having to perform a FIRST of the week Set shift.

The set shifts for the first, middle and end of each week are as follows:

| FIRST of the week Shifts Sets | MIDDLE of the week Shifts Sets | END of the week Shifts Sets |
|---|---|---|
| Saturday & Sunday – Dayshift<br>Sunday &Monday –4-12(cross-shift)<br>Sunday & Monday – Nightshift | Mon Tues & Wed – Dayshift<br>Tues Wed & Thurs –4-12 (cross shift)<br>Tues Wed & Thurs – Nightshift | Thursday & Friday – Dayshift<br>Friday&Saturday– 4-12 (cross-shift)<br>Friday & Saturday – Nightshift |

Licensee shall pay to the Club as contract damages $8.00 for each one-half hour missed up to a maximum of the lost rent charge.

The agreed "loss rental fee" is an amount equal to the above rental charge/Set Fee applicable for the set missed at PT's Mens Club.

The agreed current industry customary Entertainment Fee for a private performance/table dance is $20.00 per dance in PT's Mens Cl███████████████████████████

Licensee Print N██████████████████████

Licensee SIGN:███████████████████████████████████████████

Witness & Authorized Representative of the Licensor Print Name: _Terry Wills_

Witness & Authorized Representative of the Licensor SIGN: _____

Date: _1-4-18_

PLTFS APPX 164-167

FILED UNDER SEAL